Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 1 of 235 PageID #: 1129

Hornback vs. Czartorski                    William T. Gaut, PH. D.                    01/28/2022

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF KENTUCKY (at Louisville)


KEVIN HORNBACK, et al.,

       Plaintiffs,

   vs.                       CASE NO. 3:20-CV-00703

THOMAS CZARTORSKI, et al.,

       Defendants.
_____/




VIDEO DEPOSITION OF WILLIAM T. GAUT, PH.D.


DATE TAKEN:     January 28, 2022

TIME:         9:03 a.m. to 2:51 p.m.

BEHALF OF:     The Plaintiffs

PLACE TAKEN:   Fort Myers Court Reporting
                2180 West First Street
                Suite 120
                Fort Myers, Florida 33901

REPORTER:      Angela L. Klein, RPR, FPR
                Notary Public
                State of Florida at Large
_____

FORT MYERS COURT REPORTING
2180 West First Street, Suite 120
Fort Myers, Florida  33901
(239) 334-1411
FAX (239) 334-1476

Serving All of Southwest Florida

Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 2 of 235 PageID #: 1130

Hornback vs. Czartorski                William T. Gaut, PH. D.                01/28/2022

Page 2

1                    A P P E A R A N C E S

2

    ON BEHALF OF THE PLAINTIFFS:

3
                Chris Wiest, Attorney at Law, PLLC
4               25 Town Center Boulevard, Suite 104
                Crestview Hills, Kentucky 41017
5               chris@cwiestlaw.com

6               By:  Christopher Wiest, Esquire

7               Bruns, Connell, Vollmar & Armstrong, LLC
                4750 Ashwood Drive, Suite 200
8               Cincinnati, Ohio 45241
                tbruns@bcvalaw.com

9
                By:  Thomas B. Bruns, Esquire
10

11

12  ON BEHALF OF DEFENDANT THOMAS CZARTORSKI:

13              Ward, Hocker & Thornton, PLLC
                333 West Vine Street, Suite 1100
14              Lexington, Kentucky 40507
                jason.morgan@whtlaw.com
15
                By:  Jason S. Morgan, Esquire
16

17

18  ON BEHALF OF DEFENDANTS JAMES CAMERON WRIGHT and KEVIN
    NICHOLAS DREISBACH:
19
                Commonweath Counsel Group, PLLC
20              10343 Linn Station Road, Suite 100
                Louisville, Kentucky 40223
21              greg@ccgattorneys.com

22              By:  Gregory Healey, Esquire (By Zoom)

23

24  ALSO PRESENT:  Alain Sexto, The Videographer

25

Hornback vs. Czartorski                    William T. Gaut, PH. D.                    01/28/2022

Page 3

```
 1                          I N D E X
                                                    PAGE
 2   Direct Examination by Mr. Wiest                   5

 3   _____
                        E X H I B I T S
 4   NUMBER              DESCRIPTION               PAGE

 5   Exhibit 1   William T. Gaut Expert Report         8

 6   Exhibit 2   Photograph                          119

 7   Exhibit 3   Standards For Law Enforcement Agencies  119

 8   Exhibit 4   National Consensus Policy and Discussion 121
                 Paper on Use of Force
 9
     Exhibit 5   Sheriffs' Statement on IACP Policy    124
10               on Use of Force

11   Exhibit 6   Response To Resistance              124

12   Exhibit 7   Bench Warrant                       152

13   Exhibit 8   Definitions for KRS 520.120 and 520.130  165

14   Exhibit 9   Documents                           190

15   Exhibit 10  Law Enforcement Code of Ethics      194

16   Exhibit 11  Jefferson District Court Record     195

17   Exhibit 12  Ronald G. Janota Expert Report      196

18

19   **Exhibit 2 retained by Counsel

20   _____

21

22

23

24

25
```

Page  4

| | | |
|---|---|---|
| 09:03:21 | 1 | THE VIDEOGRAPHER:  We are on the video record |
| 09:03:22 | 2 | at 9:03 a.m.  The date today is Friday, |
| 09:03:25 | 3 | January 28th of 2022.  This is the videotape |
| 09:03:29 | 4 | deposition of William T. Gaut, Ph.D., in the matter |
| 09:03:34 | 5 | of Kevin Hornback, et al., versus Thomas |
| 09:03:37 | 6 | Czartorski, et al. |
| 09:03:39 | 7 | At this time the attorneys present will please |
| 09:03:41 | 8 | identify themselves for the record, after which the |
| 09:03:42 | 9 | court reporter, Angela Klein, will swear in the |
| 09:03:43 | 10 | witness, and we may proceed. |
| 09:03:46 | 11 | MR. WIEST:  Good morning.  Chris Wiest and Tom |
| 09:03:48 | 12 | Bruns here for the Plaintiffs; Alex Hornback, Kevin |
| 09:03:52 | 13 | Hornback, and Sonya Hornback. |
| 09:03:53 | 14 | MR. MORGAN:  Jason Morgan here for the |
| 09:03:54 | 15 | Defendant, Tom Czartorski. |
| 09:03:58 | 16 | MR. HEALEY:  And Gregory Healey here for |
| 09:03:59 | 17 | Defendants, Wright and Dreisbach. |
| 09:04:01 | 18 | THE COURT REPORTER:  Will you raise your right |
| 09:04:01 | 19 | hand to be sworn, please. |
| 09:04:01 | 20 | Thereupon, |
| 09:04:01 | 21 | WILLIAM T. GAUT, PH.D., |
| 09:04:01 | 22 | Deponent, having first been duly sworn, upon his oath, |
| 09:04:01 | 23 | testified as follows: |
| 09:04:01 | 24 | THE WITNESS:  Yes. |
| 09:04:11 | 25 | THE COURT REPORTER:  Thank you. |

Page 5

09:04:11    1                      DIRECT EXAMINATION

09:04:11    2    BY MR. WIEST:

09:04:12    3          Q.    Good morning.  Is it Dr. Gaut?

09:04:14    4          A.    Dr. Gaut.

09:04:16    5          Q.    Gaut.

09:04:16    6          A.    Um-hum.

09:04:16    7          Q.    Okay.  My name is Chris Wiest.  I represent

09:04:19    8    the Plaintiffs in this case.  I understand that you have

09:04:23    9    been deposed before, correct?

09:04:25    10         A.    Correct.

09:04:29    11         Q.    And so you're familiar with the rules.  If you

09:04:31    12    do not understand a question, let me know, and I will do

09:04:33    13    my best to fix it.  If I ask a question, I'm going to

09:04:35    14    ask you to give me an answer and be responsive to the

09:04:38    15    question.  Okay?

09:04:39    16         A.    Okay.

09:04:46    17         Q.    Before we get into too much this morning, my

09:04:50    18    understanding is you were retained as an expert in this

09:04:53    19    matter on behalf of the Defendant, Thomas Czartorski,

09:04:57    20    correct?

09:04:57    21         A.    Correct.

09:04:58    22         Q.    And -- and that was done through his counsel,

09:05:01    23    Mr. Morgan, fair?

09:05:02    24         A.    Yes.

09:05:03    25         Q.    Okay.  I understand you've brought, at my

Hornback vs. Czartorski                William T. Gaut, PH. D.                01/28/2022

Page 6

| 09:05:08 | 1 | request, your expert file with you, correct? |

09:05:08    1    request, your expert file with you, correct?

09:05:11    2        A.    I have.

09:05:12    3        Q.    And we're going to get into your -- you have

09:05:14    4    authored a report in this matter that was dated -- sir,

09:05:19    5    I don't know the date the report was -- well, let me

09:05:22    6    look.  It might be on the last page.

09:05:30    7            MR. MORGAN:  It is on the last page,

09:05:31    8        December 3, 2021.

09:05:33    9            MR. WIEST:  I've got December 4, 2021.

09:05:38   10            MR. MORGAN:  That's his date.  Hold on.  Let

09:05:39   11        me see if I have it.

09:05:40   12            THE WITNESS:  I'm sorry.  You're correct,

09:05:41   13        December 4.

09:05:43   14    BY MR. WIEST:

09:05:43   15        Q.    December 4th.  Okay.

09:05:44   16            Other than the report that's been authored on

09:05:46   17    December 4th, do you have any other reports that you're

09:05:49   18    preparing or -- or that you've completed for this

09:05:53   19    particular matter?

09:05:54   20        A.    No.

09:05:56   21        Q.    Have you done all of the work that you need to

09:05:58   22    do or that you plan to do with respect to this

09:06:02   23    particular matter?

09:06:02   24        A.    I believe, yes.

09:06:03   25        Q.    Okay.  Is there anything that --

Hornback vs. Czartorski                William T. Gaut, PH. D.                    01/28/2022

Page 7

09:06:07   1          MR. MORGAN:  Let me -- let me just insert any

09:06:09   2      objection on form with respect to any rebuttal

09:06:11   3      report given that you still have a Plaintiff's

09:06:13   4      rebuttal coming.

09:06:16   5          MR. WIEST:  Okay.  And if there is a rebuttal

09:06:20   6      report, I'm going to want to see it, and I'm going

09:06:22   7      to reserve on the ability to reopen the deposition

09:06:25   8      on that --

09:06:26   9          MR. MORGAN:  Agreed.

09:06:27  10          MR. WIEST:  -- subject matter.

09:06:27  11  BY MR. WIEST:

09:06:27  12      Q.   Dr. Gaut, is there anything that you have

09:06:29  13  asked to look at with respect to your opinions in this

09:06:31  14  matter that you've not been able to?

09:06:33  15      A.   No.

09:06:34  16      Q.   Okay.  You would agree with me that when you

09:06:37  17  approach a case, it should be done without any bias or

09:06:41  18  preconceived notions about your opinions, correct?

09:06:44  19      A.   Correct.

09:06:45  20      Q.   And you understand that your job in rendering

09:06:47  21  expert opinions is to gather all available and necessary

09:06:50  22  information, evaluate it using your expertise, and then

09:06:52  23  reach whatever opinions you think the information

09:06:55  24  supports, correct?

09:06:56  25      A.   Basically, yes.

Page 8

| 09:06:57 | 1 | Q.   Okay.  I want to start with your background. |
| 09:07:03 | 2 | We're going to mark as Plaintiffs' 1 your report in this |
| 09:07:13 | 3 | matter.  I believe you have it, but I'm going to mark |
| 09:07:15 | 4 | it. |
| 09:07:15 | 5 | (Exhibit 1 was marked for identification.) |
| 09:07:15 | 6 | MR. MORGAN:   Thank you. |
| 09:07:15 | 7 | BY MR. WIEST: |
| 09:07:18 | 8 | Q.   I understand the first couple of pages may not |
| 09:07:20 | 9 | be your report, it was Mr. Morgan's filing of your |
| 09:07:24 | 10 | report, but starting on the third page of this Exhibit 1 |
| 09:07:26 | 11 | is your report.  Right? |
| 09:07:29 | 12 | A.   That's correct, yes. |
| 09:07:29 | 13 | Q.   Okay.  If we scroll back to Page 27 of your |
| 09:07:38 | 14 | report, it's got your CV on it. |
| 09:07:41 | 15 | A.   Yes. |
| 09:07:43 | 16 | Q.   Okay.  And is this your most up-to-date |
| 09:07:47 | 17 | curriculum vitae? |
| 09:07:49 | 18 | A.   It is, yes. |
| 09:07:50 | 19 | Q.   Do you have any education or work experience |
| 09:07:53 | 20 | since graduating high school that's not contained on |
| 09:07:56 | 21 | this CV? |
| 09:07:59 | 22 | A.   Probably I do.  Hold on just a moment.  Let me |
| 09:08:04 | 23 | look at something here. |
| 09:08:14 | 24 | Q.   Okay. |
| 09:08:19 | 25 | A.   No, sir.  The only thing that would not be |

Page 9

| | | |
|---|---|---|
| 09:08:21 | 1 | contained in -- in depth is the annual CEUs, continuing |
| 09:08:28 | 2 | education, little minor courses.  I say courses. |
| 09:08:31 | 3 | Studies that would be typically one to three hours in |
| 09:08:40 | 4 | length.  I average about 16 -- 16 or so hours -- excuse |
| 09:08:45 | 5 | me -- hours a year.  And I don't include those.  I can |
| 09:08:52 | 6 | provide you a list, if necessary. |
| 09:08:54 | 7 | Q.  So I'm familiar with continuing education |
| 09:08:58 | 8 | because it's required for attorneys.  Is your continuing |
| 09:09:02 | 9 | education with relation to any certifications that |
| 09:09:05 | 10 | you've obtained or licenses that you have? |
| 09:09:09 | 11 | A.  It's -- it's required for certifications. |
| 09:09:14 | 12 | The -- the -- I'm board certified with the American |
| 09:09:20 | 13 | Academy of Forensic -- excuse me -- American Academy of |
| 09:09:21 | 14 | Forensic Examiners.  And in order to maintain that |
| 09:09:28 | 15 | status, I currently hold diplomate and fellow status, |
| 09:09:33 | 16 | they require that a certain amount of CEUs be completed |
| 09:09:38 | 17 | annually. |
| 09:09:40 | 18 | Q.  Okay.  What is the American Academy of |
| 09:09:42 | 19 | Forensic Examiners? |
| 09:09:44 | 20 | A.  It's a membership organization, like the bar |
| 09:09:49 | 21 | association, you can join.  I guess the only difference |
| 09:09:54 | 22 | is -- well, I'm not sure the -- I don't know whether |
| 09:09:58 | 23 | attorneys are actually required to join a bar |
| 09:10:00 | 24 | association.  But it's along the same lines.  It's a |
| 09:10:03 | 25 | professional organization. |

Hornback vs. Czartorski                William T. Gaut, PH. D.                01/28/2022

Page 10

| 09:10:05 | 1 | Q. So what do they focus in on? What's a |
| 09:10:08 | 2 | forensic examiner? |
| 09:10:11 | 3 | A. The study of forensics, which is loosely |
| 09:10:14 | 4 | defined as study of facts, events, scientific evidence, |
| 09:10:19 | 5 | physical evidence, that sort of thing, after the fact. |
| 09:10:23 | 6 | Q. Okay. And I'm just trying to relate this to |
| 09:10:34 | 7 | law enforcement. So would it be akin to like a |
| 09:10:39 | 8 | detective kind of role, where you're trying to get to |
| 09:10:42 | 9 | the bottom of what's going on in a particular situation? |
| 09:10:46 | 10 | A. In a manner of speaking, yes. |
| 09:10:48 | 11 | Q. Okay. |
| 09:10:49 | 12 | A. It's -- it's just an analysis of evidence. |
| 09:10:52 | 13 | Continuing education courses range anything from updates |
| 09:10:57 | 14 | on interrogation techniques, updates on laboratory |
| 09:11:03 | 15 | techniques, updates on psychological evaluations, and so |
| 09:11:06 | 16 | forth, that you take annually just to keep abreast of |
| 09:11:12 | 17 | the changing aspects of criminal justice. |
| 09:11:24 | 18 | Q. Okay. Have you had any -- have you had any |
| 09:11:25 | 19 | focus on any of your CEs that you've looked at? And let |
| 09:11:32 | 20 | me give you an example. |
| 09:11:33 | 21 | A. Okay. |
| 09:11:34 | 22 | Q. When I do CEs, I try and focus in on federal |
| 09:11:39 | 23 | litigation and federal civil rights litigation, for |
| 09:11:42 | 24 | instance, because that's where I focus a lot of my |
| 09:11:44 | 25 | practice. |

Page 11

09:11:45    1          Do you have a particular CE focus when you're

09:11:46    2    getting those CEs that you're looking at with regards

09:11:49    3    to -- to the certification?

09:11:51    4          A.    No.

09:11:51    5          Q.    Okay.  And you said it's about 16 hours a

09:11:55    6    year?

09:11:55    7          A.    Averages about 16 hours a year, yes.

09:12:02    8          Q.    And I'm just -- Mr. Bruns got on the American

09:12:05    9    Academy of -- of -- I think it's Forensic Examiners

09:12:08   10    website.  And it says one of their values is integrity,

09:12:11   11    which is to place objectivity, honesty, transparency,

09:12:15   12    honor, ethics, and unity at the center of all its

09:12:18   13    policies and operations.

09:12:20   14          Do you agree that that's a focus of this

09:12:22   15    particular organization?

09:12:23   16          A.    Yes.

09:12:23   17          Q.    Okay.  Do you adhere to that --

09:12:26   18          A.    I do.

09:12:26   19          Q.    -- in your practice?

09:12:28   20          A.    I try to, yes.

09:12:29   21          Q.    Okay.  All right.  Other than the CEs that we

09:12:37   22    talked about, is there anything else that's missing

09:12:40   23    that's not contained in your curriculum vitae?

09:12:45   24          A.    No.

09:12:45   25          Q.    Okay.  And I want to kind of walk through your

Page 12

09:12:48   1   CV before we get into the -- the nuts and bolts of the

09:12:51   2   standards, and then -- and then we'll get into the

09:12:54   3   opinions in the case once we understand what the

09:12:56   4   standards are.

09:12:57   5        I want to start with -- because this is where

09:13:00   6   you started -- your work experience.

09:13:03   7        A.   Um-hum.

09:13:04   8        Q.   And it looks like from 1968 to 1992 you were

09:13:11   9   with the Birmingham Police Department, and you retired

09:13:15   10   as the captain of detectives, correct?

09:13:17   11        A.   Yes.

09:13:18   12        Q.   And this CV kind of reflects the course

09:13:21   13   progression of your career, fair?

09:13:25   14        A.   Yes.

09:13:25   15        Q.   Okay.  What years were you the -- were you a

09:13:30   16   police academy instructor?

09:13:34   17        A.   Well, my first assignment was probably 1972,

09:13:39   18   where I was assigned to the academy as a -- I guess

09:13:46   19   the -- right now it would be comparable to be like an

09:13:51   20   adjunct professor at college.

09:13:54   21        Q.   Okay.

09:13:55   22        A.   I only taught certain courses or very few

09:13:58   23   courses, and mostly just supervised the recruits.  And

09:14:02   24   then from there, I attained the status of what's now

09:14:06   25   referred to as a master instructor.  And that's someone

Page 13

| | | |
|---|---|---|
| 09:14:09 | 1 | who's qualified to teach the entire police curriculum, |
| 09:14:13 | 2 | if necessary.  Now, so you understand, that doesn't mean |
| 09:14:18 | 3 | I taught the whole curriculum.  It just meant that I was |
| 09:14:21 | 4 | qualified to teach it.  Any time an instructor was |
| 09:14:24 | 5 | unavailable, had a scheduling conflict, called in sick, |
| 09:14:27 | 6 | anything like that, we would have to have a substitute |
| 09:14:30 | 7 | instructor, and I was one of three sergeants there who |
| 09:14:36 | 8 | was qualified to step in on any given topic. |
| 09:14:39 | 9 | Q.    And what year did you leave the police academy |
| 09:14:43 | 10 | instruction and go to the homicide division?  Do you |
| 09:14:45 | 11 | remember that? |
| 09:14:47 | 12 | A.    Probably 1975 -- well, '68, '72 -- late '74, |
| 09:14:52 | 13 | '75, somewhere in there. |
| 09:14:57 | 14 | Q.    Okay.  All right.  And then what -- what year |
| 09:15:02 | 15 | did you join the -- or become the lieutenant on the |
| 09:15:07 | 16 | chief's administrative staff? |
| 09:15:09 | 17 | A.    That would have been late 1986, early 1987. |
| 09:15:13 | 18 | Q.    Okay.  And how about the captain, as a |
| 09:15:15 | 19 | precinct commander for the east and north precincts? |
| 09:15:19 | 20 | A.    The -- I was promoted to captain in 1989.  And |
| 09:15:27 | 21 | I was first assigned to the east precinct as the east |
| 09:15:32 | 22 | precinct commander, stayed there for about a year.  And |
| 09:15:35 | 23 | then I was transferred from east over to the north |
| 09:15:38 | 24 | precinct as the precinct commander of that precinct, |
| 09:15:42 | 25 | stayed there for about a year.  And then I was brought |

Page 14

| | | |
|---|---|---|
| 09:15:46 | 1 | back to the detective division, and I was the supervisor |
| 09:15:51 | 2 | in charge of the entire detective division. |
| 09:15:56 | 3 | The -- normally there would have been a |
| 09:15:58 | 4 | captain assigned to crimes against persons and a captain |
| 09:16:01 | 5 | assigned to crimes against property, but the property |
| 09:16:04 | 6 | captain had retired suddenly, and there was no -- there |
| 09:16:09 | 7 | was no civil service exam that had been given in the |
| 09:16:13 | 8 | time, so the chief brought me in and assigned me the |
| 09:16:17 | 9 | entire division. |
| 09:16:17 | 10 | Q.   What year was that?  Do you remember? |
| 09:16:20 | 11 | A.   That -- that would have been 19 -- as I said, |
| 09:16:23 | 12 | 1988, '89.  I was captain for three years; '90, '91 and |
| 09:16:29 | 13 | '92. |
| 09:16:32 | 14 | Q.   Okay.  And then you left what I'm going to |
| 09:16:36 | 15 | refer to as the active uniformed officer or police |
| 09:16:43 | 16 | officer role in 1992? |
| 09:16:46 | 17 | A.   Well, I left the active service as a municipal |
| 09:16:51 | 18 | police officer.  I was a sworn state police officer |
| 09:16:54 | 19 | following that -- following my retirement. |
| 09:16:55 | 20 | Q.   Okay.  That was with the Jefferson County |
| 09:16:58 | 21 | District Attorney in Alabama? |
| 09:17:00 | 22 | A.   Yes. |
| 09:17:00 | 23 | Q.   Okay.  And that was from 1992 to 1994? |
| 09:17:04 | 24 | A.   That's correct.  Yes. |
| 09:17:04 | 25 | Q.   Okay.  And then it looks like you went into |

Page 15

| | | |
|---|---|---|
| 09:17:11 | 1 | working for NASCAR from 1994 to 1996? |
| 09:17:16 | 2 | A.    '94, '95, '96, part of '97, yes. |
| 09:17:20 | 3 | Q.    Okay.  And then you were an adjunct professor |
| 09:17:23 | 4 | at Jefferson State Community College in Birmingham, |
| 09:17:25 | 5 | Alabama from 1997 through 1999. |
| 09:17:30 | 6 | A.    Correct.  And so you understand, my -- my |
| 09:17:32 | 7 | entire law enforcement career with the City of |
| 09:17:37 | 8 | Birmingham and with the Jefferson County District |
| 09:17:39 | 9 | Attorney's Office, and after I returned from |
| 09:17:42 | 10 | North Carolina from my job with NASCAR, I continued to |
| 09:17:46 | 11 | teach at the Birmingham Police Academy.  They -- they |
| 09:17:49 | 12 | continued to ask me to come back and teaching specialty |
| 09:17:54 | 13 | courses, criminal investigation, homicide investigation, |
| 09:17:55 | 14 | that sort of thing. |
| 09:17:58 | 15 | Q.    When did you stop doing that? |
| 09:17:59 | 16 | A.    I stopped doing that in 19 -- 1999. |
| 09:18:04 | 17 | Q.    Okay. |
| 09:18:05 | 18 | A.    And that's when I moved to Florida. |
| 09:18:08 | 19 | Q.    You retired, kind of? |
| 09:18:09 | 20 | A.    Well, kind of, again. |
| 09:18:12 | 21 | Q.    Let me ask, sir, were you ever the subject of |
| 09:18:15 | 22 | any lawsuits while employed with either the Birmingham |
| 09:18:20 | 23 | Police Department or the Jefferson County District |
| 09:18:24 | 24 | Attorney's Office? |
| 09:18:25 | 25 | A.    Yes, I was.  With the Birmingham |

Page 16

| | | |
|---|---|---|
| 09:18:27 | 1 | Police Department, yes. |
| 09:18:29 | 2 | Q.   Can you tell me about that? |
| 09:18:30 | 3 | A.   There was -- I was working as a homicide |
| 09:18:33 | 4 | detective sergeant at the time.  We had a case where the |
| 09:18:38 | 5 | victim was the victim of a gunshot wound.  We had taken |
| 09:18:45 | 6 | the offender into custody that afternoon, and rather |
| 09:18:52 | 7 | than charging him or arraigning him the following day, |
| 09:18:57 | 8 | we were -- at the time, the general standard was you had |
| 09:19:01 | 9 | 72 hours to arraign an arrestee. |
| 09:19:05 | 10 | So I took advantage of the 72-hour rule, at |
| 09:19:09 | 11 | least I thought, and didn't charge him with attempted |
| 09:19:13 | 12 | murder, because the physician had told me at the time, |
| 09:19:16 | 13 | this man is going to die, there is no question about it, |
| 09:19:20 | 14 | he could die in the next five minutes or he could die |
| 09:19:24 | 15 | tonight.  But there's no way he's going to survive even |
| 09:19:27 | 16 | 24 hours.  There's nothing we can do. |
| 09:19:29 | 17 | And so I did not charge the individual.  The |
| 09:19:33 | 18 | victim in the case did, in fact, die that night or the |
| 09:19:36 | 19 | next night, and at that time I upgraded the charge from |
| 09:19:40 | 20 | attempted murder to murder in the first degree.  And the |
| 09:19:45 | 21 | lawsuit alleged that -- that even though the rule was 72 |
| 09:19:50 | 22 | hours, the fact that I had held him beyond 24 hours |
| 09:19:53 | 23 | violated his civil rights.  And the case went to federal |
| 09:19:58 | 24 | court. |
| 09:20:00 | 25 | Q.   Okay.  Anything else? |

Page 17

| | | |
|---|---|---|
| 09:20:02 | 1 | A.    No. |
| 09:20:04 | 2 | Q.    Do you know what the results were of the |
| 09:20:05 | 3 | federal court lawsuit? |
| 09:20:07 | 4 | MR. MORGAN:  Form. |
| 09:20:08 | 5 | A.    There was a -- I don't know whether you call |
| 09:20:11 | 6 | it a verdict.  There was a decision by the judge against |
| 09:20:13 | 7 | the City of Birmingham and me -- |
| 09:20:15 | 8 | BY MR. WIEST: |
| 09:20:16 | 9 | Q.    Okay. |
| 09:20:16 | 10 | A.    -- for the 24 -- for the 24-hour rule.  And |
| 09:20:19 | 11 | the only thing I can say in defense of that is the city |
| 09:20:24 | 12 | attorney that was defending the case failed to appear in |
| 09:20:31 | 13 | court at least twice.  He had a -- he had a problem with |
| 09:20:39 | 14 | alcohol, let's say. |
| 09:20:40 | 15 | Q.    Okay. |
| 09:20:41 | 16 | A.    And he failed to appear, and the judge issued |
| 09:20:45 | 17 | a -- and I can't recall what you call the verdict of |
| 09:20:48 | 18 | when one side fails to appear. |
| 09:20:49 | 19 | Q.    A default judgment? |
| 09:20:50 | 20 | A.    A default judgment.  There you go. |
| 09:20:52 | 21 | Q.    In your career in law enforcement, did you |
| 09:20:57 | 22 | have any citizen complaints sustained against you? |
| 09:21:01 | 23 | MR. MORGAN:  Form. |
| 09:21:02 | 24 | A.    No. |
| 09:21:02 | 25 | BY MR. WIEST: |

Hornback vs. Czartorski                William T. Gaut, PH. D.                01/28/2022

Page 18

09:21:02   1          Q.    Okay.  And I'm not going to ask you about

09:21:04   2    citizen complaints, because those happen, and if they're

09:21:07   3    not sustained, I don't care about them.

09:21:09   4          A.    No, they're not.

09:21:10   5          Q.    All right.  I want to get into your education

09:21:13   6    that's on Page 29, sir, if we can.  What year did you

09:21:18   7    get the law enforcement -- and it says AS.  What's AS?

09:21:23   8          A.    That's an associate in science.

09:21:26   9          Q.    Okay.  What year did you get that?

09:21:27  10          A.    Gosh.  Testing my memory now.  1976, I think.

09:21:35  11          Q.    Okay.  How about the bachelor's in criminal

09:21:37  12    justice, what year did you get that?

09:21:40  13          A.    That would have been 1988.

09:21:42  14          Q.    And the master's in arts and public and

09:21:45  15    private management?

09:21:47  16          A.    That would have been in 1992.

09:21:48  17          Q.    Okay.  And the Ph.D.?

09:21:50  18          A.    2011.

09:21:59  19          Q.    Have you authored any publications on the

09:22:04  20    fields of criminal justice?

09:22:06  21          A.    Nothing other than my dissertation at the

09:22:09  22    Ph.D. level, which is, of course, on file.  I think they

09:22:13  23    file all Ph.D. dissertations with the Library of

09:22:17  24    Congress.

09:22:17  25          Q.    Okay.

Page 19

| | | |
|---|---|---|
| 09:22:17 | 1 | A.    That's the only one. |
| 09:22:18 | 2 | Q.    Have you -- have you publicly presented since |
| 09:22:22 | 3 | 2011 on the subjects of criminal justice?  Have you |
| 09:22:25 | 4 | given any public presentations to trade groups or |
| 09:22:28 | 5 | anything like that? |
| 09:22:29 | 6 | A.    Oh, no. |
| 09:22:32 | 7 | Q.    Okay.  I want to look at your certifications |
| 09:22:34 | 8 | and memberships, if we can, on Page 29.  This says, |
| 09:22:40 | 9 | Certified (Level III) Forensic Medical Investigator. |
| 09:22:44 | 10 | What is that -- who is that certification through? |
| 09:22:46 | 11 | A.    The American College -- gosh.  American |
| 09:22:51 | 12 | College of Forensic Examiners International. |
| 09:22:56 | 13 | Q.    Okay. |
| 09:22:56 | 14 | A.    And then I should say that -- that |
| 09:22:58 | 15 | organization has since been dissolved. |
| 09:23:02 | 16 | Q.    Okay. |
| 09:23:04 | 17 | A.    The -- |
| 09:23:04 | 18 | Q.    So you don't have a current certification in |
| 09:23:06 | 19 | it? |
| 09:23:06 | 20 | A.    Not today, no. |
| 09:23:07 | 21 | Q.    Okay.  What years did you have that |
| 09:23:09 | 22 | certification? |
| 09:23:09 | 23 | A.    I had that one from, I guess from about the |
| 09:23:15 | 24 | year 2000 up until just recently.  The -- the owner/CEO, |
| 09:23:22 | 25 | I'm not sure what you call him, was arrested and |

Page 20

| | | |
|---|---|---|
| 09:23:26 | 1 | convicted of murder.  He murdered his girlfriend, and |
| 09:23:30 | 2 | the organization dissolved after that. |
| 09:23:32 | 3 | Q.   Okay.   To get that certification, was there a |
| 09:23:34 | 4 | test that was administered, or did you pay a fee and |
| 09:23:38 | 5 | take some classes?  How did you go about getting that |
| 09:23:42 | 6 | certification? |
| 09:23:42 | 7 | A.   Well, the requirement for the certification |
| 09:23:45 | 8 | was that I had to show field experience, I had to show |
| 09:23:48 | 9 | educational background, and I had to take a proctored |
| 09:23:52 | 10 | examination to get the certification.  And I think the |
| 09:23:57 | 11 | proctored examination I had to pass with a score of 70 |
| 09:24:02 | 12 | percent or higher.  Unfortunately, I don't know what |
| 09:24:07 | 13 | score I made, but apparently high enough to receive the |
| 09:24:11 | 14 | certification. |
| 09:24:11 | 15 | Q.   And was there continued testing to maintain |
| 09:24:13 | 16 | that, or was it just a one-time test and once you had |
| 09:24:17 | 17 | it, you had it? |
| 09:24:17 | 18 | A.   That's correct. |
| 09:24:18 | 19 | Q.   The latter, once you had it you had it. |
| 09:24:20 | 20 | A.   Once you have it, you have it, yes. |
| 09:24:21 | 21 | Q.   Okay.  How about the certified forensic |
| 09:24:23 | 22 | consultant?  Who was that through? |
| 09:24:25 | 23 | A.   Again, American College of Forensic Examiners. |
| 09:24:28 | 24 | Q.   Okay.  And so I take it that you don't |
| 09:24:29 | 25 | currently have that certification for the same reason? |

Hornback vs. Czartorski                William T. Gaut, PH. D.                          01/28/2022

Page 21

09:24:31   1      A.    No.  But, yes, the organization has since been

09:24:34   2   dissolved.

09:24:35   3      Q.    Okay.  Is that the same process, one-time

09:24:37   4   test, and then you get to maintain it?

09:24:39   5      A.    Yes.

09:24:39   6      Q.    Okay.

09:24:40   7      A.    Well, now, they follow the same rules as the

09:24:44   8   American Academy of Forensic Sciences.  You take the

09:24:47   9   test, you get certified -- excuse me -- certified, but

09:24:50   10   if you want to upgrade your status, to diplomate, for

09:24:55   11   instance, or fellow, then you have to take the cert --

09:24:57   12   the continuing education units.  And I -- and I did

09:25:00   13   that --

09:25:02   14      Q.    Okay.

09:25:02   15      A.    -- on a regular basis for the entire time that

09:25:05   16   I -- that I was certified.

09:25:06   17      Q.    When you say recently, what -- when did the

09:25:10   18   organization fold?  When did it cease?  Do you have a

09:25:13   19   date?

09:25:13   20      A.    I don't know the date.  I think it folded, I'm

09:25:19   21   guessing now, two years ago, maybe -- maybe longer.  I

09:25:23   22   don't -- I don't know exactly when it folded.  I just

09:25:26   23   know that when I -- when I sent in my information that I

09:25:31   24   got a -- I got a notification back via the Internet that

09:25:37   25   that org -- that that website no longer existed.  And

Page 22

| | | |
|---|---|---|
| 09:25:41 | 1 | that surprised me, so I did some research and found out |
| 09:25:45 | 2 | that the individual had been arrested and charged, and I |
| 09:25:48 | 3 | don't really know the date. |
| 09:25:49 | 4 | Q.    Okay.   Certified police academy instructor. |
| 09:25:53 | 5 | What -- what years were you a certified police academy |
| 09:25:55 | 6 | instructor? |
| 09:25:56 | 7 | A.    That would have been from 1972 through -- |
| 09:25:59 | 8 | well, actually, through today, I suppose. |
| 09:26:07 | 9 | Q.    Is there continuing education associated with |
| 09:26:12 | 10 | that? |
| 09:26:13 | 11 | A.    No. |
| 09:26:15 | 12 | Q.    Is that once you're certified, you're |
| 09:26:16 | 13 | certified? |
| 09:26:17 | 14 | A.    In the state of Alabama, once you're certified |
| 09:26:20 | 15 | as an instructor, yeah, then you maintain the |
| 09:26:23 | 16 | certification.  And I list on here, it's a former |
| 09:26:26 | 17 | designation by the State of Alabama.  I misspoke when I |
| 09:26:30 | 18 | said continues through today.  It continued until the |
| 09:26:34 | 19 | time I retired from the City of Birmingham. |
| 09:26:37 | 20 | Q.    So through 1992? |
| 09:26:38 | 21 | A.    1992. |
| 09:26:42 | 22 | Q.    Okay. |
| 09:26:43 | 23 | A.    And then I continued to have -- hold that |
| 09:26:46 | 24 | certification as long as I was a sworn state police |
| 09:26:49 | 25 | officer.  So I guess the certification then continued up |

Page 23

| | | |
|---|---|---|
| 09:26:53 | 1 | through, I guess, 1999. |
| 09:26:59 | 2 | Q.   Okay. |
| 09:26:59 | 3 | A.   Or, excuse me.  Not 1999.  '97. |
| 09:27:05 | 4 | Q.   So I'm looking at your CV.  You left the |
| 09:27:10 | 5 | Jefferson Country District Attorney's Office and the |
| 09:27:13 | 6 | Special Services Division in 1994. |
| 09:27:17 | 7 | A.   That's correct. |
| 09:27:20 | 8 | Q.   When -- |
| 09:27:20 | 9 | A.   I'm sorry.  The certification -- math is not |
| 09:27:25 | 10 | necessarily a strong point.  It would have -- |
| 09:27:26 | 11 | certification -- the Alabama certification would have |
| 09:27:29 | 12 | been valid through 1994. |
| 09:27:32 | 13 | Q.   Okay.  Okay.  The certified driving |
| 09:27:36 | 14 | instructor, what years were -- did you have that |
| 09:27:38 | 15 | certification? |
| 09:27:40 | 16 | A.   That would have been from, I guess, 1999 |
| 09:27:44 | 17 | through 2003 or late 2002. |
| 09:27:51 | 18 | Q.   And was that related to the NASCAR work you |
| 09:27:54 | 19 | were doing? |
| 09:27:55 | 20 | A.   No. |
| 09:27:55 | 21 | Q.   Okay.  What is a certified driving instructor? |
| 09:28:00 | 22 | A.   It's a -- I taught high speed driving and |
| 09:28:07 | 23 | defensive driving as a police academy instructor, and |
| 09:28:11 | 24 | then when I moved to Florida, I took the designated |
| 09:28:15 | 25 | State of Florida course followed by the proctored |

Hornback vs. Czartorski                 William T. Gaut, PH. D.                    01/28/2022

Page 24

| 09:28:21 | 1 | examination, and scored high enough to receive |
| 09:28:24 | 2 | certification as a driving instructor. |
| 09:28:28 | 3 | The best example, if you go to court on an -- |
| 09:28:32 | 4 | and you're arrested, let's say, for driving while |
| 09:28:35 | 5 | intoxicated, and the court orders you to attend a |
| 09:28:38 | 6 | driving school, I would have been the instructor, or one |
| 09:28:41 | 7 | of the instructors. |
| 09:28:42 | 8 | Q.   Okay.  Were you doing that through any |
| 09:28:44 | 9 | organization?  Were you -- were you doing driving |
| 09:28:46 | 10 | instruction through any organization? |
| 09:28:48 | 11 | A.   No. |
| 09:28:48 | 12 | Q.   Okay.  Were you doing it as -- on a -- in a |
| 09:28:55 | 13 | business sense?  Were you offering that to the public? |
| 09:28:58 | 14 | A.   Yeah.  I was -- I was just an independent |
| 09:29:01 | 15 | instructor. |
| 09:29:01 | 16 | Q.   Okay.  And that stopped in 2003? |
| 09:29:04 | 17 | A.   Yes. |
| 09:29:04 | 18 | Q.   Okay.  You're a member of the National |
| 09:29:09 | 19 | Sheriffs' Association? |
| 09:29:11 | 20 | A.   Yes. |
| 09:29:12 | 21 | Q.   When did you start that, and when did you -- |
| 09:29:14 | 22 | and are you still a member? |
| 09:29:16 | 23 | A.   I'm still -- I'm a member today, yes.  When I |
| 09:29:20 | 24 | first joined National Sheriffs' Association, gosh, |
| 09:29:27 | 25 | probably around 2001 or so. |

Hornback vs. Czartorski                William T. Gaut, PH. D.                01/28/2022

Page 25

09:29:31    1        Q.    Okay.

09:29:31    2        A.    I don't remember the exact date and time that

09:29:34    3    I joined that organization.

09:29:36    4        Q.    I've got a couple of follow-ups on that.  Is

09:29:39    5    that a fee-based organization?  Do you pay a fee and you

09:29:42    6    get to be a member?

09:29:43    7        A.    Yes.

09:29:43    8        Q.    Okay.  And they put out policy statements from

09:29:46    9    time to time, correct?

09:29:47   10        A.    They do.

09:29:48   11        Q.    Do you tend to agree with those policy

09:29:51   12    statements?

09:29:51   13        A.    For the most part, yes.

09:29:54   14        Q.    Okay.  How about on -- how about their policy

09:29:57   15    statements on ethics?  Do you agree with those?

09:29:59   16        A.    I do.

09:29:59   17        Q.    How about their policy statements on use of

09:30:03   18    force?  Do you agree with those?

09:30:04   19        A.    I do.

09:30:06   20        Q.    The member -- you're a member of the American

09:30:09   21    Society of Industrial Security, ASIS.  What years --

09:30:14   22    when did you join that, and are you still a member?

09:30:17   23        A.    Oh, gosh.  I joined that one back in 19 --

09:30:18   24    1986 -- wait a minute.  I'm trying to think back on

09:30:29   25    dates now.  That would go back to about 1976 when my

Page 26

| | | |
|---|---|---|
| 09:30:39 | 1 | partner and I opened Security Training Institute.  We |
| 09:30:42 | 2 | both joined ASIS at the time. |
| 09:30:46 | 3 | Q.   Okay.  And that was a side business that you |
| 09:30:51 | 4 | and your partner had to train security in certain |
| 09:30:57 | 5 | industries? |
| 09:30:57 | 6 | A.   Yes.  And, yeah, my memory, it was about 1972, |
| 09:31:02 | 7 | 1973. |
| 09:31:06 | 8 | Q.   Okay. |
| 09:31:06 | 9 | A.   That's when we started Security Training |
| 09:31:09 | 10 | Institute. |
| 09:31:09 | 11 | Q.   And you stopped operating that in 1990? |
| 09:31:12 | 12 | A.   I sold out to my partner. |
| 09:31:14 | 13 | Q.   Okay. |
| 09:31:14 | 14 | A.   My partner bought me out. |
| 09:31:18 | 15 | Q.   And are you still a member of the American |
| 09:31:21 | 16 | Society of Industrial Security? |
| 09:31:24 | 17 | A.   Yes. |
| 09:31:24 | 18 | Q.   Okay.  And is that -- you just pay a fee every |
| 09:31:27 | 19 | year? |
| 09:31:28 | 20 | A.   Yes. |
| 09:31:28 | 21 | Q.   Okay.  You don't hold any certifications or |
| 09:31:33 | 22 | specialties with the National Sheriffs' Association, |
| 09:31:35 | 23 | right? |
| 09:31:36 | 24 | A.   Correct. |
| 09:31:37 | 25 | Q.   And you don't hold any specialties or |

Page 27

| | | |
|---|---|---|
| 09:31:39 | 1 | certifications with the American Society of Industrial |
| 09:31:41 | 2 | Security, right? |
| 09:31:42 | 3 | A.    Correct. |
| 09:31:43 | 4 | Q.    Okay.  You're a member of the American Academy |
| 09:31:46 | 5 | of Forensic Sciences? |
| 09:31:47 | 6 | A.    I am. |
| 09:31:48 | 7 | Q.    What years were you a member of -- when did |
| 09:31:50 | 8 | you join, and are you still a member? |
| 09:31:52 | 9 | A.    I'm still currently a member there, and I |
| 09:31:54 | 10 | don't recall the date I joined.  It's been 15 years ago, |
| 09:31:59 | 11 | maybe. |
| 09:32:00 | 12 | Q.    Okay.  Is that a fee-based organization? |
| 09:32:02 | 13 | A.    Well -- well, that one is a -- it's a |
| 09:32:05 | 14 | fee-based organization, but they have -- they have |
| 09:32:11 | 15 | parameters that you have to meet in order to join.  You |
| 09:32:14 | 16 | can't just pay your fee.  You have to show that you have |
| 09:32:17 | 17 | a minimum of a bachelor's degree.  You have to show that |
| 09:32:22 | 18 | you are either prior or actively working in the field of |
| 09:32:25 | 19 | forensic science.  You have to show that you have both |
| 09:32:30 | 20 | education and field experience as far as the forensic |
| 09:32:36 | 21 | aspect of it.  You have to then be recommended by |
| 09:32:38 | 22 | someone who holds a minimum of fellow status, and then, |
| 09:32:42 | 23 | of course, you pay your fee.  And if all of that checks |
| 09:32:45 | 24 | out, you have to send all of your transcripts and course |
| 09:32:51 | 25 | names and so forth in.  That goes before a board.  And |

Page 28

| | | |
|---|---|---|
| 09:32:54 | 1 | then the board either accepts or denies your membership. |
| 09:33:01 | 2 | Q.   Okay.  And once you're a member, it's just a |
| 09:33:04 | 3 | fee every year? |
| 09:33:05 | 4 | A.   Yes. |
| 09:33:06 | 5 | Q.   Okay.  Do you hold any certifications through |
| 09:33:09 | 6 | that organization? |
| 09:33:10 | 7 | A.   No. |
| 09:33:12 | 8 | Q.   Okay.  And I think you told me this, but I |
| 09:33:15 | 9 | didn't write it down, what year did you join? |
| 09:33:18 | 10 | A.   I don't recall.  I've been a member for at |
| 09:33:21 | 11 | least 15 years -- |
| 09:33:24 | 12 | Q.   Okay.  That's fair. |
| 09:33:24 | 13 | A.   -- maybe longer.  I just don't remember the |
| 09:33:27 | 14 | date that I first joined the organization. |
| 09:33:29 | 15 | Q.   Okay.  It says you're a member of the American |
| 09:33:31 | 16 | College of Forensic Examiners. |
| 09:33:33 | 17 | A.   That's the one that has been dissolved. |
| 09:33:35 | 18 | Q.   Okay.  So that is not true today, but it would |
| 09:33:37 | 19 | have been true up until about two years ago? |
| 09:33:39 | 20 | A.   To my best recollection, yes, sir. |
| 09:33:46 | 21 | Q.   You're a member of the International |
| 09:33:47 | 22 | Association of Chiefs of Police? |
| 09:33:50 | 23 | A.   Yes. |
| 09:33:50 | 24 | Q.   When did you join them? |
| 09:33:51 | 25 | A.   I joined that when I was promoted to captain. |

Hornback vs. Czartorski                William T. Gaut, PH. D.                01/28/2022

Page 29

| | | |
|---|---|---|
| 09:33:54 | 1 | That would have been back in 1989. |
| 09:34:02 | 2 | Q.    Okay.  And you've been a member since? |
| 09:34:04 | 3 | A.    Yes. |
| 09:34:05 | 4 | Q.    Is that something that you need to pay a fee |
| 09:34:07 | 5 | to every year? |
| 09:34:07 | 6 | A.    Yes. |
| 09:34:09 | 7 | Q.    They put out policy statements on a variety of |
| 09:34:11 | 8 | law enforcement topics, do they not? |
| 09:34:13 | 9 | A.    Yes. |
| 09:34:14 | 10 | Q.    Do you agree with their policy statements on |
| 09:34:18 | 11 | ethics? |
| 09:34:19 | 12 | A.    I do. |
| 09:34:19 | 13 | Q.    Do you agree with their policy statements on |
| 09:34:22 | 14 | use of force? |
| 09:34:22 | 15 | A.    Yes. |
| 09:34:23 | 16 | Q.    Do you subscribe to that when you do your |
| 09:34:26 | 17 | expert evaluation work? |
| 09:34:27 | 18 | A.    I do, yes. |
| 09:34:28 | 19 | Q.    Okay.  It says you're a member of the American |
| 09:34:34 | 20 | Correctional Association.  When did you join that |
| 09:34:39 | 21 | organization? |
| 09:34:40 | 22 | A.    That one, probably six years ago.  It's fairly |
| 09:34:47 | 23 | recent. |
| 09:34:51 | 24 | Q.    Because I note you had a lot of law |
| 09:34:53 | 25 | enforcement experience, but did not see any correctional |

Page 30

09:34:56    1    experience on your CV.

09:34:59    2        A.    That's correct.  I have some correctional

09:35:00    3    experience, but it's not necessarily on the CV.  I

09:35:04    4    wasn't -- I've never actually worked as a corrections

09:35:08    5    officer, per se.  I've supervised corrections officers,

09:35:12    6    and actually I was the -- I was one of the individuals,

09:35:16    7    one of the chief staff individuals who supervised the

09:35:21    8    building and staffing of the new Birmingham City Jail.

09:35:25    9        Q.    Okay.

09:35:25    10       A.    But I did not work specifically as a

09:35:27    11   corrections officer.

09:35:29    12       Q.    Is the American Correctional Association a

09:35:33    13   membership-based organization?

09:35:35    14       A.    It is, yes.

09:35:35    15       Q.    And so you just pay a fee every year to --

09:35:38    16       A.    Yes.

09:35:39    17       Q.    And you're still a member today?

09:35:41    18       A.    Yes.

09:35:42    19       Q.    Okay.

09:35:42    20       A.    Well, I'm a member as of now, but I do not

09:35:45    21   intend to renew my membership.

09:35:47    22       Q.    Okay.  This is the -- member of the National

09:35:53    23   Emergency Number Association?

09:35:55    24       A.    Yes.

09:35:55    25       Q.    First of all, you have to tell me what that

Hornback vs. Czartorski          William T. Gaut, PH. D.          01/28/2022

Page 31

09:35:57    1    is.

09:35:58    2         A.    That's applicable to the 911 emergency

09:36:02    3    dispatch centers.  They're -- NENA are the ones who

09:36:06    4    regulate those centers as far as standards of operations

09:36:10    5    procedures.

09:36:13    6         Q.    Okay.  And when did you join them?

09:36:20    7         A.    Probably 10 years ago, maybe.

09:36:22    8         Q.    Okay.  And you're still a member today?

09:36:26    9         A.    Yes.

09:36:27   10         Q.    I think I asked you this, but I don't think I

09:36:30   11    asked you about all of these organizations.  Do you hold

09:36:32   12    any certifications or specialties issued through the

09:36:35   13    IACP?

09:36:38   14         A.    No.

09:36:38   15         Q.    How about through the ACA?

09:36:40   16         A.    No.

09:36:40   17         Q.    How about through the NENA?

09:36:44   18         A.    No.

09:36:44   19         Q.    Okay.  Sir, I think we've looked at your fee

09:36:53   20    schedule.  But that's contained on Pages 30 and 31,

09:36:56   21    right?

09:36:57   22         A.    It is, yes.

09:36:59   23         Q.    And then I want to look at your case listing

09:37:02   24    on Page 32.

09:37:14   25               And just for the record, for today's

Page 32

```
09:37:16    1    testimony, the charge was $2,000 that the Plaintiffs

09:37:20    2    paid because we took it -- we're taking your deposition

09:37:22    3    here in Florida, right?

09:37:24    4        A.   Correct.

09:37:24    5        Q.   And if we had to have you travel to us, it

09:37:27    6    would have been 3,500 per day, plus first class airfare,

09:37:30    7    right?

09:37:31    8        A.   Yes.

09:37:33    9        Q.   Okay.  All right.  You're -- I take it

09:37:39   10    Mr. Morgan informed you that this was a federal matter,

09:37:43   11    fair?

09:37:43   12        A.   Yes.

09:37:44   13        Q.   And so as a result of that, you understood

09:37:45   14    that you had to produce to us the cases in which you

09:37:50   15    gave testimony or were involved in the last four years?

09:37:54   16        A.   That's correct.

09:37:54   17        Q.   Okay.  And is the attachment on Page 32 full

09:38:00   18    and complete?

09:38:02   19        A.   For the last -- well, actually it's full and

09:38:04   20    complete for the last five years.

09:38:06   21        Q.   Okay.

09:38:06   22        A.   I have a tendency to give a little more than

09:38:10   23    what's required.

09:38:11   24        Q.   And this contains every case that you -- that

09:38:14   25    was active in last five years in which you gave
```

Page 33

09:38:17    1    testimony, fair?

09:38:18    2        A.   In which I gave deposition or trial testimony,

09:38:20    3    yes.

09:38:21    4        Q.   Okay.  And do you -- do you understand the

09:38:30    5    purpose of why experts are required to do case listing

09:38:36    6    in federal court?

09:38:38    7        A.   I'm assuming it's so that it's available for

09:38:41    8    the deposing attorney to go check out what the cases

09:38:46    9    were to see if there was testimony, if there was

09:38:49    10   deposition transcripts, that sort of thing.

09:38:52    11       Q.   Right.  And -- and part of the reason the

09:38:54    12   court -- the federal courts require that for experts,

09:38:56    13   and you understand this, is so that, you know, we can go

09:39:00    14   back and look at things like inconsistent testimony and

09:39:03    15   opinions on similar facts, right?

09:39:05    16       A.   Sure.

09:39:06    17       Q.   We could also go back and look and see if an

09:39:08    18   expert is the subject of a Daubert motion.  Are you

09:39:12    19   familiar with that?

09:39:12    20       A.   I am, yes.

09:39:13    21       Q.   And that's used to exclude experts that give

09:39:16    22   unreliable opinions, right?

09:39:18    23       A.   Yes.

09:39:19    24       Q.   Okay.  And I just want to be clear, this is a

09:39:25    25   full and complete list of every case in the last -- at

Page 34

```
09:39:28    1   least the last four years that you have given testimony

09:39:31    2   in that's been active, right?

09:39:34    3        A.   To my knowledge, yes.

09:39:35    4        Q.   Okay.

09:39:36    5        A.   If there's one missing, it's an inadvertent

09:39:38    6   mistake on my part.  But, typically, I list every case.

09:39:44    7   Today, for instance, as soon as we finish this

09:39:46    8   deposition, I'll go home and that will be added to this

09:39:49    9   list.

09:39:49   10        Q.   Okay.  And so every time you give a deposition

09:39:51   11   or you provide trial testimony, this list is updated?

09:39:54   12        A.   Yes.

09:39:54   13        Q.   And that is your regular business practice?

09:39:56   14        A.   Yes.

09:39:58   15        Q.   And you understand the importance of it.  It's

09:40:00   16   a requirement in federal court for you to testify?

09:40:02   17        A.   I do, yes.

09:40:04   18        Q.   And the parties and the Court can rely on the

09:40:06   19   accuracy of this listing?

09:40:08   20        A.   Yes.

09:40:12   21        Q.   Okay.  Before we get into some of the

09:40:16   22   opinions, sir, you've not -- just generally looking at

09:40:20   23   your CV, there's nothing in it that would mislead the

09:40:24   24   Court in terms of your qualifications or cause the Court

09:40:27   25   or a jury to think more of your qualifications than is
```

Page 35

09:40:31  1  justified, right?

09:40:32  2      A.    I don't know that that's a question I can

09:40:35  3  answer.  The -- the report that I have listed -- that I

09:40:39  4  have written, which contains my qualifications, is true

09:40:42  5  and accurate, to the best of my knowledge.

09:40:45  6      Q.    Well, and I -- I'm not actually into the

09:40:48  7  substance of your report yet.  I am simply talking about

09:40:51  8  your CV that starts on Page 27 and runs through Page 29,

09:40:58  9  with the fee schedule through 31, and the case listing

09:41:01  10  on 32.  There's nothing in terms of that CV or the

09:41:05  11  qualifications that would cause the Court in terms of

09:41:07  12  your qualifications to think more of your qualifications

09:41:11  13  than is justified?

09:41:13  14      A.    That's correct.  But I need to make sure you

09:41:17  15  understand.  You've asked me a lot of questions about

09:41:21  16  exact dates that I joined or didn't join and so forth,

09:41:24  17  and I'm giving you dates that I can recall.  But at the

09:41:29  18  same time, I don't know that those particular dates are

09:41:32  19  going to be exactly a hundred percent accurate.  I may

09:41:35  20  have joined an organization a year or so before or

09:41:38  21  after.  That's not something I've really committed to

09:41:42  22  memory.

09:41:43  23      Q.    Okay.  You haven't padded your CV in any way,

09:41:45  24  though, right?

09:41:46  25      A.    Oh, no.  No.

Page 36

09:41:51    1          Q.    How many cases have you testified as an expert

09:41:54    2    in, just approximately?

09:41:59    3          A.    Actually, I don't know.  I've never -- I've

09:42:01    4    never really counted up the total number of cases in

09:42:05    5    which I've given testimony in.

09:42:07    6          Q.    Have you ever been the subject of a successful

09:42:10    7    Daubert motion?

09:42:18    8          A.    Yes and no.  I'm not sure.  I've -- I've

09:42:23    9    actually had a couple of Daubert hearings where I had to

09:42:26   10    go and give testimony, and the judges in those cases

09:42:32   11    have ruled that I was qualified to give testimony and --

09:42:35   12    and not restricted.  But at the same time, there have

09:42:40   13    been motions, and not being an attorney, I'm not sure

09:42:45   14    whether you would call it a Daubert motion.

09:42:47   15               For instance, attorneys typically file a

09:42:50   16    motion saying that an expert such as myself is not

09:42:53   17    allowed to give, for instance, medical diagnosis and

09:42:57   18    treatment.  I'm not allowed to give legal opinions, that

09:43:02   19    sort of thing.  And I've had -- I've actually had courts

09:43:08   20    rule both ways.  One court says that I can't give any

09:43:13   21    medical opinions whatsoever.  And then I go to Texas in

09:43:16   22    federal court, and that judge says, yeah, you can give

09:43:19   23    medical testimony, but it can't be diagnosis and

09:43:21   24    treatment of disease or injury.  So it depends on the

09:43:25   25    court.  I've had rulings both ways.

Hornback vs. Czartorski               William T. Gaut, PH. D.                    01/28/2022

Page 37

| | | |
|---|---|---|
| 09:43:28 | 1 | Q.   Other than exclusions for offering legal |
| 09:43:30 | 2 | opinions or maybe ultimate opinions in a case, you know, |
| 09:43:33 | 3 | that sometimes happens as well -- |
| 09:43:35 | 4 | A.   Yeah. |
| 09:43:36 | 5 | Q.   -- or medical opinions, have you ever been |
| 09:43:38 | 6 | subject to a successful Daubert motion, for instance, |
| 09:43:41 | 7 | that the opinions you were giving were unreliable? |
| 09:43:49 | 8 | A.   I don't recall one way or the other.  I don't |
| 09:43:54 | 9 | recall that language being used, but it's possible. |
| 09:44:00 | 10 | Q.   Okay.  Can you tell me what you did in -- and |
| 09:44:14 | 11 | by the way, you are currently -- let me back up. |
| 09:44:17 | 12 | You are currently employed -- for lack of |
| 09:44:19 | 13 | a better term, I'm assuming you get your retirement |
| 09:44:22 | 14 | income from the State of Alabama? |
| 09:44:23 | 15 | A.   I do.  And from the City of Birmingham and |
| 09:44:26 | 16 | from the State of Alabama. |
| 09:44:27 | 17 | Q.   Okay.  And then you've got an expert witness |
| 09:44:30 | 18 | practice, basically? |
| 09:44:32 | 19 | A.   Yes. |
| 09:44:35 | 20 | Q.   Can you give me just an approximation of -- of |
| 09:44:37 | 21 | your income in the last three to four years just on an |
| 09:44:43 | 22 | average in terms of your expert witness practice?  How |
| 09:44:45 | 23 | much are you generating from that practice? |
| 09:44:48 | 24 | MR. MORGAN:  Form. |
| 09:44:50 | 25 | A.   Depending on the specific year which |

Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 38 of 235 PageID #: 1166

Hornback vs. Czartorski                William T. Gaut, PH. D.                01/28/2022

Page 38

| 09:44:51 | 1 | fluctuates, it can be anywhere from a 150 to 250,000. |
| 09:44:59 | 2 | BY MR. WIEST: |
| 09:20:40 | 3 | Q.   Okay.  And in terms of activities that you're |
| 09:45:03 | 4 | engaged in for revenue, that is the only thing that |
| 09:45:06 | 5 | you're doing currently, your expert witness practice? |
| 09:45:10 | 6 | A.   Well, other than -- |
| 09:45:10 | 7 | Q.   Retirement? |
| 09:45:11 | 8 | A.   Other than my retirement and investments and |
| 09:45:13 | 9 | that sort of thing, yes. |
| 09:45:15 | 10 | Q.   How many cases do you handle at any given |
| 09:45:18 | 11 | time? |
| 09:45:25 | 12 | A.   I don't know that I can answer the question in |
| 09:45:27 | 13 | that form.  Typically, I take -- well, I used to take up |
| 09:45:31 | 14 | to 25, 30 cases a year.  Now, I'm only taking probably |
| 09:45:38 | 15 | half a dozen, less than 10 cases per year.  And I'm |
| 09:45:44 | 16 | aiming to taking zero cases per year very shortly. |
| 09:45:48 | 17 | Q.   Okay.  All right.  I want to talk about a |
| 09:45:57 | 18 | concept with you, because I think it -- it bears on this |
| 09:46:01 | 19 | case.  When we began speaking this morning, the court |
| 09:46:06 | 20 | reporter put you under oath, right? |
| 09:46:08 | 21 | A.   Correct. |
| 09:46:08 | 22 | Q.   And you understood that that imposed the |
| 09:46:11 | 23 | obligation to tell the truth, the whole truth and |
| 09:46:14 | 24 | nothing but the truth, right? |
| 09:46:15 | 25 | A.   I do. |

Page 39

| | | |
|---|---|---|
| 09:46:16 | 1 | Q.   And the purpose of doing that, one, was so |
| 09:46:19 | 2 | that penalty is attached, correct? |
| 09:46:23 | 3 | A.   Correct. |
| 09:46:23 | 4 | Q.   And you understood that you could be charged |
| 09:46:25 | 5 | for perjury if you lied under oath, right? |
| 09:46:27 | 6 | MR. MORGAN:  Form. |
| 09:46:28 | 7 | A.   Of course. |
| 09:46:28 | 8 | BY MR. WIEST: |
| 09:20:40 | 9 | Q.   You understood as well that one of the |
| 09:46:34 | 10 | purposes of that is to try and ensure that courts and |
| 09:46:40 | 11 | juries can rely on the testimony.  In other words, you |
| 09:46:42 | 12 | know, it's supposed to be truthful, right? |
| 09:46:44 | 13 | A.   Of course. |
| 09:46:46 | 14 | Q.   And you would agree that truthful testimony is |
| 09:46:51 | 15 | an essential requirement for police officers as well, |
| 09:46:56 | 16 | right? |
| 09:46:57 | 17 | MR. MORGAN:  Form. |
| 09:46:57 | 18 | A.   Yes. |
| 09:46:57 | 19 | BY MR. WIEST: |
| 09:47:01 | 20 | Q.   One of the things that we've experienced, I |
| 09:47:04 | 21 | want to know if you agree with this, if an officer or |
| 09:47:08 | 22 | any witness tells one lie under oath, sometimes people |
| 09:47:12 | 23 | assume that they're lying about a lot of things under |
| 09:47:14 | 24 | oath, right? |
| 09:47:16 | 25 | MR. MORGAN:  Form. |

Page 40

| | | |
|---|---|---|
| 09:47:16 | 1 | A. That's a possible assumption, yes. |
| 09:47:18 | 2 | BY MR. WIEST: |
| 09:47:20 | 3 | Q. Would you agree that a police officer who lies |
| 09:47:22 | 4 | under oath undermines the entire system of justice? |
| 09:47:26 | 5 | MR. MORGAN: Form. |
| 09:47:27 | 6 | A. I don't know that I would make that broad a |
| 09:47:28 | 7 | statement. I don't know that one officer lying under |
| 09:47:35 | 8 | oath committing perjury has a detrimental effect on the |
| 09:47:39 | 9 | entire criminal justice system. That seems to me it |
| 09:47:43 | 10 | might be a little overly broad. Maybe it -- it might |
| 09:47:48 | 11 | affect the criminal justice system in a particular |
| 09:47:52 | 12 | jurisdiction or city, county, state, that sort of thing. |
| 09:47:55 | 13 | But it's -- |
| 09:47:56 | 14 | BY MR. WIEST: |
| 09:47:57 | 15 | Q. If it comes -- |
| 09:47:57 | 16 | A. The reason -- if I can explain, the reason I'm |
| 09:48:00 | 17 | saying that is if you have Officer A who commits perjury |
| 09:48:05 | 18 | in Kentucky, under your statement that affects the |
| 09:48:10 | 19 | criminal justice system in California. And I don't know |
| 09:48:13 | 20 | that California would even be aware that a perjury was |
| 09:48:17 | 21 | committed. So it -- like I say, it's just a little too |
| 09:48:20 | 22 | broad for me. |
| 09:48:21 | 23 | BY MR. WIEST: |
| 09:48:21 | 24 | Q. No. I understand. |
| 09:48:23 | 25 | If the public discovers that an officer has |

Page 41

| | | |
|---|---|---|
| 09:48:26 | 1 | committed perjury, does it undermine the public's |
| 09:48:29 | 2 | confidence in -- in the criminal justice system? |
| 09:48:35 | 3 | MR. MORGAN:  Form. |
| 09:48:35 | 4 | A.   It would, yes. |
| 09:48:36 | 5 | BY MR. WIEST: |
| 09:48:36 | 6 | Q.   Okay.  Could it undermine the safety of other |
| 09:48:46 | 7 | officers in the field? |
| 09:48:48 | 8 | MR. MORGAN:  Form. |
| 09:48:51 | 9 | A.   Again, that -- I don't know that that -- |
| 09:48:53 | 10 | that's a pretty broad statement.  You know, if one |
| 09:48:58 | 11 | officer commits a criminal act, does that undermine the |
| 09:49:03 | 12 | public feeling of all police officers?  Here again, |
| 09:49:07 | 13 | it's -- the statement is a little too broad for me to |
| 09:49:10 | 14 | agree to. |
| 09:49:11 | 15 | BY MR. WIEST: |
| 09:49:11 | 16 | Q.   Okay.  I want to get into -- can you tell me |
| 09:49:16 | 17 | what -- obviously you've prepared a report in this |
| 09:49:19 | 18 | matter.  Tell me step by step what you did to prepare |
| 09:49:22 | 19 | that report. |
| 09:49:28 | 20 | A.   It's listed in the Methodology section of my |
| 09:49:31 | 21 | report beginning on Page 5. |
| 09:49:34 | 22 | Q.   Okay. |
| 09:49:37 | 23 | A.   Generally, I start off by reading the |
| 09:49:40 | 24 | complaint itself.  I want to understand exactly what the |
| 09:49:44 | 25 | allegations are made by the plaintiff against who, who |

Page 42

| | | |
|---|---|---|
| 09:49:47 | 1 | the parties are that are involved, who the plaintiffs |
| 09:49:51 | 2 | are that are involved, et cetera. |
| 09:49:54 | 3 | And then -- then I want to look at case |
| 09:49:58 | 4 | documents, and typically what I tell a retaining |
| 09:50:03 | 5 | attorney is the terms that I use are, I'm from old |
| 09:50:09 | 6 | school, I would rather have too much than too little, so |
| 09:50:12 | 7 | basically send me everything.  Even if you think it's |
| 09:50:16 | 8 | not relevant, send it to me anyway and let me make that |
| 09:50:20 | 9 | decision as to whether or not it might be relevant to my |
| 09:50:22 | 10 | opinion. |
| 09:50:24 | 11 | And then I'll assume initially that I'm |
| 09:50:28 | 12 | getting everything, and then once I get all of the |
| 09:50:31 | 13 | documents from the retaining attorney, I kind of go |
| 09:50:33 | 14 | through it based on my own experience.  And I may call |
| 09:50:37 | 15 | the attorney back and say, Is there -- is there such and |
| 09:50:40 | 16 | such a document, is there -- for instance, is there -- |
| 09:50:43 | 17 | do you have a copy of the arrest report, do you have |
| 09:50:47 | 18 | copies of supplemental reports, things that I think |
| 09:50:50 | 19 | would normally follow up the average case.  And I ask |
| 09:50:53 | 20 | for all of those documents as well. |
| 09:50:56 | 21 | Q.   Okay.  And I'm looking at the Materials |
| 09:50:58 | 22 | Considered.  You've got it listed on Page 7 and Page 8 |
| 09:51:04 | 23 | of your report. |
| 09:51:07 | 24 | A.   I'm sorry.  I didn't understand. |
| 09:51:09 | 25 | Q.   What you've looked at, the materials you've |

Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 43 of 235 PageID #: 1171

Hornback vs. Czartorski                William T. Gaut, PH. D.                01/28/2022

Page 43

| | | |
|---|---|---|
| 09:51:11 | 1 | considered, are contained on Page 7 and 8 of your |
| 09:51:16 | 2 | report, right? |
| 09:51:17 | 3 | A.    That's correct, yes. |
| 09:51:17 | 4 | Q.    Is there anything that you considered that is |
| 09:51:19 | 5 | not contained on Pages 7 or 8 of your report? |
| 09:51:25 | 6 | A.    No, there's not.  Except -- well, I guess the |
| 09:51:33 | 7 | exception is there possibly is.  I was going through my |
| 09:51:39 | 8 | report and through everything yesterday, and I'm trying |
| 09:51:45 | 9 | to see, I was comparing that to my table of contents and |
| 09:51:53 | 10 | my hard copy of the case file, and I noticed that there |
| 09:51:57 | 11 | on -- in my -- in my table of contents in my hard copy, |
| 09:52:05 | 12 | I had listed CMS Defensive Tactics Techniques. |
| 09:52:13 | 13 | Q.    What is that? |
| 09:52:14 | 14 | A.    That's the Curriculum Management System.  It's |
| 09:52:18 | 15 | a system of instructions for police officers in general |
| 09:52:23 | 16 | as to what they do, how they do it, and so forth. |
| 09:52:26 | 17 | Q.    Who publishes that? |
| 09:52:30 | 18 | A.    It's a company called CMS.  And, |
| 09:52:33 | 19 | unfortunately, I spent about an hour last night trying |
| 09:52:38 | 20 | to determine what the CMS stood for and could never find |
| 09:52:41 | 21 | it.  It's an acronym, or it may not be.  That may be the |
| 09:52:46 | 22 | name -- the name of the company, CMS.  But the nearest I |
| 09:52:48 | 23 | could find is continuing management -- or Curriculum |
| 09:52:55 | 24 | Management System. |
| 09:52:56 | 25 | And if you'll give me just a moment.  I |

Page 44

09:53:03    1    considered that.  I did not see it listed in my

09:53:09    2    materials considered, although I referred to the

09:53:13    3    training and the techniques in my report.  So what I did

09:53:16    4    is I downloaded a copy of that CMS Instructor's Guide.

09:53:23    5        Q.    Okay.

09:53:23    6        A.    And I put it on a disk with the intent of

09:53:28    7    giving it to you today.  And it's just a -- it's just a

09:53:31    8    copy of the -- of the defensive tactics.  I used Lesson

09:53:36    9    16 in my -- or that's what I referred to in my report.

09:53:40    10   And this is just a copy of the -- of that.

09:53:44    11            MR. MORGAN:  And so this disk, you would like

09:53:45    12        to supplement your production responses to

09:53:48    13        Mr. Wiest's subpoena; is that correct?

09:53:50    14            THE WITNESS:  Correct.

09:53:51    15            MR. WIEST:  Okay.  At some point we're going

09:53:53    16        to want to take a break, and I may need a drive to

09:53:56    17        look at this.

09:53:59    18            MR. MORGAN:  Whatever you need to do.

09:54:01    19            MR. WIEST:  Yeah, but we'll keep pressing on.

09:54:04    20        We can do that a little later.

09:54:06    21   BY MR. WIEST:

09:54:06    22        Q.    Other than the CMS, Lesson 16, is there

09:54:09    23   anything else in this list that -- that you've looked at

09:54:11    24   that's not contained on the list?

09:54:13    25        A.    No.

Page 45

09:54:17   1          Q.   Let me ask, sir, were you aware that there

09:54:19   2     were two prior use of force complaints or allegations

09:54:26   3     related to Trooper Czartorski in the month preceding the

09:54:30   4     Hornback arrest?

09:54:32   5              MR. MORGAN:   Form.

09:54:32   6          A.   I was.

09:54:32   7     BY MR. WIEST:

09:54:33   8          Q.   Did you review the videos that led to those

09:54:36   9     complaints?

09:54:37  10              MR. MORGAN:   Continuing.

09:54:38  11          A.   No.   The -- I -- I reviewed the narratives and

09:54:44  12     everything.   And I'm trying to think.   Hold on just a

09:54:48  13     moment.   I may have seen those videos, but let me look

09:54:51  14     quickly.

09:55:09  15              I don't recall seeing the videos, but I saw

09:55:13  16     all of the transcripts and everything related to the

09:55:16  17     complaint and so forth.

09:55:17  18     BY MR. WIEST:

09:55:18  19          Q.   Did you ask for the videos?

09:55:19  20          A.   No.

09:55:20  21          Q.   Why not?

09:55:23  22          A.   It's not relevant to my opinion.

09:55:37  23          Q.   So if -- if these -- the same officer that was

09:55:40  24     involved in this case had used excessive force two times

09:55:43  25     in the preceding month, was under investigation for it

Page 46

09:55:48    1    at the time, and may have had an incentive to cover up

09:55:54    2    his use of force in this incident, that wasn't relevant

09:55:57    3    to your opinions that you've rendered in this case?

09:56:00    4              MR. MORGAN:  Form.  Move to strike.

09:56:01    5         A.    No.   That's a -- that's a theory that I don't

09:56:03    6    adhere to, that if you've committed an offense in the

09:56:08    7    past, then you must be a criminal for the rest of your

09:56:11    8    life.  And that's -- that's not -- that's not a -- an

09:56:17    9    objective fair opinion.

09:56:20    10             By the same token, I could go back and say,

09:56:22    11   Well, Mr. Hornback was arrested 58 times, and so I

09:56:27    12   considered all of that in his background.  And I didn't

09:56:30    13   do that either.

09:56:31    14   BY MR. WIEST:

09:56:31    15        Q.    Okay.

09:56:31    16        A.    Because, you know, just because he's been

09:56:32    17   arrested in the past doesn't mean he's going to do

09:56:35    18   something in the future.  So what I do is I keep my

09:56:39    19   analysis to this particular event.

09:56:43    20        Q.    So the fact that those incidents were very

09:56:50    21   recent in time within the preceding month, arguably

09:56:53    22   motivated the conduct of the officers in this case, from

09:56:57    23   your perspective it's irrelevant?

09:57:00    24             MR. MORGAN:  Again, form.  Move to strike.

09:57:03    25        A.    In my opinion, they didn't seem to be relevant

Page 47

| | | |
|---|---|---|
| 09:57:05 | 1 | for a number of reasons.  One is it's -- it's a past |
| 09:57:06 | 2 | event that should not be considered as far as having an |
| 09:57:09 | 3 | influence on this event.  And then I read the -- the |
| 09:57:13 | 4 | follow-ups of the inves -- the internal investigations |
| 09:57:17 | 5 | that were done, and they were kind of all over the |
| 09:57:21 | 6 | board, so to speak.  One investigator says that there |
| 09:57:25 | 7 | was no wrongdoing.  Another investigator says that there |
| 09:57:29 | 8 | was wrongdoing on one aspect of the complaint, but not |
| 09:57:32 | 9 | on the second.  Another report says that he was guilty |
| 09:57:38 | 10 | of an infraction on -- on both -- both of the areas of |
| 09:57:43 | 11 | the complaint. |
| 09:57:45 | 12 | And then I looked at the disciplinary action, |
| 09:57:47 | 13 | and it's, again, a six-day suspension where he only |
| 09:57:53 | 14 | served two days, and a 14-day suspension where he only |
| 09:57:57 | 15 | served four days and that sort of thing.  And it's -- |
| 09:57:58 | 16 | it's kind of all over the board as far as people's |
| 09:58:03 | 17 | opinions about whether or not his actions were or were |
| 09:58:06 | 18 | not in violation. |
| 09:58:11 | 19 | BY MR. WIEST: |
| 09:58:12 | 20 | Q.   Okay.  Did you obtain any factual background |
| 09:58:23 | 21 | or information from Mr. Morgan that you used in |
| 09:58:28 | 22 | formulating your opinions in this case? |
| 09:58:31 | 23 | A.   Any factual background? |
| 09:58:33 | 24 | Q.   Or opinion -- or -- or other factual |
| 09:58:36 | 25 | information or any other information from Mr. Morgan |

Hornback vs. Czartorski                William T. Gaut, PH. D.                01/28/2022

Page 48

| 09:58:38 | 1 | that you've used? |
|---|---|---|

09:58:39   2     A.   No.  Mr. Morgan initially gave me a general

09:58:44   3   synopsis of what the case was about.

09:58:47   4     Q.   Okay.

09:58:48   5     A.   But, no, he didn't -- he didn't give me

09:58:53   6   opinions.  I would never rely on an attorney to do that

09:58:58   7   anyway.  But he gave me, as indicated on my invoice, he

09:59:02   8   gave me an oral case or summary of what the case was

09:59:06   9   about generally.

09:59:08   10     Q.   Okay.  I want to look at the methodology on

09:59:12   11   Page 5 again with you.  You indicated -- and by the way,

09:59:19   12   were you aware that this particular incident with Alex

09:59:23   13   Hornback occurred in -- and Kevin and Sonya -- in April

09:59:27   14   of 2020?

09:59:28   15     A.   Yes.

09:59:29   16     Q.   Okay.  Let's look at -- you said that you,

09:59:39   17   Conducted an analysis using law enforcement standards

09:59:43   18   applicable to the time period and promoted by

09:59:45   19   professional law enforcement and criminal justice

09:59:48   20   organizations, including the International Association

09:59:51   21   of Chiefs of Police, the National Sheriffs' Association,

09:59:54   22   the Commission on Accreditation for Law Enforcement

09:59:58   23   Agencies, and the American Academy of Forensic Sciences.

10:00:01   24   Do you see that?

10:00:02   25     A.   I do.

Page 49

| | | |
|---|---|---|
| 10:00:02 | 1 | Q.  What particular standards are we talking |
| 10:00:05 | 2 | about? |
| 10:00:08 | 3 | A.  Particularly, use of force.  Particularly -- |
| 10:00:14 | 4 | what is referred to as intermediate weapons.  And I |
| 10:00:22 | 5 | looked -- those are the two primary areas, use of force |
| 10:00:26 | 6 | and intermediate weapons. |
| 10:00:29 | 7 | And I need to make a correction, too.  Your |
| 10:00:32 | 8 | previous question said this happened in April of 2020. |
| 10:00:35 | 9 | Q.  Yes, sir. |
| 10:00:35 | 10 | A.  I've got it happening as -- on March 28th of |
| 10:00:38 | 11 | 2020. |
| 10:00:39 | 12 | Q.  Okay.  You may be right. |
| 10:00:59 | 13 | Okay.  Yeah, I think you're right.  So |
| 10:01:02 | 14 | March of '20 -- March 28th, 2020, right? |
| 10:01:05 | 15 | A.  That's what I've got, yes, sir. |
| 10:01:07 | 16 | Q.  Okay.  Let's talk about these policies.  So |
| 10:01:09 | 17 | use of force and intermediate weapons, and you looked at |
| 10:01:13 | 18 | the policies that were put out on those by all of these |
| 10:01:16 | 19 | organizations? |
| 10:01:17 | 20 | A.  Yes.  Well, excuse me, when you say all of the |
| 10:01:20 | 21 | organizations, I'm referring to IACP -- |
| 10:01:26 | 22 | Q.  Right. |
| 10:01:26 | 23 | A.  -- to -- for CALEA, National Sheriffs' |
| 10:01:28 | 24 | Association. |
| 10:01:30 | 25 | Q.  And the Academy -- American Academy of |

Hornback vs. Czartorski          William T. Gaut, PH. D.          01/28/2022

Page 50

| | | |
|---|---|---|
| 10:01:32 | 1 | Forensic Sciences? |
| 10:01:34 | 2 | A.   Not so much the American Academy of Forensic |
| 10:01:38 | 3 | Sciences.   They -- they deal more in forensics as |
| 10:01:41 | 4 | opposed to the professional law enforcement |
| 10:01:42 | 5 | organizations.   In other words, the Academy, for |
| 10:01:46 | 6 | instance, doesn't put out a policy on use of force. |
| 10:01:49 | 7 | Q.   Okay.   Did they put out a policy on |
| 10:01:52 | 8 | intermediate weapons? |
| 10:01:54 | 9 | A.   No. |
| 10:01:54 | 10 | Q.   Okay.   So that aspect of your report that |
| 10:01:57 | 11 | indicates that you applied the standards put out by the |
| 10:01:59 | 12 | American Academy of Forensic Sciences, that's |
| 10:02:04 | 13 | inaccurate -- |
| 10:02:04 | 14 | A.   Well, it's -- |
| 10:02:04 | 15 | Q.   -- to this case? |
| 10:02:05 | 16 | A.   Well, it's not inaccurate.   They put out |
| 10:02:08 | 17 | standards as far as tasers, how they -- how they are to |
| 10:02:14 | 18 | be downloaded, and the laboratory conditions under which |
| 10:02:18 | 19 | tasers should be looked at and that sort of thing.   But |
| 10:02:23 | 20 | nothing -- nothing pertaining to the use of force |
| 10:02:25 | 21 | particularly, or particular -- that particular policy. |
| 10:02:29 | 22 | Q.   There's no allegations or involvement, and no |
| 10:02:33 | 23 | one is saying in this case that there was any taser that |
| 10:02:36 | 24 | was deployed, correct? |
| 10:02:38 | 25 | A.   Not deployed, but the taser -- there's |

Page 51

| | | |
|---|---|---|
| 10:02:39 | 1 | information that I received that a taser was displayed. |
| 10:02:42 | 2 | Q.   Was pulled on someone, for lack of a better |
| 10:02:45 | 3 | term. |
| 10:02:45 | 4 | A.   It was pulled on -- taken out, and it was |
| 10:02:45 | 5 | pointed at someone. |
| 10:02:47 | 6 | Q.   Does the American Academy of Forensic Sciences |
| 10:02:49 | 7 | have any policy that's relevant to pointing a taser at |
| 10:02:55 | 8 | someone? |
| 10:02:55 | 9 | A.   No. |
| 10:02:56 | 10 | Q.   Okay.  What is the particular standard that |
| 10:03:00 | 11 | you're relying on from the American Academy of Forensic |
| 10:03:04 | 12 | Sciences? |
| 10:03:07 | 13 | A.   Hang on just a minute.  I'll have to go |
| 10:03:08 | 14 | through my report, because I would have it footnoted if |
| 10:03:12 | 15 | I did it. |
| 10:03:49 | 16 | I'm sorry.  Tell me the paragraph you're |
| 10:03:51 | 17 | referring to on the report. |
| 10:03:52 | 18 | Q.   I'm on Page 5, sir.  I'm on your methodology. |
| 10:03:56 | 19 | A.   Page 5. |
| 10:03:57 | 20 | Q.   And I'm on the very last full paragraph of |
| 10:04:00 | 21 | that page. |
| 10:04:00 | 22 | A.   Okay. |
| 10:04:04 | 23 | Q.   And you say in part -- |
| 10:04:06 | 24 | A.   Yes. |
| 10:04:06 | 25 | Q.   -- that you conducted an analysis using law |

Page 52

10:04:08   1   enforcement standards applicable to the time period and

10:04:11   2   promoted by professional law enforcement and criminal

10:04:13   3   justice organizations, including -- and I'm specifically

10:04:13   4   looking at the American Academy of Forensic Sciences.

10:04:19   5       A.   Right.   That would pertain to the -- the

10:04:24   6   medical aspects of -- of an injury.   For instance, the

10:04:32   7   bruising effects that one would expect to see or not

10:04:35   8   see, as the case may be.   The effects of -- of a blunt

10:04:41   9   force strike to a particular set of muscle groups.

10:04:45  10       Q.   Sir, what particular policy have they put out

10:04:48  11   in that regard that you've studied?

10:04:50  12       A.   I don't recall -- I don't recall the specific

10:04:52  13   policy.

10:04:52  14       Q.   Okay.   Did you make any notes, jottings as you

10:05:01  15   went through this case file in terms of a particular

10:05:05  16   policy?   Is it somewhere that hasn't been produced to

10:05:08  17   us?   Is there anything out there that might reference

10:05:11  18   the particular policy?

10:05:12  19       A.   No.

10:05:13  20       Q.   Okay.   All right.   What -- well, so the

10:05:21  21   standards that you can't identify for me today from the

10:05:25  22   AAFS, how would they apply to this case?

10:05:35  23       A.   The American Academy of Forensic Sciences --

10:05:38  24   Sciences examines all aspects of forensics up to and

10:05:45  25   including the trauma that might be expected from a, for

Hornback vs. Czartorski                William T. Gaut, PH. D.                01/28/2022

Page 53

| | | |
|---|---|---|
| 10:05:49 | 1 | instance, a blunt force instrument versus, say, cutting, |
| 10:05:53 | 2 | stabbing instrument, that sort of thing.  They would put |
| 10:05:57 | 3 | out papers -- or they do put out papers on everything |
| 10:06:02 | 4 | from gunshot residue to -- to stippling, what to be |
| 10:06:07 | 5 | expected, patterns of particular injuries involving the |
| 10:06:12 | 6 | human body.  I don't know that they put it out in a |
| 10:06:16 | 7 | policy form.  But there are studies that are done that |
| 10:06:20 | 8 | are submitted to AAFS. |
| 10:06:24 | 9 | Q.   Okay. |
| 10:06:24 | 10 | A.   And those policies are available to -- to |
| 10:06:27 | 11 | people like me. |
| 10:06:28 | 12 | Q.   What policies did they put out that you're |
| 10:06:32 | 13 | relying on in this case? |
| 10:06:34 | 14 | A.   They -- they don't put out policies. |
| 10:06:36 | 15 | Q.   What publications, standards, bulletins, |
| 10:06:40 | 16 | whatever you want to call it, have they put out or has |
| 10:06:43 | 17 | been submitted to them that you relied on with respect |
| 10:06:47 | 18 | to this case? |
| 10:06:47 | 19 | A.   There -- I can't identify a specific study |
| 10:06:53 | 20 | that's done, but they put out literally thousands of |
| 10:06:58 | 21 | studies over the years.  And I've read -- I get a |
| 10:07:02 | 22 | monthly bulletin on new research, new topics, and so |
| 10:07:05 | 23 | forth.  I don't -- I don't know that I can answer your |
| 10:07:09 | 24 | question about a specific study, other than the fact |
| 10:07:15 | 25 | that I'm aware that studies exist.  It's part of my -- |

Page 54

10:07:20    1    part of my general knowledge, my own experience.

10:07:23    2        Q.    So let's -- let's unpack that just a little

10:07:25    3    more.

10:07:28    4            To the best of your recollection -- I realize

10:07:32    5    you cannot point to a specific bulletin, publication,

10:07:36    6    monthly newsletter, whatever it is that you specifically

10:07:41    7    relied on, but in a more general sense, what theory,

10:07:47    8    principle did they put out that you've relied on in this

10:07:52    9    case?

10:07:53    10            MR. MORGAN:    Form.

10:07:54    11        A.    If an individual, for instance, is the subject

10:07:58    12    of a blunt force strike, then there should be a

10:08:03    13    resulting visible injury, forensically speaking, as a

10:08:08    14    result of that blunt force strike.

10:08:09    15    BY MR. WIEST:

10:08:09    16        Q.    And we see that in this case with the bruising

10:08:12    17    photos, correct?

10:08:14    18        A.    No, we don't.    That's the problem.    I went

10:08:16    19    back to look, and if there's any bruising at all, it is

10:08:20    20    so slight that it doesn't show up in a photograph.

10:08:25    21        Q.    So are you contending, sir, that he wasn't

10:08:27    22    struck?

10:08:28    23        A.    No, I'm not contending.    I'm contending that

10:08:31    24    he was struck.    But, in my opinion, the blunt force

10:08:36    25    strike was not sufficient even to cause moderate

Hornback vs. Czartorski          William T. Gaut, PH. D.          01/28/2022

Page 55

| | | |
|---|---|---|
| 10:08:41 | 1 | bruising. And, of course, that -- that gets into |
| 10:08:46 | 2 | whether or not the strike was justified and within -- |
| 10:08:50 | 3 | within keeping of the generally-accepted police |
| 10:08:55 | 4 | practices of using an alternate weapon to subdue an |
| 10:08:59 | 5 | arrestee. |
| 10:09:00 | 6 | Q.   Okay. So you're saying that there were no |
| 10:09:05 | 7 | marks on him that you were able to observe? |
| 10:09:07 | 8 | A.   No, I'm not saying that. |
| 10:09:10 | 9 | Q.   Because I think you just told me that -- that |
| 10:09:13 | 10 | you did not observe bruising that you thought was |
| 10:09:16 | 11 | consistent with the -- the striking. |
| 10:09:20 | 12 | A.   No, I didn't say that either. |
| 10:09:21 | 13 | Q.   Okay. |
| 10:09:22 | 14 | A.   I said that there -- I didn't see any evidence |
| 10:09:25 | 15 | of serious bruising or even moderate bruising. The |
| 10:09:31 | 16 | photographs -- I'm not sure from the photographs that I |
| 10:09:36 | 17 | saw that there was any bruising at all. But it |
| 10:09:39 | 18 | certainly didn't show up as any sort of moderate or |
| 10:09:42 | 19 | maximum bruising as a result of being struck with a |
| 10:09:46 | 20 | blunt force instrument. |
| 10:09:47 | 21 | Q.   Were the photographs produced to you in color? |
| 10:09:49 | 22 | A.   They were. |
| 10:09:50 | 23 | Q.   Okay. What expertise do you have in |
| 10:09:56 | 24 | characterizing the severity of bruising? |
| 10:10:01 | 25 | A.   My experience as a homicide detective over 25 |

Page 56

| | | |
|---|---|---|
| 10:10:06 | 1 | years of police practices as a sworn police officer.  My |
| 10:10:12 | 2 | attendance of literally hundreds, if not thousands of |
| 10:10:18 | 3 | autopsies of death investigative cases.  That's |
| 10:10:24 | 4 | basically the basis of -- of my knowledge is field |
| 10:10:29 | 5 | experience. |
| 10:10:31 | 6 | Q.    Okay.  By the way, do you know the date that |
| 10:10:37 | 7 | the photos reviewed were taken? |
| 10:10:40 | 8 | A.    Give me just a moment.  Let me find the photos |
| 10:10:43 | 9 | here, and I'll tell you in just a second here. |
| 10:12:39 | 10 | No, I do not have the dates the photographs |
| 10:12:40 | 11 | were taken. |
| 10:12:41 | 12 | Q.    You would agree with me that the passage of |
| 10:12:44 | 13 | time causes bruising to dissipate, correct? |
| 10:12:47 | 14 | MR. MORGAN:  Objection.  Form. |
| 10:12:47 | 15 | A.    The passage of time causes bruises to |
| 10:12:50 | 16 | dissipate? |
| 10:12:50 | 17 | BY MR. WIEST: |
| 10:12:50 | 18 | Q.    Dissipate, to heal. |
| 10:12:53 | 19 | MR. MORGAN:  Same objection. |
| 10:12:53 | 20 | A.    Not necessarily, no.  No.  The -- you're -- |
| 10:12:56 | 21 | I'm getting down to specifics now.  If you get struck by |
| 10:13:03 | 22 | a blunt force object, the bruising may not show up |
| 10:13:09 | 23 | immediately.  So with the passage of time, the |
| 10:13:10 | 24 | bruising -- the visible bruising becomes more |
| 10:13:13 | 25 | pronounced, more visible.  With an extended period of |

Page 57

10:13:17    1    time, that bruising now tends to go away.  So the answer

10:13:21    2    to your question is yes and no.

10:13:22    3    BY MR. WIEST:

10:13:22    4        Q.    Okay.

10:13:22    5        A.    It becomes more prominent with the certain

10:13:26    6    passage of time, and then it begins to fade with an

10:13:28    7    additional passage of time.

10:13:30    8        Q.    To appropriately draw a conclusion about the

10:13:33    9    photos in the case, one would have to understand when in

10:13:37    10   relation to this arrest and the use of an impact weapon

10:13:44    11   that occurred on March 28th, one would have to

10:13:47    12   understand when these photos were taken, wouldn't you?

10:13:50    13       A.    I would, yes.

10:13:51    14       Q.    And you don't know that today?

10:13:52    15       A.    I don't know -- I don't know the date that

10:13:53    16   they were taken.  I'm trying to recall.  It seems like

10:13:57    17   the photographs were taken by Mr. Hornback, and they

10:14:01    18   were taken within 24 -- excuse me -- either the next day

10:14:07    19   or the following day.  But I don't know exactly the

10:14:11    20   dates.  And I don't know whether that's just an

10:14:13    21   assumption on my part or whether that's an exact date as

10:14:18    22   to when he took the photographs or had the photographs

10:14:20    23   taken --

10:14:22    24       Q.    Okay.

10:14:23    25       A.    -- and turned into law enforcement.

Page 58

| | | |
|---|---|---|
| 10:14:25 | 1 | Q.   Okay.  And assuming that your assumption is |
| 10:14:32 | 2 | incorrect, that it wasn't the next day -- let me back up |
| 10:14:35 | 3 | a little bit. |
| 10:14:36 | 4 | You understood the interaction with Alex |
| 10:14:39 | 5 | Hornback on March 28th ended with his arrest, correct? |
| 10:14:43 | 6 | A.   Correct. |
| 10:14:43 | 7 | Q.   Was it your understanding that when you got -- |
| 10:14:46 | 8 | that these photos were not taken in the jail? |
| 10:14:49 | 9 | A.   I understand that, yes. |
| 10:14:50 | 10 | Q.   Okay.  And so the photos, we would have to |
| 10:14:53 | 11 | assume, occurred after the arrest and after his release, |
| 10:14:55 | 12 | correct? |
| 10:14:56 | 13 | A.   That's my assumption. |
| 10:14:57 | 14 | Q.   Okay.  But you don't know how far -- by the |
| 10:14:59 | 15 | way, do you know when he was released? |
| 10:15:05 | 16 | A.   I do, but I didn't commit it to memory.  His |
| 10:15:07 | 17 | arrest report would show the date of -- the date of the |
| 10:15:11 | 18 | arrest and the date of release, but I don't recall what |
| 10:15:14 | 19 | it was. |
| 10:15:15 | 20 | Q.   Do you -- |
| 10:15:15 | 21 | A.   I think it was the next day. |
| 10:15:16 | 22 | Q.   Do you remember the bench warrant that he was |
| 10:15:18 | 23 | served on had a 10-day-to-serve on it? |
| 10:15:22 | 24 | A.   Yes. |
| 10:15:22 | 25 | Q.   Do you have any reason to believe that he |

Page 59

| | | |
|---|---|---|
| 10:15:24 | 1 | didn't serve those 10 days? |
| 10:15:25 | 2 |     A.   Well, that's what I mean.  The -- the report |
| 10:15:27 | 3 | would have shown when he was released, but I don't know |
| 10:15:30 | 4 | when that was.  It was, I'm assuming to be 10 days, but |
| 10:15:33 | 5 | I don't know that. |
| 10:15:34 | 6 |     Q.   So assuming that the photos were 11 days |
| 10:15:37 | 7 | later, sir -- |
| 10:15:38 | 8 |     A.   Yes, sir. |
| 10:15:38 | 9 |     Q.   -- and we still see evidence of some bruising, |
| 10:15:41 | 10 | right? |
| 10:15:46 | 11 |     A.   I guess that's debatable. |
| 10:15:49 | 12 |     Q.   Okay.  Let's -- let's look at a photo, because |
| 10:15:51 | 13 | I think that would be helpful.  Actually, we're going to |
| 10:15:56 | 14 | look at a couple.  Let me pull this up. |
| 10:16:16 | 15 |     All right.  Are you saying that that's not |
| 10:16:21 | 16 | bruising on his leg right there? |
| 10:16:35 | 17 |     MR. MORGAN:  Are you using this for |
| 10:16:36 | 18 |     illustrative purposes, or are you going to enter it |
| 10:16:38 | 19 |     in the record? |
| 10:16:39 | 20 |     MR. WIEST:  I'm going to likely -- |
| 10:16:39 | 21 |     unfortunately, I'm going to have to mark it |
| 10:16:41 | 22 |     electronically with the court reporter after the |
| 10:16:44 | 23 |     fact. |
| 10:16:44 | 24 |     MR. MORGAN:  And then send -- okay.  Sure.  No |
| 10:16:44 | 25 |     problem.  Thank you. |

Page 60

| | | |
|---|---|---|
| 10:16:44 | 1 | MR. WIEST:  It's been produced in discovery, |
| 10:16:46 | 2 | though. |
| 10:16:47 | 3 | MR. MORGAN:  Oh, yeah, absolutely. |
| 10:16:51 | 4 | THE WITNESS:  It looks like a superficial |
| 10:16:54 | 5 | injury.  I can't tell just by looking at this |
| 10:16:57 | 6 | photograph whether or not it's bruising. |
| 10:17:01 | 7 | BY MR. WIEST: |
| 10:17:01 | 8 | Q.    Okay.  So assuming that we're 10 to 11 days |
| 10:17:12 | 9 | after the incident when this photo was taken, because |
| 10:17:15 | 10 | that's when he got out of jail and that's when he got |
| 10:17:17 | 11 | home for his parents to take the photos, do you know |
| 10:17:21 | 12 | whether or not the bruising would have been more |
| 10:17:23 | 13 | pronounced in the period -- in the days prior to this |
| 10:17:28 | 14 | photo? |
| 10:17:29 | 15 | A.    I would expect the bruising to be a little |
| 10:17:34 | 16 | more pronounced and a little more definitive, I guess is |
| 10:17:39 | 17 | the correct word.  In this particular photograph, and |
| 10:17:43 | 18 | I'm trying to look, and you tell me, is that the -- is |
| 10:17:49 | 19 | that his knee or just above his knee? |
| 10:17:52 | 20 | Q.    Sir, I will represent to you that it's his |
| 10:17:56 | 21 | right thigh. |
| 10:17:57 | 22 | A.    His right thigh.  It looks like the front to |
| 10:18:00 | 23 | me, instead of the back, and that's not where he was |
| 10:18:03 | 24 | struck. |
| 10:18:03 | 25 | Q.    Well, we're going to look at where he was |

Page 61

10:18:06    1    struck in a minute.

10:18:09    2        A.    In other words, that's the -- from what it

10:18:10    3    looks like in the position, it looks like he's laying

10:18:13    4    back, he's got his hands in this position, and he's got

10:18:16    5    his leg up, and it's -- it's the thigh area, but it's

10:18:20    6    the front portion of the leg.  And, like I said, that's

10:18:24    7    not where he was struck.  He was struck in the back of

10:18:27    8    the leg, the back thigh.

10:18:28    9        Q.    Okay.  So if -- if we look at the top of the

10:18:31    10   photo, if I tell you that that is the front, his front,

10:18:35    11   and if we go around to the back, that curved area,

10:18:38    12   that's his buttocks, right, on the bottom?

10:18:42    13           MR. MORGAN:  Oh, okay.

10:18:44    14           THE WITNESS:  I'm -- I'm -- I'm just not

10:18:45    15       seeing it.

10:18:46    16           MR. MORGAN:  It's an orientation issue.

10:18:48    17       Oriented, spin it 90 degrees to the right, he's

10:18:52    18       standing straight up and down.  That's where I got

10:18:55    19       confused.

10:18:55    20           THE WITNESS:  Oh, okay.  It looks to me like

10:18:57    21       he's laying down.

10:18:58    22           MR. MORGAN:  Is that the side of the thigh?

10:18:59    23       Is that what you're trying to get at?

10:18:59    24           MR. WIEST:  Yes.

10:18:59    25           MR. MORGAN:  I'm not trying to interrupt your

Page 62

| 10:19:00 | 1 | examination. |
| 10:19:01 | 2 | MR. WIEST:  No.  No, that's fine. |
| 10:19:01 | 3 | THE WITNESS:  Yeah.  Can you rotate it |
| 10:19:03 | 4 | 90 degrees to the right? |
| 10:19:04 | 5 | MR. MORGAN:  You might not be able to through |
| 10:19:07 | 6 | the share program. |
| 10:19:09 | 7 | MR. WIEST:  I don't know that I -- |
| 10:19:09 | 8 | MR. MORGAN:  Oh, yeah, you can. |
| 10:19:09 | 9 | MR. WIEST:  Yeah.  Yeah.  Yeah. |
| 10:19:09 | 10 | MR. MORGAN:  Cool. |
| 10:19:09 | 11 | MR. WIEST:  There we go. |
| 10:19:09 | 12 | THE WITNESS:  There we go. |
| 10:19:09 | 13 | MR. MORGAN:  Okay.  I get it now, yeah. |
| 10:19:09 | 14 | BY MR. WIEST: |
| 10:19:14 | 15 | Q.   Okay.  So assuming now we can kind of see the |
| 10:19:17 | 16 | orientation a little bit better -- |
| 10:19:19 | 17 | A.   Yes. |
| 10:19:19 | 18 | Q.   Okay. |
| 10:19:19 | 19 | A.   That -- that's toward the outer thigh. |
| 10:19:24 | 20 | Q.   Right. |
| 10:19:24 | 21 | A.   Yes.  Okay. |
| 10:19:26 | 22 | Q.   So if he is struck on the 28th and he is |
| 10:19:28 | 23 | released 11 days later when these photos are taken, you |
| 10:19:32 | 24 | talked about bruising, that -- that for a period of time |
| 10:19:34 | 25 | it will not appear, then it will become pronounced, and |

Page 63

| | | |
|---|---|---|
| 10:19:38 | 1 | then it will dissipate, right?  That's what you told me |
| 10:19:40 | 2 | a couple of minutes ago. |
| 10:19:42 | 3 |     A.    Correct. |
| 10:19:42 | 4 |     Q.    Generally speaking, with an impact -- and by |
| 10:19:44 | 5 | the way, you agree that a flashlight is an impact |
| 10:19:47 | 6 | weapon, right? |
| 10:19:48 | 7 |     A.    It is, and it can be used as an impact weapon, |
| 10:19:50 | 8 | yes. |
| 10:19:51 | 9 |     Q.    And it was in this case, correct? |
| 10:19:52 | 10 |     A.    Yes. |
| 10:19:52 | 11 |     Q.    Okay. |
| 10:19:55 | 12 |     A.    Excuse me. |
| 10:19:55 | 13 |     Q.    It's an intermediate weapon as well, right? |
| 10:19:59 | 14 |     A.    Yes. |
| 10:19:59 | 15 |     Q.    Okay.  Assuming that these photos were taken |
| 10:20:03 | 16 | on day 11 after his release from jail, when -- when |
| 10:20:10 | 17 | following the use of the impact weapon would the |
| 10:20:14 | 18 | bruising be most pronounced?  Just generally, if there's |
| 10:20:17 | 19 | a day range, you know, day three to four, whatever it |
| 10:20:19 | 20 | is. |
| 10:20:20 | 21 |     A.    Generally -- |
| 10:20:20 | 22 |         MR. MORGAN:  Form. |
| 10:20:20 | 23 |     Q.    Generally speaking, 24 to 36 hours. |
| 10:20:24 | 24 | BY MR. WIEST: |
| 10:20:24 | 25 |     Q.    Okay.  And then after that, it will begin to |

Page 64

| | | |
|---|---|---|
| 10:20:27 | 1 | dissipate? |
| 10:20:27 | 2 | A.   Yes. |
| 10:20:28 | 3 | Q.   Okay.  All right.  Let's -- okay.  All right. |
| 10:20:43 | 4 | And you -- I think you just told me you assumed, though, |
| 10:20:45 | 5 | that the photos were within 24 hours of the incident? |
| 10:20:51 | 6 | A.   No.  I told you I didn't know when they were |
| 10:20:53 | 7 | taken. |
| 10:20:54 | 8 | Q.   Okay.  You rendered an opinion on the use of |
| 10:21:00 | 9 | force based on those photos in part, correct? |
| 10:21:04 | 10 | A.   In part, yes. |
| 10:21:08 | 11 | Q.   Okay.  All right.  What -- have we talked |
| 10:21:16 | 12 | about all of the American Academy of Forensic Sciences |
| 10:21:21 | 13 | publications that -- that may have been relied on?  Is |
| 10:21:24 | 14 | it just the bruising profile, for lack of a better term? |
| 10:21:27 | 15 | A.   I think that's -- that probably covered it, |
| 10:21:29 | 16 | yes. |
| 10:21:33 | 17 | Q.   Okay.  IACP.  What policies of IACP did you |
| 10:21:36 | 18 | rely on in this matter? |
| 10:21:37 | 19 | A.   Use of -- use of force.  The -- generally |
| 10:21:43 | 20 | speaking, the -- the use of non-lethal impact weapons. |
| 10:21:53 | 21 | I think those are the only two I referenced in my |
| 10:21:56 | 22 | report. |
| 10:21:56 | 23 | Q.   Okay.  How about from National Sheriffs' |
| 10:21:57 | 24 | Association? |
| 10:22:00 | 25 | A.   The same thing. |

Page 65

| | | |
|---|---|---|
| 10:22:04 | 1 | Q. Use of force and use of non-lethal impact |
| 10:22:08 | 2 | weapons? |
| 10:22:08 | 3 | A. Yes. |
| 10:22:09 | 4 | Q. Anything else? |
| 10:22:12 | 5 | A. Not that I recall. It's listed in my report, |
| 10:22:17 | 6 | if you'll give me a moment. CALEA. |
| 10:22:21 | 7 | Q. Um-hum. |
| 10:22:35 | 8 | A. No. I believe that covers it. But you should |
| 10:22:40 | 9 | understand sometimes when I'm referring to National |
| 10:22:42 | 10 | Sheriffs' Association and IACP, I will lump those into |
| 10:22:47 | 11 | CALEA, the Commission on Accreditation for Law |
| 10:22:51 | 12 | Enforcement officers -- |
| 10:22:52 | 13 | Q. Okay. |
| 10:22:52 | 14 | A. -- because the IACP and NSA were the |
| 10:22:57 | 15 | contributors to CALEA that resulted in the policy being |
| 10:23:01 | 16 | written. Now, IACP puts out training guides, they put |
| 10:23:06 | 17 | out white papers, they put out actual recommended |
| 10:23:12 | 18 | policies and so forth. |
| 10:23:14 | 19 | The Sheriffs' Association doesn't put them out |
| 10:23:17 | 20 | in that form. They put it out in more of article |
| 10:23:23 | 21 | topics, I guess is the best way to describe it, but they |
| 10:23:28 | 22 | were the contributors to CALEA, which does put out the |
| 10:23:32 | 23 | policies or standards. So when I say that it was put |
| 10:23:36 | 24 | out by NSA, I may be referring to an article that's been |
| 10:23:44 | 25 | written by a member of NSA, I may be referring to |

Hornback vs. Czartorski                 William T. Gaut, PH. D.                  01/28/2022

Page 66

| 10:23:48 | 1 | research, or I may be referring to a policy that was |
| 10:23:51 | 2 | presented to CALEA, and then -- and then reduced to a |
| 10:23:54 | 3 | policy format. |
| 10:23:56 | 4 | Q.   Can you identify any specific policies?  I |
| 10:24:01 | 5 | mean, I am aware, for instance, of IACP.  IACP has put |
| 10:24:03 | 6 | out a consensus policy on the use of force, originally |
| 10:24:09 | 7 | in October of '17, it was revised in July of 2020.  I'm |
| 10:24:13 | 8 | aware of that. |
| 10:24:14 | 9 | A.   Yes. |
| 10:24:15 | 10 | Q.   In terms of the other organizations, are there |
| 10:24:19 | 11 | specific policies or papers that you have looked at in |
| 10:24:22 | 12 | formulating your opinions? |
| 10:24:23 | 13 | A.   Yes.  CALEA puts out a standard.  You can call |
| 10:24:28 | 14 | it a policy, but it is a use-of-force standard -- |
| 10:24:31 | 15 | Q.   Okay. |
| 10:24:31 | 16 | A.   -- which is written in, I guess, kind of |
| 10:24:34 | 17 | policy format.  But here again, CALEA doesn't call it a |
| 10:24:39 | 18 | policy. CALEA refers to it as a standard. |
| 10:24:44 | 19 | Q.   Okay.  What -- because I don't necessarily see |
| 10:24:47 | 20 | it in your report, and I don't see it attached to your |
| 10:24:50 | 21 | report, what specifically is that standard? |
| 10:24:55 | 22 | A.   I thought I referenced it in my report.  Hold |
| 10:25:00 | 23 | on just a moment.  Let me find it. |
| 10:25:53 | 24 | I'm sorry.  Without a computer, it takes me a |
| 10:25:56 | 25 | while to go through the hard copies. |

Page 67

10:26:30    1          I don't recall, as we sit here today, the --

10:26:31    2    the number of the standard, but there is a use-of-force

10:26:35    3    standard by CALEA in a policy format.  And I was sure I

10:26:45    4    referenced it in my report, but I may not have.

10:26:52    5          Q.   Okay.  Sir, I'm going to ask you -- if there

10:26:55    6    is a specific standard that you relied upon, I'm going

10:26:57    7    to ask that that be produced to us.  Yeah.  I think we

10:27:01    8    need to know what that is.  I mean, you said there was,

10:27:04    9    so I think we need to know -- I think we need to see it,

10:27:08   10    or we need the specific standard.

10:27:10   11          A.   Okay.  If you'll give me just a moment.

10:29:07   12          I don't see it specifically referenced, but

10:29:09   13    yes, I can provide you a copy of that.

10:29:13   14          Q.   Sitting here today, you don't know what the

10:29:15   15    specific standard is?

10:29:17   16          A.   I know the -- I think the standard is 3.1, as

10:29:20   17    I recall.  But as soon as I can access a flash drive to

10:29:23   18    a computer, I can literally show it to you or print it

10:29:27   19    out, as the case may be.  I carry all of my case files

10:29:31   20    on my flash drive.

10:29:32   21          Q.   Okay.  We may take a break for that purpose.

10:29:35   22          A.   Sure.

10:29:35   23          Q.   Because if you used it, I need to see it, and

10:29:37   24    we need to talk about it.

10:29:38   25          A.   Yes.

Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 68 of 235 PageID #: 1196

Hornback vs. Czartorski                    William T. Gaut, PH. D.                    01/28/2022

Page 68

10:29:41   1     Q.   Do you want to do that now?  I think I want to

10:29:42   2  see it.

10:29:42   3       Let me ask -- I just have a couple of

10:29:44   4  follow-up questions on the bruising just so we can close

10:29:45   5  that off.

10:29:47   6       Do you agree that some people bruise more

10:29:50   7  easily than others?

10:29:52   8         MR. MORGAN:  Form.

10:29:52   9     A.   In some cases, yes.

10:29:54  10  BY MR. WIEST:

10:29:54  11     Q.   Okay.  Do you agree that some people heal more

10:29:57  12  quickly than others?

10:29:57  13         MR. MORGAN:  Form.

10:29:57  14     A.   In some cases.

10:30:00  15  BY MR. WIEST:

         16     Q.   Okay.  Do you know anything about Alex

10:30:03  17  Hornback's medical conditions, medical history, medical

10:30:06  18  background to give you a basis as to how quickly he --

10:30:08  19  or, I'm sorry -- as to how easily he may bruise?

10:30:15  20     A.   I don't recall seeing any of that information,

10:30:18  21  but I wouldn't use that anyway, because that gets me

10:30:23  22  giving medical testimony, which I know I'm not going to

10:30:26  23  be allowed to do.

10:30:27  24     Q.   Okay.  And the same is true for the healing.

10:30:28  25  You've not seen anything in terms of his ability to heal

Page 69

| | | |
|---|---|---|
| 10:30:32 | 1 | from a medical record perspective that would allow you |
| 10:30:33 | 2 | to inform on that either? |
| 10:30:35 | 3 | A.    I don't think anything exists along that line. |
| 10:30:39 | 4 | I mean, you can -- you can examine a subject, obviously, |
| 10:30:41 | 5 | from a medical standpoint and determine whether or not |
| 10:30:44 | 6 | they have some sort of blood thinners, that sort of |
| 10:30:47 | 7 | thing, if they have capillary veins that are close to |
| 10:30:52 | 8 | the surface of the skin.  There's any number of reasons |
| 10:30:56 | 9 | why an individual might bruise more or less easy. |
| 10:31:00 | 10 | Use myself as an example, because of a heart |
| 10:31:03 | 11 | condition, I take an aspirin every day, and |
| 10:31:07 | 12 | consequently, I have a tendency to bruise fairly easily. |
| 10:31:11 | 13 | But I don't know that there's a -- I don't know that |
| 10:31:12 | 14 | there's any standard out there on how long it takes |
| 10:31:16 | 15 | somebody to heal. |
| 10:31:17 | 16 | Q.    Okay.  Let me ask you, you indicated the |
| 10:31:19 | 17 | bruising is most pronounced in the 24- to 36-hour |
| 10:31:23 | 18 | period, correct? |
| 10:31:23 | 19 | A.    That's -- that's been my experience, yes. |
| 10:31:26 | 20 | Q.    And if one were to conduct an appropriate |
| 10:31:28 | 21 | use-of-force investigation, you would want to look at |
| 10:31:32 | 22 | the person who the force was used on probably sometime |
| 10:31:35 | 23 | in that period, right, if you were going to investigate |
| 10:31:37 | 24 | it forensically? |
| 10:31:39 | 25 | MR. MORGAN:  Form. |

Page 70

| | | |
|---|---|---|
| 10:31:40 | 1 | A.    It depends on -- it depends on how I'm |
| 10:31:43 | 2 | analyzing the case.  I probably -- and did not do it in |
| 10:31:48 | 3 | this case -- I mean, there's no question that he was |
| 10:31:50 | 4 | struck.  He was subjected to blunt force injury. |
| 10:31:54 | 5 | BY MR. WIEST: |
| 10:31:55 | 6 | Q.    Right. |
| 10:31:56 | 7 | A.    So I don't -- I don't know exactly how to |
| 10:31:59 | 8 | explain it.  There would -- there would be no real need |
| 10:32:01 | 9 | for me to go in and look at it from a medical |
| 10:32:03 | 10 | standpoint, as far as the degree of bruising and that |
| 10:32:06 | 11 | sort of thing.  Other than the fact that the photographs |
| 10:32:10 | 12 | that I was provided with did not show any significant |
| 10:32:14 | 13 | bruising, and I -- as I recall, I commented on that in |
| 10:32:18 | 14 | my report. |
| 10:32:19 | 15 | Q.    You did, yeah. |
| 10:32:19 | 16 | A.    But I don't know that I would have done a |
| 10:32:23 | 17 | bruising study on him, because, you know, maybe if -- if |
| 10:32:26 | 18 | he was saying that he was struck with a blunt force |
| 10:32:29 | 19 | object, and the officer was saying, I never did hit him |
| 10:32:33 | 20 | with a blunt force object, then I would look and see |
| 10:32:36 | 21 | whether or not there was forensic evidence to support |
| 10:32:39 | 22 | one or the other statement.  But in this case, we have a |
| 10:32:42 | 23 | video.  I mean, there's no question that he was struck. |
| 10:32:45 | 24 | Q.    Well, the officer did say he didn't strike |
| 10:32:47 | 25 | him. |

Page 71

| 10:32:48 | 1 | A.    Well, I know he did, but the video -- in this |

10:32:48    1    A.    Well, I know he did, but the video -- in this

10:32:50    2    case, the video forensic evidence outweighs any

10:32:53    3    statements by anybody.

10:32:54    4    Q.    I agree with you.  Let me -- let me back --

10:32:56    5    let me back up a little bit.

10:32:59    6          If I wanted to know how hard Alex Hornback was

10:33:03    7    hit by Trooper Czartorski, one of the pieces of forensic

10:33:08    8    evidence that I would want to look at would be

10:33:11    9    photographic evidence that would follow the use of that

10:33:14    10   force, correct?

10:33:14    11   A.    Correct.

10:33:15    12   Q.    And from what you just told me, the best time

10:33:18    13   to take those photos to get the best picture would be

10:33:21    14   within 24 to 36 hours, right?

10:33:22    15   A.    Typically, yes.

10:33:24    16   Q.    Are you aware that Trooper Czartorski failed

10:33:28    17   to comply with KSP policy in terms of reporting the use

10:33:32    18   of force in this case?

10:33:35    19   MR. MORGAN:  Objection.  Form.

10:33:35    20   A.    I am, yes.

10:33:36    21   BY MR. WIEST:

10:33:36    22   Q.    And so the reason we don't have the very

10:33:39    23   photographs that you claim we need is because Trooper

10:33:41    24   Czartorski didn't report the use of the impact weapon in

10:33:44    25   this case?

Page 72

| | | |
|---|---|---|
| 10:33:44 | 1 | MR. MORGAN: Objection. Form. |
| 10:33:45 | 2 | A. I don't know that I could -- again, that's -- |
| 10:33:47 | 3 | I have a tendency not to adhere to broad-based |
| 10:33:51 | 4 | statements. Your question assumes that everybody who is |
| 10:33:56 | 5 | subjected to a blunt force injury from a police officer, |
| 10:33:58 | 6 | 24 to 36 hours later somebody comes in and takes |
| 10:34:03 | 7 | pictures the injury, and that's not necessarily the |
| 10:34:06 | 8 | case. There's -- I guess there are some departments out |
| 10:34:10 | 9 | there that do that during the course of an |
| 10:34:12 | 10 | investigation, but there's probably thousands of police |
| 10:34:17 | 11 | agencies out there that don't do that. |
| 10:34:19 | 12 | BY MR. WIEST: |
| 10:34:20 | 13 | Q. Do you know whether or not KSP does that? |
| 10:34:24 | 14 | A. Not to my -- I mean, I don't -- to my |
| 10:34:25 | 15 | knowledge, I don't think they do. |
| 10:34:26 | 16 | Q. Okay. You don't know if they take photos |
| 10:34:26 | 17 | following a use-of-force incident? |
| 10:34:30 | 18 | A. I don't know that they come back and take |
| 10:34:32 | 19 | photographs of injuries or alleged injuries 24 to 36 |
| 10:34:34 | 20 | hours after an injury has -- has allegedly occurred. |
| 10:34:39 | 21 | Q. And assuming that they do, they would not have |
| 10:34:42 | 22 | been able to do that here, because Trooper Czartorski |
| 10:34:45 | 23 | did not report the use of force? |
| 10:34:47 | 24 | A. If they did under the theoretical -- under the |
| 10:34:49 | 25 | hypothetical that you've given me, that would be |

Page 73

| | | |
|---|---|---|
| 10:34:53 | 1 | correct. |
| 10:34:53 | 2 | MR. MORGAN:  Objection to form. |
| 10:34:54 | 3 | BY MR. WIEST: |
| 10:34:54 | 4 | Q.   Are you aware of whether or not KSP -- of the |
| 10:35:04 | 5 | purpose of KSP requiring use-of-force reports? |
| 10:35:10 | 6 | A.   I am, yes. |
| 10:35:12 | 7 | Q.   Why would a police agency require the |
| 10:35:16 | 8 | reporting of the use of force? |
| 10:35:17 | 9 | A.   To look at -- to evaluate the use of force and |
| 10:35:20 | 10 | determine whether or not it was or was not within policy |
| 10:35:24 | 11 | of the particular agency, in this case, KSP. |
| 10:35:28 | 12 | Q.   Okay.  Okay.  One of the things you say in |
| 10:35:38 | 13 | your report -- I'm on Page 5 again, sir -- is you say, |
| 10:35:46 | 14 | Law enforcement procedural standards written and |
| 10:35:50 | 15 | promoted after 2018 were not considered in that law |
| 10:35:53 | 16 | enforcement troopers could not reasonably be expected to |
| 10:35:56 | 17 | adhere to standards not yet in effect at the time of |
| 10:36:00 | 18 | this case.  Do you see that? |
| 10:36:01 | 19 | A.   Yes. |
| 10:36:02 | 20 | Q.   The time of this incident that you corrected |
| 10:36:04 | 21 | me on, and you were absolutely right to do so, was March |
| 10:36:07 | 22 | 28th, 2020, correct? |
| 10:36:09 | 23 | A.   Correct. |
| 10:36:09 | 24 | Q.   So why would it not be appropriate to look at |
| 10:36:13 | 25 | policies in '29 (sic) and 2020 up to the date of this |

Page 74

10:36:18    1    incident?

10:36:19    2                MR. MORGAN:  2019.  You said '29.

10:36:20    3                MR. WIEST:  I'm sorry.  2019.

10:36:23    4                THE WITNESS:  2019.

10:36:23    5    BY MR. WIEST:

10:36:23    6        Q.   Yes, '2019 and early 2020.

10:36:26    7        A.    It -- it -- it would be.  I'm trying to look

10:36:37    8    at why I put 2018 in there.  It's just a mistake on my

10:36:45    9    part.  It should -- it should say after the date of this

10:36:47   10    incident, March 28 of 2020.

10:36:51   11        Q.   Okay.  But the report does say that you did

10:36:52   12    not consider any policies after 2018?

10:36:55   13        A.   That's correct.

10:36:55   14        Q.   Okay.  So is your report wrong, or did you

10:37:00   15    look at policies after 2018?

10:37:04   16        A.   No.  The report's wrong.  It should say 2020.

10:37:10   17        Q.   Okay.  Are there any other -- let me back up.

10:37:15   18                Prior to testifying today, did you have the

10:37:18   19    opportunity to review your report?

10:37:20   20        A.   Did I have an opportunity to review --

10:37:23   21        Q.   Your report?

10:37:24   22        A.   Yes.

10:37:24   23        Q.   Did you go through your report page by page --

10:37:29   24        A.   I did.

10:37:29   25        Q.    -- prior to testifying?

Hornback vs. Czartorski                William T. Gaut, PH. D.                01/28/2022

Page 75

| | | |
|---|---|---|
| 10:37:30 | 1 | A.    I did. |
| 10:37:31 | 2 | Q.    Are there any other mistakes in your report |
| 10:37:35 | 3 | other than the 2018 should be 2020 that you can identify |
| 10:37:40 | 4 | for me right now? |
| 10:37:42 | 5 | A.    None that I recall, other than the disk that I |
| 10:37:46 | 6 | provided you about the CMS policies. |
| 10:37:50 | 7 | Q.    Okay.  Sir, if you can look just real quick on |
| 10:38:07 | 8 | Page 26, you end your report with a statement.  And -- |
| 10:38:20 | 9 | A.    Yes. |
| 10:38:20 | 10 | Q.    And you say, Under penalty of law, I certify |
| 10:38:23 | 11 | that the statements and information contained in this |
| 10:38:25 | 12 | report are true and correct. |
| 10:38:27 | 13 | A.    Correct. |
| 10:38:27 | 14 | Q.    Okay.  So we know at least that that's not |
| 10:38:29 | 15 | correct when it comes to the 2018 issue, right? |
| 10:38:33 | 16 | A.    That's correct. |
| 10:38:36 | 17 | Q.    Okay.  You indicated that you considered |
| 10:38:38 | 18 | standards set by the United States Supreme Court.  Do |
| 10:38:40 | 19 | you see that?  That's also on Page 5.  I'm still on Page |
| 10:38:43 | 20 | 5. |
| 10:38:45 | 21 | A.    I believe I did, yes. |
| 10:38:47 | 22 | Q.    Okay.  What standards set by the United States |
| 10:38:49 | 23 | Supreme Court?  I do know you cite the Graham case, and |
| 10:38:52 | 24 | so I'll give you that one. |
| 10:38:54 | 25 | A.    Um-hum. |

Page 76

| | | |
|---|---|---|
| 10:38:54 | 1 | Q.    Other than the Graham case, can you identify |
| 10:38:56 | 2 | other standards? |
| 10:40:29 | 3 | A.    I referred to -- I'm trying to find it here. |
| 10:40:37 | 4 | Q.    And I know you -- and, again, I know you |
| 10:40:38 | 5 | referred to Graham on, I think it was Page 23, and I |
| 10:40:43 | 6 | acknowledge that. |
| 10:40:44 | 7 | A.    22, there's also a footnote of Schulz v. Long |
| 10:40:48 | 8 | in the Eighth Circuit.  I'm trying to find out where I |
| 10:40:52 | 9 | footnoted here.  I mean, I know where the footnote is, |
| 10:40:55 | 10 | but I'm trying to find where 23 is.  Hold on.  Just a |
| 10:40:58 | 11 | moment. |
| 10:41:01 | 12 | Q.    Your footnote 23 is on Page 22. |
| 10:41:04 | 13 | A.    I think it is, but I'm trying to find where it |
| 10:41:07 | 14 | is in the -- in my narrative. |
| 10:41:14 | 15 | Here we go.  Yeah, that -- well, that came out |
| 10:41:19 | 16 | of the Graham decision. |
| 10:41:23 | 17 | Q.    Okay. |
| 10:41:23 | 18 | A.    The quoted paragraph there ends in, Only act |
| 10:41:26 | 19 | within the range of conduct we identify as reasonable, |
| 10:41:30 | 20 | and that particular statement came from the Schulz v. |
| 10:41:33 | 21 | Long case, Eighth Circuit. |
| 10:41:36 | 22 | Q.    Are you aware that this case has been filed in |
| 10:41:38 | 23 | the Western District of Kentucky? |
| 10:41:42 | 24 | A.    Yes. |
| 10:41:43 | 25 | Q.    Are you aware that the Eighth Circuit is not |

Page 77

| | | |
|---|---|---|
| 10:41:46 | 1 | binding authority on the Western District of Kentucky? |
| 10:41:50 | 2 | MR. MORGAN:  Objection.  Form. |
| 10:41:51 | 3 | A.   No. |
| 10:41:51 | 4 | MR. MORGAN:  Calls for a legal conclusion. |
| 10:41:52 | 5 | BY MR. WIEST: |
| 10:41:55 | 6 | Q.   Okay.  Do you know what Circuit Court of |
| 10:41:58 | 7 | Appeals provides the binding authority for the Western |
| 10:42:01 | 8 | District of Kentucky? |
| 10:42:03 | 9 | MR. MORGAN:  Same objection. |
| 10:42:03 | 10 | A.   No.  I'm -- I'm not an attorney, but in my |
| 10:42:06 | 11 | experience, when court cases come out, if they come out |
| 10:42:09 | 12 | in the Eighth Circuit or Eleventh Circuit, or whatever |
| 10:42:13 | 13 | they come out in, they may or not -- may or may not be |
| 10:42:15 | 14 | binding strictly to that circuit.  I mean, you know, |
| 10:42:18 | 15 | Miranda came out and it came out of a particular |
| 10:42:22 | 16 | circuit, for instance, but it was binding on the entire |
| 10:42:25 | 17 | United States. |
| 10:42:25 | 18 | BY MR. WIEST: |
| 10:42:26 | 19 | Q.   Well, that was because the United States |
| 10:42:28 | 20 | Supreme Court ultimately decided -- |
| 10:42:31 | 21 | A.   United States Supreme Court, too, but it came |
| 10:42:34 | 22 | out as a -- in a district court ruling as well.  So |
| 10:42:36 | 23 | there are cases that are applicable to strictly the |
| 10:42:40 | 24 | district they come out in, and there are other cases |
| 10:42:42 | 25 | that are applicable basically nationwide. |

Page 78

| | | |
|---|---|---|
| 10:42:46 | 1 | Q.    And that's your understanding and some of the |
| 10:42:49 | 2 | basis for preparing your report and your opinions? |
| 10:42:52 | 3 | A.    That's -- that's my understanding.  For |
| 10:42:53 | 4 | instance, to my knowledge and my experience, virtually |
| 10:42:57 | 5 | everybody follows the Graham rule. |
| 10:42:59 | 6 | Q.    Right.  And I'll represent I -- we -- we have |
| 10:43:00 | 7 | no dispute about that, sir.  That's a U.S. Supreme Court |
| 10:43:03 | 8 | case. |
| 10:43:03 | 9 | A.    Sure. |
| 10:43:03 | 10 | Q.    And we're going to talk about Graham and its |
| 10:43:05 | 11 | application in this case later this morning. |
| 10:43:11 | 12 | Were there any other Supreme Court cases other |
| 10:43:13 | 13 | than Graham that you've looked at in formulating your |
| 10:43:16 | 14 | opinions? |
| 10:43:16 | 15 | A.    Not that I recall. |
| 10:43:17 | 16 | Q.    Okay.  Are there any -- is there any other |
| 10:43:19 | 17 | case law other than Graham and Schulz versus Long that |
| 10:43:23 | 18 | you've used to help formulate your opinions? |
| 10:43:54 | 19 | A.    I guess, technically speaking -- I say |
| 10:43:57 | 20 | technically -- yes, I referred to other case law.  I |
| 10:44:01 | 21 | don't cite the particular case.  If you look on Page 18, |
| 10:44:06 | 22 | there's a footnote about Constitutional Law, and I'm |
| 10:44:09 | 23 | sure that the Constitutional Law book references a |
| 10:44:14 | 24 | particular case.  But I didn't put that reference in.  I |
| 10:44:17 | 25 | just put the reference for the -- for the textbook. |

Page 79

| 10:44:20 | 1 | Q.   Okay.  And that was Constitutional Law by |
|---|---|---|

10:44:20    1        Q.   Okay.  And that was Constitutional Law by

10:44:23    2    Jacqueline R. Kanovitz --

10:44:23    3        A.   Correct.

10:44:23    4        Q.   -- Twelfth Edition, and it's 2010?

10:44:28    5        A.   Yes.

10:44:28    6        Q.   Okay.  Have you reviewed anything more recent?

10:44:34    7        A.   I'm sure I've looked at more recent decisions,

10:44:36    8    but I can't recall any, as we sit here today, that --

10:44:39    9    that I've reviewed that were specifically applicable to

10:44:42    10   this case.

10:44:44    11       Q.   Okay.  And that would -- that would include --

10:44:46    12   you've not, for instance, done any specific research in

10:44:51    13   formulating your opinions into Court of Appeals

10:44:54    14   decisions from the United States Court of Appeals for

10:44:57    15   the Sixth Circuit, correct?

10:45:00    16       A.   No.

10:45:00    17       Q.   Okay.

10:45:00    18       A.   But here again, that -- that gets me into

10:45:03    19   providing legal opinions, which I know are not going to

10:45:05    20   be allowed, so...

10:45:07    21       Q.   Okay.  You said you utilized standards by the

10:45:11    22   State of Kentucky Law Enforcement Council.  It's on the

10:45:15    23   bottom of 5 into Page 6.  What specific standards from

10:45:18    24   the State of Kentucky Law Enforcement Council did you

10:45:23    25   utilize?

Page 80

| | | |
|---|---|---|
| 10:45:28 | 1 | A.    It's listed in my report, and I'm trying to |
| 10:45:32 | 2 | find it now.  I've footnoted it. |
| 10:46:08 | 3 | I can't tell you the specific standard that I |
| 10:46:10 | 4 | referred to.  I know that there are hiring standards and |
| 10:46:15 | 5 | so forth that are put out by the State of Kentucky, |
| 10:46:18 | 6 | there are retention standards that are put out.  I just |
| 10:46:21 | 7 | -- I don't know the name of the standard, per se. |
| 10:46:24 | 8 | Q.    Okay. |
| 10:46:24 | 9 | A.    But I -- but I researched that and I used that |
| 10:46:28 | 10 | information in constructing my report. |
| 10:46:31 | 11 | Q.    Did you -- as you were researching it, did you |
| 10:46:34 | 12 | maintain an online file of it?  Did you save it, print |
| 10:46:38 | 13 | it, keep it anywhere? |
| 10:46:42 | 14 | A.    No. |
| 10:46:43 | 15 | Q.    Okay.  You indicate that you looked at |
| 10:46:45 | 16 | textbooks typically used to train law enforcement |
| 10:46:48 | 17 | detectives during the rel -- the time period relevant to |
| 10:46:50 | 18 | this case.  Do you see that on Page 6? |
| 10:46:53 | 19 | A.    I do, yes. |
| 10:46:54 | 20 | Q.    What textbooks did you utilize or refer to |
| 10:46:57 | 21 | that were typically used to train law enforcement |
| 10:47:03 | 22 | detectives? |
| 10:47:03 | 23 | A.    There are basically two.  One is called |
| 10:47:03 | 24 | Fundamentals of Criminal Investigation. |
| 10:47:08 | 25 | Q.    Okay. |

Page 81

| | | |
|---|---|---|
| 10:47:08 | 1 | A.    And the other is Fundamentals of Homicide |
| 10:47:13 | 2 | Investigation.  Homicide investigation textbook, |
| 10:47:15 | 3 | although it's entitled as a homicide textbook, it |
| 10:47:20 | 4 | deals -- it deals with assaults, it deals with rapes, it |
| 10:47:25 | 5 | deals with lots of elements outside the specific field |
| 10:47:27 | 6 | of homicide, but homicide is its primary focus. |
| 10:47:32 | 7 | Q.    And do you know who the author is of those |
| 10:47:35 | 8 | particular books? |
| 10:47:39 | 9 | A.    Not from memory, no. |
| 10:47:42 | 10 | Q.    Okay. |
| 10:47:42 | 11 | A.    There's -- like I say, I know that the title |
| 10:47:43 | 12 | of the book is Fundamentals of Criminal Investigation, |
| 10:47:46 | 13 | because I used to teach that course in college.  And I |
| 10:47:49 | 14 | know that the Homicide Investigation is a textbook, |
| 10:47:52 | 15 | because I taught that course in college.  But I can't |
| 10:47:55 | 16 | recall the authors' names. |
| 10:47:57 | 17 | Q.    Do you know what version of those particular |
| 10:48:00 | 18 | books you're referring to in particular? |
| 10:48:04 | 19 | A.    Not without going to my library and pulling |
| 10:48:06 | 20 | the book out. |
| 10:48:07 | 21 | Q.    Okay.  Do you know the date of publication of |
| 10:48:13 | 22 | these particular books? |
| 10:48:17 | 23 | A.    No.  I use the most recent data publications, |
| 10:48:20 | 24 | because they all have updated versions.  Fundamentals of |
| 10:48:25 | 25 | Criminal Investigation, I think they have a 1997, 2006, |

Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 82 of 235 PageID #: 1210

Hornback vs. Czartorski                    William T. Gaut, PH. D.                    01/28/2022

Page 82

10:48:29    1    2012, 2018.  I used the one that was most relevant in

10:48:38    2    time.

10:48:39    3         Q.    Okay.  What particularly did you use from

10:48:41    4    those books to help formulate your opinions?

10:48:45    5         A.    The aspects of arrest procedures, service of

10:48:56    6    warrant procedures, the -- the use of physical force,

10:49:02    7    interrogation, interview techniques.  Both of the

10:49:07    8    textbooks cover a range of investigative practices and

10:49:14    9    field practices by uniformed patrol officers.

10:49:20    10        Q.    Okay.  Do you agree that notwithstanding any

10:49:22    11   particular textbook, international standard, or anything

10:49:26    12   like that, that officers have a basic obligation to

10:49:30    13   comply with constitutional standards?

10:49:32    14        A.    I would agree.

10:49:34    15        Q.    And that in part, those constitutional

10:49:35    16   standards are set forth by case law in the relevant

10:49:40    17   circuit that establishes clearly established rights for

10:49:44    18   people?

10:49:44    19        A.    That's my understanding, yes.

10:49:46    20        Q.    Okay.  But you've not done any research as to

10:49:49    21   what those particular standards are for this case in

10:49:52    22   this circuit in terms of Sixth Circuit research,

10:49:55    23   correct?

10:49:57    24        A.    Correct.  I haven't done research specific to

10:49:59    25   the Fifth Circuit.

Page 83

| Time | Line | |
|---|---|---|
| 10:50:00 | 1 | Q.    The Sixth Circuit. |
| 10:50:01 | 2 | A.    The Sixth Circuit.  I'm sorry. |
| 10:50:05 | 3 | Q.    Yes, sir. |
| 10:50:05 | 4 | A.    Sixth Circuit specific decisions. |
| 10:50:05 | 5 | Q.    Okay.  Sir, you render some -- some |
| 10:50:09 | 6 | training -- you indicate that you've got some opinions |
| 10:50:12 | 7 | about training standards there on Page 6. |
| 10:50:18 | 8 | A.    Yes. |
| 10:50:18 | 9 | Q.    You say, Pertaining to my opinions about |
| 10:50:20 | 10 | training standards.  And one of the things that struck |
| 10:50:23 | 11 | me, and I wanted to have a conversation with you about |
| 10:50:25 | 12 | it this morning, I am not aware of a single allegation |
| 10:50:31 | 13 | in this case that involves a failure to train, a Monell |
| 10:50:37 | 14 | claim, if you're familiar with that, you know, nobody is |
| 10:50:41 | 15 | alleging that there's a pattern and practice with |
| 10:50:45 | 16 | respect to a failure to train in this case, and I'm just |
| 10:50:49 | 17 | wondering why -- why you got into the training |
| 10:50:57 | 18 | standards. |
| 10:50:57 | 19 | A.    Hang on just a moment. |
| 10:51:57 | 20 | I got into it after reading the Complaint and |
| 10:52:00 | 21 | reading the case documents, and there was information, |
| 10:52:06 | 22 | at least I interpreted the information to have something |
| 10:52:11 | 23 | to do with the fact that Officer Czartorski did or did |
| 10:52:21 | 24 | not receive training pertaining to the use of impact |
| 10:52:27 | 25 | weapons or using an alternate impact weapon such as a |

Page 84

10:52:31   1   flashlight.  And from that point, that would imply that

10:52:36   2   he was either improperly trained or he was not following

10:52:40   3   the training guidelines that were administered.  And so

10:52:44   4   I thought it prudent to talk about the hiring, training,

10:52:48   5   and supervision guidelines.  And so that's why I put it

10:52:52   6   in the report.

10:52:53   7        Q.   Okay.  And so you have rendered some opinions

10:52:58   8   -- did -- by the way, did Mr. Morgan ask you to render

10:53:03   9   any opinions about training standards?

10:53:06   10       A.   He didn't ask me to render opinions one way or

10:53:08   11   the other, I mean, other than the fact that he asked me

10:53:11   12   to analyze the case --

10:53:12   13       Q.   Okay.

10:53:12   14       A.   -- and render my opinion to -- pertaining to

10:53:16   15   Officer Czartorski as far as his use of force, and

10:53:22   16   whether or not it was or was not -- was or was not

10:53:26   17   within the standards.  He didn't, and I don't allow

10:53:32   18   attorneys to suggest that I write a report a particular

10:53:37   19   way or include or not include certain aspects of the

10:53:40   20   information.

10:53:42   21       Q.   So I'm not suggesting that he told you to come

10:53:45   22   out a certain way.  I'm just suggesting that what he

10:53:48   23   said to you is, Hey, can you tell me whether or not the

10:53:50   24   training standards were up to snuff or not.  And if he

10:53:53   25   asked you to do that, then, obviously, you know, you

Page 85

| | | |
|---|---|---|
| 10:53:55 | 1 | would do that.  And if he didn't ask you to do it, then |
| 10:53:58 | 2 | you went and you did it on your own.  And I'm just |
| 10:53:59 | 3 | trying to figure out which of those is the case. |
| 10:54:01 | 4 | A.    Probably more of I did it on my own -- |
| 10:54:04 | 5 | Q.    Okay. |
| 10:54:04 | 6 | A.    -- after reading the documents and reading the |
| 10:54:06 | 7 | case documents and the Complaint and so forth. |
| 10:54:09 | 8 | Q.    Okay.  You render an opinion that the hiring |
| 10:54:13 | 9 | and training of Trooper Czartorski was appropriate, |
| 10:54:17 | 10 | right? |
| 10:54:17 | 11 | A.    Yes. |
| 10:54:17 | 12 | Q.    And you render an opinion that his supervision |
| 10:54:20 | 13 | was appropriate as well, right? |
| 10:54:22 | 14 | A.    I do. |
| 10:54:23 | 15 | Q.    You told me maybe, I don't know, it was |
| 10:54:25 | 16 | probably about an hour ago, that it was not relevant to |
| 10:54:28 | 17 | look at the two prior use-of-force incidents in the |
| 10:54:32 | 18 | month prior to this particular incident involving this |
| 10:54:36 | 19 | same trooper, right? |
| 10:54:37 | 20 | A.    I did. |
| 10:54:38 | 21 | Q.    Can you tell me how you can render an opinion |
| 10:54:41 | 22 | about whether or not supervision is appropriate without |
| 10:54:43 | 23 | looking at KSP's response to two prior use-of-force |
| 10:54:47 | 24 | incidents? |
| 10:54:48 | 25 | A.    I didn't do that.  I -- I looked at the two |

Page 86

| | |
|---|---|
| 10:54:51 | 1 | prior incidents. I saw that they were supervised, that |
| 10:54:57 | 2 | there was an investigation, there was resulting |
| 10:55:02 | 3 | corrective action taken. That indicates to me that he |
| 10:55:07 | 4 | was, in fact, being supervised as indicated by the |
| 10:55:11 | 5 | investigative process that followed the complaints. And |
| 10:55:15 | 6 | the investigative process that followed this particular |
| 10:55:18 | 7 | case after it came to light that -- that the officer had |
| 10:55:22 | 8 | been less than truthful in his testimony. |
| 10:55:26 | 9 | Q.   Okay.  But you did not review the two prior -- |
| 10:55:30 | 10 | the two prior videos for whether or not those were use |
| 10:55:35 | 11 | of force or not, whether or not KSP got it right, for |
| 10:55:39 | 12 | lack of a better term? |
| 10:55:41 | 13 | MR. MORGAN:  Form. |
| 10:55:42 | 14 | A.   I don't recall looking at those videos.  I -- |
| 10:55:44 | 15 | I recall looking at the narratives, the investigative |
| 10:55:48 | 16 | reports performed by the internal affairs division, |
| 10:55:53 | 17 | et cetera. |
| 10:55:54 | 18 | BY MR. WIEST: |
| 10:55:54 | 19 | Q.   Is there -- you just told me a couple of |
| 10:55:57 | 20 | minutes ago that the -- that the video is the very best |
| 10:56:01 | 21 | evidence that we have when we have video available, |
| 10:56:03 | 22 | right? |
| 10:56:04 | 23 | A.   No, I didn't say that. |
| 10:56:05 | 24 | Q.   Well, we talked about it.  The officers in |
| 10:56:07 | 25 | this case said they did not use force.  My client said |

Page 87

10:56:11   1   they did.  And we have a video, right?  And you said,

10:56:13   2   Well, I look at the video then, because that's the best

10:56:16   3   evidence.  That was the testimony you gave me maybe, I

10:56:18   4   don't know, 20, 30 minutes ago.

10:56:20   5        A.   And in that vein that you're asking the

10:56:21   6   question, yes, that's true.  I looked -- I looked at the

10:56:25   7   statements, the original statements by the victim and

10:56:29   8   the victim's parents, the two witnesses, and the other

10:56:33   9   officers' statements.  And there was a conflict.  One

10:56:38   10  saying, yes, there was a blunt force strike, and Officer

10:56:43   11  Czartorski saying that, no, he did not.  And rather than

10:56:47   12  putting any sort of credibility on who to believe, what

10:56:49   13  I did is what I usually do, is to go back and see

10:56:52   14  whether or not there is actual forensic evidence,

10:56:55   15  physical evidence in some cases that corroborates or

10:56:59   16  refutes one statement or the other.

10:57:02   17            And in this case, that evidence was, in fact,

10:57:04   18  a video that showed in no uncertain terms that the

10:57:08   19  officer did, in fact, use a blunt force intermediate

10:57:12   20  weapon and did, in fact, strike Mr. Hornback.  So it

10:57:16   21  doesn't really matter who said what.  The best evidence

10:57:19   22  in that particular question was the video.

10:57:22   23       Q.   But the best evidence in terms of whether or

10:57:24   24  not the supervision was appropriate on these prior

10:57:26   25  use-of-force incidents, the videos of those incidents,

Hornback vs. Czartorski                 William T. Gaut, PH. D.                    01/28/2022

Page 88

| 10:57:30 | 1 | that's not relevant? |
| 10:57:32 | 2 | MR. MORGAN:  Form. |
| 10:57:32 | 3 | A.   No, it's relevant. |
| 10:57:33 | 4 | BY MR. WIEST: |
| 10:57:33 | 5 | Q.   But you didn't ask for it? |
| 10:57:35 | 6 | A.   Well, I already knew it.  I knew -- I saw the |
| 10:57:37 | 7 | follow-up.  I saw the investigative reports.  I saw the |
| 10:57:40 | 8 | IAD disciplinary reports that followed it.  And then, as |
| 10:57:46 | 9 | I said in my report, I know that there is supervision |
| 10:57:49 | 10 | because I have handled cases at Kentucky State Police |
| 10:57:57 | 11 | where I know from prior cases that like all law |
| 10:58:04 | 12 | enforcement agencies, when a police officer takes a |
| 10:58:07 | 13 | lawful action on the street, that, generally speaking, |
| 10:58:10 | 14 | there is a report written, an incident report.  And that |
| 10:58:15 | 15 | incident report then goes up and is -- goes up to the |
| 10:58:17 | 16 | first line supervisor, i.e., a sergeant who approves or |
| 10:58:23 | 17 | disapproves, and then it goes to a lieutenant who |
| 10:58:25 | 18 | approves or disapproves.  And then it goes up the chain |
| 10:58:29 | 19 | of command until it finally works its way into the -- |
| 10:58:32 | 20 | into the records, files.  That tells me that the -- that |
| 10:58:35 | 21 | the actions of its police officers are, in fact, being |
| 10:58:39 | 22 | supervised. |
| 10:58:40 | 23 | Q.   Wouldn't you have to see the two prior videos |
| 10:58:42 | 24 | to understand whether or not the amount of discipline, |
| 10:58:45 | 25 | the timing of the investigation, et cetera, was |

Page 89

| | | |
|---|---|---|
| 10:58:47 | 1 | appropriate?  Wouldn't you actually have to see the |
| 10:58:50 | 2 | underlying incidents of those two prior use-of-force |
| 10:58:50 | 3 | incidents? |
| 10:58:53 | 4 | MR. MORGAN:  Form. |
| 10:58:53 | 5 | A.  No, I wouldn't have to see the videos.  I've |
| 10:58:55 | 6 | got -- I've got the written reports, I've got the |
| 10:58:59 | 7 | standards, I've got the statements.  I saw all of those. |
| 10:59:02 | 8 | And I saw the ultimate IAD conclusion about the |
| 10:59:08 | 9 | investigation, which told me that it was investigated, |
| 10:59:10 | 10 | i.e., supervised, and that disciplinary action was meted |
| 10:59:16 | 11 | out. |
| 10:59:17 | 12 | BY MR. WIEST: |
| 10:59:17 | 13 | Q.  How do you know whether or not that was |
| 10:59:18 | 14 | appropriate without looking at the un -- unassailable |
| 10:59:20 | 15 | objective video evidence? |
| 10:59:24 | 16 | MR. MORGAN:  Form. |
| 10:59:25 | 17 | A.  I didn't look at it in that -- that vein.  My |
| 10:59:27 | 18 | job was to analyze this particular incident and render |
| 10:59:31 | 19 | an opinion as to whether or not the officer did or did |
| 10:59:33 | 20 | not use excessive force.  Whether the officer used |
| 10:59:38 | 21 | excessive force on a prior occasion doesn't come into |
| 10:59:41 | 22 | play with my analysis. |
| 10:59:42 | 23 | BY MR. WIEST: |
| 10:59:43 | 24 | Q.  Wait a minute.  Do you know whether or not |
| 10:59:54 | 25 | more than one officer perjured himself in this case? |

Page 90

| 10:59:59 | 1 | MR. MORGAN:  Form. |
| 11:00:05 | 2 | A.   I -- that's a difficult question to ask, |
| 11:00:07 | 3 | because that puts me in a position of second guessing |
| 11:00:10 | 4 | what an officer did or did not see.  Initially the -- |
| 11:00:12 | 5 | there was a secondary officer, trooper that said that he |
| 11:00:21 | 6 | didn't see anything -- or, well, I won't say that.  He |
| 11:00:24 | 7 | didn't -- he didn't say he didn't see anything.  He said |
| 11:00:26 | 8 | he didn't see any excessive force used, didn't see the |
| 11:00:30 | 9 | individual being struck. |
| 11:00:33 | 10 | You know, I can try to second guess and say, |
| 11:00:36 | 11 | well, he must have seen it, i.e., he's committing |
| 11:00:40 | 12 | perjury saying he didn't see it.  Or maybe he just |
| 11:00:44 | 13 | didn't see it.  Maybe he had tunnel vision and his -- |
| 11:00:47 | 14 | and his vision was focused on what he was doing as |
| 11:00:50 | 15 | opposed to what another officer was doing standing |
| 11:00:54 | 16 | beside him. |
| 11:00:56 | 17 | That leads me into an area of assessing |
| 11:00:59 | 18 | credibility.  And, again, it's -- it's improper, in my |
| 11:01:05 | 19 | humble opinion as an expert, to start analyzing a case |
| 11:01:09 | 20 | based on nothing more than second guessing or surmising |
| 11:01:17 | 21 | what somebody may or may not have seen.  It's just |
| 11:01:21 | 22 | inappropriate for me to start assigning credibility.  I |
| 11:01:24 | 23 | don't know whether that officer actually saw what was |
| 11:01:26 | 24 | being done or he didn't.  He says he didn't see it. |
| 11:01:31 | 25 | That -- that leads me to a question of, you know, did he |

Hornback vs. Czartorski                William T. Gaut, PH. D.                01/28/2022

Page 91

| | | |
|---|---|---|
| 11:01:37 | 1 | actually see it and did he commit perjury saying he |
| 11:01:41 | 2 | didn't, or did he really not see it?  And I can't -- I |
| 11:01:44 | 3 | can't tell you one way or the other. |
| 11:01:46 | 4 | BY MR. WIEST: |
| 11:01:46 | 5 | Q.   Let me ask, sir, there is extensive dash cam |
| 11:01:49 | 6 | video in this case -- |
| 11:01:50 | 7 | A.   Yes. |
| 11:01:51 | 8 | Q.   -- and I think, you can correct me, I think |
| 11:01:54 | 9 | it's about an hour.  And there are -- and it's mostly |
| 11:01:59 | 10 | audio, we hear audio at the doorstep, right? |
| 11:02:03 | 11 | A.   Well, yeah.  There's -- there's video of the |
| 11:02:04 | 12 | car pulling up to the scene. |
| 11:02:07 | 13 | Q.   Right. |
| 11:02:08 | 14 | A.   There's audio of the officers at the door. |
| 11:02:13 | 15 | Q.   Right. |
| 11:02:15 | 16 | A.   And the background.  And then after the arrest |
| 11:02:18 | 17 | is made and Mr. Hornback, Alex, is taken into custody, |
| 11:02:23 | 18 | there's both video and audio about what took place after |
| 11:02:28 | 19 | the arrest was made. |
| 11:02:30 | 20 | Q.   Okay.  And you reviewed all of that? |
| 11:02:32 | 21 | A.   I saw all of that, yeah. |
| 11:02:34 | 22 | MR. WIEST:  Yeah, we've been about two hours. |
| 11:02:35 | 23 | I think now -- we'll take a stretch break. |
| 11:02:38 | 24 | MR. MORGAN:  Thank you. |
| 11:02:39 | 25 | THE VIDEOGRAPHER:  Going off the video record |

Page 92

11:02:39   1   at 11:03 a.m.

11:02:43   2        (Recess taken from 11:03 a.m. to 11:19 a.m.)

11:18:38   3        THE VIDEOGRAPHER:  Back on the video record at

11:18:39   4   11:19 a.m.

11:18:41   5   BY MR. WIEST:

11:18:47   6        Q.   All right.  Dr. Gaut, we -- before we broke,

11:18:53   7   we were discussing supervision and how that might relate

11:19:02   8   to this particular matter.  And I had asked you about

11:19:10   9   whether or not more than one officer perjured himself in

11:19:13   10  this matter, and I think you said -- I don't want to put

11:19:19   11  words in your mouth -- but you don't necessarily have

11:19:21   12  information to sustain that from a forensic perspective;

11:19:27   13  is that fair?

11:19:29   14       A.   That's fair.  I can't -- I can't -- I can't

11:19:34   15  corroborate or refute it.  I don't -- there's

11:19:37   16  insufficient evidence for me to render a valid opinion.

11:19:40   17       Q.   Let me ask about the facts in this matter.

11:19:45   18  And I know that you've got a factual background on Page

11:19:50   19  8, and we're -- and I'm not quite through the

11:19:52   20  methodology yet, but I just -- this may be one of those

11:19:56   21  where we jump around a little bit today.

11:20:01   22       My understanding is, and I think you would

11:20:03   23  agree with it, that three Kentucky state troopers were

11:20:08   24  dispatched to the Hornback residence for the purposes of

11:20:11   25  effecting an arrest warrant issued out of Jefferson

Hornback vs. Czartorski                 William T. Gaut, PH. D.                 01/28/2022

Page 93

| | | |
|---|---|---|
| 11:20:16 | 1 | County, Kentucky.  Do you agree? |
| 11:20:18 | 2 | A.    That's my understanding. |
| 11:20:18 | 3 | Q.    Okay.  And those three Kentucky state troopers |
| 11:20:21 | 4 | were Trooper Tom Czartorski, Trooper Cameron Wright, and |
| 11:20:28 | 5 | Trooper Kevin Dreisbach, correct? |
| 11:20:33 | 6 | A.    Yes. |
| 11:20:35 | 7 | Q.    The warrant itself, you reviewed that in -- in |
| 11:20:42 | 8 | connection with this matter, right? |
| 11:20:44 | 9 | A.    Yes. |
| 11:20:44 | 10 | Q.    Okay.  And you understood that it was a |
| 11:20:47 | 11 | warrant, we're going to look at it today -- that it was |
| 11:20:54 | 12 | a bench warrant with a 10-day-to-serve annotation on it, |
| 11:21:05 | 13 | right?  And I'm -- |
| 11:21:06 | 14 | A.    Correct. |
| 11:21:06 | 15 | Q.    -- going to mark that later for you. |
| 11:21:08 | 16 | A.    Okay. |
| 11:21:09 | 17 | Q.    Okay.  The troopers approached the front, and |
| 11:21:17 | 18 | I think you would agree with this from a factual |
| 11:21:19 | 19 | standpoint, the troopers approached the front door of |
| 11:21:22 | 20 | the Hornback residence and a discussion ensues, right? |
| 11:21:27 | 21 | A.    Yes. |
| 11:21:27 | 22 | Q.    And we can hear a fair amount of that |
| 11:21:30 | 23 | conversation on the dash cam video that we see from, I |
| 11:21:33 | 24 | think it's Trooper Wright's car, right? |
| 11:21:39 | 25 | A.    I -- I don't know that I would describe it as |

Page 94

| | |
|---|---|
| 11:21:41 | 1 | a fair amount.  There was -- there was a little that |
| 11:21:44 | 2 | could be heard in the background, but I don't recall it |
| 11:21:48 | 3 | including the entire conversations, and lots of it was |
| 11:21:52 | 4 | inaudible. |
| 11:21:53 | 5 | Q.   Right.  And the reason for that, I think, and |
| 11:21:54 | 6 | you may agree with me, it was -- what was being |
| 11:21:57 | 7 | broadcast from a camera-microphone device that Trooper |
| 11:22:03 | 8 | Wright was wearing that was being fed back into the dash |
| 11:22:06 | 9 | cam of his car, right?  Are you aware of that? |
| 11:22:08 | 10 | A.   Yes. |
| 11:22:08 | 11 | Q.   Okay.  Obviously, that video picked up nothing |
| 11:22:12 | 12 | that occurred in the basement, right? |
| 11:22:15 | 13 | A.   Correct. |
| 11:22:15 | 14 | Q.   And it's our understanding, I don't think |
| 11:22:18 | 15 | there's a dispute of fact about this, that when they |
| 11:22:20 | 16 | went down in the basement, his device wasn't able to |
| 11:22:23 | 17 | relay because of the obstruction of the house back to |
| 11:22:25 | 18 | the car that was parked outside? |
| 11:22:28 | 19 | A.   That's my understanding, yes. |
| 11:22:30 | 20 | Q.   Okay.  Two troopers go into the house to |
| 11:22:36 | 21 | effect the arrest warrant and to pick up Alex Hornback. |
| 11:22:40 | 22 | One trooper goes to the back door in case of the |
| 11:22:44 | 23 | possibility of him fleeing, right? |
| 11:22:46 | 24 | A.   Right. |
| 11:22:46 | 25 | Q.   And the two troopers that went into the |

Page 95

| | | |
|---|---|---|
| 11:22:48 | 1 | basement were Trooper Czartorski and Trooper Wright? |
| 11:22:52 | 2 | A.    Correct. |
| 11:22:52 | 3 | Q.    The trooper that goes around to the back is |
| 11:22:54 | 4 | Trooper Dreisbach, right? |
| 11:22:57 | 5 | A.    Yes. |
| 11:22:58 | 6 | Q.    Okay.  We're going to look at the video, but |
| 11:23:03 | 7 | is it your understanding that Trooper Wright took Alex |
| 11:23:08 | 8 | Hornback to the ground in effecting this arrest? |
| 11:23:12 | 9 | A.    I'm sorry? |
| 11:23:13 | 10 | Q.    Trooper Wright -- |
| 11:23:14 | 11 | A.    Trooper Wright, yes. |
| 11:23:15 | 12 | Q.    -- took Alex Hornback to the ground in |
| 11:23:17 | 13 | effecting the arrest? |
| 11:23:18 | 14 | A.    Yes. |
| 11:23:19 | 15 | Q.    And Trooper Wright, his testimony was -- his |
| 11:23:26 | 16 | testimony was the only force he used against Alex |
| 11:23:29 | 17 | Hornback was taking him to the ground.  Do you remember |
| 11:23:31 | 18 | that from his testimony? |
| 11:23:33 | 19 | A.    Yes. |
| 11:23:35 | 20 | Q.    Trooper Czartorski said that he didn't use any |
| 11:23:38 | 21 | force at all, right? |
| 11:23:39 | 22 | A.    Originally, that's what he said, yes. |
| 11:23:41 | 23 | Q.    Right.  And Trooper Wright and Trooper |
| 11:23:46 | 24 | Czartorski both testified that there was no need to use |
| 11:23:50 | 25 | any other force other than the possibility of the |

Hornback vs. Czartorski                    William T. Gaut, PH. D.                    01/28/2022

Page 96

| | | |
|---|---|---|
| 11:23:53 | 1 | initial takedown.  Do you remember that testimony? |
| 11:23:55 | 2 | A.    I believe so, yes. |
| 11:23:56 | 3 | Q.    Okay.  If -- you would agree with me if |
| 11:24:03 | 4 | Trooper Wright used force other than the initial |
| 11:24:07 | 5 | takedown, that would not -- his testimony would not be |
| 11:24:10 | 6 | truthful, right? |
| 11:24:16 | 7 | A.    I hate to get picky, but it -- it depends on |
| 11:24:19 | 8 | what the definition of force is. |
| 11:24:21 | 9 | Q.    How about -- how about a hand strike? |
| 11:24:23 | 10 | A.    Hand strike would be use of force, yes. |
| 11:24:25 | 11 | Q.    Right.  And if Trooper Wright used a hand |
| 11:24:27 | 12 | strike or an elbow strike against Alex Hornback, his |
| 11:24:31 | 13 | testimony would not be truthful, right? |
| 11:24:34 | 14 | A.    Here again, the video would speak for itself. |
| 11:24:38 | 15 | Q.    Right. |
| 11:24:38 | 16 | A.    If he used a strike during the course of the |
| 11:24:41 | 17 | takedown, then if the trooper then said the only force I |
| 11:24:45 | 18 | used was in the takedown, then he would be truthful. |
| 11:24:49 | 19 | Now, if the individual is -- shows that he's |
| 11:24:53 | 20 | already down on the floor and the strike is then used |
| 11:24:58 | 21 | after he's on the floor, a totally separate strike, then |
| 11:25:03 | 22 | under those circumstances, well, the officer's statement |
| 11:25:07 | 23 | would not be truthful. |
| 11:25:10 | 24 | Q.    Are you aware of Trooper Czartorski's current |
| 11:25:14 | 25 | employment status with the Kentucky State Police? |

Page 97

11:25:18    1              MR. MORGAN:  Form.

11:25:18    2         A.   No.

11:25:21    3    BY MR. WIEST:

11:25:22    4         Q.   Do you know -- let me ask it a different way.

11:25:25    5              Are you aware whether or not he's currently

11:25:27    6    employed with the Kentucky State Police?

11:25:29    7         A.   My understanding is -- is that he is not.

11:25:32    8         Q.   Okay.  Who provided you that information?

11:25:37    9         A.   I think Mr. Morgan.  I think I asked if he was

11:25:40   10    suspended or discharged or whatever and --

11:25:44   11         Q.   What did you find out in that regard?

11:25:47   12              MR. MORGAN:  Form.

11:25:47   13         A.   I found out he was no longer employed by KSP.

11:25:51   14    BY MR. WIEST:

11:25:51   15         Q.   Okay.  Did you also find out that he was

11:25:53   16    criminally charged with perjury over this incident --

11:25:57   17              MR. MORGAN:  Form.

11:25:57   18    BY MR. WIEST:

11:25:57   19         Q.   -- and his testimony?

11:25:58   20         A.   I did.  Yes.

11:25:58   21              MR. MORGAN:  Move to strike.

11:26:00   22    BY MR. WIEST:

11:26:03   23         Q.   Was -- was his no longer being employed with

11:26:09   24    KSP or his criminal perjury charge, did that weigh in at

11:26:13   25    all in terms of your evaluation of this case?

Page 98

11:26:17    1           MR. MORGAN:  Form.

11:26:17    2       A.    Not really.  My evaluation was whether or not

11:26:20    3   he used proper police procedures and whether he did or

11:26:25    4   did not use excessive force.  As to the violations of

11:26:30    5   internal policy or procedure, or his commission of

11:26:34    6   perjury after the fact, I'm aware of it, but I'm

11:26:39    7   analyzing it from the standpoint of what happened during

11:26:44    8   the event itself, not things that might have happened

11:26:48    9   before or things that might have happened after.

11:26:50   10   BY MR. WIEST:

11:26:51   11       Q.    Does -- does the officers' reaction themselves

11:26:55   12   to what happened, their handling of it, what happens in

11:26:58   13   the minutes and hours that follow, is that a relevant

11:27:02   14   factor in terms of evaluating what occurred?

11:27:06   15       A.    Not for what I'm -- I'm retained to do.

11:27:09   16       Q.    Okay.

11:27:09   17       A.    As I say, my -- my job as I understood it is

11:27:13   18   to evaluate whether or not the procedures that were used

11:27:17   19   by the officers were compliant with generally-accepted

11:27:22   20   law enforcement standards, and whether or not there was

11:27:25   21   or was not an element of excessive force.  That's --

11:27:30   22   that's limited to the event itself, and, like I say, I'm

11:27:36   23   aware of the events beforehand and the events

11:27:41   24   afterwards, but I'm looking at it in a -- in a micro

11:27:44   25   sense --

Page 99

| | | |
|---|---|---|
| 11:27:48 | 1 | Q.   Okay. |
| 11:27:48 | 2 | A.   -- as to exactly what happened during the |
| 11:27:51 | 3 | incident. |
| 11:27:52 | 4 | Q.   Okay.  Does the officer's perception of what |
| 11:28:00 | 5 | is occurring, what the officer sees, what the officer |
| 11:28:03 | 6 | perceives, is that a factor in determining what is |
| 11:28:08 | 7 | objectively reasonable force? |
| 11:28:10 | 8 | A.   Yes and no. |
| 11:28:11 | 9 | Q.   Okay.  Tell me -- tell me how it is and it's |
| 11:28:13 | 10 | not. |
| 11:28:14 | 11 | A.   Well, it's a factor in that the officer's |
| 11:28:18 | 12 | reaction to a perceived incident is based on the |
| 11:28:22 | 13 | officer's knowledge, education, training and what he |
| 11:28:27 | 14 | sees at the time. |
| 11:28:28 | 15 |      The judgmental aspect of it then comes in, |
| 11:28:32 | 16 | it's my understanding as the courts have ruled, is an |
| 11:28:37 | 17 | objective determination not based at all on what the |
| 11:28:43 | 18 | officer thinks, but based on what would a reasonable |
| 11:28:46 | 19 | officer under the same or similar circumstances think or |
| 11:28:49 | 20 | do. |
| 11:28:51 | 21 | Q.   So you would agree with me that it is an |
| 11:28:53 | 22 | objective standard under which you are evaluating |
| 11:28:57 | 23 | officers' actions in a use-of-force case? |
| 11:28:59 | 24 | A.   Yes. |
| 11:29:00 | 25 | Q.   And so if presented with a substantially |

Page 100

11:29:05    1    similar set of facts, one would come to a -- the same

11:29:10    2    outcome in terms of that evaluation, right?

11:29:13    3        A.    It's possible, yeah.  That's a -- that's a

11:29:17    4    tricky area to get into, because lots of times we talk

11:29:20    5    about a similar situation, but when you get right down

11:29:27    6    to it and you start looking at it, similar doesn't

11:29:29    7    necessarily mean exactly.  So to say that because you

11:29:36    8    ruled one way in this situation, that if you had

11:29:39    9    something similar in another situation, you should

11:29:43    10   project the same ruling.  And that's not necessarily

11:29:46    11   true.  It's supposed to be objective.  But each case, in

11:29:54    12   my opinion, stands on its own merits.  I don't look at a

11:29:58    13   case of -- at a case in terms of what, you know, what --

11:30:04    14   what's the officer's thoughts, what's he thinking.  I

11:30:07    15   look at it from an objective standpoint, and I look at

11:30:11    16   the physical evidence, if any exists, the video, for

11:30:16    17   instance, to determine whether or not the officer did or

11:30:20    18   did not comply with law enforcement standards.

11:30:25    19       Q.    Okay.  So let me boil it down.  If you've got

11:30:29    20   a video in which the same activity is going on with a

11:30:38    21   subject, whether or not the use of force is appropriate

11:30:43    22   on that subject should be the same because it's an

11:30:45    23   objective standard, would you agree?

11:30:47    24       A.    I agree.

11:30:48    25       Q.    Okay.  All right.  I want to ask about some

Hornback vs. Czartorski                William T. Gaut, PH. D.                01/28/2022

Page 101

| 11:30:57 | 1 | general principles on the use of force.  Are you |
| 11:31:02 | 2 | familiar with the force continuum? |
| 11:31:05 | 3 | A.   I am, yes. |
| 11:31:07 | 4 | Q.   Can you tell me what the force continuum is? |
| 11:31:11 | 5 | A.   It's a series of steps where a police officer |
| 11:31:18 | 6 | can start out with a certain low level force, and then |
| 11:31:23 | 7 | based on the subject's actions the level of force may |
| 11:31:27 | 8 | increase.  For instance, as the -- as the continuum |
| 11:31:33 | 9 | states, the lowest level may be nothing more than |
| 11:31:37 | 10 | officers' presence, voice commands.  The highest |
| 11:31:40 | 11 | standard, or the highest continuum may be Level 5, where |
| 11:31:45 | 12 | the officer deploys deadly force, and either does or at |
| 11:31:48 | 13 | least attempts to kill the subject. |
| 11:31:51 | 14 | Q.   Okay.  And there's three steps in between |
| 11:31:52 | 15 | officer presence and deadly force. |
| 11:31:54 | 16 | A.   Yes. |
| 11:31:55 | 17 | Q.   What are those? |
| 11:31:56 | 18 | A.   There's active resistance.  Excuse me. |
| 11:32:00 | 19 | There's verbal resistance, active resistance, aggressive |
| 11:32:04 | 20 | resistance, and then deadly force. |
| 11:32:08 | 21 | Q.   Okay. |
| 11:32:08 | 22 | A.   And you have to understand that when we talk |
| 11:32:15 | 23 | about use-of-force continuum, there are some models that |
| 11:32:20 | 24 | say that there are four steps, there are some models |
| 11:32:23 | 25 | that say there are five steps, and the language of those |

Hornback vs. Czartorski                    William T. Gaut, PH. D.                    01/28/2022

Page 102

| | | |
|---|---|---|
| 11:32:26 | 1 | various models differs ever so slightly.  So you |
| 11:32:30 | 2 | can't -- you can't say that there is A, as in one -- one |
| 11:32:35 | 3 | specific use-of-force continuum. |
| 11:32:41 | 4 | Q.    What use-of-force continuum do you employ or |
| 11:32:47 | 5 | typically employ as you give opinions in use-of-force |
| 11:32:48 | 6 | cases? |
| 11:32:50 | 7 | A.    I usually look at it from a standpoint of what |
| 11:32:53 | 8 | was in effect at the time.  If -- if there was a |
| 11:32:56 | 9 | four-step continuum in effect at the time, I'll look at |
| 11:33:02 | 10 | it from the four-step basis.  If the five-step was in |
| 11:33:06 | 11 | effect, then I'll look at it from that standpoint. |
| 11:33:08 | 12 | Q.    What -- what steps were in place in March and |
| 11:33:11 | 13 | April of 2020? |
| 11:33:12 | 14 | A.    I think the use-of-force standards that were |
| 11:33:16 | 15 | in effect were the -- in 2020 was the four-step. |
| 11:33:21 | 16 | Q.    Okay.  And what are those four steps? |
| 11:33:24 | 17 | A.    Again, officer presence, passive resistance, |
| 11:33:35 | 18 | active resistance, and aggressive resistance or deadly |
| 11:33:40 | 19 | force. |
| 11:33:40 | 20 | Q.    Okay. |
| 11:33:42 | 21 | A.    The last -- the last two basically are lumped |
| 11:33:47 | 22 | into one. |
| 11:33:51 | 23 | Q.    Okay.  Do you agree that the standards require |
| 11:33:53 | 24 | deescalation when possible? |
| 11:33:56 | 25 | A.    When possible? |

Page 103

| | | |
|---|---|---|
| 11:33:58 | 1 | Q.   Right. |
| 11:34:01 | 2 | A.   No. |
| 11:34:02 | 3 | Q.   Okay.  Have you ever taught -- let me ask. |
| 11:34:15 | 4 | Should an officer attempt to deescalate the situation |
| 11:34:19 | 5 | and not rush in and start grabbing people by the arm or |
| 11:34:22 | 6 | slinging them to the ground? |
| 11:34:25 | 7 | A.   Depending on the circumstances, the answer |
| 11:34:27 | 8 | could be yes or no.  That's why I'm hesitant to say I'd |
| 11:34:28 | 9 | have -- |
| 11:34:29 | 10 | Q.   What are the circumstances when it would be |
| 11:34:30 | 11 | appropriate, and what are the circumstances when it |
| 11:34:31 | 12 | would not be appropriate? |
| 11:34:37 | 13 | A.   The officer attempting to take into custody an |
| 11:34:40 | 14 | individual who has a history of assaulting police |
| 11:34:50 | 15 | officers, for instance.  An individual who has a weapon |
| 11:34:53 | 16 | or the availability of a weapon, whether or not the |
| 11:34:57 | 17 | individual simply by age or physical stature has an |
| 11:35:02 | 18 | advantage over the police officer.  There's all kinds of |
| 11:35:05 | 19 | circumstances that come into play that have to be |
| 11:35:08 | 20 | considered.  You can't just say, well, you're supposed |
| 11:35:12 | 21 | to try to deescalate the situation before you rush in |
| 11:35:16 | 22 | and do anything. |
| 11:35:17 | 23 | Q.   Okay. |
| 11:35:17 | 24 | A.   And, you know, if you're standing there and a |
| 11:35:18 | 25 | guy is pointing a gun at your head with the -- with the |

Page 104

| | | |
|---|---|---|
| 11:35:22 | 1 | hammer cocked and his finger on the trigger, you know, |
| 11:35:27 | 2 | it's -- it's -- you can't say, well, he should have |
| 11:35:28 | 3 | tried deescalation first.  No, he should have rushed in |
| 11:35:32 | 4 | and used deadly force first -- |
| 11:35:35 | 5 | Q.   Okay. |
| 11:35:35 | 6 | A.   -- to save his own life. |
| 11:35:37 | 7 | Q.   So we've talked about -- you said some of the |
| 11:35:39 | 8 | factors that you look at are whether there's a history |
| 11:35:42 | 9 | of assault on police officers, right? |
| 11:35:44 | 10 | A.   Yes. |
| 11:35:45 | 11 | Q.   Whether or not the subject has a weapon or |
| 11:35:48 | 12 | clearly has access to a weapon, right? |
| 11:35:50 | 13 | A.   Yes. |
| 11:35:51 | 14 | Q.   That's a factor.  The subject's age and |
| 11:35:54 | 15 | stature, right? |
| 11:35:55 | 16 | A.   Can be considered, yes. |
| 11:35:56 | 17 | Q.   What -- are there other factors that weigh |
| 11:35:58 | 18 | into that analysis? |
| 11:36:02 | 19 | A.   There are.  I don't know that I can sit here |
| 11:36:07 | 20 | and go through all of the factors.  It's kind of like |
| 11:36:11 | 21 | analyzing contaminated water.  There's T and TC, too |
| 11:36:11 | 22 | numerous to count.  You can take into consideration the |
| 11:36:20 | 23 | attitude of the offender. |
| 11:36:23 | 24 | Q.   Okay. |
| 11:36:23 | 25 | A.   The verbiage of the offender.  The body |

Page 105

| | | |
|---|---|---|
| 11:36:25 | 1 | language of the offender.  Gosh, there's so many factors |
| 11:36:32 | 2 | that can be taken into effect. |
| 11:36:36 | 3 | Q.   Well, and, Dr. Gaut, I want -- I don't want -- |
| 11:36:39 | 4 | I need to explore this with you, and if there's more |
| 11:36:42 | 5 | factors -- I mean, you've rendered testimony in a whole |
| 11:36:45 | 6 | bunch of cases, and I think you've seen the gamut of |
| 11:36:49 | 7 | police activity in those cases, and so if there's -- and |
| 11:36:51 | 8 | we're going to explore some of the ones you just gave -- |
| 11:36:53 | 9 | some of the additional factors you gave me.  But if |
| 11:36:56 | 10 | there's others that come to mind, I'd like to articulate |
| 11:37:00 | 11 | it so that I understand when you're looking at a case |
| 11:37:02 | 12 | and evaluating it what the objective standards are, you |
| 11:37:04 | 13 | know, that you're looking at as to when it's appropriate |
| 11:37:07 | 14 | to deescalate or not.  And so if there's more than one |
| 11:37:11 | 15 | we've already talked about, if you need a second to |
| 11:37:13 | 16 | think about it, that's fine, but I do want to know if |
| 11:37:16 | 17 | there's other factors that folks should be looking at. |
| 11:37:20 | 18 | A.   Well, there -- there's -- I can't emphasize |
| 11:37:22 | 19 | enough, there are -- there are too many factors for me |
| 11:37:25 | 20 | to sit here and articulate and say, well, those are all |
| 11:37:29 | 21 | of them.  I mean, there's -- there are so many factors |
| 11:37:33 | 22 | that can be considered by a police officer, especially |
| 11:37:38 | 23 | in a -- when they're about to take a person into police |
| 11:37:41 | 24 | custody, that can be considered. |
| 11:37:45 | 25 | I mean, it goes so far as looking at the |

Page 106

| | | |
|---|---|---|
| 11:37:50 | 1 | individual's eyes can be a factor.  If you're talking |
| 11:37:55 | 2 | about to someone, for instance, and you know that |
| 11:37:59 | 3 | there's going to be -- there has to be an arrest made, |
| 11:38:02 | 4 | and you've got a warrant, and the individual knows that |
| 11:38:04 | 5 | they're going to go to jail, and that individual is |
| 11:38:06 | 6 | standing in front of the officer but he's not looking at |
| 11:38:09 | 7 | the officer, he's looking over to the right, and he's |
| 11:38:11 | 8 | looking over to the left, and he's looking at potential |
| 11:38:15 | 9 | escape routes, I mean, you can take that into |
| 11:38:20 | 10 | consideration based on nothing more than eye movement. |
| 11:38:23 | 11 | There's -- there's just too many factors to |
| 11:38:25 | 12 | sit here for me to try to articulate every single |
| 11:38:29 | 13 | factor. |
| 11:38:30 | 14 | Q.   Are the number of officers present at the |
| 11:38:32 | 15 | scene a factor? |
| 11:38:34 | 16 | A.   Could be. |
| 11:38:37 | 17 | Q.   And I'm not going to hold you to every single |
| 11:38:39 | 18 | factor, because I understand there are strange cases |
| 11:38:42 | 19 | with strange facts that come about, and there's a wide |
| 11:38:45 | 20 | variety of human behavior, but are there other typical |
| 11:38:49 | 21 | factors that you've seen in these use-of-force cases |
| 11:38:53 | 22 | that are prevalent or somewhat common that we have not |
| 11:38:56 | 23 | already discussed today? |
| 11:38:58 | 24 | A.   There are other factors, yeah, like I say, |
| 11:38:59 | 25 | they're just too numerous for me to cover. |

Page 107

11:39:03   1          Q.   Anything that comes to mind that's typical

11:39:05   2   that you usually see?

11:39:09   3          A.   I guess as far as application to this

11:39:12   4   particular case, the failure to follow orders or

11:39:20   5   commands, lawful orders given by a police officer, is

11:39:25   6   one factor that I see regularly.

11:39:29   7              The other factor is when an individual who has

11:39:34   8   effectively either been told or demonstrated that he's

11:39:40   9   about to be placed under arrest and the individual wants

11:39:46  10   to verbally argue about the arrest, you tell the

11:39:48  11   individual to put your hands on the car, and the

11:39:51  12   individual at first complies, but then takes a hand off

11:39:55  13   the car, and turns toward one of the officers, I see

11:39:58  14   that a lot.  And that's -- that's an indication that --

11:40:01  15   that the individual is either about to attempt to flee,

11:40:06  16   or in the worst case scenario, he is about to attempt to

11:40:10  17   assault the police officer.

11:40:11  18          Q.   Does it matter what the individual says at the

11:40:14  19   time?

11:40:15  20          A.   Body language and verbal language can both be

11:40:19  21   considered.

11:40:20  22          Q.   For instance, if you -- if you were to tell

11:40:22  23   someone, Put your hands on the car because I want to pat

11:40:25  24   you down and we're going to arrest you --

11:40:27  25          A.   Yeah.

Page 108

| 11:40:28 | 1 | Q.  -- and the individual has his hands on the |

11:40:28    1         Q.   -- and the individual has his hands on the

11:40:30    2    car, and he -- and he turns to the officer and says, Is

11:40:31    3    this okay right here, and he indicates he's complying,

11:40:36    4    that is different than saying, you know, expletives

11:40:37    5    directed at the officer, right?

11:40:41    6         A.   Well, it may or may not be.  See, we -- we

11:40:44    7    assume, wrongly, that if a police officer tells you put

11:40:49    8    your hands on the car and you comply, that it's then

11:40:54    9    okay to take one or both of your hands off of the car to

11:40:57   10    turn around to ask the officer a question.  And lots of

11:41:02   11    police officers view that as a failure to obey a

11:41:08   12    command.  Because that -- I've seen that in -- in my own

11:41:12   13    experience, when an individual appears to comply at

11:41:16   14    first, but then casually takes one or both hands off the

11:41:20   15    car, casually turns around, asks a casual question, as

11:41:27   16    many times as they're innocent, there are a significant

11:41:30   17    number of times when that's an indication that that

11:41:32   18    person is about to flee, or simply to try to gain an

11:41:37   19    advantage to assault the officer.

11:41:44   20         Q.   Have you ever dealt with situations with

11:41:46   21    subsequent or conflicting instructions from officers,

11:41:51   22    where there's multiple officers on the scene?

11:41:54   23         A.   I have.

11:41:54   24         Q.   Is -- is it consistent with police officer

11:41:56   25    training when there's multiple officers on the scene for

Page 109

| | | |
|---|---|---|
| 11:41:59 | 1 | one particular officer to take control of -- of the |
| 11:42:01 | 2 | situation, the arrest? |
| 11:42:03 | 3 | A.   In an ideal world that's the standard, yes, |
| 11:42:05 | 4 | that one police officer should -- should be responsible |
| 11:42:09 | 5 | for issuing all of the orders so that they can be |
| 11:42:13 | 6 | clearly understood, so issuing them in a loud command |
| 11:42:17 | 7 | level voice, tone of voice, loud enough to be heard, and |
| 11:42:21 | 8 | so that there's no conflicts. |
| 11:42:23 | 9 | And I've seen cases where, when I talk about |
| 11:42:26 | 10 | conflicts, it's kind of like in a deposition, where the |
| 11:42:32 | 11 | lawyer is asking the witness a question, and during the |
| 11:42:36 | 12 | course of questioning, both the attorney and the witness |
| 11:42:40 | 13 | start talking over each other.  And the court reporter |
| 11:42:43 | 14 | then has to step in and say, Okay, you can't talk over |
| 11:42:46 | 15 | each other.  That's the type of conflict. |
| 11:42:50 | 16 | Now, if you say one thing and I answer, that's |
| 11:42:54 | 17 | not necessarily a conflict.  That's a continuation, or |
| 11:42:58 | 18 | a -- that's a continuum.  Excuse me.  A continuation as |
| 11:43:01 | 19 | opposed to a conflict.  And that's not -- I guess what |
| 11:43:07 | 20 | I'm trying to do poorly is to say that there are lots of |
| 11:43:13 | 21 | cases that I've seen where multiple orders have been |
| 11:43:16 | 22 | given by different officers telling a subject to do |
| 11:43:20 | 23 | different things which are not in conflict.  They are |
| 11:43:24 | 24 | consecutive orders as opposed to conflicting orders. |
| 11:43:28 | 25 | Q.   Okay.  And that depends on the timing of who |

Page 110

11:43:33    1    is saying what when, right?

11:43:35    2        A.    It depends on the timing.  It depends on

11:43:37    3    what's being said.  Depends on what the order is.

11:43:44    4    There's a lot of factors.

11:43:45    5        Q.    Do you agree that it's proper police procedure

11:43:48    6    to give clear instructions to subjects on what they

11:43:52    7    should do and where they should face in the course of an

11:43:56    8    arrest?

11:43:57    9        A.    Proper procedure, yes.

11:43:59   10        Q.    Let me ask, have you ever taught deescalation

11:44:03   11    before grabbing a person when making an arrest?

11:44:06   12        A.    I have.

11:44:10   13        Q.    Do you agree that if it is possible to

11:44:12   14    deescalate a situation, an officer should do so?

11:44:17   15        A.    If it's possible to do it safely --

11:44:18   16        Q.    Okay.

11:44:18   17        A.    -- considering the safety of both the police

11:44:22   18    officers, innocent bystanders, and the subjects

11:44:25   19    themselves.

11:44:26   20        Q.    Okay.  One of the things that I think you

11:44:50   21    indicated you reviewed in your report is the Kentucky

11:44:53   22    State Police's use-of-force policy, correct?

11:44:55   23        A.    I'm sorry?

11:44:56   24        Q.    Did you utilize, also, in rendering your

11:44:58   25    opinion the Kentucky State Police's use of force policy?

Page 111

| | | |
|---|---|---|
| 11:45:02 | 1 | A.    I did, yes. |
| 11:45:03 | 2 | Q.    Would you agree as a general matter that if a |
| 11:45:08 | 3 | subject is not offering any resistance, it is |
| 11:45:10 | 4 | inappropriate to use force on them to effect an arrest? |
| 11:45:14 | 5 | A.    I would agree. |
| 11:45:15 | 6 | Q.    Okay.  And the reason is when we look at these |
| 11:45:20 | 7 | use of force policies, and we're going to look at the |
| 11:45:22 | 8 | KSP's policy in a moment, they talk about using the |
| 11:45:27 | 9 | force necessary to effect an arrest, right? |
| 11:45:31 | 10 | A.    Yes. |
| 11:45:31 | 11 | Q.    And if it's necessary, that means you actually |
| 11:45:33 | 12 | have to use it to effect an arrest?  You can't do it |
| 11:45:38 | 13 | without utilizing the force, right? |
| 11:45:40 | 14 | MR. MORGAN:  Form. |
| 11:45:40 | 15 | A.    That's the way it's defined, yes. |
| 11:45:41 | 16 | BY MR. WIEST: |
| 11:45:42 | 17 | Q.    Which got right back to the principle that we |
| 11:45:43 | 18 | just talked about, if you don't need to use force to |
| 11:45:46 | 19 | effect an arrest because a subject is not resisting, |
| 11:45:47 | 20 | it's -- it's not lawful to do so? |
| 11:45:50 | 21 | MR. MORGAN:  Object to form. |
| 11:45:50 | 22 | A.    Well, I don't know that it's not lawful. |
| 11:45:53 | 23 | BY MR. WIEST: |
| 11:45:53 | 24 | Q.    It would be improper police procedure to do |
| 11:45:55 | 25 | so? |

Page 112

| | |
|---|---|
| 11:45:55 | 1 |
| 11:45:58 | 2 |
| 11:46:02 | 3 |
| 11:46:04 | 4 |
| 11:46:05 | 5 |
| 11:46:06 | 6 |
| 11:46:08 | 7 |
| 11:46:12 | 8 |
| 11:46:14 | 9 |
| 11:46:18 | 10 |
| 11:46:21 | 11 |
| 11:46:28 | 12 |
| 11:46:35 | 13 |
| 11:46:40 | 14 |
| 11:46:40 | 15 |
| 11:46:45 | 16 |
| 11:46:49 | 17 |
| 11:46:54 | 18 |
| 11:46:58 | 19 |
| 11:47:01 | 20 |
| 11:47:05 | 21 |
| 11:47:08 | 22 |
| 11:47:12 | 23 |
| 11:47:12 | 24 |
| 11:47:14 | 25 |

        A.   Depending on the circumstances, it might be
improper police procedure, yeah.  It might violate
internal policies, but it wouldn't necessarily be a
criminal act, no.

        Q.   Okay.  If an officer puts someone under arrest
and grabs their arm, do you believe the person has the
right to pull away from the officer?

        A.   Again, it depends on the circumstances.

        Q.   What circumstances?

        A.   Has any sort of command been given to the
individual, for instance.  The force used to grip the
arm.  The -- I mean, there -- there's -- there's a
number of factors that may be too many for me to
articulate.

            I mean, I've had a case where a police officer
wanted to stop an individual female because he, quote,
"wanted to talk to her."  And she didn't want to talk to
him, which she has the right to simply walk away.  And
in response, we're talking about a female that weighed
like 97 pounds, and a police officer that was six feet
four and weighed 240 something pounds, and he grabbed
her arm with sufficient force that he dislocated her
shoulder.

            Okay.  Yeah, under those circumstances, had
she been able, yeah, it would have been proper or okay

Page 113

| 11:47:17 | 1 | for her to jerk her arm away.  But, I mean, that's just |
| 11:47:23 | 2 | one set of circumstances. |
| 11:47:24 | 3 | Q.   Well, what about in the course of making an |
| 11:47:27 | 4 | arrest.  Have you -- have you ever testified that a |
| 11:47:30 | 5 | person who pulls their arm away from an officer as |
| 11:47:32 | 6 | they're trying to arrest them is not being aggressive in |
| 11:47:37 | 7 | any way? |
| 11:47:38 | 8 | A.   I would not necessarily say that simply |
| 11:47:41 | 9 | pulling the arm away was aggressive, no.  That's -- |
| 11:47:46 | 10 | that's not what I would define as aggression toward the |
| 11:47:50 | 11 | officer.  That's -- that's -- in the use of force |
| 11:47:52 | 12 | continuum, that would be defined as active resistance. |
| 11:47:55 | 13 | They're doing -- they're doing something or they're |
| 11:47:57 | 14 | saying something specifically designed to defeat the |
| 11:48:03 | 15 | actions of the officer. |
| 11:48:06 | 16 | Q.   Okay. |
| 11:48:06 | 17 | A.   Now, when you say aggressive, aggressive is |
| 11:48:09 | 18 | when they do something to attack the officer that may |
| 11:48:13 | 19 | result in bodily injury of some sort. |
| 11:48:17 | 20 | Q.   Okay.  If an officer is taking someone into |
| 11:48:19 | 21 | custody for a lawful arrest and they pull away or they |
| 11:48:22 | 22 | don't allow the officer to take them into custody, is |
| 11:48:22 | 23 | the officer then permitted to use a takedown technique? |
| 11:48:27 | 24 | A.   Yes. |
| 11:48:27 | 25 | Q.   In every circumstance? |

Page 114

11:48:29   1          A.   Depending on the circumstances.  I wouldn't --

11:48:30   2    again, it's a broad statement.

11:48:32   3          Q.   When would it not be appropriate for them to

11:48:34   4    do so?  Just give us an example.

11:48:37   5               MR. MORGAN:  Objection.

11:48:37   6               Go ahead.

11:48:38   7          A.   It just depends on what the circumstances of

11:48:39   8    the case are.

11:48:40   9    BY MR. WIEST:

11:48:40  10          Q.   Well, I'm just asking for just a couple of

11:48:43  11    circumstances when it would be inappropriate to take

11:48:45  12    someone to the ground in that instance, where an officer

11:48:47  13    is trying to effect an arrest, the person pulls away, or

11:48:51  14    is resisting, when is the officer not allowed to use the

11:48:55  15    takedown technique?

11:48:56  16               MR. MORGAN:  Objection.

11:48:56  17               You can go ahead.

11:49:04  18          A.   An officer is trying to arrest a juvenile

11:49:07  19    that's 15 years old and weighs 80 pounds, and the

11:49:14  20    officer grabs the juvenile by the arm and the juvenile

11:49:17  21    pulls away, and the officer is six feet tall and weighs

11:49:19  22    200 pounds, I don't think it would be appropriate to use

11:49:22  23    a takedown maneuver on a child.  You know, that's --

11:49:29  24    these are all hypotheticals.

11:49:33  25    BY MR. WIEST:

Page 115

11:49:34    1        Q.    You're an expert, so we get to get into

11:49:36    2    hypotheticals.

11:49:37    3        A.    I know.

11:49:38    4        Q.    Can you -- by the way, in your career, did you

11:49:43    5    ever use takedown techniques on someone who was not

11:49:46    6    actively resisting?

11:49:48    7        A.    Yes.

11:49:48    8        Q.    When?

11:49:51    9        A.    I can't remember a specific case.  I mean,

11:49:57   10    you've got to remember that I'm -- I'm a homicide

11:49:59   11    detective and I typically take people -- or did, into

11:50:03   12    custody for anything from the intent to arrest to

11:50:07   13    service of a warrant to taking them into police custody

11:50:12   14    as a material witness.

11:50:14   15           And if the individual did not comply with the

11:50:21   16    command, and rather than having a, what we refer to as a

11:50:28   17    stand-up fist fight, police officers are taught the best

11:50:34   18    technique is a takedown technique where you put the

11:50:37   19    person on the ground.  They're less likely to hurt you,

11:50:39   20    they're less likely to kick you, to strike you, bite

11:50:44   21    you, lots of things.

11:50:47   22           Ground techniques are taught in, as far as I

11:50:49   23    know, virtually every police academy from -- from

11:50:53   24    municipal to county to state to tribal to FBI.

11:50:58   25    Virtually every academy that I'm familiar with in a

Hornback vs. Czartorski                William T. Gaut, PH. D.                    01/28/2022

Page 116

11:51:02    1    50-year law enforcement career teaches takedown

11:51:06    2    maneuvers.

11:51:07    3        Q.    If -- if a subject is engaged in some form of

11:51:10    4    resistance and a takedown occurs, and force is utilized

11:51:15    5    on them, and the subject stops resisting, does the force

11:51:18    6    need to stop when the subject stops resisting?

11:51:21    7            MR. MORGAN:    Form.

11:51:21    8        A.    If the subject stops resisting, then further

11:51:24    9    use of force is not appropriate.

11:51:26    10   BY MR. WIEST:

11:51:26    11       Q.    Okay.  Would you -- if an officer has the

11:51:33    12   authority to use force, does that mean if he does so

11:51:35    13   it's justified?

11:51:36    14       A.    No.  No.

11:51:38    15       Q.    So the ability to do it doesn't necessarily

11:51:41    16   equate with the justification to do it?

11:51:43    17       A.    Correct.

11:51:44    18       Q.    Okay.  Would you agree with me that a subject

11:51:49    19   that's given an order by a law enforcement officer has

11:51:52    20   to be given a reasonable opportunity to comply?

11:51:58    21       A.    Yes.

11:52:05    22       Q.    If an officer uses force, does he have to

11:52:07    23   report it?

11:52:14    24       A.    It depends -- it depends on the jurisdiction.

11:52:19    25       Q.    Okay.

Page 117

11:52:20    1        A.    In some cases, yes.  And in some cases, the

11:52:23    2    use of force is defined as to when a report is required.

11:52:28    3        Q.    So going back to our force continuum, it may

11:52:30    4    not be step one or two, but if you get into three and

11:52:33    5    certainly into number four with the shooting, you've got

11:52:36    6    to report it?

11:52:37    7        A.    Yeah, that's the circumstances.

11:52:38    8        Q.    And I think you're telling me that that

11:52:40    9    ultimately is driven by a particular department's

11:52:42   10    policy?

11:52:43   11        A.    Typically, yeah.  There -- there's no

11:52:45   12    standard -- the standard is used for only the force

11:52:50   13    necessary to reasonably accomplish the objective.

11:52:54   14        Q.    Where does an impact weapon fit on that force

11:52:58   15    continuum?

11:53:03   16        A.    Probably at Level 3, where there is active

11:53:10   17    resistance.  And in some cases it might even go down to

11:53:15   18    a Level 2, depending on -- here again, it depends on the

11:53:19   19    individual circumstances.

11:53:20   20        Q.    And Level 2 is passive resistance?

11:53:22   21        A.    Level 2 is passive resistance, yes.

11:53:24   22        Q.    What is passive resistance?

11:53:25   23        A.    That's resistance that is not specifically

11:53:29   24    designed to either harm the officer or prevent the

11:53:36   25    officer from accomplishing the lawful objective.

Page 118

11:53:41    1        Q.    Okay.  Let me give you an example of what I

11:53:46    2    understand passive resistance to be.  If someone is

11:53:50    3    trying to effect an arrest on a protestor who is

11:53:53    4    trespassing and they're sitting there, and they're just

11:53:56    5    sitting there, they're not complying with the officer's

11:53:59    6    directive to leave, but they're not doing anything

11:54:01    7    active towards the officer, they've got to put them

11:54:04    8    under arrest.  Would that be an example of passive

11:54:07    9    resistance?

11:54:08   10        A.    It would be.

11:54:09   11        Q.    Okay.  And active resistance is maybe I'm

11:54:12   12    trying to escape or run away, as maybe an extreme case,

11:54:15   13    right?

11:54:15   14        A.    Correct.

11:54:16   15        Q.    I'm trying to maybe pull away or jerk away

11:54:19   16    and, you know, avoid the arrest?

11:54:21   17        A.    Right.

11:54:21   18        Q.    Okay.  Sir, I think your report indicated

11:54:44   19    this.  The majority of your engagements right now are

11:54:48   20    testifying for plaintiffs?

11:54:51   21        A.    You could say that.  I think it's -- I haven't

11:54:55   22    looked at it in a while.  Probably 60/40.  60 percent

11:55:02   23    plaintiff, 40 percent defense cases.

11:55:04   24        Q.    Have you been retained to do any work for the

11:55:07   25    Kentucky State Police or its officers before this

Page 119

| | | |
|---|---|---|
| 11:55:10 | 1 | matter? |
| 11:55:10 | 2 | A.   Yes, I have. |
| 11:55:11 | 3 | Q.   In how many matters? |
| 11:55:14 | 4 | A.   Probably -- I'd have to go back to my case |
| 11:55:20 | 5 | file and look.  Probably three. |
| 11:55:24 | 6 | Q.   Okay. |
| 11:55:24 | 7 | A.   I think that's correct. |
| 11:55:30 | 8 | Q.   Sir, you've never lied under oath, right? |
| 11:55:32 | 9 | A.   No. |
| 11:55:56 | 10 | MR. WIEST:  I want to mark -- I think I marked |
| 11:55:59 | 11 | that photo as Exhibit -- tentatively the virtual is |
| 11:56:02 | 12 | Exhibit 1.  I think we're up to No. 2, right? |
| 11:56:04 | 13 | MR. MORGAN:  Did you do the report as 1, |
| 11:56:04 | 14 | though? |
| 11:56:08 | 15 | MR. WIEST:  Yeah.  I'm sorry.  The report is |
| 11:56:08 | 16 | 1.  The photo is 2. |
| 11:56:09 | 17 | (Exhibit 2 was marked for identification.) |
| 11:56:09 | 18 | MR. WIEST:  I think we're now up to No. 3. |
| 11:56:10 | 19 | MR. MORGAN:  Yes, sir. |
| 11:56:10 | 20 | MR. WIEST:  Sir, I want to mark as Exhibit No. |
| 11:56:16 | 21 | 3 the Standards for Law Enforcement Agencies. |
| 11:56:19 | 22 | (Exhibit 3 was marked for identification.) |
| 11:56:19 | 23 | BY MR. WIEST: |
| 11:56:19 | 24 | Q.   And this is the CALEA that you were referring |
| 11:56:23 | 25 | to earlier? |

Page 120

| | | |
|---|---|---|
| 11:56:24 | 1 | A.    CALEA, yeah, it's an acronym for the |
| 11:56:24 | 2 | Commission on Accreditation for Law Enforcement |
| 11:56:29 | 3 | Agencies. |
| 11:56:29 | 4 | Q.    Okay.  And I'm looking at the standard on use |
| 11:56:31 | 5 | of force, 1.3.1 and 1.3.2.  And it says, Only the force |
| 11:56:40 | 6 | necessary to accomplish lawful objectives at 1.3.1.  Is |
| 11:56:40 | 7 | that the force we're referring to? |
| 11:56:43 | 8 | A.    Yes. |
| 11:56:52 | 9 | Q.    Okay.  All right.  As an aside, did you |
| 11:56:53 | 10 | generate any draft reports prior to finalizing your |
| 11:56:56 | 11 | report? |
| 11:56:56 | 12 | MR. MORGAN:  Objection.  Form. |
| 11:57:00 | 13 | A.    No, I don't. |
| 11:57:00 | 14 | BY MR. WIEST: |
| 11:57:15 | 15 | Q.    Did you conduct any witness interviews with |
| 11:57:17 | 16 | anyone in preparation to prepare your report in this |
| 11:57:20 | 17 | case? |
| 11:57:20 | 18 | A.    No. |
| 11:57:39 | 19 | Q.    Did you reach any conclusions that did not |
| 11:57:41 | 20 | make it into your final report as you were preparing the |
| 11:57:45 | 21 | report in this matter? |
| 11:57:50 | 22 | A.    Nothing other than what we've discussed. |
| 11:57:52 | 23 | BY MR. WIEST: |
| 11:57:52 | 24 | Q.    Okay.  All right.  I want to look at -- let's |
| 11:57:58 | 25 | see.  We're at 3.  Let's look at 4.  I'm marking |

Hornback vs. Czartorski                William T. Gaut, PH. D.                01/28/2022

Page 121

| 11:58:07 | 1 | Exhibit 4 the National Consensus Policy and Discussion |
| 11:58:10 | 2 | Paper on the Use of Force by the International |
| 11:58:13 | 3 | Association of Chiefs of Police. |
| 11:58:15 | 4 | (Exhibit 4 was marked for identification.) |
| 11:58:20 | 5 | MR. WIEST:  Can you hand this to the witness, |
| 11:58:21 | 6 | please. |
| 11:58:22 | 7 | BY MR. WIEST: |
| 11:58:29 | 8 | Q.   Sir, have you seen this policy before? |
| 11:58:30 | 9 | A.   I have, yes. |
| 11:58:31 | 10 | Q.   Do you believe that this policy is a generally |
| 11:58:34 | 11 | accepted policy within the policing industry? |
| 11:58:40 | 12 | A.   I believe so, yes. |
| 11:58:41 | 13 | Q.   Is this one of the policies you looked at to |
| 11:58:43 | 14 | prepare your report? |
| 11:58:48 | 15 | A.   You could say yes, I considered the policy, |
| 11:58:50 | 16 | but I didn't look at the policy as I was considering |
| 11:58:54 | 17 | this report.  I'm already familiar with the policy, so I |
| 11:58:59 | 18 | basically used my prior knowledge of the policy. |
| 11:59:02 | 19 | Q.   Memory of the policy? |
| 11:59:03 | 20 | A.   Yes. |
| 11:59:04 | 21 | Q.   Do you believe that this policy appropriately |
| 11:59:06 | 22 | reflects the national standards for what's appropriate |
| 11:59:09 | 23 | in police practices? |
| 11:59:10 | 24 | A.   I believe it would, yes. |
| 11:59:11 | 25 | Q.   Okay.  Let's go through it and let's talk |

Case 3:20-cv-00703-RGJ-LLK   Document 63   Filed 03/22/22   Page 122 of 235 PageID #: 1250

Hornback vs. Czartorski                William T. Gaut, PH. D.                01/28/2022

Page 122

| 11:59:13 | 1 | about a couple of things in this policy.  And I'm |
| 11:59:20 | 2 | looking at procedures that start on Page 3.  First, the |
| 11:59:28 | 3 | use of physical force should be discontinued when |
| 11:59:31 | 4 | resistance ceases or when the incident is under control. |
| 11:59:33 | 5 | Right?  Do you agree with that? |
| 11:59:36 | 6 | A.   I agree. |
| 11:59:38 | 7 | Q.   Second, physical force should not be used |
| 11:59:40 | 8 | against individuals in restraints.  Right? |
| 11:59:44 | 9 | A.   Well, with the exception. |
| 11:59:45 | 10 | Q.   Right. |
| 11:59:45 | 11 | A.   Yeah, there's -- because it's typically or |
| 11:59:49 | 12 | generally speaking, no, you should not use force against |
| 11:59:52 | 13 | someone in restraints.  But there are exceptions to |
| 11:59:55 | 14 | that.  If someone is, for instance, is handcuffed and |
| 11:59:58 | 15 | they're laying down on the ground and they're |
| 12:00:00 | 16 | effectively kicking the officers or third-party |
| 12:00:03 | 17 | personnel, then, yeah, force can be used to further |
| 12:00:06 | 18 | subdue the individual. |
| 12:00:09 | 19 | Q.   Okay.  Deescalation.  An officer shall use |
| 12:00:09 | 20 | deescalation techniques and other alternatives to higher |
| 12:00:09 | 21 | levels of force consistent with his or her training |
| 12:00:09 | 22 | whenever possible when appropriate before resorting to |
| 12:00:09 | 23 | force and to reduce the need for force.  Do you agree |
| 12:00:09 | 24 | with that? |
| 12:00:17 | 25 | A.   Yes. |

Page 123

| | | |
|---|---|---|
| 12:00:26 | 1 | Q.   How about, Whenever possible and when such |
| 12:00:29 | 2 | delay will not compromise the safety of the officer or |
| 12:00:29 | 3 | another, will not result in the destruction of evidence, |
| 12:00:33 | 4 | escape of a subject or commission of a crime, an officer |
| 12:00:36 | 5 | shall allow an individual time and opportunity to submit |
| 12:00:40 | 6 | to verbal commands before force is used.  Do you agree |
| 12:00:43 | 7 | with that? |
| 12:00:43 | 8 | A.   I do. |
| 12:01:09 | 9 | Q.   All right.  All right.  We're going to look -- |
| 12:01:10 | 10 | we may look at this again, but I think I'm done for now. |
| 12:01:15 | 11 | Are you aware that the National Sheriffs' |
| 12:01:17 | 12 | Association did not necessarily agree with the IACP on |
| 12:01:27 | 13 | its use-of-force standards? |
| 12:01:29 | 14 | A.   I'm not aware of that, no. |
| 12:01:34 | 15 | Q.   Because you indicated you looked at both the |
| 12:01:36 | 16 | Sheriffs' Association and IACP to render the opinions in |
| 12:01:37 | 17 | this matter, correct? |
| 12:01:40 | 18 | A.   I did, yes.  With the understanding, which I'm |
| 12:01:43 | 19 | sure you know, IACP puts out things in policy or general |
| 12:01:48 | 20 | order format, whereas the sheriff's department to my |
| 12:01:51 | 21 | knowledge, they don't -- they don't put out like a |
| 12:01:55 | 22 | recommended policy.  They -- they do it in the form of |
| 12:01:58 | 23 | reporting and articles and so forth that they write and |
| 12:02:02 | 24 | disseminate to law enforcement agencies. |
| 12:02:06 | 25 | Q.   Are you aware that the National Sheriffs' |

Page 124

| | | |
|---|---|---|
| 12:02:07 | 1 | Association has issued a statement that national |
| 12:02:11 | 2 | standards are inappropriate in law enforcement? |
| 12:02:14 | 3 | A.   I'm not aware of that, no. |
| 12:02:16 | 4 | (Exhibit 5 was marked for identification.) |
| 12:02:16 | 5 | BY MR. WIEST: |
| 12:02:22 | 6 | Q.   I'm going to hand the witness Exhibit No. 5. |
| 12:02:24 | 7 | So I take it that from the National Sheriffs' |
| 12:02:26 | 8 | Association, you've have not seen this position paper on |
| 12:02:30 | 9 | the IACP -- on the IACP policy before? |
| 12:02:33 | 10 | A.   I have not. |
| 12:02:33 | 11 | Q.   Okay.  All right.  Let's look at Exhibit 6. |
| 12:02:59 | 12 | (Exhibit 6 was marked for identification.) |
| 12:02:59 | 13 | MR. WIEST:  Can you hand the witness |
| 12:02:59 | 14 | Exhibit 6? |
| 12:03:01 | 15 | BY MR. WIEST: |
| 12:03:03 | 16 | Q.   Sir, I'm handing you what I've marked as |
| 12:03:05 | 17 | Exhibit 6.  This is General Order OM-B-4, Response to |
| 12:03:08 | 18 | Resistance.  You've seen this before, right? |
| 12:03:14 | 19 | A.   Yes. |
| 12:03:14 | 20 | Q.   This is the Kentucky State Police use-of-force |
| 12:03:17 | 21 | policy, right? |
| 12:03:18 | 22 | A.   Yes. |
| 12:03:18 | 23 | Q.   Okay.  And is it your understanding that force |
| 12:03:40 | 24 | can be used under this policy -- and I'm on Page 3 -- |
| 12:03:42 | 25 | and it's in bold and it's underlined, Use of Non-deadly |

Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 125 of 235 PageID #: 1253

Hornback vs. Czartorski                    William T. Gaut, PH. D.                        01/28/2022

Page 125

12:03:48    1    and Deadly Force in Response to Resistance.

12:03:52    2        A.    Yes, I see that.

12:03:52    3        Q.    And it says, The general use of non-deadly

12:03:55    4    and/or deadly force may be used by agency officers in

12:03:57    5    responding to subjects resisting arrest as defined in

12:03:59    6    KRS 520.090.

12:04:02    7        A.    Yes.

12:04:03    8        Q.    Subjects in this -- in this instance shall be

12:04:05    9    subsequently charged with resisting arrest in accordance

12:04:06   10    with KRS 520.090.  Do you see that?

12:04:11   11        A.    Yes.

12:04:12   12        Q.    And there's a definition of resisting arrest,

12:04:15   13    correct?

12:04:16   14        A.    There is, yes.

12:04:17   15        Q.    Okay.  In the absence of resisting arrest,

12:04:28   16    force is not appropriate, correct?

12:04:30   17        A.    In the absence of an arrest?

12:04:32   18        Q.    In the absence of resisting arrest, the use of

12:04:32   19    force is not appropriate?

12:04:39   20        A.    No, I wouldn't agree with that.  No.

12:04:40   21        Q.    Okay.  Where in this policy does it allow the

12:04:44   22    use of force if a subject is not resisting?

12:05:11   23        A.    I'm sorry.  Can you ask me the question again?

12:05:14   24        Q.    Yes, sir.  Where in this policy -- if a

12:05:15   25    subject is not resisting arrest, where in this policy is

Hornback vs. Czartorski                William T. Gaut, PH. D.                01/28/2022

Page 126

| | | |
|---|---|---|
| 12:05:19 | 1 | the use of force authorized against the subject? |
| 12:05:27 | 2 | A.    I would probably look at KR -- KRS |
| 12:05:31 | 3 | 520.090(1)(b).   When the person is using or -- I'm |
| 12:05:39 | 4 | adding to it -- using any other means of creating |
| 12:05:42 | 5 | substantial risk of causing physical injury to the peace |
| 12:05:45 | 6 | officer or another.   And it doesn't say -- it doesn't -- |
| 12:05:55 | 7 | Q.    Well, B is a continuation of No. 1, and No. |
| 12:05:57 | 8 | 1 -- |
| 12:05:59 | 9 | A.    Yes. |
| 12:05:59 | 10 | Q.    No. 1 says -- |
| 12:06:00 | 11 | A.    I see. |
| 12:06:01 | 12 | Q.    So my question isn't whether or not if you've |
| 12:06:04 | 13 | got 520.090, obviously that's resisting arrest. |
| 12:06:09 | 14 | A.    Yes. |
| 12:06:09 | 15 | Q.    My question is in the absence of that, that is |
| 12:06:12 | 16 | not occurring, is force authorized under this policy? |
| 12:06:30 | 17 | A.    Well, the policy you're referring to refers to |
| 12:06:33 | 18 | resisting arrest. |
| 12:06:34 | 19 | Q.    Correct. |
| 12:06:34 | 20 | A.    If you go to the previous policy, 503.090, in |
| 12:06:35 | 21 | Paragraph F, that one says, The use of physical force |
| 12:06:35 | 22 | upon another person is justifiable when the officer |
| 12:06:46 | 23 | acting under official authority is making or assisting |
| 12:06:49 | 24 | in making an arrest, and he believes that such force is |
| 12:06:53 | 25 | necessary to effect the arrest. |

Hornback vs. Czartorski                William T. Gaut, PH. D.                01/28/2022

Page 127

| 12:06:56 | 1 | It doesn't say anything about resisting. It |
| 12:06:58 | 2 | says they can use force if they believe that the force |
| 12:07:01 | 3 | is necessary to effect the arrest. |
| 12:07:04 | 4 | Q. So they have to use the force to get to the |
| 12:07:05 | 5 | arrest. If they can do it without it, they're not |
| 12:07:07 | 6 | allowed to do that, right, because then it's not |
| 12:07:07 | 7 | necessary? |
| 12:07:09 | 8 | A. No. It just says -- it doesn't say they have |
| 12:07:10 | 9 | to, it says they're allowed. |
| 12:07:12 | 10 | Q. Right, and if it's not necessary -- |
| 12:07:13 | 11 | A. It's justifiable. |
| 12:07:14 | 12 | Q. Right. If you're able to effect the arrest |
| 12:07:16 | 13 | without using force, it's not necessary to use force at |
| 12:07:20 | 14 | that point, correct? |
| 12:07:21 | 15 | MR. MORGAN: Form. |
| 12:07:21 | 16 | A. If -- if you can effect the arrest without |
| 12:07:24 | 17 | using force, then obviously you shouldn't use force. |
| 12:07:37 | 18 | BY MR. WIEST: |
| 12:07:40 | 19 | Q. Okay. If you go -- if you look at resistance |
| 12:07:42 | 20 | and you look at Page 4, there's discussion of using |
| 12:07:48 | 21 | non-deadly physical force, and it's underlined. |
| 12:07:52 | 22 | A. Yes. |
| 12:07:56 | 23 | Q. And it says -- and I just want to read this to |
| 12:07:59 | 24 | you, The specific use of non-deadly physical force (less |
| 12:08:03 | 25 | lethal weapons and weaponless techniques) in overcoming |

Page 128

| | | |
|---|---|---|
| 12:08:07 | 1 | resistance by an officer upon another person, is |
| 12:08:10 | 2 | justifiable in accordance with -- and there's a bunch of |
| 12:08:10 | 3 | statutes listed, right? |
| 12:08:15 | 4 | A.    Correct. |
| 12:08:15 | 5 | Q.    Is there anything in the section that says use |
| 12:08:17 | 6 | of non-deadly and deadly force in response to resistance |
| 12:08:21 | 7 | that would suggest that you can use force other than in |
| 12:08:26 | 8 | response to resistance? |
| 12:08:28 | 9 | A.    Yeah, what I just read to you. |
| 12:08:30 | 10 | Q.    Okay.  So I just want to go back.  If we look |
| 12:08:35 | 11 | at the policy on Page 1, Statutory Provisions, and they |
| 12:08:40 | 12 | list the statutes, right? |
| 12:08:43 | 13 | A.    Yes. |
| 12:08:43 | 14 | Q.    Okay.  And then they get in and they've got |
| 12:08:44 | 15 | some definitions for the actual policy that follows, |
| 12:08:49 | 16 | right?  That's on Page 3.  That follows the statutes. |
| 12:08:52 | 17 | A.    Yes. |
| 12:08:53 | 18 | Q.    And then they get into, on the bottom of Page |
| 12:08:55 | 19 | 3, The use of non-deadly and deadly force in response to |
| 12:08:59 | 20 | resistance, right? |
| 12:09:00 | 21 | A.    Yes. |
| 12:09:04 | 22 | Q.    And then there's a subsequent provision under |
| 12:09:06 | 23 | that that says, Responsibility to render medical |
| 12:09:09 | 24 | assistance.  Do you see that? |
| 12:09:12 | 25 | A.    No.  Where? |

Hornback vs. Czartorski                    William T. Gaut, PH. D.                    01/28/2022

Page 129

| | | |
|---|---|---|
| 12:09:13 | 1 | Q.   It's on Page 4, the bottom of Page 4, it's |
| 12:09:16 | 2 | also underlined. |
| 12:09:18 | 3 | A.   Yes. |
| 12:09:19 | 4 | Q.   And then it says, After administering a lethal |
| 12:09:22 | 5 | or less lethal response to resistance, all agency |
| 12:09:25 | 6 | officers, unless physically incapacitated, shall afford |
| 12:09:29 | 7 | medical assistance in accordance with the following |
| 12:09:30 | 8 | procedures, and there's a list of them, right? |
| 12:09:33 | 9 | A.   Just a moment. |
| 12:09:38 | 10 | Q.   Yeah. |
| 12:09:38 | 11 | A.   Yes. |
| 12:09:38 | 12 | Q.   Okay.  So, sir, the way that -- let me -- let |
| 12:09:46 | 13 | me back up. |
| 12:09:47 | 14 | Was there any testimony in this case from |
| 12:09:52 | 15 | anyone at KSP or anyone else, that supports your |
| 12:09:57 | 16 | construction of this policy that you can use -- KSP's |
| 12:10:01 | 17 | policy is you can use force if you simply believe that |
| 12:10:04 | 18 | it's necessary to effect the arrest versus overcoming |
| 12:10:08 | 19 | resistance? |
| 12:10:09 | 20 | MR. MORGAN:  Form. |
| 12:10:09 | 21 | MR. WIEST:  What's that? |
| 12:10:12 | 22 | MR. MORGAN:  Oh, I'm sorry. |
| 12:10:12 | 23 | A.   Is there any other -- I'm sorry.  I don't |
| 12:10:12 | 24 | understand your question. |
| 12:10:12 | 25 | BY MR. WIEST: |

Hornback vs. Czartorski                    William T. Gaut, PH. D.                    01/28/2022

Page 130

12:10:13    1    Q.    Is there any testimony that you're aware of in

12:10:15    2    this case that interprets this policy the way that you

12:10:18    3    -- you are interpreting it, that you -- if the statute

12:10:21    4    is met, that that complies with KSP policy?

12:10:25    5    A.    I read the deposition testimony of Trooper --

12:10:28    6    Trooper Wright, who indicated that because the subject

12:10:38    7    took his hands off the wall, made furtive movements

12:10:43    8    toward both Wright and then toward the other trooper,

12:10:48    9    Czartorski, that he felt the need to use force to take

12:10:50    10    the individual to the floor at that point.

12:10:54    11        And that would be in compliance with the --

12:10:56    12    the policy that I read, 503.090, which says that that's

12:11:04    13    justifiable, because he believed that such force was

12:11:07    14    necessary to effect the arrest, and that's the policy

12:11:10    15    that he was adhering to, in my opinion.

12:11:14    16    Q.    Okay.  Mr. Hornback was not charged with

12:11:23    17    resisting arrest, correct?

12:11:26    18    A.    That's my understanding.

12:11:27    19    Q.    This policy indicates that if someone is

12:11:30    20    resisting arrest, they shall be charged, correct?

12:11:37    21    A.    It does.

12:11:37    22    Q.    Okay.  All right.  And we're going to look at

12:11:48    23    videos -- we're going to finish the videos later, but I

12:11:51    24    want to get into a couple of other opinions within your

12:11:54    25    report.

Page 131

| | | |
|---|---|---|
| 12:11:59 | 1 | You're aware that Mr. Hornback, Kevin |
| 12:12:02 | 2 | Hornback, came downstairs -- actually, he left the |
| 12:12:06 | 3 | scene, right?  We see him leave the scene in the video, |
| 12:12:08 | 4 | and then he comes back with a cell phone, and we see him |
| 12:12:10 | 5 | holding it up, right? |
| 12:12:13 | 6 | A.   Correct. |
| 12:12:16 | 7 | Q.   Do you -- have you formed any opinions about |
| 12:12:19 | 8 | whether or not he, in fact, recorded what he saw when it |
| 12:12:23 | 9 | was being held -- when his phone was held up? |
| 12:12:25 | 10 | A.   The -- I haven't seen the video of |
| 12:12:32 | 11 | Mr. Hornback's cell phone recording, only the video of |
| 12:12:38 | 12 | the in-house surveillance system -- |
| 12:12:40 | 13 | Q.   Right. |
| 12:12:40 | 14 | A.   -- that was -- that was recording the event. |
| 12:12:44 | 15 | And the -- I guess we probably need to make a correction |
| 12:12:48 | 16 | early on, which I thought about.  We originally -- you |
| 12:12:52 | 17 | asked a question about hearing the language and |
| 12:12:55 | 18 | everything, and that was because of the officer's mic |
| 12:12:57 | 19 | and the transmission to the car on the front porch. |
| 12:13:02 | 20 | Q.   Right. |
| 12:13:02 | 21 | A.   And I don't believe that's correct.  I don't |
| 12:13:04 | 22 | believe the officers had their body cams on. |
| 12:13:07 | 23 | Q.   So, sir, let me represent to you, I'm not sure |
| 12:13:09 | 24 | that the officers actually have body cams. |
| 12:13:12 | 25 | A.   Well, the -- it wasn't being picked up by the |

Hornback vs. Czartorski                    William T. Gaut, PH. D.                    01/28/2022

Page 132

| 12:13:13 | 1 | officer's mic, it was being picked up on the car. |

12:13:18   2        Q.    That's what you believe?

12:13:18   3        A.    That's what I believe, yeah.

12:13:21   4        Q.    Okay.  And if Trooper Wright testified

12:13:24   5   contrary to that, then that would just be an incorrect

12:13:26   6   assumption on your part?

12:13:28   7        A.    It would be an incorrect assumption, and

12:13:30   8   the -- my experience wouldn't support that, because in

12:13:34   9   order to transmit from his mic, if we're standing this

12:13:39   10  close, first and foremost, I've got to stand there with

12:13:42   11  my finger on the transmit button and hold it down the

12:13:47   12  entire time.  And then you're going to get a pretty

12:13:50   13  clear depiction of what was said.  Where this sounds

12:13:52   14  like the conversation is being -- is being recorded at

12:13:56   15  some distance, which is effectively being recorded by

12:14:02   16  the car as opposed to a direct transmission from his

12:14:07   17  microphone.

12:14:08   18       Q.    Have you done any investigations into the

12:14:09   19  particular unit that sits -- the dash cam or the

12:14:15   20  microphone unit that was employed by KSP?

12:14:18   21       A.    I haven't done any in-depth analysis, no.  I

12:14:23   22  know that there's a dash cam, because you can --

12:14:27   23       Q.    See it?

12:14:27   24       A.    -- it shows -- the video shows the car pulling

12:14:29   25  up to the original scene.  And, obviously, that's from a

Page 133

12:14:33  1    dash cam.

12:14:33  2         Q.   Okay.  You don't know whether or not Trooper

12:14:37  3    Wright was wearing a microphone unit that was relaying

12:14:41  4    audio back to that camera, one way or the other?

12:14:44  5         A.   I -- I don't know.  I don't know that

12:14:46  6    there's -- well, I just -- it suffices to say that I

12:14:50  7    don't know.  I'm not aware of -- I'm not aware of any

12:14:53  8    technology that allows an officer to hold a mic up,

12:14:58  9    press the transmit button, and relay it back to the car.

12:15:02  10   I'm not sure that technology even exists, other than

12:15:06  11   through the body cam.

12:15:08  12        Q.   Let me ask, sir, one of the assumptions that I

12:15:10  13   believe you made is that -- at the time of the takedown,

12:15:12  14   Mr. Hornback's hands -- he had turned and he was facing

12:15:16  15   the officer; is that correct?

12:15:18  16        A.   Well, according to the video that I saw, at

12:15:21  17   one point, he had his hands on the wall, he took his

12:15:25  18   right hand off and turned toward the officer.  Then he

12:15:28  19   took his left hand off and turned toward Czartorski.  So

12:15:33  20   at that point, he effectively had taken both of his

12:15:36  21   hands off the wall and turned to face both of the

12:15:39  22   officers in sequence.  And at that point, the --

12:15:42  23   according to the video that I saw is when Trooper Wright

12:15:47  24   performed the takedown maneuver.

12:15:48  25        Q.   Okay.  So at the time of the takedown

Page 134

| | |
|---|---|
| 12:15:50 | 1 |

maneuver, his -- your testimony is, your observation of
the video, his hands were not on the wall at the time?

A.   That's my -- that's my interpretation of the
video, yes.

Q.   And the ultimate opinions that you've rendered
in this case about the appropriateness of the takedown
and the use of force that followed was based on that
interpretation, fair?

A.   That's fair, yes.

Q.   Okay.  And so if that interpretation isn't
correct and Mr. Hornback's hands are against the wall at
the time of the takedown, and he's got his hands on the
wall, the use of force would have been inappropriate,
correct?

MR. MORGAN:  Form.

A.   Not necessarily.  Here again, an officer has
to look at the totality of circumstances.  I saw the --
the deposition testimony where the officer apparently
was aware or at least a little bit aware of
Mr. Hornback's propensity to flee from an officer, and
the taking of one hand down is a -- what we refer to as
a furtive movement.  Taking the second hand down and
turning to a different direction is an escalation of
that movement, which would lead, to me, the average
officer believing that Mr. Hornback was either going to

Page 135

| | | |
|---|---|---|
| 12:17:07 | 1 | attempt to flee or he was going to attack one of the -- |
| 12:17:10 | 2 | potentially attack one of the officers in the attempt. |
| 12:17:15 | 3 | And the totality of circumstances goes back to |
| 12:17:19 | 4 | when the officers arrived. Everybody there, including |
| 12:17:24 | 5 | Kevin, Sonya and Alex Hornback, all failed to cooperate, |
| 12:17:30 | 6 | were less than cooperative I think is the way I put it |
| 12:17:33 | 7 | in my report. They argued with the officers, they |
| 12:17:36 | 8 | wanted to explain things, they wanted to know why he was |
| 12:17:39 | 9 | being arrested, they wanted to know what about the |
| 12:17:43 | 10 | circumstances, they insisted on the officers having a |
| 12:17:47 | 11 | search warrant. There was just all kinds of obvious |
| 12:17:53 | 12 | resistance toward the officers going in and arresting |
| 12:17:57 | 13 | Mr. Hornback. |
| 12:17:58 | 14 | BY MR. WIEST: |
| 12:17:58 | 15 | Q.   Let me -- let me unpack that opinion for a |
| 12:18:01 | 16 | moment. |
| 12:18:01 | 17 | So it's your understanding that Alex Hornback |
| 12:18:04 | 18 | was at the door as part of that exchange? |
| 12:18:07 | 19 | A.   No.   Kevin Hornback and Sonya Hornback were at |
| 12:18:11 | 20 | the door, and they were demanding to -- I think one of |
| 12:18:15 | 21 | them was demanding to see the warrant, wanted to know |
| 12:18:19 | 22 | what the warrant was for, wanting to know did they have |
| 12:18:24 | 23 | a search warrant to come into the house. And then they |
| 12:18:27 | 24 | wanted to know what the circumstances were that |
| 12:18:32 | 25 | justified the issuance of a warrant, arguing with the |

FMCR

Page 136

12:18:35    1    officers about -- about Alex Hornback being arrested.

12:18:40    2            And then further, when they got downstairs,

12:18:42    3    that same scenario started from Alex Hornback demanding

12:18:49    4    to want -- want to know, you know, why am I being

12:18:51    5    arrested, I want to see the warrant.  And all of which

12:18:56    6    indicated a pattern of resistance that was developing.

12:19:00    7        Q.   So what -- what are you using to establish

12:19:03    8    those facts?

12:19:05    9        A.   Deposition testimony, mostly.

12:19:06    10       Q.   Okay.  And so you are crediting the officer's

12:19:09    11   testimony in that regard?

12:19:11    12       A.   No.  I'm looking at the officer's testimony

12:19:12    13   and then trying to determine whether or not there is

12:19:17    14   sufficient information to corroborate or refute.  And

12:19:19    15   then I go to the Hornbacks' depositions, and I find that

12:19:24    16   those depositions corroborate the officer's statement.

12:19:30    17       Q.   No one testified that Alex Hornback was at the

12:19:33    18   front door or had anything to do with the initial

12:19:35    19   interaction between the parents and the Kentucky State

12:19:40    20   Police, correct?

12:19:41    21       A.   That's correct, yes.

12:19:42    22       Q.   You would agree with me that Alex doesn't

12:19:47    23   enter the scene until he exits that back bedroom, and we

12:19:49    24   see him in the basement video, correct?

12:19:54    25       A.   That's correct.

Page 137

| 12:19:57 | 1 | Q. You also would agree with me that by all |
| 12:20:00 | 2 | accounts, the Kentucky State Police begin the |
| 12:20:04 | 3 | interaction with the parents asking whether or not Alex |
| 12:20:07 | 4 | is home, correct? |
| 12:20:08 | 5 | A. Yes. |
| 12:20:09 | 6 | Q. They do not begin by informing the parents |
| 12:20:11 | 7 | that they have a warrant for his arrest, correct? |
| 12:20:14 | 8 | A. That's my understanding. |
| 12:20:16 | 9 | Q. You are familiar with warrant procedures, are |
| 12:20:20 | 10 | you not? |
| 12:20:20 | 11 | A. I am. |
| 12:20:21 | 12 | Q. There's two kinds of arrest warrants that can |
| 12:20:24 | 13 | get issued. There's a standard warrant, and there's a |
| 12:20:26 | 14 | no-knock warrant, correct? |
| 12:20:30 | 15 | A. A no-knock warrant generally applies to search |
| 12:20:34 | 16 | warrants more so than arrest warrants. |
| 12:20:38 | 17 | Q. Okay. But it can apply to arrest warrants as |
| 12:20:42 | 18 | well? |
| 12:20:42 | 19 | A. It can apply to an arrest warrant, but |
| 12:20:44 | 20 | typically it only applies to search and seizure. |
| 12:20:47 | 21 | Q. And to effect any warrant, to go into any |
| 12:20:51 | 22 | home, there's a requirement to knock and announce, is |
| 12:20:57 | 23 | there not? |
| 12:20:57 | 24 | A. No. |
| 12:20:58 | 25 | Q. In the absence of a no-knock warrant, is there |

Page 138

12:21:01  1  not a requirement to knock and announce?

12:21:04  2      A.   No, not that I'm aware of.  If you have a

12:21:06  3  valid arrest warrant, the general standard is, first of

12:21:10  4  all, it has to be a valid arrest warrant.

12:21:14  5          Secondly, there has to be a determination

12:21:16  6  made, for instance, if it's a private residence or even

12:21:19  7  a business for that matter that's -- that's privately

12:21:23  8  owned.  Without a warrant, you have to have permission,

12:21:29  9  consent.

12:21:30  10     Q.   Right.

12:21:31  11     A.   If you have an arrest warrant, you don't have

12:21:33  12 to have consent, you don't have to knock and announce,

12:21:36  13 you can simply go into the residence, for instance, once

12:21:40  14 you've established that the subject is, in fact, in the

12:21:44  15 residence.

12:21:44  16     Q.   Okay.  And that is your understanding of the

12:21:46  17 state of the law under which you've based your opinions?

12:21:50  18     A.   It is.

12:21:50  19     Q.   And if the Federal Court of Appeals see it

12:21:54  20 differently, you would be wrong in that regard, correct?

12:21:57  21          MR. MORGAN:  Objection to form.

12:21:58  22     A.   If you could show me the appeals decision that

12:22:00  23 negates that opinion, then -- then I would -- I would

12:22:03  24 update my opinion based on seeing a -- a court ruling.

12:22:08  25 BY MR. WIEST:

Hornback vs. Czartorski                    William T. Gaut, PH. D.                    01/28/2022

Page 139

| | | |
|---|---|---|
| 12:22:08 | 1 | Q.   Well, let me ask it this way:  Do you know why |
| 12:22:10 | 2 | there's a knock-and-announce rule generally? |
| 12:22:14 | 3 | A.   For a number of different reasons.  The -- |
| 12:22:18 | 4 | Q.   This case is pending in the Western District |
| 12:22:21 | 5 | of Kentucky.  There was an incident there involving not |
| 12:22:24 | 6 | the Kentucky State Police, but another group of law |
| 12:22:27 | 7 | enforcement, and this issue of whether or not there was |
| 12:22:29 | 8 | a no-knock or a knock warrant came up in the Breonna |
| 12:22:31 | 9 | Taylor matter.  I don't know if you're familiar with |
| 12:22:35 | 10 | that or not. |
| 12:22:36 | 11 | A.   Only what I've seen on television. |
| 12:22:37 | 12 | Q.   Okay.  Is one of the reasons that you're |
| 12:22:39 | 13 | familiar with -- for the knock and announce rule to help |
| 12:22:42 | 14 | protect officers' safety? |
| 12:22:43 | 15 | A.   One is, yes. |
| 12:22:44 | 16 | Q.   So that a homeowner knows that it's the police |
| 12:22:48 | 17 | entering their home versus a potential perpetrator, |
| 12:22:50 | 18 | correct? |
| 12:22:52 | 19 | A.   Correct. |
| 12:22:52 | 20 | Q.   And what you're telling me here today is it's |
| 12:22:57 | 21 | your understanding that that principle doesn't apply at |
| 12:23:00 | 22 | all in the context of an arrest warrant, and so if |
| 12:23:03 | 23 | someone is coming in to effect an arrest, the homeowner |
| 12:23:07 | 24 | may not know and the homeowner may begin to open fire |
| 12:23:10 | 25 | thinking it's an intruder under your principle; is that |

Page 140

12:23:14  1  fair?

12:23:14  2      A.    Not -- not the way you're stating it.  I'm not

12:23:16  3  saying that that's a principle.  I'm saying that I

12:23:18  4  haven't seen anything that specifically requires --

12:23:21  5  excuse me -- that specifically requires an officer to

12:23:28  6  knock and announce prior to the entry of a residence

12:23:32  7  when they're holding a valid search warrant.

12:23:35  8          And I've seen lots of cases where, for

12:23:37  9  instance, a tactical squad is -- is deployed on a

12:23:42  10  subject inside that a murder warrant, for instance, is

12:23:47  11  being held by the officers.  And, you know, they don't

12:23:50  12  go up and knock and say, Hi there, this is the police,

12:23:54  13  can we come in, here's -- here's -- here's my badge,

12:23:57  14  here's my uniform.  No.  They go up with a battering

12:24:01  15  ram, unannounced, kick the door in, or batter the door

12:24:06  16  in.  They immediately go in and they deploy officers for

12:24:10  17  officer protection.

12:24:11  18      Q.    They have to announce as they go through the

12:24:13  19  door, don't they, that they're the police?

12:24:15  20      A.    They don't have to.  For officer safety, it's

12:24:17  21  a good idea to do that.  And it's a good idea to be in

12:24:20  22  uniform, so that you don't raise the issue of mistaken

12:24:23  23  identity.  But I don't know that there's any sort of

12:24:27  24  statute that says that you have to.

12:24:28  25      Q.    Okay.  Have you researched at all Kentucky

Hornback vs. Czartorski                William T. Gaut, PH. D.                01/28/2022

Page 141

| | | |
|---|---|---|
| 12:24:31 | 1 | statutory law regarding the execution of arrest |
| 12:24:35 | 2 | warrants? |
| 12:24:35 | 3 | A. No. |
| 12:24:36 | 4 | Q. Have you -- okay. Let me back up to the |
| 12:24:46 | 5 | arrest of Alex Hornback. Assuming that you're correct |
| 12:24:50 | 6 | that a hand comes off, maybe another hand comes off, but |
| 12:24:56 | 7 | all furtive movements have ceased, and his hands are on |
| 12:24:59 | 8 | the wall, fixed at the time of the takedown, and all |
| 12:25:02 | 9 | resistance, therefore, would have ceased as well, would |
| 12:25:05 | 10 | it be appropriate to use force on him? |
| 12:25:07 | 11 | A. Not under that hypothetical, no. |
| 12:25:09 | 12 | Q. Okay. You're aware that he gets taken to the |
| 12:25:16 | 13 | ground? |
| 12:25:17 | 14 | A. Yes. |
| 12:25:19 | 15 | Q. Is it your testimony that following that, you |
| 12:25:21 | 16 | don't see Trooper Wright strike him in any fashion? |
| 12:25:26 | 17 | A. I'd have to see the video again, but that |
| 12:25:32 | 18 | doesn't come to mind. |
| 12:25:34 | 19 | Q. Okay. We will play that, but your -- your |
| 12:25:37 | 20 | understanding, the basis of your opinions is that did |
| 12:25:39 | 21 | not happen once he's on the ground? |
| 12:25:46 | 22 | A. I was operating under the opinion that that |
| 12:25:48 | 23 | did not happen. If it's -- if it's proved otherwise, |
| 12:25:51 | 24 | then, obviously, that -- I'm wrong. |
| 12:25:56 | 25 | Q. Okay. |

Page 142

| | | |
|---|---|---|
| 12:25:56 | 1 | A.    But it would not affect my opinion. |
| 12:25:58 | 2 | Q.    If we see Alex Hornback once he's taken to the |
| 12:26:02 | 3 | ground in the video, and he's not moving at all, and |
| 12:26:07 | 4 | he's just waiting for them to put handcuffs on him, |
| 12:26:13 | 5 | would the use of an impact weapon upon him be |
| 12:26:17 | 6 | inappropriate? |
| 12:26:19 | 7 | A.    If your hypothetical is correct, which is not |
| 12:26:23 | 8 | my understanding, then it would be inappropriate to use |
| 12:26:26 | 9 | force.  But simply -- simply because your subject is |
| 12:26:30 | 10 | laying there, face down, with his hands either under him |
| 12:26:35 | 11 | or out to the side, doesn't mean that there's no |
| 12:26:39 | 12 | resistance.  I can lay down on the floor all day long |
| 12:26:45 | 13 | and put my hands down, and you guys look like you're |
| 12:26:49 | 14 | pretty physically fit, trust me, you'd have a hard time |
| 12:26:55 | 15 | putting my hands behind me, okay, if I didn't want you |
| 12:26:57 | 16 | to.  Now, it can be done, obviously, and you would have |
| 12:27:00 | 17 | to use force to do it.  But just because the subject is |
| 12:27:03 | 18 | doing that doesn't mean there is no resistance.  If the |
| 12:27:06 | 19 | subject tenses up or does that -- |
| 12:27:10 | 20 | Q.    That's passive resistance, right? |
| 12:27:12 | 21 | A.    Well, it's -- it could be passive or active. |
| 12:27:15 | 22 | Q.    Okay.  Well, can you give me an example of |
| 12:27:17 | 23 | when it would be one or the other? |
| 12:27:20 | 24 | A.    Passive resistance might be where the |
| 12:27:22 | 25 | individual lays down on the floor on their own, puts |

Page 143

12:27:25    1    their hands outstretched -- outstretched, and when they

12:27:29    2    say, Put your hands behind your back, the individual

12:27:31    3    puts their hands behind their back.  That might be

12:27:35    4    considered a passive action.

12:27:37    5            But when the individual tenses up, when you

12:27:39    6    put one hand under you so that it can't be pulled out,

12:27:42    7    now you're into active resistance.  You're -- you're --

12:27:45    8    you're committing an act, either verbally or physically,

12:27:49    9    to prevent the officer from effecting the custody.

12:28:00   10        Q.   If someone is fully compliant, they're not

12:28:02   11    resisting at all, it's not even passive resistance,

12:28:05   12    right?  I mean --

12:28:05   13        A.   If they're fully complying, yes, with

12:28:07   14    everything, yes, that's correct.

12:28:19   15        Q.   By the way, you're not aware of any

12:28:22   16    allegations in this case by the Plaintiffs that would

12:28:24   17    suggest the lack of probable cause for the arrest,

12:28:28   18    right?  I mean, I think everybody has conceded that,

12:28:30   19    that the arrest was valid with the warrant?

12:28:33   20        A.   Well, my understanding is -- is that there was

12:28:35   21    a valid arrest warrant present.

12:28:38   22        Q.   Right.

12:28:38   23        A.   Now, your question is, did the Plaintiffs

12:28:42   24    accept that, and in that case, the answer would probably

12:28:46   25    be no.  Because they argued with the officer about what

Page 144

| | | |
|---|---|---|
| 12:28:51 | 1 | the arrest warrant was for, did they have a search |
| 12:28:54 | 2 | warrant, could they see the arrest warrant.  And then |
| 12:28:57 | 3 | they started demanding to explain why the arrest warrant |
| 12:29:03 | 4 | should not have been issued.  So, no, they -- they were |
| 12:29:05 | 5 | not compliant. |
| 12:29:15 | 6 | Q.    That was the parents that did that upstairs? |
| 12:29:17 | 7 | A.    I'm sorry? |
| 12:29:18 | 8 | Q.    You're referring to the parents, Mr. and |
| 12:29:19 | 9 | Mrs. Hornback, that had the discussion upstairs? |
| 12:29:22 | 10 | A.    Well, the discussion upstairs and then their |
| 12:29:25 | 11 | physical actions downstairs. |
| 12:29:26 | 12 | Q.    Okay.  We're going to look at the downstairs |
| 12:29:28 | 13 | in a minute. |
| 12:29:37 | 14 | Sir, what are the Graham factors? |
| 12:29:43 | 15 | A.    Basically that officers should only use the |
| 12:29:47 | 16 | force necessary to effect the arrest, which is similar |
| 12:29:51 | 17 | to the model policy.  And that the judgment about |
| 12:29:58 | 18 | whether or not the officer's use of force was justified, |
| 12:30:03 | 19 | depends on not what the officer thought at the scene, |
| 12:30:08 | 20 | but what a reasonable officer under the same or similar |
| 12:30:12 | 21 | circumstances would have thought or acted. |
| 12:30:16 | 22 | Then it goes further to say that officers are |
| 12:30:20 | 23 | never required -- or I shouldn't say never -- officers |
| 12:30:24 | 24 | are not required to use the least amount of force |
| 12:30:28 | 25 | necessary.  The question is, is the force that was used |

Page 145

12:30:31   1   reasonable?

12:30:34   2        Q.   Okay.  Are you aware that there's actually

12:30:36   3   factors that are set out in the Graham case?

12:30:39   4        A.   I'm aware, yes.

12:30:41   5        Q.   Are you familiar with the -- the three Graham

12:30:44   6   factors?  And I'm going go through those with you, but

12:30:46   7   are you aware that there's three of them?

12:30:49   8        A.   I would say probably I'm familiar with them,

12:30:51   9   if you'll tell me which ones you're talking about.

12:30:54   10       Q.   So sitting here today, you can't list them --

12:30:56   11   I'm going to go through with you, but you can't list

12:30:58   12   them off the top of your head?

12:30:59   13       A.   Oh, no.  I don't -- I don't try to do things

12:31:02   14   based solely on memory.

12:31:05   15       Q.   Okay.

12:31:05   16       A.   There's too big of possibility of being

12:31:07   17   inaccurate.

12:31:08   18       Q.   Okay.  So the -- are you familiar with one of

12:31:09   19   the Graham factors being the severity of the crime at

12:31:11   20   issue?

12:31:12   21       A.   Yes.

12:31:12   22       Q.   Okay.  How about whether the suspect posed an

12:31:20   23   immediate threat?  Is that a factor?

12:31:23   24       A.   Yes.

12:31:27   25       Q.   Whether the suspect -- and the third factor is

Page 146

| | | |
|---|---|---|
| 12:31:29 | 1 | whether the suspect was actively resisting or trying to |
| 12:31:33 | 2 | evade arrest by flight. |
| 12:31:36 | 3 | A.   Correct. |
| 12:31:36 | 4 | Q.   Okay. |
| 12:31:36 | 5 | A.   And when you say that, that's not to imply |
| 12:31:39 | 6 | that those are the only factors, because there are lots |
| 12:31:42 | 7 | of other factors that may not be listed out in a -- in |
| 12:31:45 | 8 | a -- in that type of outline format.  But there's |
| 12:31:49 | 9 | factors that consider things like totality of |
| 12:31:52 | 10 | circumstance, whether or not the individual poses a |
| 12:31:56 | 11 | threat to third-party individuals, or the officers or |
| 12:31:59 | 12 | themselves, for that matter.  There are other factors in |
| 12:32:02 | 13 | there that may not be written, as I say, in an outline |
| 12:32:06 | 14 | format. |
| 12:32:07 | 15 | Q.   Well, you understand the Graham factors come |
| 12:32:09 | 16 | from Graham versus Connor, 1989 United States Supreme |
| 12:32:10 | 17 | Court decision, right? |
| 12:32:15 | 18 | A.   That's my understanding, yes. |
| 12:32:16 | 19 | Q.   And those three factors are the three factors |
| 12:32:19 | 20 | that the U.S. Supreme Court lays out, right? |
| 12:32:21 | 21 | A.   Correct.  That's my understanding. |
| 12:32:23 | 22 | Q.   Okay.  I'm going to look at -- before we get |
| 12:32:29 | 23 | into the takedown of Alex, I'm going to look at video in |
| 12:32:31 | 24 | a couple of minutes.  The severity of the crime at |
| 12:32:38 | 25 | issue.  And, in fact, I think -- let me ask, you |

Page 147

12:33:01  1   indicate in your report, sir, and I'm just going to -- I

12:33:03  2   want to start looking at -- really the meat of this

12:33:09  3   case, I think, starts on Page 16.  And I'll tell you, I

12:33:15  4   don't know that the training is an issue in this case.

12:33:17  5   I don't -- we have not alleged a failure to train.

12:33:20  6   We're not claiming that there's a failure to train.

12:33:22  7   And, frankly, Monell doesn't apply with state actors

12:33:26  8   anyways.  And we're dealing with state actors in this

12:33:27  9   case.

12:33:28  10           So I really want to focus in on the arrest and

12:33:32  11  the use of force, because I think -- don't take this the

12:33:36  12  wrong way -- we're probably going to Daubert out your

12:33:38  13  training stuff, because it's not relevant to this case.

12:33:41  14  So -- because there's no dispute over that.

12:33:44  15           I want to look at this particular matter.  You

12:34:00  16  say that in your experience, police troopers serving a

12:34:04  17  valid arrest warrant have no duty to understand the

12:34:07  18  underlying basis for the charge on Page 16.  Do you see

12:34:10  19  that?

12:34:15  20       A.   Yeah, I was just -- I'm sorry.  I was --

12:34:16  21       Q.   No.  No.  You're good.

12:34:16  22       A.   I was looking at Page 22 to see whether or not

12:34:19  23  I outlined the three Graham factors, and I did, so where

12:34:25  24  on Page 16 are we?

12:34:28  25       Q.   Page 16, on the bottom, you say, In my

Page 148

12:34:32  1   experience, police troopers serving a valid arrest

12:34:36  2   warrant have no duty to understand the underlying basis

12:34:39  3   of the charge.  Do you see that?

12:34:40  4        A.   Yes.

12:34:41  5        Q.   And you take issue, I guess, with the

12:34:44  6   Plaintiffs' Complaint where we indicated that the

12:34:47  7   troopers were reckless in not understanding that the

12:34:49  8   charges that they were arresting Alex Hornback for were

12:34:50  9   minor, evidenced by the mere 10-days-to-serve on the

12:34:56  10  bench warrant.  Do you see that?

12:34:58  11       A.   Yes.

12:34:58  12       Q.   Okay.  If I'm going to assess whether or not

12:35:01  13  force is appropriate under the Graham factors, the first

12:35:04  14  of which is the severity of the crime, don't I have to

12:35:07  15  understand what the arrest is for?

12:35:10  16       A.   No.

12:35:12  17            MR. MORGAN:  Form.

12:35:12  18       A.   No.  The -- my interpretation of that is we're

12:35:16  19  talking about under Graham something that the officers

12:35:20  20  are directly involved in, an ongoing visual of a crime

12:35:28  21  taking place, the severity of the crime, et cetera.  But

12:35:32  22  in my experience, if you have a valid arrest warrant in

12:35:35  23  your hand and your orders are serve the warrant, arrest

12:35:40  24  the individual in compliance, it's effectively a court

12:35:44  25  order to take the individual into custody.  There's no

FMCR

Page 149

| Time | Line | Text |
|------|------|------|
| 12:35:47 | 1 | requirement that I'm aware of that says, Well, wait a |
| 12:35:49 | 2 | minute.  I've got to understand why this warrant was |
| 12:35:53 | 3 | issued.  I have to understand all of the circumstances |
| 12:35:55 | 4 | that led up to this warrant and who the parties are and |
| 12:35:58 | 5 | what the justification was for the warrant.  I'm not |
| 12:36:01 | 6 | aware that a police officer serving a warrant has to |
| 12:36:03 | 7 | know any of that. |
| 12:36:05 | 8 | The police officer, as I state here, when the |
| 12:36:08 | 9 | court issues an arrest warrant, that is a direct order |
| 12:36:11 | 10 | from the court for the officer to take that individual |
| 12:36:13 | 11 | into custody and deliver that -- that individual to the |
| 12:36:17 | 12 | appropriate jail facility.  There's nothing, unless you |
| 12:36:23 | 13 | can show me, that says that the officers have to |
| 12:36:26 | 14 | completely understand all of the underlying facts that |
| 12:36:30 | 15 | led to the issuance of a warrant. |
| 12:36:32 | 16 | Q.   Okay.  Let me start with this premise. |
| 12:36:38 | 17 | A.   Okay. |
| 12:36:39 | 18 | Q.   I don't think, sir, we have a disagreement |
| 12:36:41 | 19 | about needing to understand the basis of the charge for |
| 12:36:44 | 20 | the purposes of serving the warrant. |
| 12:36:47 | 21 | A.   Okay. |
| 12:36:47 | 22 | Q.   Okay.  But the U.S. Supreme court says you |
| 12:36:52 | 23 | have to understand whether -- the degree of force that |
| 12:36:54 | 24 | you're using, you have to understand the severity of the |
| 12:36:57 | 25 | offense at issue -- |

Page 150

| | | |
|---|---|---|
| 12:36:58 | 1 | A.   Yes. |
| 12:36:58 | 2 | Q.   -- in Graham. |
| 12:36:59 | 3 | A.   Yes. |
| 12:37:00 | 4 | Q.   And what you're saying is, when it comes to an |
| 12:37:03 | 5 | arrest warrant, that Graham factor doesn't matter, |
| 12:37:06 | 6 | right?  Do I have that right? |
| 12:37:08 | 7 | A.   No. |
| 12:37:09 | 8 | MR. MORGAN:  Form. |
| 12:37:09 | 9 | A.   That's not what I'm saying at all.  The -- the |
| 12:37:11 | 10 | severity of the crime applies, as I said, when the |
| 12:37:17 | 11 | officers are effecting the arrest.  It -- it doesn't |
| 12:37:21 | 12 | refer to the fact that an arrest warrant has been |
| 12:37:25 | 13 | issued.  That's -- under -- under your question, there's |
| 12:37:29 | 14 | an assumption that if an arrest warrant is issued for a |
| 12:37:35 | 15 | lesser crime, then the officers should take that into |
| 12:37:39 | 16 | account and not use any force to effect the arrest.  And |
| 12:37:42 | 17 | in my experience, that's simply not true. |
| 12:37:47 | 18 | The severity of the crime may be no more than |
| 12:37:53 | 19 | misdemeanor trespassing, but if you're trying to arrest |
| 12:37:57 | 20 | an individual with a warrant for that and that |
| 12:38:00 | 21 | individual comes out with a .45 automatic and points it |
| 12:38:04 | 22 | at you, the severity of the crime has no basis |
| 12:38:08 | 23 | whatsoever.  We now transverse into the officer safety. |
| 12:38:13 | 24 | Am I -- am I -- am I using force to effect the service |
| 12:38:18 | 25 | of an arrest warrant, or am I using force to protect my |

Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 151 of 235 PageID #: 1279

Hornback vs. Czartorski          William T. Gaut, PH. D.          01/28/2022

Page 151

12:38:22    1    own life?

12:38:23    2    BY MR. WIEST:

12:38:23    3        Q.    So maybe we're talking past each other,

12:38:25    4    because what you just brought up, officer safety --

12:38:26    5        A.    Seems like.

12:38:26    6        Q.    -- deals with the second and third factors

12:38:31    7    under Graham, which are relevant in every arrest.  The

12:38:34    8    threat to the officers, that's the second factor, right?

12:38:36    9        A.    Yes.

12:38:37   10        Q.    And the third factor, you know, whether or not

12:38:40   11    that subject is actively resisting or evading arrest.

12:38:43   12    Coming out with a firearm is pretty clearly resisting

12:38:47   13    arrest, right?  You would agree with me, right?

12:38:49   14        A.    I'd agree, yes.

12:38:50   15        Q.    And so in your scenario, those are already

12:38:52   16    taken into account.  But Factor 1 is the severity of the

12:38:57   17    crime at issue, correct?

12:38:58   18        A.    Yes.

12:38:59   19        Q.    And I just want to be clear, you would agree

12:39:01   20    with me that that is always a factor in every arrest,

12:39:04   21    whether it's an arrest warrant or whether it's the

12:39:08   22    officer detecting the crime afresh on the street without

12:39:10   23    a judge telling him to go and arrest someone, right?

12:39:13   24        A.    It's a factor that should be considered.

12:39:15   25        Q.    Right.  Right.  And here it was a bench

Page 152

| | | |
|---|---|---|
| 12:39:19 | 1 | warrant with a 10-day-to-serve for not showing up to |
| 12:39:21 | 2 | court, correct? |
| 12:39:22 | 3 | A.    That's my understanding. |
| 12:39:23 | 4 | Q.    And the officers understood it because it was |
| 12:39:25 | 5 | flat on the warrant itself, right? |
| 12:39:27 | 6 | A.    That's my understanding. |
| 12:39:28 | 7 | MR. WIEST:  Okay.  Let me authenticate the |
| 12:39:28 | 8 | warrant -- |
| 12:39:28 | 9 | What are we up to? |
| 12:39:28 | 10 | THE COURT REPORTER:  7. |
| 12:39:28 | 11 | (Exhibit 7 was marked for identification.) |
| 12:39:28 | 12 | BY MR. WIEST: |
| 12:39:29 | 13 | Q.    Okay.  Sir, I've marked as Exhibit 7 -- this |
| 12:40:03 | 14 | is the arrest warrant, correct? |
| 12:40:05 | 15 | A.    That's my understanding, yes. |
| 12:40:08 | 16 | Q.    Okay.  And when it talks about the charge, |
| 12:40:09 | 17 | it's bench warrant, 10 days to serve, and the police |
| 12:40:12 | 18 | officers understood it, right? |
| 12:40:14 | 19 | A.    That's my understanding. |
| 12:40:32 | 20 | Q.    And I think the next thing you take issue with |
| 12:40:35 | 21 | with the Hornbacks -- |
| 12:40:38 | 22 | MR. WIEST:  Wait a minute.  Did you want to |
| 12:40:39 | 23 | take a break? |
| 12:40:42 | 24 | MR. BRUNS:  Yeah, I think we -- yeah, let's |
| 12:40:42 | 25 | take a quick break. |

Page 153

| | |
|---|---|
| 12:40:42 | 1 |
| 12:40:43 | 2 |
| 12:40:46 | 3 |
| 12:40:46 | 4 |
| 12:40:48 | 5 |
| 12:40:51 | 6 |
| 01:36:08 | 7 |
| 01:36:09 | 8 |
| 01:36:11 | 9 |
| 01:36:12 | 10 |
| 01:36:17 | 11 |
| 01:36:21 | 12 |
| 01:36:27 | 13 |
| 01:36:35 | 14 |
| 01:36:39 | 15 |
| 01:36:42 | 16 |
| 01:36:43 | 17 |
| 01:36:46 | 18 |
| 01:36:50 | 19 |
| 01:36:53 | 20 |
| 01:36:55 | 21 |
| 01:36:59 | 22 |
| 01:37:00 | 23 |
| 01:37:01 | 24 |
| 01:37:02 | 25 |

1  MR. WIEST:  Tom wants to take a break, because

2  it's 12:41.  I don't know.  Do we want to take a

3  lunch break?  It's up to you-all.

4  THE VIDEOGRAPHER:  Going off the video record

5  at 12:41 p.m.

6  (Recess taken from 12:41 p.m to 1:36 p.m.)

7  THE VIDEOGRAPHER:  Back on the video record at

8  1:36 p.m.

9  BY MR. WIEST:

10  Q.   All right.  We -- Dr. Gaut, before we broke we

11  were into the Graham factors for the use of force.  And

12  we talked about the severity of the crime at issue.  And

13  I think when we look at the Hornback use of force, you

14  would agree that a bench warrant with 10 days to serve

15  is a minor crime, right?

16  A.   I would agree.

17  Q.   And from an officer perspective, including an

18  officer safety perspective, the risk to the officers is

19  different if you're going in to effect an arrest

20  warrant, let's say, on a murder or even worse, an

21  aggravated murder charge versus, you know, trespassing

22  or a bench warrant, right?

23  MR. MORGAN:  Objection.  Form.

24  A.   No.  I would not agree.

25  BY MR. WIEST:

Page 154

01:37:03    1        Q.    So you're saying that arresting somebody for a

01:37:05    2    murder does not -- does not pose greater risk to the

01:37:09    3    officers than --

01:37:09    4        A.    No.  The majority of officers killed in the

01:37:12    5    United States last year and in 2020, the vast majority

01:37:15    6    of them were killed serving mis -- attempting to make

01:37:19    7    misdemeanor arrests, and the majority were killed

01:37:24    8    following a routine traffic stop for a traffic citation.

01:37:28    9        Q.    Okay.  From the Supreme Court of the United

01:37:30    10   States' perspective in terms of the severity of the

01:37:32    11   crime, the more serious the crime the more justified the

01:37:35    12   use of force, right?

01:37:36    13       A.    From that perspective, that's true.

01:37:39    14       Q.    Okay.  And I'm looking at the Graham factors,

01:37:47    15   and I am going -- I want to talk about the use of force

01:37:50    16   against Alex Hornback and the takedown.  And we talked

01:37:54    17   before, you base that on your viewing of the video,

01:37:58    18   right?

01:37:59    19       A.    Yes.

01:38:00    20       Q.    And I think your testimony was that you

01:38:03    21   believe at the time of the takedown his hands were off

01:38:06    22   the wall, and he -- he had turned towards one of the

01:38:09    23   officers, correct?

01:38:11    24       A.    Well, during the course of the event.

01:38:15    25       Q.    Okay.

Page 155

01:38:15    1        A.    At one point, of course there's no audio, but

01:38:19    2    I see one officer that's doing this with his hand

01:38:22    3    (indicating), and then I see Mr. Hornback put his hands

01:38:25    4    on the wall -- or, excuse me.  He did not put his

01:38:28    5    hands on the wall at first.  And then the second

01:38:30    6    officer, which is Officer Wright, I think, then takes

01:38:34    7    his finger and points to the wall, and at that point,

01:38:37    8    Mr. Hornback puts his hands on the wall, and he turns

01:38:42    9    around, takes one hand off and faces Officer Wright, and

01:38:45   10    then takes the other hand off.  At this point now, he's

01:38:48   11    got both hands off the wall, turns to face Czartorski,

01:38:52   12    and then as he turns back around, that's when Trooper

01:38:56   13    Wright then performs what we refer to as a twisting

01:39:02   14    takedown maneuver.

01:39:03   15        Q.    And -- and your testimony is his hands were

01:39:05   16    not on the wall -- both his hands were not on the wall

01:39:09   17    when that occurs, right?

01:39:11   18        A.    That's correct.

01:39:12   19        Q.    And that is the basis in part for the opinions

01:39:13   20    that you render in this case, right?

01:39:15   21        A.    In part, yes.

01:39:16   22        Q.    Okay.  In your view, did the video depict any

01:39:24   23    threats to the officers?

01:39:30   24        A.    I can't answer that.  I can't say yes or no

01:39:36   25    pertaining to Alex Hornback, because I don't have the

Page 156

| 01:39:41 | 1 | audio.  I don't see anything physically, other than |
|----------|---|------|

01:39:41    1    audio.  I don't see anything physically, other than

01:39:45    2    turning toward the officer, which may be perceived as a

01:39:49    3    threat, but that would have to be by the officer and not

01:39:51    4    me.

01:39:51    5         And then the second thing, as far as a threat,

01:39:53    6    there was -- there was a threat by Sonya Hornback,

01:39:58    7    the -- Alex's mother after the takedown took place, when

01:40:05    8    she pretty aggressively goes toward the officer at one

01:40:09    9    point, and then her husband literally grabs her and

01:40:12   10    pulls her back.  And then at one point, she advances

01:40:16   11    forward and she's actually standing over her son a foot

01:40:22   12    away from Officer Wright, and that's when Officer Wright

01:40:25   13    says -- I don't know, but he says he -- says he told her

01:40:30   14    to get back, and then pulled his taser out and pointed

01:40:32   15    it at her in a threatening manner, and then at that

01:40:35   16    point, she stepped back.  So there was -- there's a

01:40:37   17    perceived threat there from one of the bystanders, i.e.,

01:40:41   18    his mother.

01:40:42   19         Q.   So the force, though, that was actually, the

01:40:44   20    physical force, there was no physical force that was

01:40:48   21    used on Sonya, right?

01:40:50   22         A.   No.  No.

01:40:50   23         Q.   That's correct, right?

01:40:51   24         A.   That -- I'm sorry, that's correct, yes.  There

01:40:53   25    was a threat of force but not a physical force.

Page 157

01:40:55    1         Q.    Right.  And there was no threat of force

01:41:00    2    towards Kevin Hornback, correct?

01:41:02    3         A.    No.

01:41:03    4         Q.    You would have -- that's correct, right?

01:41:05    5         A.    I'm sorry.  That's -- that's correct, unless

01:41:08    6    you're counting the threat of an arrest as a -- as a

01:41:12    7    form of force.

01:41:12    8         Q.    Right.  And we're going to get into that

01:41:14    9    outside --

01:41:14   10         A.    Sure.

01:41:14   11         Q.    -- later.  But I'm still focused in on the

01:41:17   12    basement interaction right now.

01:41:19   13         A.    No.  There was not any force towards Mr. Kevin

01:41:22   14    Hornback.

01:41:23   15         Q.    You agree that Kevin Hornback acted

01:41:25   16    appropriately in restraining his wife, correct?

01:41:29   17         A.    I would agree.

01:41:29   18         Q.    And would you agree that watching your son

01:41:31   19    being struck with an impact weapon mere feet away from

01:41:35   20    you could be upsetting to a mother?

01:41:37   21             MR. HEALEY:  Objection.  Form.

01:41:37   22             MR. MORGAN:  Objection.  Form.

01:41:38   23         A.    I would agree.  Sorry.

01:41:39   24    BY MR. WIEST:

01:41:40   25         Q.    Did you say you would agree?

Page 158

01:41:41    1        A.    I would agree.

01:41:42    2        Q.    Okay.  The -- but I think you testified you

01:41:53    3    didn't see any -- any threats towards the officers from

01:41:57    4    Alex in the video, correct?

01:41:59    5        A.    Nothing other than turning toward the

01:42:02    6    officers, and without any audio, I can only go by what

01:42:06    7    the officers say that -- or Officer -- Trooper Wright in

01:42:10    8    this case perceived a threat.

01:42:12    9        Q.    Okay.  But the standard that we're looking at

01:42:15   10    is objective reasonableness.  So what his perception is

01:42:19   11    doesn't matter, correct?

01:42:20   12        A.    That's correct.

01:42:21   13        Q.    Okay.  And when we look at the third Graham

01:42:24   14    factor, active resistance, did you see any active

01:42:27   15    resistance from Alex in the video?

01:42:34   16        A.    I don't know.

01:42:35   17        Q.    Okay.

01:42:37   18        A.    Like I say, the -- the big factor is the

01:42:39   19    audio, which there is none.  And just looking at the

01:42:44   20    video, I can't tell whether he's tensing up, whether

01:42:48   21    he's refusing to put his arm behind his back.  I don't

01:42:52   22    know what's said by him or by the officers.  From an

01:42:58   23    independent observation, I could reasonably say it could

01:43:02   24    go both ways.  If, in fact, Mr. Hornback was tensing up,

01:43:06   25    then there would have been -- that would have been

Page 159

01:43:09    1    resistance, which would have been threatening to an

01:43:11    2    officer.

01:43:12    3        Q.   But you're not able to discern that from the

01:43:14    4    video itself, correct?

01:43:15    5        A.   No.  No.

01:43:15    6        Q.   Is that correct?

01:43:16    7        A.   That's correct.  I'm sorry.  I keep doing

01:43:18    8    that.

01:43:19    9        Q.   And I've been through this before, and then

01:43:22    10   the transcript looked really ugly.  So I'm just trying

01:43:25    11   to, you know, make sure we've got clear answers.

01:43:27    12            MR. MORGAN:  You're doing a fine job.

01:43:28    13   BY MR. WIEST:

01:43:30    14       Q.   The -- after Trooper Wright executes his

01:43:33    15   takedown, do you discern any threats to the officers

01:43:39    16   from Alex once Alex is on the ground?

01:43:45    17       A.   I can't see anybody -- or I can't see any

01:43:49    18   threats on the video.

01:43:52    19       Q.   Okay.

01:43:52    20       A.   But I don't know what was said, and as I said,

01:43:53    21   I don't know whether he's tensing his arms, putting his

01:43:56    22   arms to a position to where they couldn't be pulled out

01:44:00    23   from under him with some degree of force.

01:44:02    24       Q.   Do you discern any active resistance from Alex

01:44:06    25   Hornback once he's on the ground?

Page 160

01:44:07  1       A.    Not that I can see in the video.

01:44:09  2       Q.    Okay.  You mentioned in your report on Page 17

01:44:17  3    that Alex had a prior history of fleeing or evading and

01:44:21  4    for assault.  Do you see that?

01:44:23  5       A.    I do, yes.

01:44:26  6       Q.    This was the subject of a discussion that I

01:44:28  7    think I had with the troopers, and you might have seen

01:44:30  8    it in the transcript.  If someone has an arrest, but not

01:44:34  9    a conviction, can you count that?

01:44:37  10      A.    You can take it into consideration.  It's --

01:44:41  11   it's something that you might consider.

01:44:47  12      Q.    Let me -- let me ask.  Have you ever

01:44:50  13   experienced in your career someone who has been falsely

01:44:54  14   charged with something?

01:44:55  15      A.    I have.

01:44:56  16      Q.    And that's why we have courts to figure out

01:44:58  17   whether or not people did what they were charged with,

01:45:00  18   right?

01:45:01  19      A.    Well, yes and no.  I mean, there's, like

01:45:05  20   anything else, there are sometimes -- there are those

01:45:08  21   cases where the District Attorney declines to prosecute

01:45:13  22   a whole array of charges, opts to charge one or two out

01:45:18  23   of four, so to speak.  There's cases where they may ask

01:45:23  24   the defendant to plead guilty to a lesser charge.

01:45:26  25   There's all kinds of reasoning that would -- that would

Page 161

01:45:29    1    serve to document the fact that the individual wasn't

01:45:31    2    particularly convicted for a specific offense.  But you

01:45:34    3    can't really know unless you can go back and look at

01:45:38    4    that particular case and all of the circumstances, so I

01:45:41    5    don't know.

01:45:41    6        Q.    And -- and I'm going to call it a rap sheet,

01:45:43    7    because that's what it's commonly known as, right?

01:45:46    8        A.    Right.

01:45:46    9        Q.    But it's someone's criminal history, correct?

01:45:49   10        A.    Correct.

01:45:49   11        Q.    If I'm an officer and I'm looking at someone's

01:45:51   12    criminal history, does the age of the offense matter?

01:45:57   13        A.    It could, yes.

01:45:58   14        Q.    And so something that might be 5, 10, 15 years

01:46:01   15    ago might be less relevant than something that happened

01:46:05   16    a couple of weeks ago, right?

01:46:07   17             MR. MORGAN:   Form.

01:46:07   18        A.    In that hypothetical --

01:46:07   19    BY MR. WIEST:

01:46:09   20        Q.    Right.

01:46:09   21        A.    -- that's possible, yes.

01:46:15   22        Q.    Irrespective of Mr. Hornback's criminal

01:46:18   23    record, if he is not engaged in any resistance

01:46:23   24    whatsoever and he's compliant with officers and their

01:46:29   25    instructions, the use of force against him would not be

Page 162

01:46:31    1    appropriate, correct?

01:46:34    2         A.    Under that hypothetical, that's correct.

01:46:36    3         Q.    Okay.  You render the opinion that you believe

01:46:53    4    that the troopers had consent to enter the home.

01:46:57    5         A.    Yes.

01:46:57    6         Q.    And I want to discuss that with you, because,

01:47:02    7    sir, you would agree that consent is a different concept

01:47:06    8    than authority, right?

01:47:07    9         A.    I would agree.

01:47:09   10         Q.    In other words, if you've got an arrest

01:47:13   11    warrant and you're entering the home to effect it, it

01:47:18   12    doesn't matter as the homeowner whether or not I let you

01:47:20   13    in or not, you have the authority to -- to execute that

01:47:23   14    warrant, correct?

01:47:24   15         A.    Correct.  You don't need consent.

01:47:28   16         Q.    Correct.  And I agree with you.  Consent is

01:47:30   17    when the homeowner says, Sure, come on in, and does so

01:47:35   18    voluntarily, right?

01:47:36   19         A.    Correct.

01:47:36   20         Q.    And you would agree that to have valid

01:47:38   21    consent, it has to be a voluntary action, not under

01:47:42   22    threat of compulsion of law, right?

01:47:44   23         A.    I would agree.

01:47:45   24         Q.    Okay.  Do you know whether or not at the time

01:47:46   25    that the officers were let inside the Hornback home,

Page 163

01:47:50    1    they were told that the officers had a warrant?

01:47:54    2         A.   My understanding is that, yes, they were told

01:47:57    3    that the officers had a -- no.  I'm sorry.  No, not

01:48:00    4    initially.  Initially, the officers said, as I recall

01:48:05    5    reading in the documents, that they were there and they

01:48:08    6    wanted to speak to Alex.

01:48:10    7         Q.   Right.

01:48:10    8         A.   But they didn't say why, or they didn't

01:48:13    9    articulate that we have an arrest warrant initially.

01:48:16   10         Q.   So I agree with you.

01:48:18   11              My question is, though, at the time that they

01:48:19   12    entered the home, when they crossed the barrier through

01:48:22   13    the front door, do you know whether or not they had

01:48:24   14    informed the Hornbacks that they had a valid arrest

01:48:28   15    warrant?

01:48:29   16         A.   My understanding is by that time, yes.

01:48:30   17         Q.   Okay.  And so we're really not dealing with

01:48:32   18    their consenting.  The officers had presented legal

01:48:35   19    authority at that point to enter the home, right?

01:48:38   20         A.   That's my opinion and my analysis.  They

01:48:40   21    didn't really need consent, so consent was a -- was a

01:48:43   22    moot area.  Whether they did or did not give consent was

01:48:48   23    immaterial to my analysis, because they had the

01:48:51   24    authority to enter with or without consent.

01:48:53   25         Q.   Okay.  Let me ask, one of the things that I'm

Page 164

01:48:58     1    sure you're aware of is later on there's this

01:49:01     2    interaction on the street with respect to -- this is

01:49:03     3    after the arrest -- with respect to Kevin Hornback's

01:49:07     4    cell phone.  Do you know what I'm talking about?

01:49:09     5         A.   Yes.

01:49:10     6         Q.   And there is an allegation, and I think it's

01:49:18     7    supported by the dash cam video, we could hear audio

01:49:22     8    about it, where the troopers say that they don't want to

01:49:27     9    see that phone video showing up on social media.  Did

01:49:30    10    you hear that in the dash cam?

01:49:32    11         A.   I believe so, yes.

01:49:33    12         Q.   Okay.  And the -- the discussion is had, and I

01:49:39    13    think it's borne out in the testimony, including of

01:49:41    14    Sergeant Brown, that there was a call that the troopers

01:49:45    15    made regarding possibly arresting the Hornbacks, Kevin

01:49:50    16    and Sonya, for harboring a fugitive.  You're familiar

01:49:51    17    with that, right?

01:49:54    18         A.   Well, I don't know that it was for harboring a

01:49:57    19    fugitive.  It was -- the call was made as to whether or

01:49:58    20    not they could arrest the parents, Kevin and Sonya, for

01:50:01    21    interfering with the investigation or interfering with

01:50:03    22    the arrest.

01:50:07    23         Q.   Okay.

01:50:07    24         A.   And -- excuse me.  And -- and harboring a

01:50:13    25    fugitive.

Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 165 of 235 PageID
#: 1293

Hornback vs. Czartorski                 William T. Gaut, PH. D.                    01/28/2022

Page 165

| | | |
|---|---|---|
| 01:50:14 | 1 | Q.   Okay.  Or hindering prosecution? |
| 01:50:21 | 2 | A.   I think that's -- |
| 01:50:22 | 3 | Q.   That's the official charge? |
| 01:50:23 | 4 | A.   -- the official charge, yeah. |
| 01:50:27 | 5 | MR. WIEST:  Am I up to 8? |
| 01:50:27 | 6 | THE COURT REPORTER:  Yes. |
| 01:50:27 | 7 | MR. WIEST:  Thank you. |
| 01:50:27 | 8 | (Exhibit 8 was marked for identification.) |
| 01:50:27 | 9 | BY MR. WIEST: |
| 01:50:44 | 10 | Q.   You make the statement at the bottom of Page |
| 01:50:47 | 11 | 18 of your report, and you say -- well, first, let's |
| 01:51:01 | 12 | begin with this. |
| 01:51:01 | 13 | You say, Plaintiffs further allege that the |
| 01:51:03 | 14 | troopers should have known that a defense to those |
| 01:51:06 | 15 | charges is the fact that they were the parents of the |
| 01:51:08 | 16 | fugitive.  Right? |
| 01:51:09 | 17 | A.   I'm trying to find that.  Yes. |
| 01:51:10 | 18 | Q.   It's on the bottom of 18. |
| 01:51:12 | 19 | A.   Yes. |
| 01:51:12 | 20 | Q.   And you acknowledge that that is a defense |
| 01:51:15 | 21 | under KRS 520.110, Subsection 2, that I just handed you, |
| 01:51:20 | 22 | correct? |
| 01:51:20 | 23 | A.   I would agree. |
| 01:51:21 | 24 | Q.   Okay.  Do you think the troopers -- was there |
| 01:51:23 | 25 | -- do you think there was any doubt in the troopers' |

Page 166

01:51:25    1   mind that, in fact, Kevin and Sonya were the parents of

01:51:29    2   Alex?

01:51:29    3        A.    I don't --

01:51:29    4             MR. MORGAN:  Objection.  Speculation.

01:51:29    5             MR. HEALEY:  Form.

01:51:32    6        A.    I don't have any reason to doubt that.

01:51:33    7   BY MR. WIEST:

01:51:33    8        Q.    Okay.  So in terms of rendering your opinions,

01:51:35    9   you're assuming that they knew that the -- that Alex and

01:51:40   10   Sonya -- I'm sorry.  Strike that.  That Kevin and Sonya

01:51:42   11   were the parents of Alex, correct?

01:51:45   12        A.    That's my understanding.

01:51:46   13        Q.    Okay.  And what you say is for probable cause

01:51:49   14   purposes, the troopers having knowledge of a -- that an

01:51:55   15   affirmative defense applies doesn't matter in terms of

01:51:58   16   the arrest.  Do I have that right?

01:52:01   17        A.    Tell me what line you're quoting from.

01:52:03   18        Q.    Yeah.  You say, However, I saw no absolute

01:52:08   19   prohibition against arrest in the statute.  Right?

01:52:11   20        A.    Yes.  Correct.

01:52:12   21        Q.    Just as self-defense is a defense against a

01:52:15   22   criminal homicide charge, it is up to the Court to

01:52:15   23   interpret the law and rule on the troopers' actions.

01:52:15   24   Right?

01:52:16   25        A.    Correct.

Page 167

01:52:22  1       Q.   And so -- and tell me if this is wrong, but I

01:52:24  2   think what you're saying here is that the troopers could

01:52:26  3   have arrested them for this, even though they knew that

01:52:28  4   an affirmative defense applied?

01:52:31  5       A.   I'm -- I'm -- yes.  My opinion is that they

01:52:33  6   could have arrested them for interfering with the police

01:52:38  7   officer.

01:52:39  8       Q.   Or hindering prosecution?

01:52:41  9       A.   Hindering prosecution, as you say.  That's my

01:52:45  10  opinion is that they could have been arrested for that,

01:52:47  11  and then as far as a defense, that would be up to a

01:52:50  12  trial court.

01:52:59  13      Q.   Okay.  And, obviously, sir, if the United

01:53:02  14  States Court of Appeals for the Sixth Circuit holds

01:53:06  15  exactly contrary to that, you -- you have nothing to say

01:53:08  16  about that, right?

01:53:09  17      A.   No, sir.  That's --

01:53:11  18      Q.   Okay.

01:53:11  19      A.   -- outside the scope of my expertise.

01:53:12  20      Q.   Okay.  And you've not read any of those cases

01:53:15  21  on this issue, correct?

01:53:16  22      A.   Correct.

01:53:16  23      Q.   Thank you.

01:53:22  24           All right.  I want to look at the assumptions

01:53:28  25  that you make on Page 19 regarding the takedown of Alex.

Page 168

01:53:54    1    You say, Trooper Czartorski appears to direct Alex to

01:53:59    2    face the wall.  Do you see that?

01:54:01    3        A.    Yes.

01:54:02    4        Q.    And I am assuming that the point in time that

01:54:03    5    you're talking about is after Alex has come out and the

01:54:07    6    troopers are in the basement, and the parents are

01:54:09    7    depicted on the video, right?

01:54:11    8        A.    Correct.

01:54:11    9        Q.    Okay.  How do you -- how do you know that

01:54:12   10    Trooper Czartorski was appearing to direct Alex to face

01:54:16   11    the wall?  Are you just looking at the video?

01:54:18   12        A.    I'm looking at the video.  I'm considering the

01:54:22   13    testimony, depositions, that he was told to put his

01:54:27   14    hands on the wall.  And then in the video, it shows the

01:54:30   15    officer making a physical motion as if he's pointing to

01:54:34   16    the wall, which I interpret as his direction for

01:54:39   17    Mr. Hornback to put his hands on the wall.

01:54:43   18        Q.    Okay.  And then you say, Trooper Wright

01:54:47   19    appears to give the same direction, and he places his

01:54:49   20    hands -- he places his back to the wall facing the

01:54:52   21    troopers.

01:54:53   22        A.    Right.

01:54:54   23        Q.    Okay.  Trooper Wright turns Alex, who places

01:54:58   24    his hands on the wall.  So I think what you're saying is

01:55:00   25    he turns him around to face the wall?

Page 169

01:55:03    1        A.    Right.

01:55:05    2        Q.    Okay.  And then you say, Immediately after

01:55:07    3    placing his hands on the wall, within two seconds, Alex

01:55:10    4    removes his right hand and turns slightly towards

01:55:13    5    Trooper Wright.  As Sonya steps towards the trooper's

01:55:18    6    position, her forward motion is stopped by Trooper

01:55:18    7    Wright.  He uses his left arm to block her forward

01:55:22    8    motion.

01:55:22    9        And then you say, Within three seconds, Alex

01:55:25   10    then appears to take his left hand off the wall and turn

01:55:28   11    to his left towards Trooper Czartorski.  Trooper Wright

01:55:32   12    then grabs Alex around the shoulders in a twisting

01:55:35   13    motion and takes him to the floor.  Correct?

01:55:37   14        A.    Correct.

01:55:38   15        Q.    Those are the factual assumptions that

01:55:40   16    underline -- that underlie the opinions that you've

01:55:43   17    rendered in this case?

01:55:44   18        A.    Based on my observation of the video, yes.

01:55:47   19        Q.    And I think we've talked about it before, but,

01:55:48   20    obviously, if those are incorrect and Alex has both his

01:55:53   21    hands on the wall, and he's complying, then the

01:55:55   22    subsequent opinions you render about use of force would

01:55:58   23    be inappropriate, correct?

01:56:01   24        A.    You'd have to show me something in greater

01:56:03   25    detail than that.  I mean, you'd have to show me.

Page 170

01:56:07    1        Q.    I'm giving you the hypothetical.

01:56:08    2        A.    Yes.

01:56:08    3        Q.    If his hands are on the wall and he's

01:56:10    4    complying, the use of force against him would be

01:56:10    5    inappropriate?

01:56:11    6        A.    Hypothetically, yes.

01:56:12    7        Q.    Okay.  Let me ask, how many times did you

01:56:17    8    watch the video in the basement?

01:56:21    9        A.    I don't know.  Probably four or five times,

01:56:26   10    maybe six.

01:56:27   11        Q.    Okay.  And so there's no doubt in your mind

01:56:32   12    that you've got the facts, as you've stated them, that

01:56:36   13    they're correct?

01:56:37   14        A.    I believe I have.  Because, like I say, I've

01:56:40   15    -- I've viewed the video in the realtime speed, and then

01:56:43   16    my equipment, of course, I have the ability to slow it

01:56:46   17    down.  So --

01:56:46   18        Q.    Did you do that?  Did you slow it down?

01:56:48   19        A.    I slowed it down, so that I could put a timing

01:56:50   20    sequence on it so that I could tell whether it's one

01:56:53   21    second or three seconds or whatever it is to

01:56:55   22    determine -- that's why I put the detail in about two

01:56:59   23    seconds, three seconds.

01:57:00   24        Q.    Okay.  Did you -- did you take a frame by

01:57:02   25    frame of it?

Page 171

01:57:03    1        A.    No, I did not.

01:57:04    2        Q.    Okay.  What speed did you slow it down to?

01:57:07    3    Was it half normal speed?  Quarter normal speed?

01:57:11    4        A.    Probably one-third, I think is as low as my

01:57:14    5    system will go.  It won't -- it won't go down to a

01:57:16    6    quarter.  I -- I think I can slow it down to two-thirds

01:57:19    7    or one-third, and those are -- I don't have the

01:57:22    8    capabilities of doing it frame by frame.

01:57:24    9        Q.    Okay.  And so when you did the one-third,

01:57:26   10    that's what you're talking about in terms of -- of sort

01:57:28   11    of breaking this down?

01:57:30   12        A.    Yes, sir.

01:57:30   13        Q.    Okay.  All right.  And you acknowledge, of

01:57:36   14    course, that audio would be imminently helpful in this

01:57:40   15    case, correct?

01:57:41   16        A.    It would have been helpful, yes.

01:57:43   17        Q.    Because then we get two senses, our hearing

01:57:46   18    and our vision, instead of just our vision, right?

01:57:49   19        A.    Right.

01:57:49   20        Q.    Okay.  The video -- you indicate Sonya then

01:57:53   21    again steps forwards towards the troopers and is pushed

01:57:57   22    back by Trooper Czartorski, correct?

01:58:00   23        A.    Correct.

01:58:00   24        Q.    And then the video shows Trooper Czartorski

01:58:02   25    using his flashlight to deliver four strikes to Alex's

Page 172

01:58:06    1    right thigh.  Do you see that?

01:58:08    2         A.    Correct.

01:58:08    3         Q.    Was Alex resisting at the time of these --

01:58:11    4    these thigh strikes?

01:58:18    5         A.    It appears to me that he was not compliant

01:58:21    6    with the officers' commands, although I cannot hear the

01:58:25    7    commands.  He is not -- at that point, he is not face

01:58:30    8    down.  He has -- he has gone from a face-down position

01:58:33    9    to a slightly on his left side position with his right

01:58:38   10    thigh slightly higher than his left thigh, and that's

01:58:43   11    when the strikes are -- are administered.  And from the

01:58:47   12    video, it looks to me as if he is not compliant as in

01:58:53   13    laying in a totally prone position flat on his face, but

01:58:56   14    he's slightly trying to roll over.

01:58:58   15         Q.    And you are assuming that he's not compliant,

01:59:00   16    because you are making the assumption that the officers

01:59:03   17    directed him to lay face down?

01:59:05   18         A.    No.  I'm making the assumption that the

01:59:07   19    officers -- in the initial takedown, Mr. Hornback was in

01:59:12   20    a face-down position, completely in a face-down

01:59:16   21    position, because Officer Wright actually had his knee

01:59:19   22    across his back, upper shoulder blades and so forth,

01:59:23   23    which is a typical containment posture that an officer

01:59:27   24    uses.  After a takedown maneuver, you hold your subject

01:59:30   25    down to prevent them from getting up.  And while that's

Page 173

01:59:33   1   going on, Mr. Hornback is suddenly turned slightly to

01:59:38   2   his left side, not completely on his left side, but

01:59:41   3   slightly to his left as if he's trying to get up.

01:59:45   4       Q.   Okay.   Is he kicking or striking the troopers

01:59:48   5   in any way?

01:59:48   6       A.   No.

01:59:52   7       Q.   Did you observe, once he was taken down,

01:59:56   8   Trooper Wright strike him in any form or fashion?

02:00:05   9       A.   I'm trying to remember that aspect of the

02:00:07  10   video, and it seems like Officer Wright may have used

02:00:13  11   his right hand to do what we call a hammer strike,

02:00:16  12   that's down to -- on the -- it would have been on

02:00:20  13   Mr. Hornback's right side shoulder.

02:00:25  14       Q.   After the takedown?

02:00:26  15       A.   After the takedown.

02:00:27  16       Q.   Why isn't that mentioned in your factual

02:00:28  17   summary on Page 19?

02:00:30  18       A.   I don't know.   I just neglected to mention

02:00:33  19   that, because it's -- I guess I'm caught up in that --

02:00:37  20   that's a standard procedure for a takedown to occur is

02:00:41  21   if the individual starts trying to get up, you do a

02:00:45  22   number of different things available, one of which is a

02:00:48  23   hammer strike to the upper back region.   It forces the

02:00:52  24   individual back down on a flat position.   And I just

02:00:58  25   neglected to put that in there.

Hornback vs. Czartorski                William T. Gaut, PH. D.                01/28/2022

Page 174

02:01:00   1        Q.   You would agree that the use of an impact

02:01:03   2   weapon or a flashlight would be inappropriate for every

02:01:06   3   single arrest, correct?

02:01:08   4        A.   For every single arrest?

02:01:11   5        Q.   Right.

02:01:11   6        A.   I don't know that that would be appropriate.

02:01:13   7        Q.   You would agree that the use of an impact

02:01:13   8   weapon or a flashlight would be inappropriate if a

02:01:13   9   subject is not resisting, correct?

02:01:18  10        A.   I would agree.

02:01:29  11        Q.   Can you turn to Page 21 with me of your

02:01:32  12   report?  There's a statement you make on the -- it's

02:01:49  13   like right in the middle, it says -- starts, In the

02:01:52  14   light.  Tell me -- do you see that?

02:01:54  15        A.   I do.

02:01:54  16        Q.   You say, In the light most favorable to

02:01:56  17   Trooper Czartorski, I noted that he was dealing with a

02:02:00  18   resistive subject and two individuals, parents, who had

02:02:02  19   already demonstrated their intent to interfere with the

02:02:05  20   arrest of Alex Hornback.  Right?

02:02:07  21        A.   Correct.

02:02:08  22        Q.   Why was it appropriate to draft this report in

02:02:14  23   a light most favorable to Trooper Czartorski?

02:02:18  24        A.   It doesn't say that the entire report, only

02:02:20  25   that one aspect.

Hornback vs. Czartorski                William T. Gaut, PH. D.                    01/28/2022

Page 175

02:02:21    1        Q.    Okay.  Why was it appropriate to draft this

02:02:23    2    one aspect in the light most favorable to Trooper

02:02:27    3    Czartorski?

02:02:28    4        A.    Because I wanted the Plaintiffs' attorney and

02:02:33    5    the Court for that matter, to know that that was an

02:02:36    6    impression that I got, and that was not -- not based on

02:02:41    7    subjective forensic evidence.  In other words, I don't

02:02:44    8    have any audio or video, but it appeared to me based on

02:02:50    9    the information that I did have that the parents were --

02:02:54    10   had already demonstrated their intent to interfere with

02:02:59    11   the arrest.  But I wanted it clear that I was taking

02:03:02    12   that from the perspective of the officer.

02:03:04    13       Q.    And you -- what -- what standard are you

02:03:10    14   referring to?  Is there a law enforcement standard or

02:03:12    15   something like that that talks about taking something in

02:03:15    16   the light most favorable to Trooper Czartorski?

02:03:19    17       A.    There's no standard, per se.  But I typically

02:03:21    18   do that in -- in a report.  If I'm -- if I'm looking at

02:03:24    19   a particular aspect of the total analysis, some of my

02:03:28    20   reports will say, for instance, in the light most

02:03:31    21   favorable to the plaintiff, or in the light most

02:03:34    22   favorable to the defendant.  And I just want to make it

02:03:36    23   clear that that borderlines on credibility, which I

02:03:40    24   don't intend to testify to.  I mean, it's -- I think

02:03:44    25   it's inappropriate to -- for an expert to testify about

Hornback vs. Czartorski                    William T. Gaut, PH. D.                    01/28/2022

Page 176

| | | |
|---|---|---|
| 02:03:47 | 1 | credibility.  I just want to make sure that you |
| 02:03:50 | 2 | understand. |
| 02:03:51 | 3 | Q.   And so if we were to view this in the light |
| 02:03:54 | 4 | most favorable -- and I think what -- some of what |
| 02:03:56 | 5 | you're speaking to is the limitations on not having |
| 02:03:59 | 6 | audio.  Would you agree? |
| 02:04:01 | 7 | A.   I agree. |
| 02:04:01 | 8 | Q.   And if we were to view this case in the light |
| 02:04:04 | 9 | most favorable to the Plaintiffs, we would be dealing |
| 02:04:09 | 10 | with a compliant individual who was asking for |
| 02:04:12 | 11 | clarification and no use would have been appropriate, |
| 02:04:15 | 12 | right? |
| 02:04:16 | 13 | A.   I don't think we could go that far for the |
| 02:04:18 | 14 | entire thing, because there was ample evidence that the |
| 02:04:21 | 15 | parents were interfering with this -- with this law |
| 02:04:25 | 16 | enforcement action. |
| 02:04:26 | 17 | Q.   So, sir, that happened upstairs, correct? |
| 02:04:29 | 18 | A.   It did. |
| 02:04:32 | 19 | Q.   Is there any indications in the video that the |
| 02:04:34 | 20 | parents were trying to interfere prior to the takedown? |
| 02:04:39 | 21 | A.   I don't have the audio, and nothing in the |
| 02:04:41 | 22 | video until that -- the takedown occurs, and then |
| 02:04:45 | 23 | there's direct interference by Sonya Hornback to |
| 02:04:50 | 24 | interfere with the officers' actions. |
| 02:04:54 | 25 | Q.   Right.  They were beating her son, right? |

Hornback vs. Czartorski                William T. Gaut, PH. D.                01/28/2022

Page 177

02:04:56  1              MR. MORGAN:  Objection.  Form.  Move to

02:04:57  2      strike.

02:04:57  3      A.   That's -- that may be upsetting to a mother,

02:05:01  4  but that doesn't justify interfering -- interfering with

02:05:04  5  a law enforcement action.

02:05:04  6  BY MR. WIEST:

02:05:05  7      Q.   Right.  Which is why Kevin pulled her back,

02:05:08  8  right?

02:05:08  9      A.   I'm sorry?

02:05:09  10             MR. MORGAN:  Objection.

02:05:09  11  BY MR. WIEST:

02:05:10  12      Q.   Which is why, Kevin, her husband, pulled her

02:05:12  13  back to keep her from doing that?

02:05:13  14      A.   No, not exactly.  See, that's -- that's a half

02:05:15  15  truth --

02:05:15  16             MR. MORGAN:  Objection.  Speculation.

02:05:15  17      A.    -- with all due respect.  It's not because her

02:05:17  18  husband pulled her back.  It's because the officer

02:05:18  19  pulled her -- the officer put his arm out and pushed her

02:05:22  20  back the first time.  And then she advanced forward a

02:05:25  21  second time, and then that's when the husband pulls her

02:05:27  22  back.

02:05:27  23  BY MR. WIEST:

02:05:30  24      Q.   Are individuals allowed to use force or

02:05:35  25  interfere with officers who are violating the law?

Page 178

02:05:39   1        A.    I'm sorry.  Are they?

02:05:40   2        Q.    Are individuals allowed to use force or to

02:05:42   3   interfere with officers in the performance of their duty

02:05:45   4   if they're violating the law?

02:05:47   5        A.    Not that I'm aware of, no.

02:05:48   6        Q.    And so let me give you an example.  Because

02:05:50   7   it's been in the news.  George Floyd, right, with the

02:05:53   8   bystanders.

02:05:53   9        A.    Right.

02:05:53   10        Q.    If they see -- if the bystanders see the

02:05:56   11   officer is choking the life out of George Floyd, are

02:05:59   12   they allowed to go and push the officer off of George

02:06:02   13   Floyd to save his life?

02:06:05   14        A.    That's not a matter for an expert to render an

02:06:08   15   opinion on.  In my opinion, impropriety or even an

02:06:14   16   illegal action by a police officer doesn't justify a

02:06:17   17   third-party citizen to immediately go and interfere.

02:06:23   18   You know, maybe from an ethical standpoint, it should be

02:06:26   19   done, but I don't know of any -- I don't know of any

02:06:30   20   statutory authority that allows it to be done.

02:06:37   21        Q.    Okay.  You agree that viewing it in the light

02:06:42   22   most favorable to Trooper Czartorski involves a

02:06:43   23   subjective belief, your subjective belief that that's

02:06:43   24   the appropriate way to view the circumstance, correct?

02:06:48   25        A.    No.

Page 179

| | | |
|---|---|---|
| 02:06:49 | 1 | Q.   Well, you viewed it that way, right? |
| 02:06:50 | 2 | A.   No.  I'm telling you that the reason I put it |
| 02:06:52 | 3 | there is to tell you that I was referring -- that |
| 02:06:55 | 4 | specific paragraph was written in a light most favorable |
| 02:07:00 | 5 | to the -- to the trooper.  And it's not meant to be |
| 02:07:04 | 6 | applicable to my entire report, or that I viewed |
| 02:07:08 | 7 | everything in view of somebody's favor. |
| 02:07:11 | 8 | Q.   I'm not suggesting otherwise.  I'm saying when |
| 02:07:15 | 9 | dealing with this aspect, you viewed it as appropriate |
| 02:07:18 | 10 | to give the benefit of the doubt to Trooper Czartorski |
| 02:07:22 | 11 | about what was happening in the absence of audio, |
| 02:07:23 | 12 | correct? |
| 02:07:24 | 13 | A.   I viewed it as an appropriate thing to put in |
| 02:07:27 | 14 | my report. |
| 02:07:28 | 15 | Q.   And that was based on your subjective belief |
| 02:07:30 | 16 | that that was the right thing to do, just on this |
| 02:07:33 | 17 | aspect, correct? |
| 02:07:37 | 18 | A.   I don't say that, no. |
| 02:07:39 | 19 | Q.   Well, you don't say that, but that is implied |
| 02:07:42 | 20 | in and is an underpinning of viewing it in the light |
| 02:07:45 | 21 | most favorable to Trooper Czartorski, correct? |
| 02:07:49 | 22 | MR. MORGAN:  Form. |
| 02:07:49 | 23 | A.   Not in my opinion.  I mean, that may be your |
| 02:07:51 | 24 | interpretation, but... |
| 02:07:51 | 25 | BY MR. WIEST: |

Page 180

02:07:52    1        Q.    And what standard are you referring to?

02:07:55    2        A.    There is no standard.  That's what I just

02:07:57    3    said.  There's -- there's no standard that says that --

02:07:58    4    that --

02:08:02    5        Q.    Okay.  There's another statement you made.

02:08:04    6    You say at the bottom of the paragraph, I note that once

02:08:07    7    Trooper Wright arrived in the room and Mr. Hornback was

02:08:12    8    fully handcuffed, there was no further use -- no further

02:08:15    9    force used by any KSP trooper.  Do you see that?

02:08:18    10       A.    I do.

02:08:19    11       Q.    Do you actually mean Trooper Wright?  Because

02:08:21    12   he was there with the takedown the whole time.  Or do

02:08:21    13   you mean Trooper Dreisbach?

02:08:26    14       A.    You're correct.  That should be Trooper

02:08:29    15   Dreisbach arriving, yes.

02:08:31    16       Q.    So we have the 2018 thing, and now we've got

02:08:33    17   the Trooper Dreisbach.  Okay.

02:08:36    18       A.    Yes, sir.  You've uncovered two mistakes in my

02:08:38    19   report.

02:08:40    20       Q.    Okay.  I want to look at 20 -- Page 23 with

02:09:01    21   you, sir.  You -- at the bottom of that, in the very

02:09:14    22   last sentence, you say, One might argue that Trooper

02:09:16    23   Czartorski had other less direct, less volatile, less

02:09:18    24   physical options.  Do you see that?

02:09:20    25       A.    I do.

Hornback vs. Czartorski                    William T. Gaut, PH. D.                    01/28/2022

Page 181

| | | |
|---|---|---|
| 02:09:21 | 1 | Q.    What were those other less direct, less |
| 02:09:24 | 2 | volatile, less physical options? |
| 02:09:35 | 3 | A.    The trooper could have used his full body |
| 02:09:40 | 4 | weight to pin Mr. Hornback to the floor.  The officer, |
| 02:09:47 | 5 | if he had available to him, might have used a taser to |
| 02:09:54 | 6 | incapacitate him for five seconds.  Those are the only |
| 02:10:01 | 7 | two things that I can think of. |
| 02:10:03 | 8 | Q.    You think a taser was less direct than a |
| 02:10:08 | 9 | flashlight? |
| 02:10:09 | 10 | A.    It depends.  A flashlight is an impact weapon, |
| 02:10:12 | 11 | whereas a taser is an incapacitating electronic control |
| 02:10:14 | 12 | weapon. |
| 02:10:18 | 13 | Q.    Okay.  Is a taser less physical? |
| 02:10:20 | 14 | A.    A taser is less physical and less -- as Taser |
| 02:10:21 | 15 | International says, and as police administrators say, |
| 02:10:26 | 16 | The taser is the weapon most likely or the least likely |
| 02:10:30 | 17 | to produce a physical injury to the subject. |
| 02:10:34 | 18 | Q.    Okay.  He also could have grabbed his wrists, |
| 02:10:43 | 19 | put them behind his back and cuffed him, right? |
| 02:10:46 | 20 | A.    Not necessarily.  Not by himself. |
| 02:10:49 | 21 | Q.    Well, he had -- he had Wright there, too, |
| 02:10:52 | 22 | right? |
| 02:10:52 | 23 | A.    Have you ever tried to put an arm behind a |
| 02:10:55 | 24 | resistive subject?  I have hundreds of times.  You can't |
| 02:10:58 | 25 | say that, oh, well, he had two officers there, he could |

Hornback vs. Czartorski                William T. Gaut, PH. D.                01/28/2022

Page 182

| | | |
|---|---|---|
| 02:11:01 | 1 | have just grabbed his arm and put it behind his back. |
| 02:11:03 | 2 | Trust me when I say for literally hundreds, if not |
| 02:11:07 | 3 | thousands of events, sometimes it takes as many as five |
| 02:11:11 | 4 | or six officers to pull one arm out. |
| 02:11:13 | 5 | Q.   Let me ask you, sir, before the takedown, did |
| 02:11:16 | 6 | any -- did either of the troopers grab Mr. Hornback's |
| 02:11:18 | 7 | wrists to attempt to effect handcuffing of him? |
| 02:11:24 | 8 | A.   I don't recall that.  I'd have to see the |
| 02:11:25 | 9 | video again.  I didn't look at that aspect of it. |
| 02:11:27 | 10 | Q.   Did you look for that? |
| 02:11:29 | 11 | A.   I don't recall looking for that. |
| 02:11:33 | 12 | Q.   Isn't whether or not somebody is pulling away |
| 02:11:35 | 13 | from being cuffed a relevant factor? |
| 02:11:38 | 14 | A.   It's a relevant factor, but you're asking did |
| 02:11:40 | 15 | I -- did I see him grab Mr. Hornback by the arm.  As I |
| 02:11:45 | 16 | sit here today, I think -- I think the answer is yes, |
| 02:11:47 | 17 | but I'm not a hundred percent sure, so I'd rather see |
| 02:11:51 | 18 | the video, and that -- the video will speak for itself. |
| 02:11:55 | 19 | Q.   Assuming that didn't happen, wouldn't |
| 02:11:56 | 20 | attempting the handcuffing of him first prior to a |
| 02:11:59 | 21 | takedown be appropriate? |
| 02:12:01 | 22 | A.   Not necessarily.  If a subject is resisting, |
| 02:12:05 | 23 | up to the point of simply not giving you his hands or |
| 02:12:07 | 24 | arms, then is using an impact weapon an appropriate use |
| 02:12:12 | 25 | of force?  And the answer is, yes, it is.  Sometimes the |

Page 183

02:12:16   1   -- the purpose of the impact weapon is to, quote,

02:12:20   2   "encourage the individual to submit to the authority or

02:12:25   3   to the arrest or to comply with an order that's being

02:12:28   4   given."

02:12:29   5       Q.   Okay.  You would agree to discern whether or

02:12:33   6   not Alex was, in fact, resisting we would -- we would

02:12:35   7   need the audio of the event, right?

02:12:37   8           MR. MORGAN:   Objection.

02:12:37   9       A.   If --

02:12:38  10   BY MR. WIEST:

02:12:38  11       Q.   We would need the audio of the event.  The

02:12:41  12   video is perhaps not enough, is it?

02:12:42  13       A.   Well, the video is not enough to be absolutely

02:12:46  14   conclusive.  I can only go by what the witnesses,

02:12:48  15   Mr. and Ms. Hornback, the three troopers say, and the

02:12:53  16   combination with the video.

02:12:56  17       Q.   Well, let's talk about that.  Because Alex

02:12:58  18   Hornback's testimony, Kevin Hornback's testimony, and

02:13:01  19   Sonya Hornback's testimony was that Alex was following

02:13:04  20   the officers' instructions, right?

02:13:06  21       A.   Right.

02:13:06  22       Q.   They -- they got a little confused because

02:13:09  23   they thought that they were -- and I know you have a

02:13:10  24   different view of that -- but they thought that there

02:13:12  25   were two different instructions he was given, right?

Page 184

02:13:15    1       A.    Right.

02:13:16    2       Q.    But -- but that he was compliant.  And so if

02:13:18    3    we credit that testimony, there was no resistance,

02:13:21    4    correct?

02:13:24    5       A.    If we credit that testimony without any other

02:13:28    6    evidence, then the answer would be yes.  But in this

02:13:31    7    case that particular statement is contradicted by the

02:13:34    8    video, because the video shows that he was not

02:13:37    9    compliant.

02:13:40    10      Q.    We don't know what he was being told, though,

02:13:42    11   do we?

02:13:43    12      A.    Well, we know we've got two different officers

02:13:45    13   that are doing that, and doing that, and we see him

02:13:48    14   follow instructions, the physical instructions to put

02:13:52    15   his hands on the wall.  And then we also see him at some

02:13:54    16   point take both hands off the wall and turn toward the

02:13:57    17   two officers, so he wasn't being compliant.

02:14:00    18      Q.    Okay.  And at the time of the takedown, if his

02:14:01    19   hands were on the wall, he was being compliant?  I know

02:14:04    20   you don't agree with that -- with that characterization

02:14:06    21   of the video, but if that's what it shows, he was being

02:14:11    22   compliant, correct?

02:14:12    23      A.    It would depend on what the video shows.

02:14:15    24      Q.    Right.

02:14:15    25      A.    The -- you know, I don't want -- I don't want

Page 185

| 02:14:15 | 1 | to get into absolute details, but if you've got a |
| 02:14:20 | 2 | subject that has taken their hands off the wall or off |
| 02:14:23 | 3 | the car and made furtive movements toward the two |
| 02:14:24 | 4 | officers, if in the process of grabbing the individual |
| 02:14:32 | 5 | by an officer, the individual suddenly puts his hands |
| 02:14:34 | 6 | back up on the wall, too little, too late. |
| 02:14:37 | 7 | Q.  Well, that -- that's one hypothetical. |
| 02:14:38 | 8 | Another hypothetical is that he's -- there's some |
| 02:14:40 | 9 | furtive movements and then his hands are on the wall and |
| 02:14:43 | 10 | he's compliant prior to the takedown.  Assuming that |
| 02:14:45 | 11 | that's -- those are the facts, then -- |
| 02:14:48 | 12 | A.  Well, those facts are not supported by the |
| 02:14:50 | 13 | video evidence. |
| 02:14:51 | 14 | Q.  Well, I -- so, sir, I understand that that's |
| 02:14:53 | 15 | your answer.  But assume that those are -- assume that |
| 02:14:55 | 16 | those are the facts, that his hands are on the wall, |
| 02:14:57 | 17 | that there's no furtive movement at the time of the |
| 02:15:00 | 18 | takedown.  It would be inappropriate to exercise a |
| 02:15:03 | 19 | takedown, correct? |
| 02:15:04 | 20 | A.  If that were true and he was fully compliant, |
| 02:15:07 | 21 | put his hands on the wall and never took his hands off |
| 02:15:08 | 22 | the wall, was fully cooperative, there would be no |
| 02:15:13 | 23 | justification for the use of force, and I would say that |
| 02:15:15 | 24 | the officers were wrong. |
| 02:15:16 | 25 | Q.  So I think we're talking past each other.  Let |

Page 186

02:15:19    1    me give you the hypothetical again.

02:15:22    2            Assume that -- I just want you to assume this

02:15:25    3    set of facts, sir.  Assume his hands are on the wall

02:15:28    4    because he's told to put his hands on the wall.  And

02:15:31    5    then one of the troopers says, You need to put your

02:15:33    6    hands behind your back.  And he turns and he says, What

02:15:33    7    do you want me to do?  Behind my back or on the wall?

02:15:33    8    And then his hands go back on the wall.  And his hands

02:15:33    9    are there, and he's not furtively moving at that point.

02:15:33   10    And then the takedown occurs.  It would be inappropriate

02:15:44   11    to take him down under those circumstances, correct?

02:15:47   12        A.    Under that hypothetical scenario --

02:15:50   13        Q.    Yes, sir.

02:15:50   14        A.    -- which did not happen, that would be

02:15:52   15    inappropriate for the officers to use force.

02:15:54   16        Q.    And -- and when you say it didn't happen,

02:15:56   17    that's based on your review of the video, correct?

02:15:58   18        A.    No.  That's based on your demonstration.  Your

02:16:01   19    demonstration, you're holding your hands up as if

02:16:03   20    they're on a wall, and then you're simply turning your

02:16:06   21    head.  That didn't happen.

02:16:07   22        Q.    No.  I agree, the hands came off the wall.

02:16:08   23        A.    The hands came off the wall.

02:16:09   24        Q.    And then assume they're back up.

02:16:11   25        A.    Okay.

Hornback vs. Czartorski                William T. Gaut, PH. D.                01/28/2022

Page 187

02:16:11    1        Q.    And then -- and then the takedown occurs after

02:16:15    2    they're back up.  Inappropriate, correct?

02:16:17    3        A.    No.  It depends on how soon the takedown

02:16:19    4    maneuver occurred.

02:16:20    5        Q.    Okay.

02:16:20    6        A.    If the takedown maneuver occurred within one

02:16:23    7    second, then, as I said before, not to be -- be a smart

02:16:29    8    ass, it's too little, too late.  The officer has already

02:16:33    9    started his takedown maneuver, and at that point, it

02:16:36    10   doesn't matter whether or not he puts his hands back up

02:16:39    11   on the wall.  The officer is already responding at that

02:16:42    12   point.

02:16:45    13       Q.    You admit that you could be wrong because you

02:16:47    14   don't know what was said, correct?

02:16:50    15       A.    I admit that I don't know what was said.

02:16:52    16       Q.    Right.  And as a result, your conclusions

02:16:56    17   could be incorrect, right?

02:16:57    18       A.    I don't believe my conclusions are incorrect.

02:16:59    19       Q.    Well, I understand you don't believe it, but

02:17:00    20   they could be if -- if --

02:17:01    21            MR. MORGAN:  Objection.

02:17:01    22   BY MR. WIEST:

02:17:02    23       Q.    -- your assumptions about what was said is

02:17:03    24   incorrect.

02:17:04    25            MR. MORGAN:  Objection.  Form.

Page 188

| | | |
|---|---|---|
| 02:17:05 | 1 | A.    That's too speculative for me. |
| 02:17:07 | 2 | BY MR. WIEST: |
| 02:17:07 | 3 | Q.    Well, sir, you're an expert.  You're allowed |
| 02:17:09 | 4 | to speculate.  So you're saying you're not going to |
| 02:17:11 | 5 | speculate.  You're going to assume in the light most |
| 02:17:14 | 6 | favorable to Trooper Czartorski that there was |
| 02:17:16 | 7 | resistance, but you don't hear it, correct? |
| 02:17:19 | 8 | A.    No.  I didn't say that. |
| 02:17:22 | 9 | Q.    And you think maybe you see it, correct?  It's |
| 02:17:23 | 10 | correct you don't hear it? |
| 02:17:23 | 11 | MR. MORGAN:  Hold on a second. |
| 02:17:23 | 12 | A.    No, sir, you're -- |
| 02:17:25 | 13 | MR. MORGAN:  Let's not talk over each other. |
| 02:17:27 | 14 | Let the questions get out, let the witness answer. |
| 02:17:28 | 15 | Go ahead. |
| 02:17:31 | 16 | A.    No, sir.  You're taking my answer, adding your |
| 02:17:33 | 17 | own interpretation to it, restating my answer in a |
| 02:17:36 | 18 | different form, and then implying that I should agree |
| 02:17:38 | 19 | with it.  And I can't do that. |
| 02:17:40 | 20 | MR. WIEST:  Okay.  Can you repeat the question |
| 02:17:42 | 21 | to him about hearing? |
| 02:17:42 | 22 | (Discussion held off the record.) |
| 02:17:42 | 23 | THE COURT REPORTER:  "You admit that you could |
| 02:17:42 | 24 | be wrong because you don't know what was said, |
| 02:17:42 | 25 | correct?" |

Page 189

| | | |
|---|---|---|
| 02:17:42 | 1 | A.    And the answer is no, I don't admit that I |
| 02:18:18 | 2 | could be wrong, because I don't know what I've said.  I |
| 02:18:20 | 3 | believe I'm correct -- |
| 02:18:20 | 4 | BY MR. WIEST: |
| 02:18:22 | 5 | Q.    Okay. |
| 02:18:22 | 6 | A.    -- even though I don't know what was said. |
| 02:18:27 | 7 | Q.    Could what was said change the outcome of your |
| 02:18:29 | 8 | opinions? |
| 02:18:30 | 9 | A.    It could. |
| 02:18:37 | 10 | Q.    All right.  You render an opinion on Page 25 |
| 02:18:43 | 11 | about the reputation of Alex Hornback.  Do you see that? |
| 02:18:47 | 12 | A.    I do. |
| 02:18:48 | 13 | Q.    Mr. Morgan did not ask you to render that |
| 02:18:51 | 14 | opinion, correct? |
| 02:18:55 | 15 | A.    No, sir.  He didn't ask me to render any |
| 02:18:57 | 16 | opinions. |
| 02:18:58 | 17 | Q.    Right.  And he didn't ask you to look at the |
| 02:19:00 | 18 | Plaintiff's alleged injury to reputation, did he? |
| 02:19:05 | 19 | A.    He didn't ask me to do anything.  I don't take |
| 02:19:08 | 20 | directions from attorneys.  He asked me to analyze the |
| 02:19:10 | 21 | case and render an opinion appropriately. |
| 02:19:12 | 22 | Q.    Okay.  Actually -- so you're saying he didn't |
| 02:19:16 | 23 | ask you to render an opinion about the use of force |
| 02:19:21 | 24 | justified or within standards? |
| 02:19:24 | 25 | A.    No.  That's an entirely different question. |

Page 190

| 02:19:26 | 1 | He asked -- |
| 02:19:27 | 2 | Q.   Well, that was one of the things he asked you |
| 02:19:27 | 3 | to do, right? |
| 02:19:29 | 4 | A.   He asked me to render an opinion pertaining to |
| 02:19:32 | 5 | the aspects of the case as to whether or not the actions |
| 02:19:35 | 6 | of the officer did or did not comply with generally |
| 02:19:38 | 7 | accepted standards. |
| 02:19:39 | 8 | MR. WIEST:  Okay.  What exhibit number are we |
| 02:19:40 | 9 | up to? |
| 02:19:41 | 10 | THE COURT REPORTER:  9. |
| 02:19:54 | 11 | MR. MORGAN:  9. |
| 02:19:54 | 12 | MR. WIEST:  Thank you. |
| 02:19:54 | 13 | (Exhibit 9 was marked for identification.) |
| 02:19:54 | 14 | BY MR. WIEST: |
| 02:20:01 | 15 | Q.   So, sir, let me start with the first page of |
| 02:20:03 | 16 | Exhibit 9.  Are these your notes? |
| 02:20:32 | 17 | A.   They are, yes. |
| 02:20:33 | 18 | MR. MORGAN:  I would ask that my cell phone be |
| 02:20:35 | 19 | redacted from the public record. |
| 02:20:38 | 20 | MR. WIEST:  We will do that prior to filing. |
| 02:20:40 | 21 | BY MR. WIEST: |
| 02:20:40 | 22 | Q.   And I just want to -- I just want to go |
| 02:20:43 | 23 | through your notes.  You were told by Mr. Morgan that |
| 02:20:46 | 24 | the state police prior to this incident had ordered |
| 02:20:48 | 25 | Czartorski not to use a flashlight, correct? |

Page 191

| 02:20:51 | 1 | A. I'm sorry. I was reading. I'm sorry. |

| 02:20:54 | 2 | Q. No. We're on the first page -- |

| 02:20:56 | 3 | A. Yeah. |

| 02:20:56 | 4 | Q. -- of No. 9. Mr. Morgan told you that prior |

02:20:58    5    to this incident that Kentucky State Police ordered

02:21:02    6    Czartorski not to use a flashlight, correct?

02:21:08    7        A.    Correct.

02:21:09    8        Q.    Okay. That was the notes that you took down,

02:21:11    9    right? You took these notes down, I'm assuming, while

02:21:17   10    you're having the call with Mr. Morgan, right?

02:21:20   11        A.    Pretty much, yes.

02:21:20   12        Q.    Okay. And the question that Mr. Morgan asked

02:21:22   13    to you look into was, was the use of force justified and

02:21:25   14    within the standards?

02:21:26   15        A.    No, sir. You're making the wrong assumption.

02:21:28   16        Q.    Okay. There's a Q there, right? Do you see

02:21:29   17    the Q?

02:21:30   18        A.    That's my question.

02:21:31   19        Q.    Okay.

02:21:31   20        A.    Not a question from the attorney.

02:21:33   21        Q.    Okay.

02:21:33   22        A.    That's my question.

02:21:35   23        Q.    That's the question in your mind?

02:21:36   24        A.    That's the question that comes to my mind was

02:21:38   25    the use of force justified and within standards.

Hornback vs. Czartorski                 William T. Gaut, PH. D.                        01/28/2022

Page 192

02:21:47   1        Q.   Okay.  All right.  And I want to be clear, why

02:21:52   2   would you note that you had not been asked to opine

02:21:55   3   about the Plaintiff's allegation on the bottom of Page

02:22:00   4   25 -- or, I'm sorry, about midway through Page 25 of

02:22:01   5   your report?

02:22:02   6        A.   All right.  Tell me what you're reading and

02:22:13   7   asking me.

02:22:14   8        Q.   Yeah.  Finally, although not asked to opine

02:22:17   9   about the Plaintiff's allegation of injury to

02:22:18  10   reputation, I noted that Alex Hornback had an extensive

02:22:23  11   history of prior criminal arrests and convictions, all

02:22:27  12   of which are public record.  Right?

02:22:29  13        A.   Correct.

02:22:29  14        Q.   And so you were not asked to opine about his

02:22:32  15   allegation of injury to reputation, correct?

02:22:34  16        A.   That's correct.

02:22:35  17        Q.   Why would you note that you hadn't been asked

02:22:37  18   about it?

02:22:38  19        A.   Because I hadn't been asked to -- I hadn't

02:22:40  20   been asked that specific question.

02:22:42  21        Q.   Have you had any training about injury to

02:22:47  22   reputation?  Have you had any professional training

02:22:50  23   on -- on assessing injury to reputation?

02:22:54  24        A.   I'm not aware that there is any professional

02:22:56  25   training on that topic.

Page 193

02:22:58    1         Q.    Have you had any education that would -- that

02:23:01    2    would -- or was centered on assessing claims regarding

02:23:06    3    injury to reputation?

02:23:07    4         A.    Nothing other than criminal law courses that

02:23:11    5    I've taken, constitutional law courses that I've taken

02:23:15    6    pertaining to defamation of character, written

02:23:20    7    defamation versus verbal defamation.  I guess -- I guess

02:23:24    8    the answer would be yes, I have.

02:23:26    9         Q.    Have you had any training on valuing the

02:23:29    10   injury to reputation?

02:23:31    11        A.    On valuing the --

02:23:32    12        Q.    Right.

02:23:36    13        A.    Again, I don't know that there is such a

02:23:38    14   course.  As I say, I've had training in criminal justice

02:23:43    15   and criminal law and constitutional law, explaining the

02:23:48    16   difference between defamation and libel, those types of

02:23:53    17   explanations.

02:23:54    18        Q.    Okay.  But in terms of assessing claims on

02:23:58    19   injury to reputation, I think what you're telling me is

02:24:00    20   you've not had any specialized education or training in

02:24:05    21   those specific fields.  Fair?

02:24:08    22        A.    I'm telling you that I have not had such

02:24:10    23   training because I'm not aware such training exists.

02:24:14    24        Q.    Why would you render an opinion about the

02:24:16    25   Plaintiff's allegation of injury to reputation?

Hornback vs. Czartorski              William T. Gaut, PH. D.              01/28/2022

Page 194

| | | |
|---|---|---|
| 02:24:19 | 1 | A.    Because I wanted to. |
| 02:24:20 | 2 | Q.    Okay.  And the reason you wanted to was you |
| 02:24:26 | 3 | didn't like his background, and, therefore, you didn't |
| 02:24:28 | 4 | like the claim, right? |
| 02:24:29 | 5 | A.    No, sir, not at all. |
| 02:24:30 | 6 | Q.    Okay. |
| 02:24:31 | 7 | A.    There was a -- some mention of his reputation |
| 02:24:34 | 8 | being tarnished, I think, in the original Complaint. |
| 02:24:38 | 9 | And I just -- I wanted to point out the fact that, you |
| 02:24:42 | 10 | know, it's -- it's difficult to tarnish somebody's -- |
| 02:24:45 | 11 | tarnish somebody's reputation that's been arrested 58 |
| 02:24:52 | 12 | times, if I counted correctly. |
| 02:24:56 | 13 | MR. MORGAN:  Let's go -- take a break -- a |
| 02:24:57 | 14 | quick bathroom break. |
| 02:24:58 | 15 | MR. WIEST:  Yeah. |
| 02:24:59 | 16 | THE VIDEOGRAPHER:  Going off the video record |
| 02:25:00 | 17 | at 2:25 p.m. |
| 02:35:03 | 18 | (Recess taken from 2:25 p.m. to 2:35 p.m.) |
| 02:35:09 | 19 | THE VIDEOGRAPHER:  Back on the video record at |
| 02:35:14 | 20 | 2:35 p.m. |
| 02:35:14 | 21 | (Exhibit 10 was marked for identification.) |
| 02:35:14 | 22 | BY MR. WIEST: |
| 02:35:15 | 23 | Q.    Dr. Gaut, I'm going to hand you what I've |
| 02:35:17 | 24 | marked as Exhibit 10.  And I think we talked about this |
| 02:35:24 | 25 | before, but this is the IACP's Law Enforcement Code of |

Page 195

02:35:25  1    Ethics.

02:35:29  2         A.   Yes, sir.

02:35:30  3         Q.   You've seen this before?

02:35:31  4         A.   I have, yes.

02:35:32  5         Q.   And you believe that law enforcement officers

02:35:33  6    should comply with it, this is a national standard?

02:35:38  7         A.   I believe so, yes.

02:35:39  8              (Exhibit 11 was marked for identification.)

02:35:39  9    BY MR. WIEST:

02:35:42  10        Q.   I'm mostly doing cleanup at this point.  I'm

02:35:44  11   going to hand you what I've marked as Exhibit 11.

02:35:49  12             This is, I guess, former Trooper Czartorski's

02:36:00  13   docket for the perjury charge related to his testimony

02:36:04  14   in this matter.  Have you reviewed this?

02:36:07  15        A.   I've seen it, yes.

02:36:08  16        Q.   Did you use it in any way, shape, or form, or

02:36:11  17   did it form your opinions in any way?

02:36:14  18             MR. MORGAN:  Objection.

02:36:17  19        A.   I took it into consideration, but not in terms

02:36:20  20   of whether or not the use of force was appropriate.

02:36:22  21   BY MR. WIEST:

02:36:22  22        Q.   How did you take it into consideration?

02:36:24  23        A.   That the evidence appears to show that the --

02:36:27  24   that the state trooper was unethical in his answers and

02:36:33  25   subsequently was charged with perjury.  He -- he lied

Page 196

02:36:36    1    under oath intentionally.

02:36:39    2        Q.    Okay.

02:36:39    3        A.    And my understanding of the perjury charge is

02:36:42    4    not -- if I'm correct now, I'm not playing attorney, it

02:36:46    5    doesn't have anything to do with making simple mistakes,

02:36:48    6    but if -- but if you lie intentionally, then it becomes

02:36:53    7    a criminal offense.

02:36:54    8        Q.    That's right.

02:36:58    9        MR. WIEST:    All right.    Jason, I don't have --

02:36:59   10        unfortunately, I'm going to need it.    And I'm happy

02:37:01   11        to send it --

02:37:03   12        MR. MORGAN:    You don't have to give it to me.

02:37:04   13        Just tell me what it is.

02:37:05   14        MR. WIEST:    It's our -- it's Janota's expert

02:37:07   15        report.

02:37:07   16        MR. MORGAN:    I've got it.    I've got it.    No

02:37:08   17        problem.

02:37:08   18            (Exhibit 12 was marked for identification.)

02:37:08   19    BY MR. WIEST:

02:37:08   20        Q.    Okay.    I'm going to hand you, sir, what I've

02:37:14   21    marked as Exhibit 12.    Have you had the opportunity to

02:37:21   22    review Mr. Janota's expert report?

02:37:28   23        A.    Yes, sir, I have.

02:37:28   24        Q.    Okay.    Are you planning to draft or have you

02:37:34   25    drafted in any way a -- any kind of rebuttal report?

Page 197

02:37:40    1        A.    No.

02:37:41    2        Q.    Okay.  And I understand you ultimately draw

02:37:45    3    different conclusions than he does regarding this case,

02:37:48    4    right?

02:37:49    5        A.    Correct.

02:37:50    6        Q.    Do you believe -- and experts go different

02:37:54    7    ways, but do you believe that the standards that he

02:37:57    8    viewed it under, that he evaluated the case under, were

02:38:01    9    appropriate?

02:38:01   10            And I don't mean whether or not the standards

02:38:03   11    were violated, and I don't mean whether or not the force

02:38:04   12    was used, but I'm just talking about the objective

02:38:08   13    standards themselves.

02:38:09   14        A.    I believe that the standards that he used to

02:38:11   15    make his evaluation were -- were appropriate.  But I

02:38:17   16    can't say that I -- that I agree that his interpretation

02:38:21   17    of those standards was correct.

02:38:23   18        Q.    Or that he did not interpret the facts in the

02:38:26   19    same way that you did?

02:38:27   20        A.    Correct.

02:38:28   21        Q.    Okay.  And, obviously, if you interpret the

02:38:30   22    facts differently, the opinions that you draw may be

02:38:35   23    different, correct?

02:38:36   24        A.    In that -- in that respect, that's -- that's

02:38:36   25    possible.  But I'm talking about the interpretation of

Page 198

| | | |
|---|---|---|
| 02:38:40 | 1 | the standards, not the facts of the case. |
| 02:38:41 | 2 | Q.    Okay.  In what way do you disagree with his |
| 02:38:43 | 3 | interpretation of the standards? |
| 02:38:48 | 4 | A.    All I did was a cursory review reading through |
| 02:38:52 | 5 | it, so I can't cite as to -- as to specifics.  I'd have |
| 02:38:55 | 6 | to go back and reread the report, and -- and then I |
| 02:38:58 | 7 | could possibly form opinions.  I just don't have any |
| 02:39:01 | 8 | opinions in that vein right now. |
| 02:39:03 | 9 | MR. WIEST:  And I understand that -- that |
| 02:39:05 | 10 | there may be rebuttal reports.  If those are going |
| 02:39:08 | 11 | to be drafted or offered, if he's going to offer |
| 02:39:13 | 12 | critical opinions, we want to hear it. |
| 02:39:16 | 13 | MR. MORGAN:  Sure. |
| 02:39:16 | 14 | MR. WIEST:  And I don't know -- it sounds like |
| 02:39:18 | 15 | he hasn't already done that work. |
| 02:39:20 | 16 | MR. MORGAN:  No, he has not. |
| 02:39:21 | 17 | BY MR. WIEST: |
| 02:39:29 | 18 | Q.    Let me ask, one of the things that Mr. Janota |
| 02:39:30 | 19 | finds relevant is the failure to fill out a use-of-force |
| 02:39:37 | 20 | report by Trooper Czartorski, which was required under |
| 02:39:37 | 21 | KSP policy.  Do you believe that that's a relevant fact? |
| 02:39:41 | 22 | A.    No. |
| 02:39:41 | 23 | Q.    For you it's not relevant at all? |
| 02:39:43 | 24 | A.    That's -- well, to me, that's whether or not |
| 02:39:45 | 25 | an officer violates an internal policy doesn't have |

Page 199

| | | |
|---|---|---|
| 02:39:49 | 1 | anything to do with whether or not that officer may have |
| 02:39:51 | 2 | violated someone's constitutional rights or used |
| 02:39:54 | 3 | excessive force.  Typically, internal policies are |
| 02:40:00 | 4 | completely different from -- from aspects of a criminal |
| 02:40:06 | 5 | charge or a civil rights violation. |
| 02:40:09 | 6 | Q.    Okay.  By the way, have you had any prior |
| 02:40:12 | 7 | interactions with Mr. Janota? |
| 02:40:15 | 8 | A.    No. |
| 02:40:15 | 9 | Q.    Have you testified opposite him in any other |
| 02:40:18 | 10 | cases? |
| 02:40:18 | 11 | A.    I don't believe I have.  If I have, I don't |
| 02:40:20 | 12 | remember his name. |
| 02:40:21 | 13 | Q.    Okay.  And, sir, the opinions that you did |
| 02:40:32 | 14 | render in your report at Exhibit 1, you rendered those |
| 02:40:36 | 15 | to a degree of professional certainty? |
| 02:40:39 | 16 | A.    That's the way I end my reports, yes. |
| 02:40:42 | 17 | Q.    On Page 25, right? |
| 02:40:43 | 18 | A.    Yes. |
| 02:40:44 | 19 | Q.    That's accurate, correct? |
| 02:40:45 | 20 | A.    Yes. |
| 02:40:47 | 21 | MR. WIEST:  Give Mr. Bruns and I just a couple |
| 02:40:49 | 22 | of minutes.  We may have some cleanup.  Otherwise |
| 02:40:52 | 23 | we will tender you.  I don't know if your counsel |
| 02:40:54 | 24 | or -- |
| 02:40:55 | 25 | MR. MORGAN:  I don't.  I save it for trial. |

Page 200

02:40:58    1        So do you have any questions?

02:41:00    2             MR. HEALEY:  No.  I have no questions.

02:41:02    3             MR. MORGAN:  Oh, okay.

02:41:02    4             MR. WIEST:  Let us -- let us check, and we may

02:41:04    5        be batting cleanup, and we'll get everybody out of

02:41:08    6        here.

02:41:09    7             THE VIDEOGRAPHER:  Going off the video record

02:41:10    8        at 2:41 p.m.

02:41:12    9             (Recess taken from 2:41 p.m. to 2:45 p.m.)

02:45:22   10             THE VIDEOGRAPHER:  Back on the video record at

02:45:23   11        2:45 p.m.

02:45:24   12   BY MR. WIEST:

02:45:25   13        Q.   All right.  Dr. Gaut, I know we talked before

02:45:29   14   about Daubert motions and your past experience with

02:45:37   15   them.  You would agree that if your opinion or testimony

02:45:43   16   had been the subject of a successful Daubert challenge,

02:45:46   17   that's a serious issue in the world of experts, correct?

02:45:49   18        A.   Not necessarily.

02:45:52   19             MR. MORGAN:  Form.

02:45:53   20        A.   It can be -- it can be serious.  It can lead

02:45:55   21   to everything from disqualification down to disallowance

02:46:02   22   of certain aspects of testimony, but as far as I know,

02:46:05   23   I've seen a lot of Daubert motions over the years, and a

02:46:10   24   lot of them are pretty routine in the sense that, okay,

02:46:13   25   this expert is not going to be allowed to give medical

FMCR

Page 201

| | | |
|---|---|---|
| 02:46:17 | 1 | testimony.  I don't intend to do that anyway.  This |
| 02:46:19 | 2 | expert is not allowed to give legal opinions.  I'm not |
| 02:46:22 | 3 | going to do that anyway.  This officer is not allowed to |
| 02:46:27 | 4 | assign credibility.  I don't do that anyway, so... |
| 02:46:29 | 5 | BY MR. WIEST: |
| 02:46:31 | 6 | Q.   All of the opinions -- |
| 02:46:33 | 7 | A.   And I -- if I -- I don't mean to interrupt, |
| 02:46:34 | 8 | but I need to correct an answer.  While you were out, I |
| 02:46:38 | 9 | read, quickly skimmed through my copy of the -- the |
| 02:46:42 | 10 | opposing expert report. |
| 02:46:44 | 11 | Q.   Yes, sir. |
| 02:46:45 | 12 | A.   And my answer to you to your question involved |
| 02:46:49 | 13 | my belief that he improperly interpreted some of the |
| 02:46:53 | 14 | standards, and I need to correct that.  Because the |
| 02:46:58 | 15 | evidence that I saw in his report, he not only |
| 02:47:01 | 16 | misinterpreted some of the standards, he got his facts |
| 02:47:07 | 17 | entirely -- in some cases entirely wrong.  He -- for |
| 02:47:12 | 18 | instance, he says that the officers grabbed Alex and |
| 02:47:15 | 19 | placed him in a headlock, that they grabbed his arms and |
| 02:47:18 | 20 | threw him up against the wall, that they entered without |
| 02:47:23 | 21 | permission.  And then in the next line, it says that the |
| 02:47:26 | 22 | officers were allowed to enter the home by Kevin |
| 02:47:30 | 23 | Hornback.  He's kind of all over the board.  That |
| 02:47:34 | 24 | Officer Wright put his knee on his neck, that he put him |
| 02:47:39 | 25 | in a chokehold, that numerous times he was struck with |

Page 202

02:47:44    1    both the officers' elbow and forearm.  There's probably

02:47:50    2    a dozen places here where it's just factually incorrect.

02:47:54    3        Q.    According to you?

02:47:56    4        A.    According to the video evidence.  I mean, you

02:47:59    5    know, when you say he put him in a headlock and officers

02:48:05    6    struck him multiple times with elbows and so forth, and

02:48:11    7    there's -- there's no evidence that I saw that any of

02:48:15    8    that kind of stuff happened.

02:48:16    9        Q.    Well, you would agree with me that the video

02:48:18    10    is the video, right?

02:48:19    11        A.    The video, that's -- as I say, the video --

02:48:21    12    the video speaks for itself.

02:48:22    13        Q.    Right.  And if -- if his narrative of the

02:48:25    14    video and what he says occurred, you have a different

02:48:30    15    interpretation of what you say is in that video, right?

02:48:34    16        A.    Well, I have a different interpretation based

02:48:36    17    on viewing of the video.  And then there was a couple of

02:48:40    18    places in there, for instance, that when I say he's

02:48:44    19    factually incorrect, it says that he held him in a

02:48:49    20    chokehold and so forth.  And then in one place he says

02:48:52    21    that they entered the house without permission, and in

02:48:56    22    the very next line it says, Kevin Hornback gave

02:48:59    23    permission to the officers to enter.  A direct conflict

02:49:03    24    with what he says.

02:49:05    25            That's the only critique.  And, typically,

Page 203

02:49:08    1    rarely, but if I'm ever asked, I prefer not to critique

02:49:12    2    an opposing expert's report.

02:49:14    3        Q.    Okay.

02:49:14    4        A.    That's -- he has his opinion, I have mine.

02:49:18    5        Q.    Is there anything else that you have a

02:49:19    6    critique of while we're sitting here?

02:49:22    7        A.    No.  Those are the only things that I can --

02:49:24    8    that just came to mind while I was quickly looking --

02:49:27    9        Q.    Okay.

02:49:27   10        A.    -- at his report that I highlighted.

02:49:30   11        Q.    Okay.  Sir, you've rendered an opinion --

02:49:32   12    you've -- I'm sorry.  You've rendered a report in this

02:49:35   13    case.  We've previously marked it as Exhibit 1.  And I

02:49:37   14    think I asked you this at the start, but Mr. Bruns wants

02:49:41   15    me to bat some cleanup, so I'm going to do it.  All of

02:49:44   16    your opinions that you intend to offer in this case are

02:49:48   17    contained in that report, correct?

02:49:49   18        A.    Yes.

02:49:49   19        Q.    Okay.  Sir, how many times have you been

02:49:51   20    deposed?

02:49:56   21        A.    I don't know.  Fifty or more.

02:49:58   22        Q.    Okay.  And so you know that opposing attorneys

02:50:02   23    want to see any documents that you relied on to render

02:50:05   24    your opinions, correct?

02:50:06   25        A.    Correct.

Page 204

| | | |
|---|---|---|
| 02:50:07 | 1 | Q.   In other words, you need to show your work, |
| 02:50:08 | 2 | right? |
| 02:50:09 | 3 | A.   I need to show my work, and -- but, now, |
| 02:50:11 | 4 | that's within reason. |
| 02:50:12 | 5 | Q.   Okay. |
| 02:50:12 | 6 | A.   I mean, I -- my experience includes my reading |
| 02:50:16 | 7 | and taking courses that involved a hundred textbooks. |
| 02:50:20 | 8 | And if you asked a question did I -- were those |
| 02:50:24 | 9 | considered, then my answer would be yes.  But did I |
| 02:50:29 | 10 | supply you with a hundred textbooks?  Typically, no. |
| 02:50:32 | 11 | Q.   Okay.  So you've not, and I think you've just |
| 02:50:35 | 12 | tried to explain the answer to my next question, but I |
| 02:50:38 | 13 | just want to be clear.  You're saying that there was two |
| 02:50:41 | 14 | -- there's been too -- too much material, too many |
| 02:50:46 | 15 | standards, textbooks, and other materials that you may |
| 02:50:48 | 16 | have relied on to provide it to us, correct? |
| 02:50:51 | 17 | A.   Correct.  Based on -- and that's based on my |
| 02:50:54 | 18 | experience and field experience as a sworn law |
| 02:50:56 | 19 | enforcement officer. |
| 02:50:57 | 20 | Q.   Okay.  Have we talked about all of the |
| 02:51:00 | 21 | opinions that you intend to render today? |
| 02:51:02 | 22 | A.   I believe we have, yes, sir. |
| 02:51:03 | 23 | MR. WIEST:  Okay.  Sir, we have nothing else. |
| 02:51:06 | 24 | I know she's going to talk to you about reading, |
| 02:51:10 | 25 | and I think we can go off the record, and I'm going |

Page 205

02:51:14   1        to talk to her about ordering.

02:51:17   2              THE VIDEOGRAPHER:  Going off the video record

02:51:18   3        at 2:51 p.m.

           4              (Discussion held off the record.)

           5              THE COURT REPORTER:  Can I have Exhibit 1

           6        before you leave?

           7              THE WITNESS:  Yes.

           8              THE COURT REPORTER:  And do you want to read

           9        or waive?

          10              THE WITNESS:  I'll waive.

          11              (Discussion held off the record.)

          12              MR. WIEST:  I'm going to order seven-day rush.

          13        E-Tran only.

          14              MR. MORGAN:  I'll take E-Tran and exhibits.

          15              THE COURT REPORTER:  Attorney Healey, do you

          16        want a copy?

          17              MR. HEALEY:  Yes, send a copy to me.

          18                          - - -

          19              (Thereupon, at 2:51 p.m., the deposition was

          20        concluded.)

          21                          - - -

          22

          23

          24

          25

Hornback vs. Czartorski                William T. Gaut, PH. D.                01/28/2022

Page 206

CERTIFICATE OF OATH

STATE OF FLORIDA   )

COUNTY OF LEE      )


              I, Angela L. Klein, RPR, FPR,

Notary Public, State of Florida at Large, certify that

the Witness, WILLIAM T. GAUT, PH.D., personally appeared

before me on the 28th day of January, 2022, and was duly

sworn.


              WITNESS my hand and official seal

this 6th day of February, 2022.


              (This transcript has been digitally signed.)


_____
Angela L. Klein, RPR, FPR
Notary Public, State of Florida
My Commission Expires 3/19/2023
Commission Number GG280171

Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 207 of 235 PageID #: 1335

Hornback vs. Czartorski                    William T. Gaut, PH. D.                    01/28/2022

Page 207

CERTIFICATE OF REPORTER

STATE OF FLORIDA         )

COUNTY OF LEE            )


        I, Angela L. Klein, RPR, FPR, and

Notary Public in and for the State of Florida at Large,

do hereby certify that I was authorized to and did

stenographically report the deposition of WILLIAM T.

GAUT, PH.D.; that a review of the transcript was not

requested; and that the foregoing transcript, pages 1

through 205, is a true record of my stenographic notes.


        I further certify that I am not a

relative, employee, attorney, or counsel of any of the

parties, nor am I a relative or employee of any of the

parties' attorneys or counsel connected with the action,

nor am I financially interested in the action.


        DATED this 6th day of February, 2022,

at Fort Myers, Lee County, Florida.

    (This transcript has been digitally signed.)




_____

Angela L. Klein, RPR, FPR

## Exhibits

**37310 Exhibit 1**
3:5 8:5,10 119:12
199:14 203:13
205:5

**37310 Exhibit 3**
3:7 119:20,21,22

**37310 Exhibit 4**
3:8 121:1,4

**37310 Exhibit 5**
3:9 124:4,6

**37310 Exhibit 6**
3:11 124:11,12,14,
17

**37310 Exhibit 7**
3:12 152:11,13

**37310 Exhibit 8**
3:13 165:8

**37310 Exhibit 9**
3:14 190:13,16

**37310 Exhibit 10**
3:15 194:21,24

**37310 Exhibit 11**
3:16 195:8,11

**37310 Exhibit 12**
3:17 196:18,21

## $

**$2,000**
32:1

## 1

**1**
8:2,5,10 119:12,
13,16 126:7,8,10
128:11 151:16
199:14 203:13
205:5

**1.3.1**
120:5,6

**1.3.2**
120:5

**10**
31:7 38:15 59:1,4
60:8 152:17
153:14 161:14
194:21,24

**10-day-to-serve**
58:23 93:12 152:1

**10-days-to-serve**
148:9

**11**
59:6 60:8 62:23
63:16 195:8,11

**11:03**
92:1,2

**11:19**
92:2,4

**12**
196:18,21

**12:41**
153:2,5,6

**14-day**
47:14

**15**
27:10 28:11
114:19 161:14

**150**
38:1

**16**
9:4 11:5,7 44:9,22
147:3,18,24,25

**17**
66:7 160:2

**18**
78:21 165:11,18

**19**
14:11 15:16 25:23
167:25 173:17

**1968**
12:8

**1972**
12:17 22:7 26:6

**1973**
26:7

**1975**
13:12

**1976**
18:10 25:25

**1986**
13:17 25:24

**1987**
13:17

**1988**
14:12 18:13

**1989**
13:20 29:1 146:16

**1990**
26:11

**1992**
12:8 14:16,23
18:16 22:20,21

**1994**
14:23 15:1 23:6,12

**1996**
15:1

**1997**
15:5 81:25

**1999**
15:5,16 23:1,3,16

**1:36**
153:6,8

## 2

**2**
117:18,20,21
119:12,16,17
165:21

**20**
49:14 87:4 180:20

**200**
114:22

**2000**
19:24

**2001**
24:25

**2002**
23:17

**2003**
23:17 24:16

**2006**
81:25

**2010**
79:4

**2011**
18:18 19:3

**2012**
82:1

**2018**
73:15 74:8,12,15
75:3,15 82:1
180:16

**2019**
74:2,3,4,6

**2020**
48:14 49:8,11,14
66:7 73:22,25
74:6,10,16 75:3
102:13,15 154:5

**2021**
6:8,9

**2022**
4:3

**21**
174:11

**22**
76:7,12 147:22

**23**
76:5,10,12 180:20

**24**
16:16,22 17:10
57:18 63:23 64:5
71:14 72:6,19

**24-**
69:17

**24-hour**
17:10

**240**
112:21

**25**
38:14 55:25
189:10 192:4
199:17

**250,000**
38:1

**26**
75:8

**27**
8:13 35:8

**28**
74:10

**28th**
4:3 49:10,14 57:11
58:5 62:22 73:22

**29**
18:6 19:8 35:8
73:25 74:2

**2:25**
194:17,18

**2:35**
194:18,20

**2:41**
200:8,9

**2:45**
200:9,11

**2:51**
205:3,19

## 3

**3**
6:8 117:16 119:18,
21,22 120:25
122:2 124:24
128:16,19

**3,500**
32:6

**3.1**
67:16

**30**
31:20 38:14 87:4

**31**
31:20 35:9

**32**
31:24 32:17 35:10

**36**
63:23 71:14 72:6,
19

**36-hour**
69:17

## 4

**4**
6:9,13 120:25
121:1,4 127:20
129:1

**40**
118:23

**45**
150:21

**4th**
6:15,17

## 5

**5**
41:21 48:11 51:18,
19 73:13 75:19,20
79:23 101:11
124:4,6 161:14

**50-year**
116:1

**503.090**
126:20 130:12

**520.090**
125:6,10 126:13

**520.090(1)(b)**
126:3



Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 209 of 235 PageID
#: 1337

Hornback vs. Czartorski                    William T. Gaut, PH. D.                    01/28/2022 Index: 520.110..airfare

**520.110**
165:21

**58**
46:11 194:11

---

**6**

**6**
79:23 80:18 83:7
124:11,12,14,17

**60**
118:22

**60/40**
118:22

**68**
13:12

---

**7**

**7**
42:22 43:1,5
152:10,11,13

**70**
20:11

**72**
13:12 16:9,21

**72-hour**
16:10

**74**
13:12

**75**
13:13

---

**8**

**8**
42:22 43:1,5 92:19
165:5,8

**80**
114:19

**89**
14:12

---

**9**

**9**
190:10,11,13,16
191:4

**90**
14:12 61:17 62:4

**91**
14:12

**911**
31:2

**92**
14:13

**94**
15:2

**95**
15:2

**96**
15:2

**97**
15:2 23:3 112:20

**9:03**
4:2

---

**A**

**a.m.**
4:2 92:1,2,4

**AAFS**
52:22 53:8

**ability**
7:7 68:25 116:15
170:16

**abreast**
10:16

**absence**
125:15,17,18
126:15 137:25
179:11

**absolute**
166:18 185:1

**absolutely**
60:3 73:21 183:13

**ACA**
31:15

**academy**
9:13,18 11:9
12:16,18 13:9
15:11 21:8 22:4,5
23:23 27:4 48:23
49:25 50:2,5,12
51:6,11 52:4,23
64:12 115:23,25

**accept**
143:24

**accepted**
121:11 190:7

**accepts**
28:1

**access**

67:17 104:12

**accomplish**
117:13 120:6

**accomplishing**
117:25

**accordance**
125:9 128:2 129:7

**account**
150:16 151:16

**accounts**
137:2

**Accreditation**
48:22 65:11 120:2

**accuracy**
34:19

**accurate**
35:5,19 199:19

**acknowledge**
76:6 165:20
171:13

**acronym**
43:21 120:1

**act**
41:11 76:18 112:4
143:8

**acted**
144:21 157:15

**acting**
126:23

**action**
47:12 86:3 88:13
89:10 143:4
162:21 176:16
177:5 178:16

**actions**
47:17 88:21 99:23
101:7 113:15
144:11 166:23
176:24 190:5

**active**
14:15,17 32:25
34:2 101:18,19
102:18 113:12
117:16 118:7,11
142:21 143:7
158:14 159:24

**actively**
27:18 115:6 146:1
151:11

**activities**
38:3

**activity**
100:20 105:7

**actors**
147:7,8

**actual**
65:17 87:14
128:15

**added**
34:8

**adding**
126:4 188:16

**additional**
57:7 105:9

**adhere**
11:17 46:6 72:3
73:17

**adhering**
130:15

**adjunct**
12:20 15:3

**administered**
20:4 84:3 172:11

**administering**
129:4

**administrative**
13:16

**administrators**
181:15

**admit**
187:13,15 188:23
189:1

**advanced**
177:20

**advances**
156:10

**advantage**
16:10 103:18
108:19

**affairs**
86:16

**affect**
40:11 142:1

**affects**
40:18

**affirmative**
166:15 167:4

**afford**
129:6

**afresh**
151:22

**afternoon**
16:6

**age**
103:17 104:14
161:12

**agencies**
48:23 72:11 88:12
119:21 120:3
123:24

**agency**
73:7,11 125:4
129:5

**aggravated**
153:21

**aggression**
113:10

**aggressive**
101:19 102:18
113:6,9,17

**aggressively**
156:8

**agree**
7:16 11:14 25:11,
15,18 29:10,13
39:14,21 40:3
41:14 56:12 63:5
68:6,11 71:4
82:10,14 92:23
93:1,18 94:6 96:3
99:21 100:23,24
102:23 110:5,13
111:2,5 116:18
122:5,6,23 123:6,
12 125:20 136:22
137:1 151:13,14,
19 153:14,16,24
157:15,17,18,23,
25 158:1 162:7,9,
16,20,23 163:10
165:23 174:1,7,10
176:6,7 178:21
183:5 184:20
186:22 188:18
197:16 200:15
202:9

**Agreed**
7:9

**ahead**
114:6,17 188:15

**aiming**
38:16

**airfare**

Case 3:20-cv-00703-RGJ-LLK     Document 63     Filed 03/22/22     Page 210 of 235 PageID #: 1338

Hornback vs. Czartorski                William T. Gaut, PH. D.                01/28/2022Index: akin..assigning

32:6

**akin**
10:7

**Alabama**
14:21 15:5 22:14,
17 23:11 37:14,16

**alcohol**
17:14

**Alex**
4:12 48:12 58:4
68:16 71:6 91:17
94:21 95:7,12,16
96:12 135:5,17
136:1,3,17,22
137:3 141:5 142:2
146:23 148:8
154:16 155:25
158:4,15 159:16,
24 160:3 163:6
166:2,9,11 167:25
168:1,5,10,23
169:3,9,12,20
172:3 174:20
183:6,17,19
189:11 192:10
201:18

**Alex's**
156:7 171:25

**allegation**
83:12 164:6 192:3,
9,15 193:25

**allegations**
41:25 45:2 50:22
143:16

**allege**
165:13

**alleged**
16:21 72:19 147:5
189:18

**allegedly**
72:20

**alleging**
83:15

**allowed**
36:17,18 68:23
79:20 114:14
127:6,9 177:24
178:2,12 188:3
200:25 201:2,3,22

**alternate**
55:4 83:25

**alternatives**
122:20

**American**
9:12,13,18 11:8
19:11 20:23 21:8
25:20 26:15 27:1,4
28:15 29:19 30:12
48:23 49:25 50:2,
12 51:6,11 52:4,23
64:12

**amount**
9:16 88:24 93:22
94:1 144:24

**ample**
176:14

**analysis**
10:12 46:19 48:17
51:25 89:22
104:18 132:21
163:20,23 175:19

**analyze**
84:12 89:18
189:20

**analyzing**
70:2 90:19 98:7
104:21

**and/or**
125:4

**Angela**
4:9

**annotation**
93:12

**announce**
137:22 138:1,12
139:13 140:6,18

**annual**
9:1

**annually**
9:17 10:16

**answers**
159:11 195:24

**apparently**
20:13 134:18

**appeals**
77:7 79:13,14
138:19,22 167:14

**appeared**
175:8

**appearing**
168:10

**appears**
108:13 168:1,19
169:10 172:5
195:23

**applicable**
31:2 48:18 52:1
77:23,25 79:9
179:6

**application**
78:11 107:3

**applied**
50:11 167:4

**applies**
137:15,20 150:10
166:15

**apply**
52:22 137:17,19
139:21 147:7

**approach**
7:17

**approached**
93:17,19

**appropriately**
57:8 121:21
157:16 189:21

**appropriateness**
134:6

**approves**
88:16,18

**approximately**
36:2

**approximation**
37:20

**April**
48:13 49:8 102:13

**area**
61:5,11 90:17
100:4 163:22

**areas**
47:10 49:5

**arguably**
46:21

**argue**
107:10 180:22

**argued**
135:7 143:25

**arguing**
135:25

**arm**
103:5 112:6,12,22
113:1,5,9 114:20

**appears**
158:21 169:7
177:19 181:23
182:1,4,15

**arms**
159:21,22 182:24
201:19

**arraign**
16:9

**arraigning**
16:7

**array**
160:22

**arrest**
42:17 45:4 57:10
58:5,11,17,18 82:5
91:16,19 92:25
94:21 95:8,13
106:3 107:9,10,24
109:2 110:8,11
111:4,9,12,19
112:5 113:4,6,21
114:13,18 115:12
118:3,8,16 125:5,
9,12,15,17,18,25
126:13,18,24,25
127:3,5,12,16
129:18 130:14,17,
20 137:7,12,16,17,
19 138:3,4,11
139:22,23 141:1,5
143:17,19,21
144:1,2,3,16 146:2
147:10,17 148:1,
15,22,23 149:9
150:5,11,12,14,16,
19,25 151:7,11,13,
20,21,23 152:14
153:19 157:6
160:8 162:10
163:9,14 164:3,20,
22 166:16,19
174:3,4,20 175:11
183:3

**arrested**
19:25 22:2 24:4
46:11,17 135:9
136:1,5 167:3,6,10
194:11

**arrestee**
16:9 55:5

**arresting**
135:12 148:8
154:1 164:15

**arrests**
154:7 192:11

**arrived**
135:4 180:7

**arriving**
180:15

**article**
65:20,24

**articles**
123:23

**articulate**
105:10,20 106:12
112:14 163:9

**arts**
18:14

**ASIS**
25:21 26:2

**asks**
108:15

**aspect**
27:21 47:8 50:10
99:15 173:9
174:25 175:2,19
179:9,17 182:9

**aspects**
10:17 52:6,24 82:5
84:19 190:5 199:4
200:22

**aspirin**
69:11

**ass**
187:8

**assault**
104:9 107:17
108:19 160:4

**assaulting**
103:14

**assaults**
81:4

**assess**
148:12

**assessing**
90:17 192:23
193:2,18

**assign**
201:4

**assigned**
12:18 13:21 14:4,
5,8

**assigning**
90:22

Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 211 of 235 PageID #: 1339

Hornback vs. Czartorski                     William T. Gaut, PH. D.                01/28/2022 Index: assignment..blunt

**assignment**
  12:17
**assistance**
  128:24 129:7
**assisting**
  126:23
**associate**
  18:8
**association**
  9:21,24 24:19,24
  26:22 28:22 29:20
  30:12,23 48:20,21
  49:24 64:24 65:10,
  19 121:3 123:12,
  16 121:1,8
**assume**
  39:23 42:11 58:11
  108:7 185:15
  186:2,3,24 188:5
**assumed**
  64:4
**assumes**
  72:4
**assuming**
  33:7 37:13 58:1
  59:4,6 60:8 62:15
  63:15 72:21 141:5
  166:9 168:4
  172:15 182:19
  185:10 191:9
**assumption**
  40:1 57:21 58:1,13
  132:6,7 150:14
  172:16,18 191:15
**assumptions**
  133:12 167:24
  169:15 187:23
**attached**
  39:2 66:20
**attachment**
  32:17
**attack**
  113:18 135:1,2
**attained**
  12:24
**attempt**
  103:4 107:15,16
  135:1,2 182:7
**attempted**
  16:11,20
**attempting**

103:13 154:6
  182:20
**attempts**
  101:13
**attend**
  24:5
**attendance**
  56:2
**attitude**
  104:23
**attorney**
  14:21 17:12 33:8
  36:13 42:5,13,15
  48:6 77:10 109:12
  160:21 175:4
  191:20 196:4
  205:15
**Attorney's**
  15:9,24 23:5
**attorneys**
  4:7 9:8,23 36:15
  84:18 189:20
  203:22
**audio**
  91:10,14,18 133:4
  155:1 156:1 158:6,
  19 164:7 171:14
  175:8 176:6,21
  179:11 183:7,11
**authenticate**
  152:7
**author**
  81:7
**authored**
  6:4,16 18:19
**authority**
  77:1,7 116:12
  126:23 162:8,13
  163:19,24 178:20
  183:2
**authorized**
  126:1,16
**authors'**
  81:16
**automatic**
  150:21
**autopsies**
  56:3
**availability**
  103:16

**average**
  9:4 37:22 42:19
  134:24
**Averages**
  11:7
**avoid**
  118:16
**aware**
  40:20 45:1 48:12
  53:25 66:5,8 71:16
  73:4 76:22,25
  83:12 94:9 96:24
  97:5 98:6,23
  123:11,14,25
  124:3 130:1 131:1
  133:7 134:19
  138:2 141:12
  143:15 145:2,4,7
  149:1,6 164:1
  178:5 192:24
  193:23

---
**B**
---
**bachelor's**
  18:11 27:17
**back**
  8:13 14:1 15:12
  21:24 25:23,24,25
  29:1 33:14,17
  37:11 42:15 46:10
  54:19 58:2 60:23
  61:4,7,8,11 71:4,5
  72:18 74:17 87:13
  92:3 94:8,17,22
  95:3 111:17 117:3
  119:4 128:10
  129:13 131:4
  133:4,9 135:3
  136:23 141:4
  143:2,3 153:7
  155:12 156:10,14,
  16 158:21 161:3
  168:20 171:22
  172:22 173:23,24
  177:7,13,18,20,22
  181:19 182:1
  185:6 186:6,7,8,24
  187:2,10 194:19
  198:6 200:10
**background**
  8:1 20:9 46:12
  47:20,23 68:18
  91:16 92:18 94:2

194:3
**badge**
  140:13
**bar**
  9:20,23
**barrier**
  163:12
**base**
  154:17
**based**
  42:14 64:9 90:20
  99:12,17,18 101:7
  106:10 134:7
  138:17,24 145:14
  169:18 175:6,8
  179:15 186:17,18
  202:16 204:17
**basement**
  94:12,16 95:1
  136:24 157:12
  168:6 170:8
**basic**
  82:12
**basically**
  7:25 37:18 42:7
  56:4 77:25 80:23
  102:21 121:18
  144:15
**basis**
  21:15 56:4 68:18
  78:2 102:10
  141:20 147:18
  148:2 149:19
  150:22 155:19
**bat**
  203:15
**bathroom**
  194:14
**batter**
  140:15
**battering**
  140:14
**batting**
  200:5
**bears**
  38:18
**beating**
  176:25
**bedroom**
  136:23

**began**
  38:19
**begin**
  63:25 137:2,6
  139:24 165:12
**beginning**
  41:21
**begins**
  57:6
**behalf**
  5:19
**behavior**
  106:20
**belief**
  178:23 179:15
  201:13
**believed**
  130:13
**believes**
  126:24
**believing**
  134:25
**bench**
  58:22 93:12
  148:10 151:25
  152:17 153:14,22
**benefit**
  179:10
**bias**
  7:17
**big**
  145:16 158:18
**binding**
  77:1,7,14,16
**Birmingham**
  12:9 15:4,8,11,22,
  25 17:7 22:19 30:8
  37:15
**bit**
  58:3 62:16 71:5
  92:21 134:19
**bite**
  115:20
**blades**
  172:22
**block**
  169:7
**blood**
  69:6
**blunt**



Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 212 of 235 PageID #: 1340

Hornback vs. Czartorski                    William T. Gaut, PH. D.                    01/28/2022Index: board..charge

52:8 53:1 54:12,
14,24 55:20 56:22
70:4,18,20 72:5
87:10,19

**board**
9:12 27:25 28:1
47:6,16 201:23

**bodily**
113:19

**body**
53:6 104:25
107:20 131:22,24
133:11 181:3

**boil**
100:19

**bold**
124:25

**bolts**
12:1

**book**
78:23 81:12,20

**books**
81:8,18,22 82:4

**borderlines**
175:23

**borne**
164:13

**bottom**
10:9 61:12 79:23
128:18 129:1
147:25 165:10,18
180:6,21 192:3

**bought**
26:14

**break**
44:16 67:21 91:23
152:23,25 153:1,3
194:13,14

**breaking**
171:11

**Breonna**
139:8

**broad**
40:6,10,22 41:10,
13 114:2

**broad-based**
72:3

**broadcast**
94:7

**broke**
92:6 153:10

**brought**
5:25 13:25 14:8
151:4

**Brown**
164:14

**bruise**
68:6,19 69:9,12

**bruises**
56:15

**bruising**
52:7 54:16,19
55:1,10,15,17,19,
24 56:13,22,24
57:1 59:9,16 60:6,
12,15 62:24 63:18
64:14 68:4 69:17
70:10,13,17

**Bruns**
4:12 11:8 152:24
199:21 203:14

**building**
30:8

**bulletin**
53:22 54:5

**bulletins**
53:15

**bunch**
105:6 128:2

**business**
24:13 26:3 34:13
138:7

**buttocks**
61:12

**button**
132:11 133:9

**bystanders**
110:18 156:17
178:8,10

─────────

**C**

**CALEA**
49:23 65:6,11,15,
22 66:2,13,17,18
67:3 119:24 120:1

**California**
40:19,20

**call**
17:5,17 19:25
36:14 42:14 53:16
66:13,17 161:6
164:14,19 173:11

191:10

**called**
13:5 43:18 80:23

**Calls**
77:4

**cam**
91:5 93:23 94:9
132:19,22 133:1,
11 164:7,10

**camera**
133:4

**camera-
microphone**
94:7

**Cameron**
93:4

**cams**
131:22,24

**capabilities**
171:8

**capillary**
69:7

**captain**
12:10 13:18,20
14:4,6,12 28:25

**car**
91:12 93:24 94:9,
18 107:11,13,23
108:2,8,9,15
131:19 132:1,16,
24 133:9 185:3

**care**
18:3

**career**
12:13 15:7 17:21
115:4 116:1
160:13

**Carolina**
15:10

**carry**
67:19

**case**
5:8 7:17 12:3 16:4,
18,23 17:12 31:23
32:24 33:5,25 34:6
35:9 37:2 38:19
42:3,19 43:10
45:24 46:3,22
47:22 48:3,8
50:15,23 52:8,15,
22 53:13,18 54:9,

16 57:9 63:9 67:19
70:2,3,22 71:2,18,
25 72:8 73:11,18
75:23 76:1,21,22
78:8,11,17,20,21,
24 79:10 80:18
82:16,21 83:13,16,
21 84:12 85:3,7
86:7,25 87:17
89:25 90:19 91:6
94:22 97:25 99:23
100:11,13 105:11
107:4,16 112:15
114:8 115:9
118:12 119:4
120:17 129:14
130:2 134:6 139:4
143:16,24 145:3
147:3,4,9,13
155:20 158:8
161:4 169:17
171:15 176:8
184:7 189:21
190:5 197:3,8
198:1 203:13,16

**cases**
32:14 33:8 36:1,4,
10 38:10,14,15,16
56:3 68:9,14
77:11,23,24 78:12
87:15 88:10,11
102:6 105:6,7
106:18,21 109:9,
21 117:1,17
118:23 140:8
160:21,23 167:20
199:10 201:17

**casual**
108:15

**casually**
108:14,15

**caught**
173:19

**causing**
126:5

**CE**
11:1

**cease**
21:18

**ceased**
141:7,9

**ceases**
122:4

**cell**
131:4,11 164:4
190:18

**center**
11:12

**centered**
193:2

**centers**
31:3,4

**cert**
21:11

**certainty**
199:15

**certification**
11:3 19:10,18,22
20:3,6,7,10,14,25
22:16,24,25 23:9,
11,15 24:2

**certifications**
9:9,11 19:7 26:21
27:1 28:5 31:12

**certified**
9:12 19:9 20:21
21:9,16 22:4,5,12,
13,14 23:13,21

**certify**
75:10

**CES**
10:19,22 11:2,21

**cetera**
42:2 86:17 88:25
148:21

**CEUS**
9:1,16

**chain**
88:18

**challenge**
200:16

**change**
189:7

**changing**
10:17

**character**
193:6

**characterization**
184:20

**characterizing**
55:24

**charge**
14:2 16:11,17,19
32:1 97:24 147:18



Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 213 of 235 PageID #: 1341

Hornback vs. Czartorski                William T. Gaut, PH. D.                01/28/2022Index: charged..containment

148:3 149:19
152:16 153:21
160:22,24 165:3,4
166:22 195:13
196:3 199:5

**charged**
22:2 39:4 97:16
125:9 130:16,20
160:14,17 195:25

**charges**
148:8 160:22
165:15

**charging**
16:7

**check**
33:8 200:4

**checks**
27:23

**chief**
14:8 30:7

**chief's**
13:16

**Chiefs**
28:22 48:21 121:3

**child**
114:23

**chokehold**
201:25 202:20

**choking**
178:11

**Chris**
4:11 5:7

**circuit**
76:8,21,25 77:6,
12,14,16 79:15
82:17,22,25 83:1,
2,4 167:14

**circumstance**
113:25 146:10
178:24

**circumstances**
96:22 99:19 103:7,
10,11,19 112:1,8,
9,24 113:2 114:1,
7,11 117:7,19
134:17 135:3,10,
24 144:21 149:3
161:4 186:11

**citation**
154:8

**cite**

75:23 78:21 198:5

**citizen**
17:22 18:2 178:17

**city**
15:7 17:7,11 22:19
30:8 37:15 40:12

**civil**
10:23 14:7 16:23
199:5

**claim**
71:23 83:14 194:4

**claiming**
147:6

**claims**
193:2,18

**clarification**
176:11

**class**
32:6

**classes**
20:5

**cleanup**
195:10 199:22
200:5 203:15

**clear**
33:24 110:6
132:13 151:19
159:11 175:11,23
192:1 204:13

**client**
86:25

**close**
68:4 69:7 132:10

**CMS**
43:12,18,20,22
44:4,22 75:6

**cocked**
104:1

**Code**
194:25

**college**
12:20 15:4 19:11,
12 20:23 28:16
81:13,15

**color**
55:21

**combination**
183:16

**command**
88:19 108:12
109:6 112:10

115:16

**commander**
13:19,22,24

**commands**
101:10 107:5
123:6 172:6,7

**commented**
70:13

**commission**
48:22 65:11 98:5
120:2 123:4

**commit**
58:16 91:1

**commits**
40:17 41:11

**committed**
35:21 40:21 41:1
46:6

**committing**
40:8 90:11 143:8

**common**
106:22

**commonly**
161:7

**Community**
15:4

**company**
43:18,22

**comparable**
12:19

**comparing**
43:9

**complaint**
41:24 45:17 47:8,
11 83:20 85:7
148:6 194:8

**complaints**
17:22 18:2 45:2,9
86:5

**complete**
32:18,20 33:25

**completed**
6:18 9:16

**completely**
149:14 172:20
173:2 199:4

**compliance**
130:11 148:24

**compliant**
98:19 143:10

144:5 161:24
172:5,12,15
176:10 184:2,9,17,
19,22 185:10,20

**complies**
107:12 130:4

**comply**
71:17 82:13
100:18 108:8,13
115:15 116:20
183:3 190:6 195:6

**complying**
108:3 118:5
143:13 169:21
170:4

**compromise**
123:2

**compulsion**
162:22

**computer**
66:24 67:18

**conceded**
143:18

**concept**
38:18 162:7

**concluded**
205:20

**conclusion**
57:8 77:4 89:8

**conclusions**
120:19 187:16,18
197:3

**conclusive**
183:14

**condition**
69:11

**conditions**
50:18 68:17

**conduct**
46:22 69:20 76:19
120:15

**conducted**
48:17 51:25

**confidence**
41:2

**conflict**
13:5 87:9 109:15,
17,19,23 202:23

**conflicting**
108:21 109:24

**conflicts**
109:8,10

**confused**
61:19 183:22

**Congress**
18:24

**connection**
93:8

**Connor**
146:16

**consecutive**
109:24

**consensus**
66:6 121:1

**consent**
138:9,12 162:4,7,
15,16,21 163:21,
22,24

**consenting**
163:18

**consideration**
104:22 106:10
160:10 195:19,22

**considered**
42:22 43:1,4 44:1,
2 46:12 47:2 73:15
75:17 103:20
104:16 105:22,24
107:21 121:15
143:4 151:24
204:9

**consistent**
55:11 108:24
122:21

**constitutional**
78:22,23 79:1
82:13,15 193:5,15
199:2

**constructing**
80:10

**construction**
129:16

**consultant**
20:22

**contained**
8:20 9:1 11:23
31:20 43:1,5 44:24
75:11 203:17

**containment**
172:23

Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 214 of 235 PageID #: 1342

Hornback vs. Czartorski                William T. Gaut, PH. D.                01/28/2022 Index: contaminated..date

**contaminated**
104:21

**contending**
54:21,23

**contents**
43:9,11

**context**
139:22

**continuation**
109:17,18 126:7

**continued**
15:10,12 20:15
22:18,23,25

**continues**
22:18

**continuing**
9:1,7,8 10:13
21:12 22:9 43:23
45:10

**continuum**
101:2,4,8,11,23
102:3,4,9 109:18
113:12 117:3,15

**contradicted**
184:7

**contrary**
132:5 167:15

**contributors**
65:15,22

**control**
109:1 122:4
181:11

**conversation**
83:11 93:23
132:14

**conversations**
94:3

**convicted**
20:1 161:2

**conviction**
160:9

**convictions**
192:11

**Cool**
62:10

**cooperate**
135:5

**cooperative**
135:6 185:22

**copies**

42:18 66:25

**copy**
42:17 43:10,11
44:4,8,10 67:13
201:9 205:16,17

**correct**
5:9,10,20,21 6:1,
12 7:18,19,24 8:12
12:10 14:24 15:6
20:18 23:7 25:9
26:24 27:3 30:2
32:4,16 35:14
38:21 39:2,3 43:3
44:13,14 50:24
54:17 56:13 58:5,
6,12 60:17 63:3,9
64:9 69:18 71:10,
11 73:1,22,23
74:13 75:12,13,15,
16 79:3,15 82:23,
24 91:8 93:5,14
94:13 95:2 110:22
116:17 118:14
119:7 123:17
125:13,16 126:19
127:14 128:4
130:17,20 131:6,
21 133:15 134:11,
14 136:20,21,24,
25 137:4,7,14
138:20 139:18,19
141:5 142:7
143:14 146:3,21
151:17 152:2,14
154:23 155:18
156:23,24 157:2,4,
5,16 158:4,11,12
159:4,6,7 161:9,10
162:1,2,14,15,16,
19 165:22 166:11,
20,25 167:21,22
168:8 169:13,14,
23 170:13 171:15,
22,23 172:2 174:3,
9,21 176:17
178:24 179:12,17,
21 180:14 184:4,
22 185:19 186:11,
17 187:2,14 188:7,
9,10,25 189:3,14
190:25 191:6,7
192:13,15,16
196:4 197:5,17,20,
23 199:19 200:17

201:8,14 203:17,
24,25 204:16,17

**corrected**
73:20

**correction**
49:7 131:15

**correctional**
29:20,25 30:2,12

**corrections**
30:4,5,11

**corrective**
86:3

**correctly**
194:12

**corroborate**
92:15 136:14,16

**corroborates**
87:15

**Council**
79:22,24

**counsel**
5:22 199:23

**count**
104:22 160:9

**counted**
36:4 194:12

**counting**
157:6

**Country**
23:5

**county**
14:20 15:8,23
40:12 93:1 115:24

**couple**
8:8 25:4 36:9
59:14 63:2 68:3
86:19 114:10
122:1 130:24
146:24 161:16
199:21 202:17

**courses**
9:2 10:13 12:22,23
15:13 193:4,5
204:7

**court**
4:9,18,25 16:24
17:3,13 24:3,5
33:6,12 34:16,18,
24 35:11 36:20,22,
25 38:19 59:22
75:18,23 77:6,11,

20,21,22 78:7,12
79:13,14 109:13
138:19,24 146:17,
20 148:24 149:9,
10,22 152:2,10
154:9 165:6
166:22 167:12,14
175:5 188:23
190:10 205:5,8,15

**courts**
33:12 36:19 39:10
99:16 160:16

**cover**
46:1 82:8 106:25

**covered**
64:15

**covers**
65:8

**creating**
126:4

**credibility**
87:12 90:18,22
175:23 176:1
201:4

**credit**
184:3,5

**crediting**
136:10

**crime**
123:4 145:19
146:24 148:14,20,
21 150:10,15,18,
22 151:17,22
153:12,15 154:11

**crimes**
14:4,5

**criminal**
10:17 15:13 18:11,
20 19:3 40:9,11,19
41:2,11 46:7 48:19
52:2 80:24 81:12,
25 97:24 112:4
161:9,12,22
166:22 192:11
193:4,14,15 196:7
199:4

**criminally**
97:16

**critical**
198:12

**critique**
202:25 203:1,6

20,21,22 78:7,12

**crossed**
163:12

**cuffed**
181:19 182:13

**current**
19:18 96:24

**curriculum**
8:17 11:23 13:1,3
43:14,23

**cursory**
198:4

**curved**
61:11

**custody**
16:6 91:17 103:13
105:24 113:21,22
115:12,13 143:9
148:25 149:11

**cutting**
53:1

**CV**
8:14,21 12:1,12
23:4 30:1,3 34:23
35:8,10,23

**Czartorski**
4:6,15 5:19 45:3
71:7,16,24 72:22
83:23 84:15 85:9
87:11 93:4 95:1,
20,24 130:9
133:19 155:11
168:1,10 169:11
171:2,2,24 174:17,
23 175:3,16
178:22 179:10,21
180:23 188:6
190:25 191:6
198:20

**Czartorski's**
96:24 195:12

---

**D**

**dash**
91:5 93:23 94:8
132:19,22 133:1
164:7,10

**data**
81:23

**date**
4:2 6:5,10 21:19,
20 22:3 25:2 27:10



Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 215 of 235 PageID #: 1343

Hornback vs. Czartorski                    William T. Gaut, PH. D.                    01/28/2022Index: dated..disease

28:14 56:6 57:15,
21 58:17,18 73:25
74:9 81:21
**dated**
6:4
**dates**
25:25 35:16,17,18
56:10 57:20
**Daubert**
33:18 36:7,9,14
37:6 147:12
200:14,16,23
**day**
16:7 32:6 57:18,19
58:2,21 63:16,19
69:11 142:12
**days**
47:14,15 59:1,4,6
60:8,13 62:23
152:17 153:14
**deadly**
101:12,15,20
102:18 104:4
125:1,4 128:6,19
**deal**
50:3
**dealing**
147:8 163:17
174:17 176:9
179:9
**deals**
81:4,5 151:6
**dealt**
108:20
**death**
56:3
**debatable**
59:11
**December**
6:8,9,13,15,17
**decided**
77:20
**decision**
17:6 42:9 76:16
138:22 146:17
**decisions**
79:7,14 83:4
**declines**
160:21
**deescalate**
103:4,21 105:14

110:14
**deescalation**
102:24 104:3
110:10 122:19,20
**defamation**
193:6,7,16
**default**
17:19,20
**defeat**
113:14
**defendant**
4:15 5:19 160:24
175:22
**Defendants**
4:17
**defending**
17:12
**defense**
17:11 118:23
165:14,20 166:15,
21 167:4,11
**defensive**
23:23 43:12 44:8
**define**
113:10
**defined**
10:4 111:15
113:12 117:2
125:5
**definition**
96:8 125:12
**definitions**
128:15
**definitive**
60:16
**degree**
16:20 27:17 70:10
149:23 159:23
199:15
**degrees**
61:17 62:4
**delay**
123:2
**deliver**
149:11 171:25
**demanding**
135:20,21 136:3
144:3
**demonstrated**
107:8 174:19
175:10

**demonstration**
186:18,19
**denies**
28:1
**department**
12:9 15:23 16:1
123:20
**department's**
117:9
**departments**
72:8
**depend**
184:23
**depending**
37:25 103:7 112:1
114:1 117:18
**depends**
36:24 70:1 96:7
109:25 110:2,3
112:8 114:7
116:24 117:18
144:19 181:10
187:3
**depict**
155:22
**depicted**
168:7
**depiction**
132:13
**deploy**
140:16
**deployed**
50:24,25 140:9
**deploys**
101:12
**Deponent**
4:22
**deposed**
5:9 203:20
**deposing**
33:8
**deposition**
4:4 7:7 32:2 33:2,
10 34:8,10 109:10
130:5 134:18
136:9 205:19
**depositions**
136:15,16 168:13
**depth**
9:1

**describe**
65:21 93:25
**designated**
23:24
**designation**
22:17
**designed**
113:14 117:24
**destruction**
123:3
**detail**
169:25 170:22
**details**
185:1
**detecting**
151:22
**detective**
10:8 14:1,2 16:4
55:25 115:11
**detectives**
12:10 80:17,22
**determination**
99:17 138:5
**determine**
43:20 69:5 73:10
100:17 136:13
170:22
**determining**
99:6
**detrimental**
40:8
**developing**
136:6
**device**
94:7,16
**diagnosis**
36:17,23
**die**
16:13,14,18
**difference**
9:21 193:16
**differently**
138:20 197:22
**differs**
102:1
**difficult**
90:2 194:10
**diplomate**
9:15 21:10

**direct**
5:1 132:16 149:9
168:1,10 176:23
180:23 181:1,8
202:23
**directed**
108:5 172:17
**direction**
134:23 168:16,19
**directions**
189:20
**directive**
118:6
**directly**
148:20
**disagree**
198:2
**disagreement**
149:18
**disallowance**
200:21
**disapproves**
88:17,18
**discern**
159:3,15,24 183:5
**discharged**
97:10
**disciplinary**
47:12 88:8 89:10
**discipline**
88:24
**discontinued**
122:3
**discovers**
40:25
**discovery**
60:1
**discuss**
162:6
**discussed**
106:23 120:22
**discussing**
92:7
**discussion**
93:20 121:1
127:20 144:9,10
160:6 164:12
188:22 205:4,11
**disease**
36:24



Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 216 of 235 PageID #: 1344

Hornback vs. Czartorski                    William T. Gaut, PH. D.                    01/28/2022Index: disk..evidence

disk
 44:6,11 75:5
dislocated
 112:22
dispatch
 31:3
dispatched
 92:24
displayed
 51:1
dispute
 78:7 94:15 147:14
disqualification
 200:21
disseminate
 123:24
dissertation
 18:21
dissertations
 18:23
dissipate
 56:13,16,18 63:1
 64:1
dissolved
 19:15 20:2 21:2
 28:17
distance
 132:15
district
 14:21 15:8,23 23:5
 76:23 77:1,8,22,24
 139:4 160:21
division
 13:10 14:1,2,9
 23:6 86:16
docket
 195:13
document
 42:16 161:1
documents
 42:4,13,20 83:21
 85:6,7 163:5
 203:23
door
 91:14 93:19 94:22
 135:18,20 136:18
 140:15,19 163:13
doorstep
 91:10
doubt
 165:25 166:6

170:11 179:10
downloaded
 44:4 50:18
downstairs
 131:2 136:2
 144:11,12
dozen
 38:15 202:2
draft
 120:10 174:22
 175:1 196:24
drafted
 196:25 198:11
draw
 57:8 197:2,22
Dreisbach
 4:17 93:5 95:4
 180:13,15,17
drive
 44:16 67:17,20
driven
 117:9
driving
 23:13,21,22,23
 24:2,4,6,9
due
 177:17
duly
 4:22
duty
 147:17 148:2
 178:3

————————
        E
————————

E-TRAN
 205:13,14
earlier
 119:25
early
 13:17 74:6 131:16
easily
 68:7,19 69:12
east
 13:19,21,23
easy
 69:9
Edition
 79:4
education
 8:19 9:2,7,9 10:13

18:5 21:12 22:9
 27:20 99:13 193:1,
 20
educational
 20:9
effect
 40:8 73:17 94:21
 102:8,9,11,15
 105:2 111:4,9,12,
 19 114:13 118:3
 126:25 127:3,12,
 16 129:18 130:14
 137:21 139:23
 144:16 150:16,24
 153:19 162:11
 182:7
effecting
 92:25 95:8,13
 143:9 150:11
effectively
 107:8 122:16
 132:15 133:20
 148:24
effects
 52:7,8
Eighth
 76:8,21,25 77:12
elbow
 96:12 202:1
elbows
 202:6
electronic
 181:11
electronically
 59:22
element
 98:21
elements
 81:5
Eleventh
 77:12
emergency
 30:23 31:2
emphasize
 105:18
employ
 102:4,5
employed
 15:22 37:12 97:6,
 13,23 132:20

employment
 96:25
encourage
 183:2
end
 75:8 199:16
ended
 58:5
ends
 76:18
enforcement
 10:7 15:7 17:21
 18:7 29:8,25
 48:17,19,22 50:4
 52:1,2 57:25 65:12
 73:14,16 79:22,24
 80:16,21 88:12
 98:20 100:18
 116:1,19 119:21
 120:2 123:24
 124:2 139:7
 175:14 176:16
 177:5 194:25
 195:5 204:19
engaged
 38:4 116:3 161:23
engagements
 118:19
ensues
 93:20
ensure
 39:10
enter
 59:18 136:23
 162:4 163:19,24
 201:22 202:23
entered
 163:12 201:20
 202:21
entering
 139:17 162:11
entire
 13:1 14:2,9 15:7
 21:15 40:4,9 77:16
 94:3 132:12
 174:24 176:14
 179:6
entitled
 81:3
entry
 140:6

equate
 116:16
equipment
 170:16
escalation
 134:23
escape
 106:9 118:12
 123:4
essential
 39:15
establish
 136:7
established
 82:17 138:14
establishes
 82:17
et al
 4:5,6
ethical
 178:18
ethics
 11:12 25:15 29:11
 195:1
evade
 146:2
evading
 151:11 160:3
evaluate
 7:22 73:9 98:18
evaluated
 197:8
evaluating
 98:14 99:22
 105:12
evaluation
 29:17 97:25 98:2
 100:2 197:15
evaluations
 10:15
event
 46:19 47:2,3 98:8,
 22 131:14 154:24
 183:7,11
events
 10:4 98:23 182:3
evidence
 10:4,5,12 55:14
 59:9 70:21 71:2,8,
 9 86:21 87:3,14,
 15,17,21,23 89:15

Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 217 of 235 PageID
#: 1345

Hornback vs. Czartorski                    William T. Gaut, PH. D.                    01/28/2022Index: evidenced..figure

92:16 100:16
123:3 175:7
176:14 184:6
185:13 195:23
201:15 202:4,7

**evidenced**
148:9

**exact**
25:2 35:16 57:21

**exam**
14:7

**examination**
5:1 20:10,11 24:1
62:1

**examine**
69:4

**examiner**
10:2

**Examiners**
9:14,19 11:9 19:12
20:23 28:16

**examines**
52:24

**exception**
43:7 122:9

**exceptions**
122:13

**excessive**
45:24 89:20,21
90:8 98:4,21 199:3

**exchange**
135:18

**exclude**
33:21

**exclusions**
37:1

**excuse**
9:4,13 21:9 23:3
49:20 57:18 63:12
101:18 109:18
140:5 155:4
164:24

**execute**
162:13

**executes**
159:14

**execution**
141:1

**exercise**
185:18

**exhibit**
8:5,10 119:11,12,
17,20,22 121:1,4
124:4,6,11,12,14,
17 152:11,13
165:8 190:8,13,16
194:21,24 195:8,
11 196:18,21
199:14 203:13
205:5

**exhibits**
205:14

**exist**
53:25

**existed**
21:25

**exists**
69:3 100:16
133:10 193:23

**exits**
136:23

**expect**
52:7 60:15

**expected**
52:25 53:5 73:16

**experience**
8:19 12:6 20:8
27:20 29:25 30:1,3
42:14 54:1 55:25
56:5 69:19 77:11
78:4 108:13 132:8
147:16 148:1,22
150:17 200:14
204:6,18

**experienced**
39:20 160:13

**expert**
5:18 6:1 7:21
29:17 33:18 36:1,
16 37:17,22 38:5
90:19 115:1
175:25 178:14
188:3 196:14,22
200:25 201:2,10

**expert's**
203:2

**expertise**
7:22 55:23 167:19

**experts**
33:5,12,21 197:6
200:17

**explain**
40:16 70:8 135:8
144:3 204:12

**explaining**
193:15

**explanations**
193:17

**expletives**
108:4

**explore**
105:4,8

**extended**
56:25

**extensive**
91:5 192:10

**extreme**
118:12

**eye**
106:10

**eyes**
106:1

**F**

**face**
110:7 133:21
142:10 155:11
168:2,10,25 172:7,
13,17

**face-down**
172:8,20

**faces**
155:9

**facility**
149:12

**facing**
133:14 168:20

**fact**
10:5 16:18,22
46:20 53:24 59:23
70:11 83:23 84:11
86:4 87:17,19,20
88:21 94:15 98:6
131:8 138:14
146:25 150:12
158:24 161:1
165:15 166:1
183:6 194:9
198:21

**factor**
98:14 99:6,11
104:14 106:1,13,

15,18 107:6,7
145:23,25 150:5
151:8,10,16,20,24
158:14,18 182:13,
14

**factors**
104:8,17,20 105:1,
5,9,17,19,21
106:11,21,24
110:4 112:13
144:14 145:3,6,19
146:6,7,9,12,15,19
147:23 148:13
151:6 153:11
154:14

**facts**
10:4 33:15 92:17
100:1 106:19
136:8 149:14
170:12 185:11,12,
16 186:3 197:18,
22 198:1 201:16

**factual**
47:20,23,24 92:18
93:18 169:15
173:16

**factually**
202:2,19

**fade**
57:6

**failed**
17:12,16 71:16
135:5

**fails**
17:18

**failure**
83:13,16 107:4
108:11 147:5,6
198:19

**fair**
5:23 12:13 28:12
32:11 33:1 46:9
92:13,14 93:22
94:1 134:8,9 140:1
193:21

**fairly**
29:22 69:12

**falsely**
160:13

**familiar**
5:11 9:7 33:19
83:14 101:2

115:25 121:17
137:9 139:9,13
145:5,8,18 164:16

**fashion**
141:16 173:8

**favor**
179:7

**favorable**
174:16,23 175:2,
16,21,22 176:4,9
178:22 179:4,21
188:6

**FBI**
115:24

**fed**
94:8

**federal**
10:22,23 16:23
17:3 32:10 33:6,12
34:16 36:22
138:19

**fee**
20:4 25:5 26:18
27:16,23 28:3 29:4
30:15 31:19 35:9

**fee-based**
25:5 27:12,14

**feeling**
41:12

**feet**
112:20 114:21
157:19

**fellow**
9:15 21:11 27:22

**felt**
130:9

**female**
112:16,19

**field**
20:8 27:18,20 41:7
56:4 81:5 82:9
204:18

**fields**
18:20 193:21

**Fifty**
203:21

**fight**
115:17

**figure**
85:3 160:16

**file**
6:1 18:22,23 36:15
43:10 52:15 80:12
119:5

**filed**
76:22

**files**
67:19 88:20

**filing**
8:9 190:20

**fill**
198:19

**final**
120:20

**finalizing**
120:10

**finally**
88:19 192:8

**find**
43:20,23 56:8
66:23 76:3,8,10,13
80:2 97:11,15
136:15 165:17

**finds**
198:19

**fine**
62:2 105:16
159:12

**finger**
104:1 132:11
155:7

**finish**
34:7 130:23

**fire**
139:24

**firearm**
151:12

**fist**
115:17

**fit**
117:14 142:14

**five-step**
102:10

**fix**
5:13

**fixed**
141:8

**flash**
67:17,20

**flashlight**

**force**
63:5 84:1 171:25
174:2,8 181:9,10
190:25 191:6

**flat**
152:5 172:13
173:24

**flee**
107:15 108:18
134:20 135:1

**fleeing**
94:23 160:3

**flight**
146:2

**floor**
96:20,21 130:10
142:12,25 169:13
181:4

**Florida**
15:18 23:24,25
32:3

**Floyd**
178:7,11,13

**fluctuates**
38:1

**focus**
10:1,19,22,24
11:1,14 81:6
147:10

**focused**
90:14 157:11

**fold**
21:18

**folded**
21:20,22

**folks**
105:17

**follow**
21:7 42:19 71:9
98:13 107:4
184:14

**follow-up**
68:4 88:7

**follow-ups**
25:4 47:4

**foot**
156:11

**footnote**
76:7,9,12 78:22

**footnoted**
51:14 76:9 80:2

**force**
25:18 29:14 45:2,
24 46:2 49:3,5,17
50:6,20 52:9 53:1
54:12,14,24 55:20
56:22 64:9,19 65:1
66:6 69:22 70:4,
18,20 71:10,18
72:5,23 73:8,9
82:6 84:15 86:11,
25 87:10,19 89:20,
21 90:8 95:16,21,
25 96:4,8,10,17
98:4,21 99:7
100:21 101:1,2,4,
6,7,12,15,20
102:19 104:4
110:25 111:4,7,9,
13,18 112:11,22
113:11 116:4,5,9,
12,22 117:2,3,12,
14 120:5,7 121:2
122:3,7,12,17,21,
23 123:6 124:23
125:1,4,16,19,22
126:1,16,21,24
127:2,4,13,17,21,
24 128:6,7,19
129:17 130:9,13
134:7,13 141:10
142:9,17 144:16,
18,24,25 147:11
148:13 149:23
150:16,24,25
153:11,13 154:12,
15 156:19,20,25
157:1,7,13 159:23
161:25 169:22
170:4 177:24
178:2 180:9
182:25 185:23
186:15 189:23
191:13,25 195:20
197:11 199:3

**forces**
173:23

**forearm**
202:1

**foremost**
132:10

**forensic**
9:13,14,19 10:2
11:9 19:9,12
20:21,23 21:8

27:5,19,20 28:16
48:23 50:1,2,12
51:6,11 52:4,23
64:12 70:21 71:2,7
87:14 92:12 175:7

**forensically**
54:13 69:24

**forensics**
10:3 50:3 52:24

**form**
7:2 17:4,23 37:24
38:13 39:6,17,25
40:5 41:3,8 45:5
46:4,24 53:7 54:10
56:14 63:22 65:20
68:8,13 69:25
71:19 72:1 73:2
77:2 86:13 88:2
89:4,16 90:1 97:1,
12,17 98:1 111:14,
21 116:3,7 120:12
123:22 127:15
129:20 134:15
138:21 148:17
150:8 153:23
157:7,21,22
161:17 166:5
173:8 177:1
179:22 187:25
188:18 195:16,17
198:7 200:19

**format**
66:3,17 67:3
123:20 146:8,14

**formed**
131:7

**formulate**
78:18 82:4

**formulating**
47:22 66:12 78:13
79:13

**forward**
156:11 169:6,7
177:20

**forwards**
171:21

**found**
22:1 97:13

**four-step**
102:9,10,15

**frame**
170:24,25 171:8

**frankly**
147:7

**Friday**
4:2

**front**
60:22 61:6,10
93:17,19 106:6
131:19 136:18
163:13

**fugitive**
164:16,19,25
165:16

**full**
32:17,19 33:25
51:20 181:3

**fully**
143:10,13 180:8
185:20,22

**Fundamentals**
80:24 81:1,12,24

**furtive**
130:7 134:22
141:7 185:3,9,17

**furtively**
186:9

**future**
46:18

---

**G**

**gain**
108:18

**gamut**
105:6

**gather**
7:21

**Gaut**
4:4,21 5:3,4,5 7:12
92:6 105:3 153:10
194:23 200:13

**gave**
32:15,25 33:2
48:2,7,8 87:3
105:8,9 202:22

**general**
16:8 43:15 48:2
54:1,7 101:1 111:2
123:19 124:17
125:3 138:3

**generally**
34:22 41:23 48:9
63:4,18,21,23

Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 219 of 235 PageID #: 1347

Hornback vs. Czartorski                  William T. Gaut, PH. D.          01/28/2022Index: generally-accepted..homicide

64:19 88:13
121:10 122:12
137:15 139:2
190:6

**generally-accepted**
55:3 98:19

**generate**
120:10

**generating**
37:23

**George**
178:7,11,12

**get all**
42:12

**girlfriend**
20:1

**give**
5:14 10:20 32:22
33:21 34:10 36:10,
11,17,18,20,22
37:20 43:25 48:5
56:8 65:6 67:11
68:18 75:24 102:5
110:6 114:4 118:1
142:22 163:22
168:19 178:6
179:10 186:1
196:12 199:21
200:25 201:2

**giving**
35:17 37:7 44:7
68:22 170:1
182:23

**good**
4:11 5:3 140:21
147:21

**gosh**
18:10 19:11 24:24
25:23 105:1

**grab**
182:6,15

**grabbed**
112:21 181:18
182:1 201:18,19

**grabbing**
103:5 110:11
185:4

**grabs**
112:6 114:20
156:9 169:12

**graduating**
8:20

**Graham**
75:23 76:1,5,16
78:5,10,13,17
144:14 145:3,5,19
146:15,16 147:23
148:13,19 150:2,5
151:7 153:11
154:14 158:13

**greater**
154:2 169:24

**Gregory**
4:16

**grip**
112:11

**ground**
95:8,12,17 103:6
114:12 115:19,22
122:15 141:13,21
142:3 159:16,25

**group**
139:6

**groups**
19:4 52:9

**guess**
9:21 12:18 19:23
22:25 23:1,16 43:6
59:11 60:16 65:21
66:16 72:8 78:19
90:10 107:3
109:19 131:15
148:5 173:19
193:7 195:12

**guessing**
21:21 90:3,20

**Guide**
44:4

**guidelines**
84:3,5

**guides**
65:16

**guilty**
47:9 160:24

**gun**
103:25

**gunshot**
16:5 53:4

**guy**
103:25

**guys**

142:13

---

**H**

**half**
38:15 171:3
177:14

**hammer**
104:1 173:11,23

**hand**
4:19 96:9,10,11
107:12 121:5
124:6,13 133:18,
19 134:21,22
141:6 143:6
148:23 155:2,9,10
169:4,10 173:11
194:23 195:11
196:20

**handcuffed**
122:14 180:8

**handcuffing**
182:7,20

**handcuffs**
142:4

**handed**
165:21

**handing**
124:16

**handle**
38:10

**handled**
88:10

**handling**
98:12

**hands**
61:4 107:11,23
108:1,8,9,14 130:7
133:14,17,21
134:2,11,12 141:7
142:10,13,15
143:1,2,3 154:21
155:3,5,8,11,15,16
168:14,17,20,24
169:3,21 170:3
182:23 184:15,16,
19 185:2,5,9,16,21
186:3,4,6,8,19,22,
23 187:10

**Hang**
51:13 83:19

**happen**

18:2 141:21,23
182:19 186:14,16,
21

**happened**
49:8 98:7,8,9,12
99:2 161:15
176:17 202:8

**happening**
49:10 179:11

**happy**
196:10

**harboring**
164:16,18,24

**hard**
43:10,11 66:25
71:6 142:14

**harm**
117:24

**hate**
96:7

**head**
103:25 145:12
186:21

**headlock**
201:19 202:5

**heal**
56:18 68:11,25
69:15

**Healey**
4:16 157:21 166:5
200:2 205:15,17

**healing**
68:24

**hear**
91:10 93:22 164:7,
10 172:6 188:7,10
198:12

**heard**
94:2 109:7

**hearing**
131:17 171:17
188:21

**hearings**
36:9

**heart**
69:10

**held**
16:22 131:9
140:11 188:22
202:19 205:4,11

**helpful**
59:13 171:14,16

**hesitant**
103:8

**Hey**
84:23

**high**
8:20 20:13 23:22
24:1

**higher**
20:12 122:20
172:10

**highest**
101:10,11

**highlighted**
203:10

**hindering**
165:1 167:8,9

**hiring**
80:4 84:4 85:8

**history**
68:17 103:14
104:8 160:3 161:9,
12 192:11

**hit**
70:19 71:7

**hold**
6:10 8:22 9:15
22:23 26:21,25
28:5 31:11 45:12
66:22 76:10
106:17 132:11
133:8 172:24
188:11

**holding**
131:5 140:7
186:19

**holds**
27:22 167:14

**home**
34:8 60:11 137:4,
22 139:17 162:4,
11,25 163:12,19
201:22

**homeowner**
139:16,23,24
162:12,17

**homicide**
13:10 15:13 16:3
55:25 81:1,2,3,6,
14 115:10 166:22

Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 220 of 235 PageID
#: 1348

Hornback vs. Czartorski    William T. Gaut, PH. D.    01/28/2022Index: honesty..injury

**honesty**
11:11

**honor**
11:12

**Hornback**
4:5,12,13 45:4
46:11 48:13 57:17
58:5 71:6 87:20
91:17 92:24 93:20
94:21 95:8,12,17
96:12 130:16
131:1,2 134:25
135:5,13,17,19
136:1,3,17 141:5
142:2 144:9 148:8
153:13 154:16
155:3,8,25 156:6
157:2,14,15
158:24 159:25
162:25 168:17
172:19 173:1
174:20 176:23
180:7 181:4
182:15 183:15
189:11 192:10
201:23 202:22

**Hornback's**
68:17 131:11
133:14 134:11,20
161:22 164:3
173:13 182:6
183:18,19

**Hornbacks**
152:21 163:14
164:15

**Hornbacks'**
136:15

**hour**
43:19 85:16 91:9

**hours**
9:3,4,5 11:5,7
16:9,16,22 63:23
64:5 71:14 72:6,20
91:22 98:13

**house**
94:17,20 135:23
202:21

**human**
53:6 106:20

**humble**
90:19

**hundred**

35:19 182:17
204:7,10

**hundreds**
56:2 181:24 182:2

**hurt**
115:19

**husband**
156:9 177:12,18,
21

**hypothetical**
72:25 141:11
142:7 161:18
162:2 170:1 185:7,
8 186:1,12

**Hypothetically**
170:6

**hypotheticals**
114:24 115:2

_____

**I**

**i.e.**
88:16 89:10 90:11
156:17

**IACP**
31:13 49:21 64:17
65:10,14,16 66:5
123:12,16,19
124:9

**IACP's**
194:25

**IAD**
88:8 89:8

**idea**
140:21

**ideal**
109:3

**identification**
8:5 119:17,22
121:4 124:4,12
152:11 165:8
190:13 194:21
195:8 196:18

**identify**
4:8 52:21 53:19
66:4 75:3 76:1,19

**identity**
140:23

**III**
19:9

**illegal**
178:16

**illustrative**
59:18

**immaterial**
163:23

**immediately**
56:23 140:16
169:2 178:17

**imminently**
171:14

**impact**
57:10 63:4,5,7,17
64:20 65:1 71:24
83:24,25 117:14
142:5 157:19
174:1,7 181:10
182:24 183:1

**implied**
179:19

**imply**
84:1 146:5

**implying**
188:18

**importance**
34:15

**imposed**
38:22

**impression**
175:6

**improper**
90:18 111:24
112:2

**improperly**
84:2 201:13

**impropriety**
178:15

**in-depth**
132:21

**in-house**
131:12

**inaccurate**
50:13,16 145:17

**inadvertent**
34:5

**inappropriate**
90:22 111:4
114:11 124:2
134:13 142:6,8
169:23 170:5
174:2,8 175:25
185:18 186:10,15
187:2

**inaudible**
94:4

**incapacitate**
181:6

**incapacitated**
129:6

**incapacitating**
181:11

**incentive**
46:1

**incident**
46:2 48:12 60:9
64:5 72:17 73:20
74:1,10 85:18
88:14,15 89:18
97:16 99:3,12
122:4 139:5
190:24 191:5

**incidents**
46:20 85:17,24
86:1 87:25 89:2,3

**include**
9:5 79:11 84:19

**includes**
204:6

**including**
48:20 52:3,25 94:3
135:4 153:17
164:13

**income**
37:14,21

**inconsistent**
33:14

**incorrect**
58:2 132:5,7
169:20 187:17,18,
24 202:2,19

**increase**
101:8

**independent**
24:14 158:23

**indicating**
155:3

**indication**
107:14 108:17

**indications**
176:19

**individual**
16:17 22:2 54:11
69:9 90:9 96:19
103:14,15,17

106:4,5 107:7,9,
11,12,15,18 108:1,
13 112:11,16
115:15 117:19
122:18 123:5
130:10 142:25
143:2,5 146:10
148:24,25 149:10,
11 150:20,21
161:1 173:21,24
176:10 183:2
185:4,5

**individual's**
106:1

**individuals**
30:6,7 122:8
146:11 174:18
177:24 178:2

**Industrial**
25:21 26:16 27:1

**industries**
26:5

**industry**
121:11

**influence**
47:3

**inform**
69:2

**information**
7:22,23 21:23
47:21,25 51:1
68:20 75:11 80:10
83:21,22 84:20
92:12 97:8 136:14
175:9

**informed**
32:10 163:14

**informing**
137:6

**infraction**
47:10

**initial**
96:1,4 136:18
172:19

**initially**
42:11 48:2 90:4
163:4,9

**injuries**
53:5 72:19

**injury**
36:24 52:6 54:13
60:5 70:4 72:5,7,

Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 221 of 235 PageID #: 1349

Hornback vs. Czartorski                William T. Gaut, PH. D.                01/28/2022Index: innocent..Kentucky

20 113:19 126:5
181:17 189:18
192:9,15,21,23
193:3,10,19,25

**innocent**
108:16 110:18

**insert**
7:1

**inside**
140:10 162:25

**insisted**
135:10

**instance**
10:24 21:11 34:7
36:15,17 37:6
42:16 50:6 52:6
53:1 54:11 66:5
77:16 78:4 79:12
100:17 101:8
103:15 106:2
107:22 112:11
114:12 122:14
125:8 138:6,13
140:9,10 175:20
201:18 202:18

**Institute**
26:1,10

**instruction**
13:10 24:10

**instructions**
43:15 108:21
110:6 161:25
183:20,25 184:14

**instructor**
12:16,25 13:4,7
22:4,6,15 23:14,
21,23 24:2,6,15

**Instructor's**
44:4

**instructors**
24:7

**instrument**
53:1,2 55:20

**insufficient**
92:16

**integrity**
11:10

**intend**
30:21 175:24
201:1 203:16
204:21

**intent**
44:6 115:12
174:19 175:10

**intentionally**
196:1,6

**interaction**
58:4 136:19 137:3
157:12 164:2

**interactions**
199:7

**interfere**
174:19 175:10
176:20,24 177:25
178:3,17

**interference**
176:23

**interfering**
164:21 167:6
176:15 177:4

**intermediate**
49:4,6,17 50:8
63:13 87:19

**internal**
47:4 86:16 98:5
112:3 198:25
199:3

**international**
19:12 28:21 48:20
82:11 121:2
181:15

**Internet**
21:24

**interpret**
166:23 168:16
197:18,21

**interpretation**
134:3,8,10 148:18
179:24 188:17
197:16,25 198:3
202:15,16

**interpreted**
83:22 201:13

**interpreting**
130:3

**interprets**
130:2

**interrogation**
10:14 82:7

**interrupt**
61:25 201:7

**interview**
82:7

**interviews**
120:15

**intoxicated**
24:5

**intruder**
139:25

**inves**
47:4

**investigate**
69:23

**investigated**
89:9

**investigation**
15:13 45:25 69:21
72:10 80:24 81:2,
12,14,25 86:2
88:25 89:9 164:21

**investigations**
47:4 132:18

**investigative**
56:3 82:8 86:5,6,
15 88:7

**investigator**
19:9 47:6,7

**investments**
38:8

**invoice**
48:7

**involved**
32:15 42:1,2 45:24
148:20 201:12
204:7

**involvement**
50:22

**involves**
83:13 178:22

**involving**
53:5 85:18 139:5

**irrelevant**
46:23

**Irrespective**
161:22

**issuance**
135:25 149:15

**issue**
61:16 75:15 139:7
140:22 145:20
146:25 147:4
148:5 149:25

151:17 152:20
153:12 167:21
200:17

**issued**
17:16 31:12 92:25
124:1 137:13
144:4 149:3
150:13,14

**issues**
149:9

**issuing**
109:5,6

**J**

**Jacqueline**
79:2

**jail**
30:8 58:8 60:10
63:16 106:5
149:12

**Janota**
198:18 199:7

**Janota's**
196:14,22

**January**
4:3

**Jason**
4:14 196:9

**Jefferson**
14:20 15:4,8,23
23:5 92:25

**jerk**
113:1 118:15

**job**
7:20 15:10 89:18
98:17 159:12

**join**
9:21,23 13:15
25:22 27:8,15
28:9,24 29:20 31:6
35:16

**joined**
24:24 25:3,23 26:2
27:10 28:14,25
35:16,20

**jottings**
52:14

**judge**
17:6,16 36:22
151:23

**judges**
36:10

**judgment**
17:19,20 144:17

**judgmental**
99:15

**July**
66:7

**jump**
92:21

**juries**
39:11

**jurisdiction**
40:12 116:24

**jury**
34:25

**justice**
10:17 18:12,20
19:3 40:4,9,11,19
41:2 48:19 52:3
193:14

**justifiable**
126:22 127:11
128:2 130:13

**justification**
116:16 149:5
185:23

**justified**
35:1,13 55:2
116:13 135:25
144:18 154:11
189:24 191:13,25

**justify**
177:4 178:16

**juvenile**
114:18,20

**K**

**Kanovitz**
79:2

**keeping**
55:3

**Kentucky**
40:18 76:23 77:1,8
79:22,24 80:5
88:10 92:23 93:1,3
96:25 97:6 110:21,
25 118:25 124:20
136:19 137:2
139:5,6 140:25
191:5

Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 222 of 235 PageID #: 1350

Hornback vs. Czartorski                William T. Gaut, PH. D.        01/28/2022Index: Kevin..management

Kevin
  4:5,12 48:13 93:5
  131:1 135:5,19
  157:2,13,15 164:3,
  15,20 166:1,10
  177:7,12 183:18
  201:22 202:22
kick
  115:20 140:15
kicking
  122:16 173:4
kill
  101:13
killed
  154:4,6,7
kind
  10:8 11:25 12:12
  15:19,20 42:13
  47:5,16 62:15
  66:16 104:20
  109:10 196:25
  201:23 202:8
kinds
  103:18 135:11
  137:12 160:25
Klein
  4:9
knee
  60:19 172:21
  201:24
knew
  88:6 166:9 167:3
knock
  137:22 138:1,12
  139:8,13 140:6,12
knock-and-
  announce
  139:2
knowledge
  34:3 35:5 54:1
  56:4 72:15 78:4
  99:13 121:18
  123:21 166:14
KR
  126:2
KRS
  125:6,10 126:2
  165:21
KSP
  71:17 72:13 73:4,
  5,11 86:11 97:13,
  24 129:15 130:4

132:20 180:9
  198:21
KSP's
  85:23 111:8
  129:16

L

laboratory
  10:14 50:18
lack
  37:12 51:2 64:14
  86:12 143:17
language
  37:9 101:25 105:1
  107:20 131:17
late
  13:12,17 23:17
  185:6 187:8
law
  10:7 15:7 17:21
  18:7 29:8,24
  48:17,19,22 50:4
  51:25 52:2 57:25
  65:11 73:14,15
  75:10 78:17,20,22,
  23 79:1,22,24
  80:16,21 82:16
  88:11 98:20
  100:18 116:1,19
  119:21 120:2
  123:24 124:2
  138:17 139:6
  141:1 162:22
  166:23 175:14
  176:15 177:5,25
  178:4 193:4,5,15
  194:25 195:5
  204:18
lawful
  88:13 107:5
  111:20,22 113:21
  117:25 120:6
lawsuit
  16:21 17:3
lawsuits
  15:22
lawyer
  109:11
lay
  142:12 172:17
laying
  61:3,21 122:15

142:10 172:13
lays
  142:25 146:20
lead
  134:24 200:20
leads
  90:17,25
leave
  13:9 118:6 131:3
  205:6
led
  45:8 149:4,15
left
  14:14,17 23:4
  106:8 131:2
  133:19 169:7,10,
  11 172:9,10 173:2,
  3
leg
  59:16 61:5,6,8
legal
  36:18 37:1 77:4
  79:19 163:18
  201:2
length
  9:4
lesser
  150:15 160:24
Lesson
  44:8,22
lethal
  127:25 129:4,5
level
  18:22 19:9 101:6,
  7,9,11 109:7
  117:16,18,20,21
levels
  122:21
libel
  193:16
library
  18:23 81:19
licenses
  9:10
lie
  39:22 196:6
lied
  39:5 119:8 195:25
lies
  40:3

lieutenant
  13:15 88:17
life
  46:8 104:6 151:1
  178:11,13
light
  86:7 174:14,16,23
  175:2,16,20,21
  176:3,8 178:21
  179:4,20 188:5
limitations
  176:5
limited
  98:22
lines
  9:24
list
  9:6 22:16 33:25
  34:6,9,11 44:23,24
  128:12 129:8
  145:10,11
listed
  35:3 41:20 42:22
  43:12 44:1 65:5
  80:1 128:3 146:7
listing
  31:23 33:5 34:19
  35:9
literally
  53:20 56:2 67:18
  156:9 182:2
litigation
  10:23
long
  22:24 69:14 76:7,
  21 78:17 142:12
longer
  21:21,25 28:13
  97:13,23
looked
  10:19 31:19 42:25
  44:23 47:12 49:5,
  17 50:19 66:11
  78:13 79:7 80:15
  85:25 87:6 118:22
  121:13 123:15
  159:10
loosely
  10:3
lot
  10:24 29:24 35:15
  39:23 107:14

110:4 200:23,24
lots
  81:5 94:3 100:4
  108:10 109:20
  115:21 140:8
  146:6
loud
  109:6,7
low
  101:6 171:4
lowest
  101:9
lump
  65:10
lumped
  102:21
lunch
  153:3
lying
  39:23 40:7

M

made
  20:13 41:25 91:17,
  19 106:3 130:7
  133:13 138:6
  164:15,19 180:5
  185:3
maintain
  9:14 20:15 21:4
  22:15 80:12
majority
  118:19 154:4,5,7
make
  35:14 40:6 42:8
  49:7 52:14 120:20
  131:15 154:6
  159:11 165:10
  167:25 174:12
  175:22 176:1
  197:15
making
  110:11 113:3
  126:23,24 168:15
  172:16,18 191:15
  196:5
man
  16:13
management
  18:15 43:14,23,24

Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 223 of 235 PageID #: 1351

Hornback vs. Czartorski                    William T. Gaut, PH. D.                    01/28/2022Index: maneuver..names

**maneuver**
114:23 133:24
134:1 155:14
172:24 187:4,6,9

**maneuvers**
116:2

**manner**
10:10 156:15

**March**
49:10,14 57:11
58:5 73:21 74:10
102:12

**mark**
8:2,3 59:21 93:15
119:10,20

**marked**
8:5 119:10,17,22
121:4 124:4,12,16
152:11,13 165:8
190:13 194:21,24
195:8,11 196:18,
21 203:13

**marking**
120:25

**marks**
55:7

**master**
12:25

**master's**
18:14

**material**
115:14 204:14

**materials**
42:21,25 44:2
204:15

**math**
23:9

**matter**
4:4 5:19 6:4,19,23
7:10,14 8:3 32:10
41:18 64:18 87:21
92:8,10,17 93:8
107:18 111:2
119:1 120:21
123:17 138:7
139:9 146:12
147:15 150:5
158:11 161:12
162:12 166:15
175:5 178:14
187:10 195:14

**matters**
119:3

**maximum**
55:19

**means**
111:11 126:4

**meant**
13:3 179:5

**meat**
147:2

**media**
164:9

**medical**
19:9 36:17,21,23
37:5 52:6 68:17,22
69:1,5 70:9 128:23
129:7 200:25

**meet**
27:15

**member**
24:18,22,23 25:6,
20,22 26:15 27:4,
7,8,9 28:2,10,15,
21 29:2,19 30:17,
20,22 31:8 65:25

**membership**
9:20 28:1 30:21

**membership-
based**
30:13

**memberships**
19:8

**memory**
18:10 26:6 35:22
58:16 81:9 121:19
145:14

**mention**
173:18 194:7

**mentioned**
160:2 173:16

**mere**
148:9 157:19

**merits**
100:12

**met**
130:4

**meted**
89:10

**methodology**
41:20 48:10 51:18
92:20

**mic**
131:18 132:1,9
133:8

**micro**
98:24

**microphone**
132:17,20 133:3

**middle**
174:13

**midway**
192:4

**mind**
105:10 107:1
141:18 166:1
170:11 191:23,24
203:8

**mine**
203:4

**minimum**
27:17,22

**minor**
9:2 148:9 153:15

**minute**
25:24 51:13 61:1
89:24 144:13
149:2 152:22

**minutes**
16:14 63:2 86:20
87:4 98:13 146:24
199:22

**Miranda**
77:15

**mis**
154:6

**misdemeanor**
150:19 154:7

**misinterpreted**
201:16

**mislead**
34:23

**missing**
11:22 34:5

**misspoke**
22:17

**mistake**
34:6 74:8

**mistaken**
140:22

**mistakes**
75:2 180:18 196:5

**model**
144:17

**models**
101:23,24 102:1

**moderate**
54:25 55:15,18

**moment**
8:22 43:25 45:13
56:8 65:6 66:23
67:11 76:11 83:19
111:8 129:9
135:16

**Monell**
83:13 147:7

**month**
45:3,25 46:21
85:18

**monthly**
53:22 54:6

**moot**
163:22

**Morgan**
4:14 5:23 6:7,10
7:1,9 8:6 17:4,23
32:10 37:24 39:6,
17,25 40:5 41:3,8
44:11,18 45:5,10
46:4,24 47:21,25
48:2 54:10 56:14,
19 59:17,24 60:3
61:13,16,22,25
62:5,8,10,13 63:22
68:8,13 69:25
71:19 72:1 73:2
74:2 77:2,4,9 84:8
86:13 88:2 89:4,16
90:1 91:24 97:1,9,
12,17,21 98:1
111:14,21 114:5,
16 116:7 119:13,
19 120:12 127:15
129:20,22 134:15
138:21 148:17
150:8 153:23
157:22 159:12
161:17 166:4
177:1,10,16
179:22 183:8
187:21,25 188:11,
13 189:13 190:11,
18,23 191:4,10,12
194:13 195:18
196:12,16 198:13,

16 199:25 200:3,
19 205:14

**Morgan's**
8:9

**morning**
4:11 5:3,17 38:19
78:11 83:12

**mother**
156:7,18 157:20
177:3

**motion**
33:18 36:7,14,16
37:6 168:15 169:6,
8,13

**motions**
36:13 200:14,23

**motivated**
46:22

**mouth**
92:11

**Move**
46:4,24 97:21
177:1

**moved**
15:18 23:24

**movement**
106:10 134:22,24
185:17

**movements**
130:7 141:7 185:3,
9

**moving**
142:3 186:9

**multiple**
108:22,25 109:21
202:6

**municipal**
14:17 115:24

**murder**
16:12,20 20:1
140:10 153:20,21
154:2

**murdered**
20:1

**muscle**
52:9

**N**

**names**
27:25 81:16

Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 224 of 235 PageID
#: 1352

Hornback vs. Czartorski                William T. Gaut, PH. D.              01/28/2022Index: narrative..operations

**narrative**
76:14 202:13

**narratives**
45:11 86:15

**NASCAR**
15:1,10 23:18

**national**
24:18,24 26:22
30:22 48:21 49:23
64:23 65:9 121:1,
22 123:11,25
124:1,7 195:6

**nationwide**
77:25

**nearest**
43:22

**necessarily**
23:10 30:3 56:20
66:19 72:7 92:11
100:7,10 109:17
112:3 113:8
116:15 123:12
134:16 181:20
182:22 200:18

**neck**
201:24

**needing**
149:19

**negates**
138:23

**neglected**
173:18,25

**NENA**
31:3,17

**news**
178:7

**newsletter**
54:6

**night**
16:18,19 43:19

**no-knock**
137:14,15,25
139:8

**non-deadly**
124:25 125:3
127:21,24 128:6,
19

**non-lethal**
64:20 65:1

**normal**
171:3

**north**
13:19,23 15:10

**note**
29:24 180:6 192:2,
17

**noted**
174:17 192:10

**notes**
52:14 190:16,23
191:8,9

**noticed**
43:10

**notification**
21:24

**notions**
7:18

**notwithstanding**
82:10

**NSA**
65:14,24,25

**number**
30:23 36:4 47:1
67:2 69:8 106:14
108:17 112:13
117:5 139:3
173:22 190:8

**numerous**
104:22 106:25
201:25

**nuts**
12:1

———————

**O**

**oath**
4:22 38:20 39:5,
22,24 40:4,8 119:8
196:1

**obey**
108:11

**object**
56:22 70:19,20
111:21

**objection**
7:2 56:14,19 71:19
72:1 73:2 77:2,9
114:5,16 120:12
138:21 153:23
157:21,22 166:4
177:1,10,16 183:8
187:21,25 195:18

**objective**
46:9 89:15 99:17,
22 100:11,15,23
105:12 117:13,25
158:10 197:12

**objectively**
99:7

**objectives**
120:6

**objectivity**
11:11

**obligation**
38:23 82:12

**observation**
134:1 158:23
169:18

**observe**
55:7,10 173:7

**obstruction**
94:17

**obtain**
47:20

**obtained**
9:10

**obvious**
135:11

**occasion**
89:21

**occur**
173:20

**occurred**
48:13 57:11 58:11
72:20 94:12 98:14
187:4,6 202:14

**occurring**
99:5 126:16

**occurs**
116:4 155:17
176:22 186:10
187:1

**October**
66:7

**offender**
16:6 104:23,25
105:1

**offense**
46:6 149:25 161:2,
12 196:7

**offer**
198:11 203:16

**offered**
198:11

**offering**
24:13 37:1 111:3

**Office**
15:9,24 23:5

**officer**
14:15,16,18 22:25
30:5,11 39:21
40:3,7,17,25 41:11
45:23 56:1 70:19,
24 72:5 83:23
84:15 86:7 87:10,
19 88:12 89:19,20,
25 90:4,5,15,23
92:9 99:5,18,19
100:17 101:5,12,
15 102:17 103:4,
13,18 105:22
106:6,7 107:5,17
108:2,5,7,10,19,24
109:1,4 110:14
112:5,7,15,20
113:5,11,15,18,20,
22,23 114:12,14,
18,20,21 116:11,
19,22 117:24,25
118:7 122:19
123:2,4 126:6,22
128:1 133:8,15,18
134:16,18,20,25
140:5,17,20 143:9,
25 144:19,20
149:6,8,10 150:23
151:4,22 153:17,
18 155:2,6,9
156:2,3,8,12 158:7
159:2 161:11
167:7 168:15
172:21,23 173:10
175:12 177:18,19
178:11,12,16
181:4 185:5 187:8,
11 190:6 198:25
199:1 201:3,24
204:19

**officer's**
96:12 99:4,11,13
100:14 118:5
131:18 132:1
136:10,12,16
144:18

**officers**
30:5 39:15 41:7,12

**offered**
43:15 46:22 65:12
82:9,12 86:24
88:21 91:14 98:19
103:15 104:9
106:14 107:13
108:11,21,22,25
109:22 110:18
115:17 118:25
122:16 125:4
129:6 131:22,24
133:22 135:2,4,7,
10,12 136:1
140:11,16 144:15,
22,23 146:11
148:19 149:13
150:11,15 151:8
152:4,18 153:18
154:3,4,23 155:23
158:3,6,7,22
159:15 161:24
162:25 163:1,3,4,
18 172:16,19
177:25 178:3
181:25 182:4
184:12,17 185:4,
24 186:15 195:5
201:18,22 202:5,
23

**officers'**
87:9 98:11 99:23
101:10 139:14
172:6 176:24
183:20 202:1

**official**
126:23 165:3,4

**OM-B-4**
124:17

**one-third**
171:4,7,9

**one-time**
20:16 21:3

**ongoing**
148:20

**online**
80:12

**open**
139:24

**opened**
26:1

**operating**
26:11 141:22

**operations**

Case 3:20-cv-00703-RGJ-LLK   Document 63   Filed 03/22/22   Page 225 of 235 PageID #: 1353

Hornback vs. Czartorski                    William T. Gaut, PH. D.                    01/28/2022Index: opine..photos

11:13 31:4

**opine**
192:2,8,14

**opinion**
42:10 45:22 46:9,
25 47:24 54:24
64:8 84:14 85:8,
12,21 89:19 90:19
92:16 100:12
110:25 130:15
135:15 138:23,24
141:22 142:1
162:3 163:20
167:5,10 178:15
179:23 189:10,14,
21,23 190:4
193:24 200:15
203:4,11

**opinions**
7:13,18,21,23 12:3
33:15,22 34:22
36:18,21 37:2,5,7
46:3 47:17,22 48:6
66:12 78:2,14,18
79:13,19 82:4
83:6,9 84:7,9,10
102:5 123:16
130:24 131:7
134:5 138:17
141:20 155:19
166:8 169:16,22
189:8,16 195:17
197:22 198:7,8,12
199:13 201:2,6
203:16,24 204:21

**opportunity**
74:19,20 116:20
123:5 196:21

**opposed**
50:4 90:15 109:19,
24 132:16

**opposing**
201:10 203:2,22

**opposite**
199:9

**options**
180:24 181:2

**opts**
160:22

**oral**
48:8

**order**

9:14 27:15 110:3
116:19 123:20
124:17 132:9
148:25 149:9
183:3 205:12

**ordered**
190:24 191:5

**ordering**
205:1

**orders**
24:5 107:4,5
109:5,21,24
148:23

**org**
21:25

**organization**
9:20,25 11:15
19:15 20:2 21:1,18
24:9,10 25:3,5
27:12,14 28:6,14
29:21 30:13 35:20

**organizations**
31:11 48:20 49:19,
21 50:5 52:3 66:10

**orientation**
61:16 62:16

**Oriented**
61:17

**original**
87:7 132:25 194:8

**originally**
66:6 95:22 131:16

**outcome**
100:2 189:7

**outer**
62:19

**outline**
146:8,13

**outlined**
147:23

**outstretched**
143:1

**outweighs**
71:2

**overcoming**
127:25 129:18

**overly**
40:10

**owned**
138:8

**owner/ceo**
19:24

---

**P**

**p.m**
153:6

**p.m.**
153:5,6,8 194:17,
18,20 200:8,9,11
205:3,19

**padded**
35:23

**pages**
8:8 31:20 43:5

**paid**
32:2

**paper**
121:2 124:8

**papers**
53:3 65:17 66:11

**paragraph**
51:16,20 76:18
126:21 179:4
180:6

**parameters**
27:15

**parents**
60:11 87:8 136:19
137:3,6 144:6,8
164:20 165:15
166:1,11 168:6
174:18 175:9
176:15,20

**parked**
94:18

**part**
15:2 25:13 33:11
34:6 51:23 53:25
54:1 57:21 64:9,10
74:9 82:15 132:6
135:18 155:19,21

**parties**
34:18 42:1 149:4

**partner**
26:1,4,12,14

**pass**
20:11

**passage**
56:12,15,23 57:6,7

**passive**
102:17 117:20,21,

22 118:2,8 142:20,
21,24 143:4,11

**past**
46:7,17 47:1 151:3
185:25 200:14

**pat**
107:23

**patrol**
82:9

**pattern**
83:15 136:6

**patterns**
53:5

**pay**
20:4 25:5 26:18
27:16,23 29:4
30:15

**peace**
126:5

**penalty**
39:2 75:10

**pending**
139:4

**people**
39:22 53:11 68:6,
11 82:18 103:5
115:11 160:17

**people's**
47:16

**perceived**
99:12 156:2,17
158:8

**perceives**
99:6

**percent**
20:12 35:19
118:22,23 182:17

**perception**
99:4 158:10

**performance**
178:3

**performed**
86:16 133:24

**performs**
155:13

**period**
48:18 52:1 56:25
60:13 62:24 69:18,
23 80:17

**perjured**
89:25 92:9

**perjury**
39:5 40:8,17,20
41:1 90:12 91:1
97:16,24 98:6
195:13,25 196:3

**permission**
138:8 201:21
202:21,23

**permitted**
113:23

**perpetrator**
139:17

**person**
69:22 105:23
108:18 110:11
112:6 113:5
114:13 115:19
126:3,22 128:1

**personnel**
122:17

**persons**
14:4

**perspective**
46:23 69:1 92:12
153:17,18 154:10,
13 175:12

**pertain**
52:5

**pertaining**
50:20 83:9,24
84:14 155:25
190:4 193:6

**Ph.d.**
4:4,21 18:17,22,23

**phone**
131:4,9,11 164:4,9
190:18

**photo**
59:12 60:9,14
61:10 119:11,16

**photograph**
54:20 60:6,17

**photographic**
71:9

**photographs**
55:16,21 56:10
57:17,22 70:11
71:23 72:19

**photos**
54:17 56:7,8 57:9,
12 58:8,10 59:6



Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 226 of 235 PageID #: 1354

Hornback vs. Czartorski                    William T. Gaut, PH. D.                01/28/2022Index: physical..procedures

60:11 62:23 63:15
64:5,9 71:13 72:16

**physical**
10:5 82:6 87:15
100:16 103:17
122:3,7 126:5,21
127:21,24 144:11
156:20,25 168:15
180:24 181:2,13,
14,17 184:14

**physically**
129:6 142:14
143:8 156:1

**physician**
16:12

**pick**
94:21

**picked**
94:11 131:25
132:1

**picky**
96:7

**picture**
71:13

**pictures**
72:7

**pieces**
71:7

**pin**
181:4

**place**
11:11 91:18
102:12 148:21
156:7 202:20

**places**
168:19,20,23
202:2,18

**placing**
169:3

**plaintiff**
41:25 118:23
175:21

**Plaintiff's**
7:3 189:18 192:3,9
193:25

**plaintiffs**
4:12 5:8 32:1 42:1
118:20 143:16,23
165:13 176:9

**Plaintiffs'**
8:2 148:6 175:4

**plan**
6:22

**planning**
196:24

**play**
89:22 103:19
141:19

**playing**
196:4

**plead**
160:24

**point**
23:10 44:15 54:5
84:1 127:14
130:10 133:17,20,
22 155:1,7,10
156:9,10,16
163:19 168:4
172:7 182:23
184:16 186:9
187:9,12 194:9
195:10

**pointed**
51:5 156:14

**pointing**
51:7 103:25
168:15

**points**
150:21 155:7

**police**
12:9,16 13:1,9
14:15,18 15:11,23
16:1 22:4,5,24
23:23 28:22 39:15
40:3 41:12 43:15
48:21 55:3 56:1
72:5,10 73:7
88:10,12,21 96:25
97:6 98:3 101:5
103:14,18 104:9
105:7,22,23 107:5,
17 108:7,11,24
109:4 110:5,17
111:24 112:2,15,
20 115:13,17,23
118:25 121:3,23
124:20 136:20
137:2 139:6,16
140:12,19 147:16
148:1 149:6,8
152:17 167:6
178:16 181:15
190:24 191:5

**Police's**
110:22,25

**policies**
11:13 49:16,18
53:10,12,14 64:17
65:18,23 66:4,11
73:25 74:12,15
75:6 111:7 112:3
121:13 199:3

**policing**
121:11

**policy**
25:8,11,14,17
29:7,10,13 50:6,7,
21 51:7 52:10,13,
16,18 53:7 65:15
66:1,3,6,14,17,18
67:3 71:17 73:10
98:5 110:22,25
111:8 117:10
121:1,8,10,11,15,
16,17,18,19,21
122:1 123:19,22
124:9,21,24
125:21,24,25
126:16,17,20
128:11,15 129:16,
17 130:2,4,12,14,
19 144:17 198:21,
25

**poorly**
109:20

**porch**
131:19

**portion**
61:6

**pose**
154:2

**posed**
145:22

**poses**
146:10

**position**
61:3,4 90:3 124:8
159:22 169:6
172:8,9,13,20,21
173:24

**possibility**
94:23 95:25
145:16

**possibly**
43:7 164:15 198:7

**posture**
172:23

**potential**
106:8 139:17

**potentially**
135:2

**pounds**
112:20,21 114:19,
22

**practice**
10:25 11:19 34:13
37:18,22,23 38:5
83:15

**practices**
55:4 56:1 82:8,9
121:23

**preceding**
45:3,25 46:21

**precinct**
13:19,21,22,24

**precincts**
13:19

**preconceived**
7:18

**prefer**
203:1

**premise**
149:16

**preparation**
120:16

**prepare**
41:18 120:16
121:14

**prepared**
41:17

**preparing**
6:18 78:2 120:20

**presence**
101:10,15 102:17

**present**
4:7 106:14 143:21

**presentations**
19:4

**presented**
19:2 66:2 99:25
163:18

**press**
133:9

**pressing**
44:19

**posture**
172:23

**potential**
106:8 139:17

**pretty**
41:10 132:12
142:14 151:12
156:8 191:11
200:24

**prevalent**
106:22

**prevent**
117:24 143:9
172:25

**previous**
49:8 126:20

**previously**
203:13

**primary**
49:5 81:6

**principle**
54:8 111:17
139:21,25 140:3

**principles**
101:1

**print**
67:18 80:12

**prior**
27:18 45:2 60:13
74:18,25 85:17,18,
23 86:1,9,10 87:24
88:11,23 89:2,21
120:10 121:18
140:6 160:3
176:20 182:20
185:10 190:20,24
191:4 192:11
199:6

**private**
18:15 138:6

**privately**
138:7

**probable**
143:17 166:13

**problem**
17:13 54:18 59:25
196:17

**procedural**
73:14

**procedure**
98:5 110:5,9
111:24 112:2
173:20

**procedures**
31:5 82:5,6 98:3,

Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 227 of 235 PageID #: 1355

Hornback vs. Czartorski                    William T. Gaut, PH. D.                    01/28/2022Index: proceed..recently

18 122:2 129:8
137:9

**proceed**
4:10

**process**
21:3 86:5,6 185:4

**proctored**
20:9,11 23:25

**produce**
32:14 181:17

**produced**
52:16 55:21 60:1
67:7

**production**
44:12

**professional**
9:25 48:19 50:4
52:2 192:22,24
199:15

**professor**
12:20 15:3

**profile**
64:14

**program**
62:6

**progression**
12:13

**prohibition**
166:19

**project**
100:10

**prominent**
57:5

**promoted**
13:20 28:25 48:18
52:2 73:15

**prone**
172:13

**pronounced**
56:25 60:13,16
62:25 63:18 69:17

**propensity**
134:20

**proper**
98:3 110:5,9
112:25

**property**
14:5

**prosecute**
160:21

**prosecution**
165:1 167:8,9

**protect**
139:14 150:25

**protection**
140:17

**protestor**
118:3

**proved**
141:23

**provide**
9:6 34:11 67:13
204:16

**provided**
70:12 75:6 97:8

**providing**
79:19

**provision**
128:22

**Provisions**
128:11

**prudent**
84:4

**psychological**
10:15

**public**
18:14 19:4 24:13
40:25 41:12
190:19 192:12

**public's**
41:1

**publication**
54:5 81:21

**publications**
18:19 53:15 64:13
81:23

**publicly**
19:2

**publishes**
43:17

**pull**
59:14 112:7
113:21 118:15
182:4

**pulled**
51:2,4 143:6
156:14 159:22
177:7,12,18,19

**pulling**
81:19 91:12 113:9
132:24 182:12

**pulls**
113:5 114:13,21
156:10 177:21

**purpose**
33:5 39:1 67:21
73:5 183:1

**purposes**
39:10 59:18 92:24
149:20 166:14

**push**
178:12

**pushed**
171:21 177:19

**put**
25:8 29:7 38:20
44:6 49:18 50:6,7,
11,16 52:10 53:2,
3,6,12,14,16,20
54:8 65:16,17,19,
20,22,23 66:5 74:8
78:24,25 80:5,6
84:5 92:10 107:11,
23 108:7 115:18
118:7 123:21
135:6 142:4,13
143:2,6 155:3,4
158:21 168:13,17
170:19,22 173:25
177:19 179:2,13
181:19,23 182:1
184:14 185:21
186:4,5 201:24
202:5

**puts**
65:16 66:13 90:3
112:5 123:19
142:25 143:3
155:8 185:5
187:10

**putting**
87:12 142:15
159:21

---

**Q**

**qualifications**
34:24,25 35:4,11,
12

**qualified**
13:1,4,8 36:11

**quarter**
171:3,6

**question**
5:12,13,15 16:13
35:2 38:12 49:8
53:24 57:2 70:3,23
72:4 87:6,22 90:2,
25 108:10,15
109:11 125:23
126:12,15 129:24
131:17 143:23
144:25 150:13
163:11 188:20
189:25 191:12,18,
20,22,23,24
192:20 201:12
204:8,12

**questioning**
109:12

**questions**
35:15 68:4 188:14
200:1,2

**quick**
75:7 152:25
194:14

**quickly**
45:14 68:12,18
201:9 203:8

**quote**
112:16 183:1

**quoted**
76:18

**quoting**
166:17

---

**R**

**raise**
4:18 140:22

**ram**
140:15

**range**
10:13 63:19 76:19
82:8

**rap**
161:6

**rapes**
81:4

**rarely**
203:1

**reach**
7:23 120:19

**reaction**
98:11 99:12

**read**
47:3 53:21 127:23
128:9 130:5,12
167:20 201:9
205:8

**reading**
41:23 83:20,21
85:6 163:5 191:1
192:6 198:4 204:6,
24

**real**
70:8 75:7

**realize**
54:4

**realtime**
170:15

**reason**
20:25 33:11 40:16
58:25 71:22 94:5
111:6 166:6 179:2
194:2 204:4

**reasonable**
76:19 99:7,18
116:20 144:20
145:1

**reasonableness**
158:10

**reasoning**
160:25

**reasons**
47:1 69:8 139:3,12

**rebuttal**
7:2,4,5 196:25
198:10

**recall**
17:17 27:10 28:10
35:17 37:8,9 45:15
52:12 57:16 58:18
65:5 67:1,17 68:20
70:13 75:5 78:15
79:8 81:16 86:14,
15 94:2 163:4
182:8,11

**receive**
20:13 24:1 83:24

**received**
51:1

**recent**
29:23 46:21 79:6,7
81:23

**recently**
19:24 21:17



Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 228 of 235 PageID #: 1356

Hornback vs. Czartorski                    William T. Gaut, PH. D.                    01/28/2022 Index: recess..response

**recess**
92:2 153:6 194:18
200:9

**reckless**
148:7

**recollection**
28:20 54:4

**recommended**
27:21 65:17
123:22

**record**
4:1,8 31:25 59:19
69:1 91:25 92:3
153:4,7 161:23
188:22 190:19
192:12 194:16,19
200:7,10 204:25
205:2,4,11

**recorded**
131:8 132:14,15

**recording**
131:11,14

**records**
88:20

**recruits**
12:23

**redacted**
190:19

**reduce**
122:23

**reduced**
66:2

**refer**
14:15 80:20
115:16 134:21
150:12 155:13

**reference**
52:17 78:24,25

**referenced**
64:21 66:22 67:4,
12

**references**
78:23

**referred**
12:25 44:2,9 49:4
76:3,5 78:20 80:4

**referring**
49:21 51:17 65:9,
24,25 66:1 81:18
119:24 120:7
126:17 144:8

**refers**
66:18 126:17

**reflects**
12:12 121:22

**refusing**
158:21

**refute**
92:15 136:14

**refutes**
87:16

**regard**
52:11 97:11
136:11 138:20

**region**
173:23

**regular**
21:15 34:13

**regularly**
107:6

**regulate**
31:4

**rel**
80:17

**relate**
10:6 92:7

**related**
23:18 45:3,16
195:13

**relation**
9:9 57:10

**relay**
94:17 133:9

**relaying**
133:3

**release**
58:11,18 63:16

**released**
58:15 59:3 62:23

**relevant**
42:8,9 45:22 46:2,
25 51:7 80:17
82:1,16 85:16
88:1,3 98:13
147:13 151:7
161:15 182:13,14
198:19,21,23

**relied**
53:17 54:7,8 64:13
67:6 203:23

204:16

**rely**
34:18 39:11 48:6
64:18

**relying**
51:11 53:13

**remember**
13:11 14:10 25:2
28:13 58:22 95:17
96:1 115:9,10
173:9 199:12

**removes**
169:4

**render**
83:5 84:8,10,14
85:8,12,21 89:18
92:16 123:16
128:23 155:20
162:3 169:22
178:14 189:10,13,
15,21,23 190:4
193:24 199:14
203:23 204:21

**rendered**
46:3 64:8 84:7
105:5 134:5
169:17 199:14
203:11,12

**rendering**
7:20 110:24 166:8

**renew**
30:21

**reopen**
7:7

**repeat**
188:20

**report**
6:4,5,16 7:3,6 8:2,
9,10,11,14 35:3,7
41:17,19,21 42:17,
23 43:2,5,8 44:3,9
47:9 50:10 51:14,
17 58:17 59:2
64:22 65:5 66:20,
21,22 67:4 70:14
71:24 72:23 73:13
74:11,14,19,21,23
75:2,8,12 78:2
80:1,10 84:6,18
88:9,14,15 110:21
116:23 117:2,6
118:18 119:13,15

120:11,16,20,21
121:14,17 130:25
135:7 147:1 160:2
165:11 174:12,22,
24 175:18 179:6,
14 180:19 192:5
196:15,22,25
198:6,20 199:14
201:10,15 203:2,
10,12,17

**report's**
74:16

**reporter**
4:9,18,25 38:20
59:22 109:13
152:10 165:6
188:23 190:10
205:5,8,15

**reporting**
71:17 73:8 123:23

**reports**
6:17 42:18 73:5
86:16 88:7,8 89:6
120:10 175:20
198:10 199:16

**represent**
5:7 60:20 78:6
131:23

**reputation**
189:11,18 192:10,
15,22,23 193:3,10,
19,25 194:7,11

**request**
6:1

**require**
9:16 33:12 73:7
102:23

**required**
9:8,11,23 32:23
33:5 117:2 144:23,
24 198:20

**requirement**
20:7 34:16 39:15
137:22 138:1
149:1

**requires**
140:4,5

**requiring**
73:5

**reread**
198:6

**research**
22:1 53:22 66:1
79:12 82:20,22,24

**researched**
80:9 140:25

**researching**
80:11

**reserve**
7:7

**residence**
92:24 93:20 138:6,
13,15 140:6

**residue**
53:4

**resistance**
101:18,19,20
102:17,18 111:3
113:12 116:4
117:17,20,21,22,
23 118:2,9,11
122:4 124:18
125:1 127:19
128:1,6,8,20
129:5,19 135:12
136:6 141:9
142:12,18,20,24
143:7,11 158:14,
15 159:1,24
161:23 184:3
188:7

**resisting**
111:19 114:14
115:6 116:5,6,8
125:5,9,12,15,18,
22,25 126:13,18
127:1 130:17,20
143:11 146:1
151:11,12 172:3
174:9 182:22
183:6

**resistive**
174:18 181:24

**resorting**
122:22

**respect**
6:22 7:2,13 53:17
83:16 164:2,3
177:17 197:24

**responding**
125:5 187:11

**response**
85:23 112:19

Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 229 of 235 PageID #: 1357

Hornback vs. Czartorski                    William T. Gaut, PH. D.                    01/28/2022Index: responses..significant

124:17 125:1
128:6,8,19 129:5

**responses**
44:12

**Responsibility**
128:23

**responsible**
109:4

**responsive**
5:14

**rest**
46:7

**restating**
188:17

**restraining**
157:16

**restraints**
122:8,13

**restricted**
36:12

**result**
32:13 54:14 55:19
113:19 123:3
187:16

**resulted**
65:15

**resulting**
54:13 86:2

**results**
17:2

**retained**
5:18 98:15 118:24

**retaining**
42:4,13

**retention**
80:6

**retired**
12:9 14:6 15:19
22:19

**retirement**
14:19 37:13 38:7,8

**returned**
15:9

**revenue**
38:4

**review**
45:8 74:19,20 86:9
186:17 196:22
198:4

**reviewed**

45:11 56:7 79:6,9
91:20 93:7 110:21
195:14

**revised**
66:7

**rights**
10:23 16:23 82:17
199:2,5

**risk**
126:5 153:18
154:2

**role**
10:8 14:16

**roll**
172:14

**room**
180:7

**rotate**
62:3

**routes**
106:9

**routine**
154:8 200:24

**rule**
16:10,21 17:10
36:20 78:5 139:2,
13 166:23

**ruled**
36:11 99:16 100:8

**rules**
5:11 21:7

**ruling**
77:22 100:10
138:24

**rulings**
36:25

**run**
118:12

**runs**
35:8

**rush**
103:5,21 205:12

**rushed**
104:3

———————
**S**

**safely**
110:15

**safety**
41:6 110:17 123:2

139:14 140:20
150:23 151:4
153:18

**save**
80:12 104:6
178:13 199:25

**scenario**
107:16 136:3
151:15 186:12

**scene**
91:12 106:15
108:22,25 131:3
132:25 136:23
144:19

**schedule**
31:20 35:9

**scheduling**
13:5

**school**
8:20 24:6 42:6

**Schulz**
76:7,20 78:17

**science**
18:8 27:19

**Sciences**
21:8 27:5 48:23
50:1,3,12 51:6,12
52:4,23,24 64:12

**scientific**
10:4

**scope**
167:19

**score**
20:11,13

**scored**
24:1

**scroll**
8:13

**search**
135:11,23 137:15,
20 140:7 144:1

**secondary**
90:5

**seconds**
169:3,9 170:21,23
181:6

**section**
41:20 128:5

**security**
25:21 26:1,4,9,16
27:2

**sees**
99:5,14

**seizure**
137:20

**self-defense**
166:21

**send**
27:24 42:7,8 59:24
196:11 205:17

**sense**
24:13 54:7 98:25
200:24

**senses**
171:17

**sentence**
180:22

**separate**
96:21

**sequence**
133:22 170:20

**sergeant**
16:4 88:16 164:14

**sergeants**
13:7

**series**
101:5

**serve**
59:1 148:23
152:17 153:14
161:1

**served**
47:14,15 58:23

**service**
14:7,17 82:5
115:13 150:24

**Services**
23:6

**serving**
147:16 148:1
149:6,20 154:6

**set**
52:9 75:18,22
82:16 100:1 113:2
145:3 186:3

**seven-day**
205:12

**severity**
55:24 145:19
146:24 148:14,21
149:24 150:10,18,
22 151:16 153:12

154:10

**shape**
195:16

**share**
62:6

**sheet**
161:6

**sheriff's**
123:20

**Sheriffs'**
24:19,24 26:22
48:21 49:23 64:23
65:10,19 123:11,
16,25 124:7

**shooting**
117:5

**shortly**
38:16

**shoulder**
112:23 172:22
173:13

**shoulders**
169:12

**show**
20:8 27:16,17,19
54:20 55:18 56:22
58:17 67:18 70:12
138:22 149:13
169:24,25 195:23
204:1,3

**showed**
87:18

**showing**
152:1 164:9

**shown**
59:3

**shows**
96:19 132:24
168:14 171:24
184:8,21,23

**sic**
73:25

**sick**
13:5

**side**
17:18 26:3 61:22
142:11 172:9
173:2,13

**significant**
70:12 108:16

Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 230 of 235 PageID #: 1358

Hornback vs. Czartorski                    William T. Gaut, PH. D.                    01/28/2022 Index: similar..stating

**similar**
33:15 99:19 100:1,
5,6,9 144:16,20

**simple**
196:5

**simply**
35:7 103:17
108:18 112:18
113:8 129:17
138:13 142:9
150:17 182:23
186:20

**single**
83:12 106:12,17
174:3,4

**sir**
6:4 8:25 15:21
18:6 28:20 31:19
34:22 45:1 49:9,15
51:18 52:10 54:21
59:7,8 60:20 67:5
73:13 75:7 78:7
83:3,5 91:5 118:18
119:8,19,20 121:8
124:16 125:24
129:12 131:23
133:12 144:14
147:1 149:18
152:13 162:7
167:13,17 171:12
176:17 180:18,21
182:5 185:14
186:3,13 188:3,12,
16 189:15 190:15
191:15 194:5
195:2 196:20,23
199:13 201:11
203:11,19 204:22,
23

**sit**
67:1 79:8 104:19
105:20 106:12
182:16

**sits**
132:19

**sitting**
67:14 118:4,5
145:10 203:6

**situation**
10:9 100:5,8,9
103:4,21 109:2
110:14

**situations**
108:20

**six-day**
47:13

**Sixth**
79:15 82:22 83:1,
2,4 167:14

**skimmed**
201:9

**skin**
69:8

**slight**
54:20

**slightly**
102:1 169:4 172:9,
10,14 173:1,3

**slinging**
103:6

**slow**
170:16,18 171:2,6

**slowed**
170:19

**smart**
187:7

**snuff**
84:24

**social**
164:9

**Society**
25:21 26:16 27:1

**sold**
26:12

**solely**
145:14

**somebody's**
179:7 194:10,11

**someone's**
161:9,11 199:2

**son**
156:11 157:18
176:25

**Sonya**
4:13 48:13 135:5,
19 156:6,21
164:16,20 166:1,
10 169:5 171:20
176:23 183:19

**sort**
10:5 15:14 33:10
36:19 38:9 40:12
47:15 50:19 53:2

55:18 69:6 70:11
87:12 112:10
113:19 140:23
171:10

**sounds**
132:13 198:14

**speak**
47:6 96:14 160:23
163:6 182:18

**speaking**
10:10 38:19 54:13
63:4,23 64:20
78:19 88:13
122:12 176:5

**speaks**
202:12

**Special**
23:6

**specialized**
193:20

**specialties**
26:22,25 31:12

**specialty**
15:12

**specific**
37:25 52:12 53:19,
24 54:5 66:4,11
67:6,10,15 79:12,
23 80:3 81:5 82:24
83:4 102:3 115:9
127:24 161:2
179:4 192:20
193:21

**specifically**
30:10 52:3 54:6
66:21 67:12 79:9
113:14 117:23
140:4,5

**specifics**
56:21 198:5

**speculate**
188:4,5

**Speculation**
166:4 177:16

**speculative**
188:1

**speed**
23:22 170:15
171:2,3

**spent**
43:19

**spin**
61:17

**squad**
140:9

**stabbing**
53:2

**staff**
13:16 30:7

**staffing**
30:8

**stand**
132:10

**stand-up**
115:17

**standard**
16:8 51:10 66:13,
14,18,21 67:2,3,6,
10,15,16 69:14
80:3,7 82:11 99:22
100:23 101:11
109:3 117:12
120:4 137:13
138:3 158:9
173:20 175:13,14,
17 180:1,2,3 195:6

**standards**
12:2,4 31:4 48:17
49:1 50:11,17
52:1,21 53:15
65:23 73:14,17
75:18,22 76:2
79:21,23 80:4,6
82:13,16,21 83:7,
10,18 84:9,17,24
89:7 98:20 100:18
102:14,23 105:12
119:21 121:22
123:13 124:2
189:24 190:7
191:14,25 197:7,
10,13,14,17 198:1,
3 201:14,16
204:15

**standing**
61:18 90:15
103:24 106:6
132:9 156:11

**standpoint**
69:5 70:10 93:19
98:7 100:15 102:7,
11 178:18

**stands**

**spin**
100:12

**start**
8:1 12:5 24:21
41:23 90:19,22
100:6 101:6 103:5
109:13 122:2
147:2 149:16
190:15 203:14

**started**
12:6 26:9 136:3
144:3 187:9

**starting**
8:10

**starts**
35:8 147:3 173:21
174:13

**state**
14:18 15:4 22:14,
17,24 23:25 37:14,
16 40:12 79:22,24
80:5 88:10 92:23
93:3 96:25 97:6
110:22,25 115:24
118:25 124:20
136:19 137:2
138:17 139:6
147:7,8 149:8
190:24 191:5
195:24

**stated**
170:12

**statement**
40:7,18 41:10,13
70:22 75:8 76:20
87:16 96:22 114:2
124:1 136:16
165:10 174:12
180:5 184:7

**statements**
25:8,12,15,17
29:7,10,13 71:3
72:4 75:11 87:7,9
89:7

**states**
75:18,22 77:17,19,
21 79:14 101:9
146:16 154:5
167:14

**States'**
154:10

**stating**
140:2



Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 231 of 235 PageID #: 1359

Hornback vs. Czartorski                     William T. Gaut, PH. D.                01/28/2022Index: stature..talking

**stature**
103:17 104:15

**status**
9:15 12:24 21:10
27:22 96:25

**statute**
130:3 140:24
166:19

**statutes**
128:3,12,16

**statutory**
128:11 141:1
178:20

**stayed**
13:22,25

**step**
13:8 41:18 109:14
117:4

**stepped**
156:16

**steps**
101:5,14,24,25
102:12,16 169:5
171:21

**stippling**
53:4

**stood**
43:20

**stop**
15:15 112:16
116:6 154:8

**stopped**
15:16 24:16 26:11
169:6

**stops**
116:5,6,8

**straight**
61:18

**strange**
106:18,19

**street**
88:13 151:22
164:2

**stretch**
91:23

**strictly**
77:14,23

**strike**
46:4,24 52:9
54:12,14,25 55:2
70:24 87:10,20

96:9,10,12,16,20,
21 97:21 115:20
141:16 166:10
173:8,11,23 177:2

**strikes**
171:25 172:4,11

**striking**
55:11 173:4

**strong**
23:10

**struck**
54:22,24 55:19
56:21 60:24 61:1,7
62:22 70:4,18,23
83:10 90:9 157:19
201:25 202:6

**studied**
52:11

**studies**
9:3 53:7,21,25

**study**
10:3,4 53:19,24
70:17

**stuff**
147:13 202:8

**subdue**
55:4 122:18

**subject**
7:10 15:21 33:18
36:6 37:6 54:11
69:4 100:21,22
101:13 104:11
109:22 111:3,19
116:3,5,6,8,18
123:4 125:22,25
126:1 130:6
138:14 140:10
142:9,17,19
151:11 160:6
172:24 174:9,18
181:17,24 182:22
185:2 200:16

**subject's**
101:7 104:14

**subjected**
70:4 72:5

**subjective**
175:7 178:23
179:15

**subjects**
19:3 110:6,18
125:5,8

**submit**
123:5 183:2

**submitted**
53:8,17

**subpoena**
44:13

**subscribe**
29:16

**Subsection**
165:21

**subsequent**
108:21 128:22
169:22

**subsequently**
125:9 195:25

**substance**
35:7

**substantial**
126:5

**substantially**
99:25

**substitute**
13:6

**successful**
36:6 37:6 200:16

**suddenly**
14:6 173:1 185:5

**suffices**
133:6

**sufficient**
54:25 112:22
136:14

**suggest**
84:18 128:7
143:17

**suggesting**
84:21,22 179:8

**summary**
48:8 173:17

**superficial**
60:4

**supervised**
12:23 30:5,7 86:1,
4 88:22 89:10

**supervision**
84:5 85:12,22
87:24 88:9 92:7

**supervisor**
14:1 88:16

**supplement**

44:12

**supplemental**
42:18

**supply**
204:10

**support**
70:21 132:8

**supported**
164:7 185:12

**supports**
7:24 129:15

**suppose**
22:8

**supposed**
39:12 100:11
103:20

**Supreme**
75:18,23 77:20,21
78:7,12 146:16,20
149:22 154:9

**surface**
69:8

**surmising**
90:20

**surprised**
22:1

**surveillance**
131:12

**survive**
16:15

**suspect**
145:22,25 146:1

**suspended**
97:10

**suspension**
47:13,14

**sustain**
92:12

**sustained**
17:22 18:3

**swear**
4:9

**sworn**
4:19,22 14:18
22:24 56:1 204:18

**synopsis**
48:3

**system**
40:4,9,11,19 41:2
43:14,15,24

131:12 171:5

---

**T**

**table**
43:9,11

**tactical**
140:9

**tactics**
43:12 44:8

**takedown**
96:1,5,17,18
113:23 114:15,23
115:5,18 116:1,4
133:13,24,25
134:6,12 141:8
146:23 154:16,21
155:14 156:7
159:15 167:25
172:19,24 173:14,
15,20 176:20,22
180:12 182:5,21
184:18 185:10,18,
19 186:10 187:1,3,
6,9

**takes**
66:24 69:14 72:6
88:12 107:12
108:14 155:6,9,10
169:13 182:3

**taking**
32:2 38:14,16
95:17 113:20
115:13 134:21,22
148:21 175:11,15
188:16 204:7

**talk**
38:17 49:16 67:24
78:10 84:4 100:4
101:22 109:9,14
111:8 112:17
121:25 154:15
183:17 188:13
204:24 205:1

**talked**
11:22 62:24 64:11
86:24 104:7
105:15 111:18
153:12 154:16
169:19 194:24
200:13 204:20

**talking**
35:7 49:1 106:1

Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 232 of 235 PageID #: 1360

Hornback vs. Czartorski                    William T. Gaut, PH. D.                    01/28/2022 Index: talks..training

109:13 112:19
145:9 148:19
151:3 164:4 168:5
171:10 185:25
197:12,25

**talks**
152:16 175:15

**tall**
114:21

**tarnish**
194:10,11

**tarnished**
194:8

**taser**
50:23,25 51:1,7
156:14 181:5,8,11,
13,14,16

**tasers**
50:17,19

**taught**
12:22 13:3 23:22
81:15 103:3
110:10 115:17,22

**Taylor**
139:9

**TC**
104:21

**teach**
13:1,4 15:11 81:13

**teaches**
116:1

**teaching**
15:12

**technically**
78:19,20

**technique**
113:23 114:15
115:18

**techniques**
10:14,15 43:12
44:3 82:7 115:5,22
122:20 127:25

**technology**
133:8,10

**television**
139:11

**telling**
109:22 117:8
139:20 151:23
179:2 193:19,22

**tells**
39:22 88:20 108:7

**tend**
25:11

**tendency**
32:22 69:12 72:3

**tender**
199:23

**tenses**
142:19 143:5

**tensing**
158:20,24 159:21

**tentatively**
119:11

**term**
37:13 51:3 64:14
86:12

**terms**
34:24 35:10,11
37:22 38:3 42:5
52:15 66:10 68:25
71:17 82:22 87:18,
23 97:25 98:14
100:2,13 154:10
166:8,15 171:10
193:18 195:19

**test**
20:4,16 21:4,9

**testified**
4:23 36:1 95:24
113:4 132:4
136:17 158:2
199:9

**testify**
34:16 175:24,25

**testifying**
74:18,25 118:20

**testimony**
32:1,15 33:1,2,9,
14 34:1,11 36:5,
10,11,23 39:11,14
68:22 86:8 87:3
95:15,16,18 96:1,
5,13 97:19 105:5
129:14 130:1,5
134:1,18 136:9,11,
12 141:15 154:20
155:15 164:13
168:13 183:18,19
184:3,5 195:13
200:15,22 201:1

**testing**
18:10 20:15

**Texas**
36:21

**textbook**
78:25 81:2,3,14
82:11

**textbooks**
80:16,20 82:8
204:7,10,15

**theoretical**
72:24

**theory**
46:5 54:7

**thigh**
60:21,22 61:5,8,22
62:19 172:1,4,10

**thing**
8:25 10:5 15:14
17:11 33:10 36:19
38:4,9 40:12 47:15
50:19 53:2 64:25
69:7 70:11 109:16
152:20 156:5
176:14 179:13,16
180:16

**things**
33:14 39:20,23
42:18 73:12 83:10
98:8,9 109:23
110:20 115:21
122:1 123:19
135:8 145:13
146:9 163:25
173:22 181:7
190:2 198:18
203:7

**thinking**
100:14 139:25

**thinks**
99:18

**thinners**
69:6

**third-party**
122:16 146:11
178:17

**Thomas**
4:5 5:19

**thought**
16:11 55:10 66:22
84:4 131:16
144:19,21 183:23,

24

**thoughts**
100:14

**thousands**
53:20 56:2 72:10
182:3

**threat**
145:23 146:11
151:8 156:3,5,6,
17,25 157:1,6
158:8 162:22

**threatening**
156:15 159:1

**threats**
155:23 158:3
159:15,18

**threw**
201:20

**time**
4:7 13:4 14:8 16:4,
8,12,19 21:15
22:19 25:2,9 26:2
34:10 35:18 36:12
38:11 46:1,21
48:18 52:1 56:13,
15,23 57:1,6,7
62:24 71:12 73:17,
20 80:17 82:2
99:14 102:8,9
107:19 123:5
132:12 133:13,25
134:2,12 141:8
142:14 154:21
162:24 163:11,16
168:4 172:3
177:20,21 180:12
184:18 185:17

**times**
45:24 46:11 100:4
108:16,17 170:7,9
181:24 194:12
201:25 202:6
203:19

**timing**
88:25 109:25
110:2 170:19

**title**
81:11

**today**
4:2 19:20 22:8,18
24:23 28:18 30:17
31:8 34:7 44:7

**24**

**thoughts**
100:14

52:21 57:14 67:1,
14 74:18 79:8
92:21 93:11
106:23 139:20
145:10 182:16
204:21

**today's**
31:25

**token**
46:10

**told**
16:12 28:8 55:9
63:1 64:4,6 71:12
84:21 85:15 86:19
89:9 107:8 156:13
163:1,2 168:13
184:10 186:4
190:23 191:4

**Tom**
4:11,15 93:4 153:1

**tone**
109:7

**tonight**
16:15

**top**
61:9 145:12

**topic**
13:8 192:25

**topics**
29:8 53:22 65:21

**total**
36:4 175:19

**totality**
134:17 135:3
146:9

**totally**
96:21 172:13

**trade**
19:4

**traffic**
154:8

**train**
26:4 80:16,21
83:13,16 147:5,6

**trained**
84:2

**training**
26:1,9 44:3 65:16
83:6,7,10,17,24
84:3,4,9,24 85:9
99:13 108:25



Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 233 of 235 PageID
#: 1361

Hornback vs. Czartorski                    William T. Gaut, PH. D.                    01/28/2022Index: transcript..valuing

122:21 147:4,13
192:21,22,25
193:9,14,20,23

**transcript**
159:10 160:8

**transcripts**
27:24 33:10 45:16

**transferred**
13:23

**transmission**
131:19 132:16

**transmit**
132:9,11 133:9

**transparency**
11:11

**transverse**
150:23

**trauma**
52:25

**travel**
32:5

**treatment**
36:18,24

**trespassing**
118:4 150:19
153:21

**trial**
33:2 34:11 167:12
199:25

**tribal**
115:24

**tricky**
100:4

**trigger**
104:1

**trooper**
45:3 71:7,16,23
72:22 85:9,19 90:5
93:4,5,24 94:7,22
95:1,3,4,7,10,11,
15,20,23 96:4,11,
17,24 130:5,6,8
132:4 133:2,23
141:16 155:12
158:7 159:14
168:1,10,18,23
169:5,6,11 171:22,
24 173:8 174:17,
23 175:2,16
178:22 179:5,10,
21 180:7,9,11,13,

14,17,22 181:3
188:6 195:12,24
198:20

**trooper's**
169:5

**troopers**
73:16 92:23 93:3,
17,19 94:20,25
147:16 148:1,7
160:7 162:4 164:8,
14 165:14,24
166:14 167:2
168:6,21 171:21
173:4 182:6
183:15 186:5

**troopers'**
165:25 166:23

**true**
28:18,19 35:4
68:24 75:12 87:6
100:11 150:17
154:13 185:20

**trust**
142:14 182:2

**truth**
38:23,24 177:15

**truthful**
39:12,14 86:8
96:6,13,18,23

**tunnel**
90:13

**turn**
108:10 169:10
174:11 184:16

**turned**
57:25 133:14,18,
19,21 154:22
173:1

**turning**
134:23 156:2
158:5 186:20

**turns**
107:13 108:2,15
155:8,11,12
168:23,25 169:4
186:6

**Twelfth**
79:4

**twisting**
155:13 169:12

**two-thirds**
171:6

**type**
109:15 146:8

**types**
193:16

**typical**
106:20 107:1
172:23

**typically**
9:3 34:6 36:15
38:13 42:4 71:15
80:16,21 102:5
115:11 117:11
122:11 137:20
175:17 199:3
202:25 204:10

---

**U**

**U.S.**
78:7 146:20
149:22

**ugly**
159:10

**ultimate**
37:2 89:8 134:5

**ultimately**
77:20 117:9 197:2

**Um-hum**
5:6 12:7 65:7
75:25

**un**
89:14

**unannounced**
140:15

**unassailable**
89:14

**unavailable**
13:5

**uncertain**
87:18

**uncovered**
180:18

**underlie**
169:16

**underline**
169:16

**underlined**
124:25 127:21
129:2

**underlying**
89:2 147:18 148:2
149:14

**undermine**
41:1,6,11

**undermines**
40:4

**underpinning**
179:20

**understand**
5:8,12,25 7:20 8:8
12:3 13:2 15:6
33:4,13 34:15
35:15 40:24 41:24
42:24 57:9,12 58:9
65:9 88:24 101:22
105:11 106:18
118:2 129:24
146:15 147:17
148:2,15 149:2,3,
14,19,23,24 176:2
185:14 187:19
197:2 198:9

**understanding**
5:18 58:7 78:1,3
82:19 92:22 93:2
94:14,19 95:7 97:7
99:16 123:18
124:23 130:18
135:17 137:8
138:16 139:21
141:20 142:8
143:20 146:18,21
148:7 152:3,6,15,
19 163:2,16
166:12 196:3

**understood**
32:13 38:22 39:4,9
58:4 93:10 98:17
109:6 152:4,18

**unethical**
195:24

**uniform**
140:14,22

**uniformed**
14:15 82:9

**unit**
132:19,20 133:3

**United**
75:18,22 77:17,19,
21 79:14 146:16
154:5,9 167:13

**units**
21:12

**unity**

11:12

**unpack**
54:2 135:15

**unreliable**
33:22 37:7

**up-to-date**
8:16

**update**
138:24

**updated**
34:11 81:24

**updates**
10:13,14,15

**upgrade**
21:10

**upgraded**
16:19

**upper**
172:22 173:23

**upsetting**
157:20 177:3

**upstairs**
144:6,9,10 176:17

**use-of-force**
66:14 67:2 69:21
72:17 73:5 85:17,
23 87:25 89:2
99:23 101:23
102:3,4,5,14
106:21 110:22
123:13 124:20
198:19

**utilize**
79:25 80:20
110:24

**utilized**
79:21 116:4

**utilizing**
111:13

---

**V**

**valid**
23:12 92:16 138:3,
4 140:7 143:19,21
147:17 148:1,22
162:20 163:14

**values**
11:10

**valuing**
193:9,11

Case 3:20-cv-00703-RGJ-LLK    Document 63    Filed 03/22/22    Page 234 of 235 PageID #: 1362

Hornback vs. Czartorski                    William T. Gaut, PH. D.                    01/28/2022Index: variety..work

**variety**
29:7 106:20

**vast**
154:5

**vein**
87:5 89:17 198:8

**veins**
69:7

**verbal**
101:19 107:20
123:6 193:7

**verbally**
107:10 143:8

**verbiage**
104:25

**verdict**
17:6,17

**version**
81:17

**versions**
81:24

**versus**
4:5 53:1 78:17
129:18 139:17
146:16 153:21
193:7

**victim**
16:5,18 87:7

**victim's**
87:8

**video**
4:1 70:23 71:1,2
86:20,21 87:1,2,
18,22 89:15 91:6,
11,18,25 92:3
93:23 94:11 95:6
96:14 100:16,20
131:3,10,11
132:24 133:16,23
134:2,4 136:24
141:17 142:3
146:23 153:4,7
154:17 155:22
158:4,15,20 159:4,
18 160:1 164:7,9
168:7,11,12,14
169:18 170:8,15
171:20,24 172:12
173:10 175:8
176:19,22 182:9,
18 183:12,13,16
184:8,21,23

185:13 186:17
194:16,19 200:7,
10 202:4,9,10,11,
12,14,15,17 205:2

**videos**
45:8,13,15,19
86:10,14 87:25
88:23 89:5 130:23

**videotape**
4:3

**view**
108:11 155:22
176:3,8 178:24
179:7 183:24

**viewed**
170:15 179:1,6,9,
13 197:8

**viewing**
154:17 178:21
179:20 202:17

**violate**
112:2

**violated**
16:23 197:11
199:2

**violates**
198:25

**violating**
177:25 178:4

**violation**
47:18 199:5

**violations**
98:4

**virtual**
119:11

**virtually**
78:4 115:23,25

**visible**
54:13 56:24,25

**vision**
90:13,14 171:18

**visual**
148:20

**vitae**
8:17 11:23

**voice**
101:10 109:7

**volatile**
180:23 181:2

**voluntarily**
162:18

**voluntary**
162:21

_____

**W**

**wait**
25:24 89:24 149:1
152:22

**waiting**
142:4

**waive**
205:9,10

**walk**
11:25 112:18

**wall**
130:7 133:17,21
134:2,11,13 141:8
154:22 155:4,5,7,
8,11,16 168:2,11,
14,16,17,20,24,25
169:3,10,21 170:3
184:15,16,19
185:2,6,9,16,21,22
186:3,4,7,8,20,22,
23 187:11 201:20

**wanted**
71:6 83:11 112:16,
17 135:8,9,21,24
163:6 175:4,11
194:1,2,9

**wanting**
135:22

**warrant**
58:22 82:6 92:25
93:7,11,12 94:21
106:4 115:13
135:11,21,22,23,
25 136:5 137:7,9,
13,14,15,19,21,25
138:3,4,8,11
139:8,22 140:7,10
143:19,21 144:1,2,
3 147:17 148:2,10,
22,23 149:2,4,5,6,
9,15,20 150:5,12,
14,20,25 151:21
152:1,5,8,14,17
153:14,20,22
162:11,14 163:1,9,
15

**warrants**
137:12,16,17
141:2

**voluntary**
162:21

**watch**
170:8

**watching**
157:18

**water**
104:21

**ways**
36:20,25 158:24
197:7

**weapon**
55:4 57:10 63:6,7,
13,17 71:24 83:25
87:20 103:15,16
104:11,12 117:14
142:5 157:19
174:2,8 181:10,12,
16 182:24 183:1

**weaponless**
127:25

**weapons**
49:4,6,17 50:8
64:20 65:2 83:25
127:25

**wearing**
94:8 133:3

**website**
11:10 21:25

**weeks**
161:16

**weigh**
97:24 104:17

**weighed**
112:19,21

**weighs**
114:19,21

**weight**
181:4

**Western**
76:23 77:1,7 139:4

**whatsoever**
36:21 150:23
161:24

**white**
65:17

**wide**
106:19

**Wiest**
4:11 5:2,7 6:9,14
7:5,10,11 8:7 17:8,
25 38:2 39:8,19
40:2,14,23 41:5,15

44:15,19,21 45:7,
18 46:14 47:19
54:15 56:17 57:3
59:20 60:1,7 61:24
62:2,7,9,11,14
63:24 68:10,15
70:5 71:21 72:12
73:3 74:3,5 77:5,
18 86:18 88:4
89:12,23 91:4,22
92:5 97:3,14,18,22
98:10 111:16,23
114:9,25 116:10
119:10,15,18,20,
23 120:14,23
121:5,7 124:5,13,
15 127:18 129:21,
25 135:14 138:25
151:2 152:7,12,22
153:1,9,25 157:24
159:13 161:19
165:5,7,9 166:7
177:6,11,23
179:25 183:10
187:22 188:2,20
189:4 190:8,12,14,
20,21 194:15,22
195:9,21 196:9,14,
19 198:9,14,17
199:21 200:4,12
201:5 204:23
205:12

**Wiest's**
44:13

**wife**
157:16

**William**
4:4,21

**witnesses**
87:8 183:14

**wondering**
83:17

**word**
60:17

**words**
39:11 50:5 61:2
92:11 162:10
175:7 204:1

**work**
6:21 8:19 12:6
23:18 29:17 30:10
118:24 198:15
204:1,3

**worked**
30:4

**working**
15:1 16:3 27:18

**works**
88:19

**world**
109:3 200:17

**worse**
153:20

**worst**
107:16

**wound**
16:5

**Wright**
4:17 93:4 94:8
95:1,7,10,11,15,23
96:4,11 130:6,8
132:4 133:3,23
141:16 155:6,9,13
156:12 158:7
159:14 168:18,23
169:5,7,11 172:21
173:8,10 180:7,11
181:21 201:24

**Wright's**
93:24

**wrists**
181:18 182:7

**write**
28:9 84:18 123:23

**written**
35:4 65:16,25
66:16 73:14 88:14
89:6 146:13 179:4
193:6

**wrong**
74:14,16 138:20
141:24 147:12
167:1 185:24
187:13 188:24
189:2 191:15
201:17

**wrongdoing**
47:7,8

**wrongly**
108:7

---

**Y**

---

**year**
9:5 11:6,7 13:9,14,
22,25 14:10 18:6,
9,12 19:24 26:19
28:3,9 29:5 30:15
35:20 37:25 38:14,
15,16 154:5

**years**
12:15 14:12 19:21
21:21 22:5 23:14
25:21 27:7,10
28:11,19 29:22
31:7 32:15,20,25
34:1 37:21 53:21
56:1 114:19
161:14 200:23

**yesterday**
43:8

**you-all**
153:3

