**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION (at Louisville)**

| | | |
|---|---|---|
| **KEVIN HORNBACK, et. al.** | : | **Case No. 3:20-CV-703** |
| **Plaintiffs** | : | **Judge Jennings** |
| **v.** | : | |
| **THOMAS CZARTORSKI, et. al.** | : | |
| **Defendants** | : | |

**PLAINTIFFS' MOTION TO EXCLUDE, OR IN THE ALTERNATIVE LIMIT, TESTIMONY OF WILLIAM GAUT, UNDER *Daubert v. Merrell Dow Pharm., Inc.*, 113 S. Ct. 2786 (1993)**

Plaintiffs, through Counsel, move this Court for an order to exclude, or the alternative, significantly limit, the testimony of William Gaut, the expert identified by Defendant, Thomas Czartorski ("Defendant Czartorski"). A Memorandum in Support is attached hereto and incorporated herein, and a proposed order attached.

Respectfully submitted,

/s/ Christopher Wiest_____
Christopher Wiest (KBA 90725)
Chris Wiest, Atty at Law, PLLC
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
513/257-1895 (v)
859/495-0803 (f)
chris@cwiestlaw.com

/s/ Thomas B. Bruns_____
Thomas B. Bruns (KBA 84985)
Bruns, Connell, Vollmar, Armstrong
4555 Lake Forrest Dr., Ste. 330
Cincinnati, OH 45242
513-312-9890 (v)
tbruns@bcvalaw.com

**Attorneys for Plaintiffs**

1

## <u>MEMORANDUM IN SUPPORT</u>

### I.    FACTS

A.    <u>Background of facts and claims</u>

Among other things, this case involves claims of excessive force used in the execution of an arrest warrant upon Plaintiff, Alex Hornback.  The operative Complaint is Plaintiffs' Second Amendment Complaint, filed of record on August 19, 2021 after Plaintiffs lodged it the previous January, but Defendants objected to it, requiring the Court's intervention.  [Sec. Am. Compl., DE#40, PageID#640-656].

"On or about March 28, 2020, a bench warrant was issued out of Jefferson County for Alex Hornback, for failing to appear for a contempt hearing, in which he had to pay costs, fees, and/or fines, in Jefferson District Court ('Bench Warrant')."  *Id.* at ¶21.  "The Bench Warrant indicated that it was for a relatively minor purpose, with a 'BW-10 days to serve,' meaning that, after he was picked up, Alex Hornback should not be kept in jail more than 10 days."  *Id.* at ¶22.

On April 9, 2020, at approximately 1930 hours, KSP Troopers, Defendant Czartorski, Cameron Wright ("Defendant Wright"), and Kevin Dreisbach ("Defendant Dreisbach") were dispatched to the home owned by Kevin and Sonia Hornback, where Alex was also residing, and located at 166 S. Cole Ridge Road, Sheperdsville, KY 40165 ('Home'), to execute the Bench Warrant.  *Id.* at ¶28.

The KSP Troopers arrived at the front door, a discussion ensued, and Defendants Wright and Czartorski ultimately let Mr. and Mrs. Hornback know they had an arrest warrant for Alex. *Id.* at ¶¶ 32-35.  Mr. Hornback then led the Troopers downstairs to the basement where Alex was located.  *Id.* at ¶36.  Despite the fact Alex Hornback did not resist in any respect, he was thrown to the ground by Defendant Wright, who then struck Alex while Alex was on the ground.

2

Defendant Czartorski jumped in and repeatedly struck Alex with a mag light flashlight while Alex was on the ground.  *Id.* at ¶¶ 39-50.  Alex still never resisted despite this beating, was taken into custody, and the parties then went outside.

Once outside, Defendants Czartorski, Wright, and Dreisbach made the decision that the phone video that Kevin Hornback had taken while in the basement needed to be deleted, in part, because Defendant Czartorski was already facing two, ongoing internal affairs investigations for unlawful use of force, and the Defendants were afraid that this recording would likely have captured the unconstitutional and unlawful use of force by Defendants Wright and Czartorksi. Consequently, the troopers told Kevin Hornback they did not want any video being posted to "social media." *Id.* at ¶ 52.  They specifically made the statement to Kevin and Sonya Hornback that if the video was shown on social media, then they would charge Kevin with a crime: in other words, they used the improper and illegal threat of arrest to attempt to suppress evidence.  *Id.*

Among other things, to affect the cover up and deletion of the video, they threatened Kevin Hornback with arrest for harboring a fugitive, even though both the KRS 520.120 and KRS 520.130 charge have an exception under KRS 520.110 that provides parents an absolute defense to such a charge.  *Id.* at ¶ 53.  In fact, they detained Kevin and Sonya as they engaged in significant discussion about charging them in order to try to cover up the Troopers' own misconduct.  *Id.* at ¶¶ 54-66.

Sonya and Kevin Hornback brought a claim for First Amendment retaliation where they verbally opposed the beating of their son, and then prepared to take steps to share the Troopers' misconduct by Kevin's recording of same, only to be retaliated against by those Troopers.  *Id.* at ¶¶ 71-73; *Houston v. Hill*, 482 U.S. 451, 462 (1986); *Bloch v. Ribar*, 156 F.3d 673 (6th Cir. 1998).

Sonya and Kevin Hornback also brought a claim under the Fourth Amendment for illegal seizure of Kevin's cell phone and their illegal outside detention. *Id.* at ¶¶ 73; *Allen v. Thompson*, 14 F. Supp.3d 885 (W.D. Ky. 2014); *Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011); *Smith v. City of Cumming*, 212 F.3d 1332 (11th Cir. 2000).

Alex Hornback brought a Fourth Amendment claim for excessive force in effecting the arrest. *Id.* at ¶ 74; *Burgess v. Fischer*, 735 F.3d 462 (6th Cir. 2013); *Allen v. Thompson*, 14 F. Supp.3d 885 (W.D. Ky. 2014) and *Kennedy v. City of Villa Hills*, 635 F.3d 210 (6th Cir. 2011), *Evans v. Plummer*, 687 Fed. Appx. 434 (6th Cir. 2017), *Grawey v. Drury*, 567 F.3d 302, 314 (6th Cir. 2009), and cases cited therein.

Significant to the current Motion, two videos captured the assault and coverup at issue (each capturing different parts): first, and unbeknownst to the Defendant Troopers, a video without sound from a hidden camera the Hornbacks had in their basement, and second, a dash camera video from the Kentucky State Police that contains the outside interactions (including the Troopers arriving on scene, the interactions between the Troopers and Kevin and Sonya Hornback on the doorstep of the Home, and then most of the occurrences outside with respect to the threats directed at the Hornbacks, the seizure of Kevin's phone and destruction of the video on it by Defendant Wright). We conventionally filed both (DE#62; DE#64).

Simply put, the basement video is dispositive of the excessive force issues: it clearly depicts what occurred, and what Defendants Wright and Czartorski lied about under oath when they denied striking Alex, particularly with any object, where there was no resistance by Alex. Specifically, it clearly depicts a non-resisting subject (Alex Hornback), being viciously and gratuitously being thrown to the floor, and then struck twice by Trooper Wright with his elbow,

and beaten by Trooper Czartorski repeatedly with a flashlight.  (Conventionally filed flash drive, DE#62, DE#64, authenticated with the deposition of Kevin Hornback, DE#61 at Exhibit 3).

B.  Gaut's Report and Expert Testimony (Defending the Indefensible)

1.  Gaut's Report and Opinions offered therein

Dr. William Gaut ("Gaut") was retained by Defendant Czartorski to provide certain opinions in this matter.  He proposes to give testimony in the following areas: (1) That the procedures used by KSP Troopers in serving a Criminal Arrest Warrant were in keeping with generally accepted law enforcement standards; and (2) That the force used by Defendant Czartorski to take Alex Hornback into police custody was not excessive, and was in keeping with generally accepted law enforcement standards.  (Report, DE#63-1, at Report p.9).[1]

His report also offers the additional areas of testimony: (i) that the training for Kentucky State Police Troopers generally, and these troopers specifically, was adequate and in keeping with generally recognized standards (*Id.* at Report, DE#63-1, p. 11-16); (ii) he offers a discussion of his view of failure to train liability under 1983 cases (*Id.* at Report, DE#63-1, p. 14); (iii) he offers opinions about the practice of a trooper to cover the rear of the residence (*Id.* at Report, DE#63-1, p. 17); (iv) he offers opinions about the Troopers threats of arrest directed to Kevin and Sonya Hornback for harboring a fugitive/interference (something they threatened unless Kevin Hornback deleted his cell phone video of the arrest), the Troopers' knowledge that an affirmative defense applied to the Hornbacks as the parents of Alex Hornback, and Gaut's opinion that this knowledge does not matter (*Id.* at Report, DE#63-1, p. 18); (v) he offers his opinions and summary of the facts from his viewing of the basement video (Report, DE#63-1, at 19-25); (vi) he offers his opinion about his interpretation of the Kentucky State Police's Use of

---

[1] His Report is being filed herewith, as Exhibit 1 to his deposition.

Force policy (*Id.* Report, DE#63-1, p. 21); (vii) he offers his opinions about the use of force and application of *Graham v. Connor* (*Id.* at Report, DE#63-1, p. 22); (viii) he offers his opinions about the use of force in light of an Eighth Circuit case (*Id.* at Report, DE#63-1, p. 24); (ix) he offers opinions about Alex Hornback not being injured from the beating he received (*Id.* at Report, DE#63-1, p. 25); and finally (x) he offers his unsolicited opinion about Plaintiffs' damage to reputation claims (*Id.* at Report, DE#63-1, p. 25).

    2.  <u>Gaut's Deposition Testimony</u>

Gaut received a PhD in 2011, has a Masters Degree in Public Administration, and had a long career in Alabama with the Birmingham Police, but retired in 1999. (Depo. Gaut, DE#63, 18-23). He has no publications and no public presentations of his work or opinions. (*Id.* at 18-19). He used to be a police academy instructor, but that certification expired in 1999 when he retired. (*Id.* at 22-23). He cited certifications he had in connection with memberships in organizations that have been dissolved. (*Id.* at 18-21).

He testified that he provided a listing of every case he was involved in, in the last five years (*Id.* at 32-34), but he was not forthcoming in that regard, having left off numerous cases, particularly ones in which his testimony was limited or stricken. (see discussion below).

His deposition testimony indicated that, for purposes of his conclusions/opinions, he looked at the American Academy of Forensic Sciences policies, but when asked which specific policies, he could identify no such policies. (*Id.* at 52-53).

He likewise claimed expertise in "bruising" and allegedly used that expertise to draw his conclusions about the use of force in this matter, but admitted that had no medical training, and indicated his expertise was as a "homicide detective" who had attended (but not performed) autopsies on corpses. (*Id.* at 55-57). He thus attempted to justify his conclusions on the use of

force based on his observations of bruises on corpses, and his review of photos of Alex. (*Id.* at 64). He admitted that he did not know when the photos of Alex were taken and this fact would need to be known in order to draw any conclusion, (*id.* at 64), and he acknowledged that some people bruise easier than others and he had no knowledge of Alex Hornback's medical history concerning bruising. (*Id.* at 68-69).

He purported to rely upon U.S. Supreme Court standards for use of force, (*id.* at 75), said he was applying an Eighth Circuit case to his opinions in this matter (*id.* at 76), and an unknown constitutional law text book that he did not identify. (*Id.* at 78). He also indicated that he relied upon Kentucky Law Enforcement Council policies, but again, when pressed was unable to identify any particular policy. (*Id.* at 79-80).

He did, at least, admit that if a subject is not offering resistance, no use of force is appropriate to effect an arrest (*id.* at 111), and for an impact weapon – such as a flashlight – to be used, there has to be active resistance by a subject. (*Id.* at 117). He likewise testified to the IACP standards as being the national standards, and acknowledged that KSP policies indicate that if an arrest can be affected without force, force should not be issued. (*Id.* at 121-23, 127). But he nevertheless offered his own interpretation about the meaning of the KSP use of force policy. (*Id.* at 124-130). All of which merely cites KRS statutes. *Id.*

Gaut offered testimony about the contents of the basement video of this incident that directly conflict with what is clearly depicted in the video, which shows the beating began when Alex had both of his hands on the basement wall. However, Gaut simultaneously admitted that his opinions are all based on his observations of this video. (*Id.* at 133-134).

He testified:

Q. Have you -- okay. Let me back up to the arrest of Alex Hornback. Assuming that you're correct that a hand comes off, maybe another hand comes off, but all furtive movements have ceased, and his hands are on the wall, fixed at the time of the takedown, and all resistance, therefore, would have ceased as well, would it be appropriate to use force on him?

**A. Not under that hypothetical, no.**  (*Id.* at 141).  *See, also, id.* at 170.

Q. Is it your testimony that following that, you don't see Trooper Wright strike him in any fashion?

**A. I'd have to see the video again, but that doesn't come to mind.**  (*Id.* at 141).

Gaut was asked about his analysis of the *Graham v. Connor* factors, which he claims he relied upon in rendering his opinions.  He could not list them.  (*Id.* at 145).  But when asked about those three factors (the severity of the crime for the arrest, whether the person being arrested is a threat to officers, or whether the person being arrested is engaged in active resistance or attempting to flee),[2] he says there are other factors (which he declined to state). (Depo. Gaut at 146).

More incredibly, he then stated that, notwithstanding what the U.S. Supreme Court said to the contrary in *Graham*, an officer making an arrest does not need to know what the crime the arrest is for to determine the appropriate level of force to be used.  (*Id.* at 148, 153-154).

Even with his false recollection of the video, he acknowledges that Alex Hornback was not presenting any threat to officers other than possibly turning towards them (once again, the video clearly shows Alex had both hands on the wall when the takedown and beating occurred), (*id.* at 158.  Gaut also admitted he could not determine whether there was any active resistance from Alex, (*id.* at 158), and he saw no threats to officers after the takedown.  (*Id.* at 158-159).

---

[2] *See Graham v. Connor*, 490 U.S. 386, 396 (1989).

In terms of force on the ground, he renders opinions about the use of force against Alex being reasonable on the proposition that Alex was taken down and was in the prone position, but then attempted to get up.  (*Id.* at 172-173).

In terms of the threats to Kevin and Sonya Hornback regarding deletion of the phone recording of the incident or be arrested, he opined that the officers could have arrested them for harboring a fugitive, even though the officers had knowledge that Kevin and Sonya were Alex's parents and the officers were aware that was an applicable affirmative defense.  (*Id.* at 165-166).

He then offered a version of the "facts" (namely his speculation) about what occurred in the basement based on his viewing of the evidence (as he saw it) in the light "most favorable" to Defendant Czartorski (which was nothing more than his false recollection of what is depicted in the video), apparently offering a credibility determination.  (*Id.* at 174-175).  Finally, Gaut admitted he gratuitously offered his opinion of Alex Hornback's claim for injury to reputation, even though he had no professional or other training on that subject.  (*Id.* at 189, 192).

3.   The Troopers' Testimony/Perjury

Sergeant <u>Scott Brown</u>, Defendants' supervisor, testified about the meaning of KSP's Use of Force Policy:

Q.   Okay.  I think we talked about resistance and I just want to pull this up as well.  This is the resistance policy.  It's OM-B-4; is that correct?

A.   Correct.  That is correct.

Q.   And you would agree with me that not only state police policy, but the federal constitution prohibits the use of force unless there's active resistance?

A.   Yes, I would agree with that.  (Depo. Brown, DE#23, at 25).

In terms of what happened in the basement, Defendant Czartorski falsely testified about not using any force, and otherwise testified in a manner that prevents his expert, Gaut, from

relying on his testimony.  Specifically, Defendant Czartorski testified that he recalled nothing that precipitated the takedown of Alex Hornback to the ground, nor whether or not Alex Hornback said anything beforehand.  (Depo. Czartorski, DE#22, at 76).  He testified that he did not recall whether he, or Defendant Wright, told Alex Hornback to put his hands on the wall.  *Id.* at 77.  Nor does he recall whether or not Alex Hornback was resisting.  *Id.* at 77-78.

Q.   You indicated that you don't remember whether or not he was taken to the ground, right?

A.   So I think that he was taken to the ground.

Q.   Do you know why?

A.   I don't.

Q.   When he was taken to the ground, did you use any force on him?

A.   No.

Q.   Did you ever strike him with any object?

A.   No.

Q.   As you sit here today, you have no recollection that you can recall or reason why you would have to use force on him, right?

A.   No.

Q.   There is no reason, as you sit here today, that there would be cause to use additional force on him, correct?

A.   No.

Q.   Is that correct?

A.   Correct.   (*Id.* at 78-79)

Q.   Let me -- so you can answer this one true or false.  Is it true that you had no reason to strike him with an object?

A.   True.   (*Id.* at 81).

      <u>Trooper Wright</u> also falsely testified, as demonstrated by the video, that he didn't throw

Alex to the ground and never struck Alex with any part of his body such as his hand:

Q.  Okay.  And what happened next?

A.  I told Alex that he was under arrest, place his hands behind his back, and then he began questioning why we were there.  And then he asked to see the warrant.  And I told him, we'll do all that when we get outside.  I said, place your hands behind your back.  He wouldn't.  He grabbed ahold of the wall and I grabbed ahold of him and then had to take him to the ground.

Q.  Okay.  I want to break that down just kind of step by step.  So you had to tell him to place his hands behind his back twice?

A.  I don't know how many times I told him to place them, but he was --

Q.  More than once?

A.  I mean, he was -- he was given a loud verbal command to put his hands behind his back.

Q.  Okay.  Did anybody tell him to put his hands on the wall?

A.  I don't recall.

Q.  Do you know if Trooper Czartorski told him to put his hands on the wall?

A.  I don't know what he said, but I know that I never would tell somebody to place -- because that's not how I'm trained to do that.

...
Q.  And do you know how many times you told him to place his hands behind his back?

A.  No.

Q.  Okay.  Did he say that he wasn't going to put his hands behind his back?

A.  No.

Q.  He just failed to immediately do so?

A.  He would not put his hands behind his back and he tensed up his body.  And when I tried to grab ahold of him, he pulled away and would not put his hands behind his back.

Q.  How did he -- so did you grab his -- so he's -- just so I understand what you're saying, he's got his hands up on the wall.  Did you go to grab his hand and put it behind his back?

A.  I grabbed onto his -- I believe his right arm and I went to pull it behind his back and then that's when he tensed up.

Q.  Okay.  Did he say anything to you?

A.  Not that I can recall.

Q.  Okay.  In any event, he had enough time to ask what you were there for, and you said you were there for a warrant?

A.  As I was approaching him, yes.

Q.  Okay.  And did you say to him I've got an arrest warrant and you're under arrest?  Did you say that to him?

A.  I don't recall what I said specifically.  I advised him that he had an arrest warrant and that he needed to place his hands behind his back.
...

Q.  All right.  Would you agree that he was surrounded by police officers?  I mean, there's two of you in the basement and you knew that Dreisbach was going to be inside shortly, right?

A.  I wouldn't say surrounded.  There was two troopers and then Dreisbach on the other side of a locked door, so...

Q.  Do you recall Trooper Czartorski saying anything to him?

A.  No.

Q.  Did you throw Alex to the ground; is that what happened next?

A.  I didn't throw him to the ground.  We went to the ground as part of effecting arrest.

...

Q.  Once you had him on the ground, did you strike or hit him with a closed fist at all?

A.  No, sir.

Q.  Or any part of your body?

A.  No, sir.

Q.  Okay.  And the reason that you didn't do that is that there was no more force that was required at that point in time to have effected the arrest, right?

12

A.   He did not need to be struck with my hands or any impact weapon.  And also his mother ran up to us and tried to interfere, and I had to draw my Taser and point it at the mother.

Q.   Okay.  Would you have been in a position to see Trooper Czartorski strike the suspect with a flashlight if that happened?

A.   I don't recall him hitting him, but I don't -- I wasn't watching Trooper Czartorski.
...
Q.   As you sit here today, as best as you can recall, at no time did Trooper Czartorski ever strike Alex?

A.   I never saw Trooper Czartorski strike Alex.

(Depo. Wright, DE# 27 at 61-69)
...

Q.   And just to be clear, you never struck him even once with your fist, elbow or any part of your --

A.   Never.  (*Id.* at 73).

Q.   There would have been no reason for him to have been struck with an object as far as you're aware?

A.   Again, I control situations how I control them.  I did not strike him with anything, did not see anything, anybody strike anybody with anything. Other than taking him to the ground, there was no force used.

Q.   Okay.  And there was no -- as you sit here, there was no reason for you to have done that. And as far as you're aware, there's no reason for anybody else to have done it?

A.   I did not do that because I didn't think it needed to be done.

(*Id.* at 74-75).

Q.   And the resistance [before the takedown] was that he did not immediately put his hands behind his back when he was told, right?

A.   Correct.

Q.   Okay.  Any other resistance?

A.   Placing his hands on the wall, ignoring commands, pulling away from me, tensing up his body.

(*Id.* at 81-82).

## II.    LAW AND ARGUMENT

### A.  Standard

*Daubert v. Merrell Dow Pharm., Inc.*, 113 S. Ct. 2786 (1993), "established a general gatekeeping . . . obligation for trial courts[,]" requiring them "to exclude from trial expert testimony that is unreliable and irrelevant. *Conwood Co., L.P. v. U.S. Tobacco Co.*, 290 F.3d 768, 792 (6th Cir. 2002).  Rule 702 lays out the framework, providing: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

   (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

   (b) the testimony is based on sufficient facts or data;

   (c) the testimony is the product of reliable principles and methods; and

   (d) the expert has reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.

   *Daubert* provides a non-exhaustive list of factors relevant to the analysis: "(1) whether the theory or technique has been tested and subjected to peer review and publication, (2) whether the potential rate of error is known, and (3) its general acceptance."  *Conwood Co.*, 290 F.3d at 792.  The calculus ultimately "is a flexible one, with an overarching goal of assessing the [ ] validity and thus the evidentiary relevance and reliability of the principles and methodology underlying the proposed expert testimony." *Id.* (*quoting United States v. Langan*, 263 F.3d 613, 621 (6th Cir. 2001)).

   Rule 702 applies equally to scientific and non-scientific expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 1174, 143 L. Ed. 2d 238 (1999).  "With

respect to the individual factors enumerated in *Daubert*, the *Kumho* Court held that trial courts may consider such factors when assessing the reliability of all types of expert testimony." *First Tennessee Bank Nat. Ass'n v. Barreto*, 268 F.3d 319, 335 (6th Cir. 2001).

"In some cases (even cases involving non-scientific expert testimony), the factors may be pertinent, while in other cases the relevant reliability concerns may focus upon personal knowledge or experience." *Id.* (quotation marks omitted). "[W]hether *Daubert*'s specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine." *Id.* (quotation marks omitted). Ultimately, Rule 702 foundationally ensures that "the witness must be qualified[,] . . . the testimony must be relevant, . . . [and] the testimony must be reliable." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008). The proponent of the expert opinion must establish its admissibility by a preponderance of the evidence. *See Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001).

Where the testimony of a proffered expert is challenged for insufficient "factual basis, data, principles, methods, or their application . . . the trial judge must determine whether the testimony has a reliable basis in the knowledge and experience of [his or her] discipline." *Kumho Tire*, 526 U.S. at 149 (*quoting Daubert*, 509 U.S. at 592).

In the Sixth Circuit, there are three stages to a Rule 702 analysis. First, "the witness must be qualified by knowledge, skill, experience, training, or education." *United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016). Second, "the testimony must be relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue." *Id.* Third, "the testimony must be reliable." *Id.* "Red flags that caution against certifying an expert include reliance on anecdotal evidence, improper extrapolation, failure to consider other possible causes,

lack of testing, and subjectivity." *Newell Rubbermaid, Inc. v. Raymond Corp.*, 676 F.3d 521, 527 (6th Cir. 2012) (*citing Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 177 (6th Cir. 2009)). The fact that a purported expert's opinion was prepared solely for litigation may also be considered as a basis for exclusion. *Id.*

Further, expert conclusions expressly founded upon incorrect factual assumptions would be inherently unreliable. *See Rose v. Truck Centers, Inc.*, 388 F. App'x 528, 535 (6th Cir. 2010) ("Expert testimony may not be based on mere speculation, and assumptions must be supported by evidence in the record.") (citation omitted). And, generally, law enforcement experts may not testify to ultimate issues in a case. *Boyer v. Shirley*, 2020 U.S. Dist. LEXIS 215758 (KYED 2020) (not permitting law enforcement expert to testify to ultimate issues). Nor may they testify to legal conclusions. It is not "proper for the witness to testify as to a legal conclusion; it is the sole function of the trial judge to instruct the jury on the law." *United States v. Zipkin*, 729 F.2d 384, 387 (6th Cir. 1984).

With those standards in mind, we now turn to the specific opinions offered by Gaut.

**B. Gaut's opinion that the procedures used by KSP Troopers in serving a Criminal Arrest Warrant were in keeping with generally accepted law enforcement standards, other than his opinion about the use of force (addressed below), is not at issue in this case, is thus irrelevant and not helpful to the jury; Gaut's opinions in this area are also unsupported;**

Gaut's opinion that the procedures used by KSP Troopers in serving a Criminal Arrest Warrant were in keeping with generally accepted law enforcement standards, other than his opinion about the use of force (addressed below), is not at issue in this case, is thus irrelevant and not helpful to the jury; Gaut's opinions in this area are also unsupported.

There is no dispute here about the lawfulness of the arrest. And thus any commentary about the Troopers warrant service being in keeping with standards is likely to confuse issues in

this case, and should, on that basis, be excluded. *Goodwin v. Richland Cty.*, 832 Fed. Appx. 354 (6th Cir. 2020), *citing Salem v. U.S. Lines Co.*, 370 U.S. 31, 35, 82 S. Ct. 1119, 8 L. Ed. 2d 313 (1962), Fed. R. Evid. 702(a) (requiring the court to determine that the proffered expert testimony "will help the trier of fact to understand the evidence or to determine a fact in issue").

> **C. Gaut's opinion that the force used to take Alex Hornback into police custody was not excessive, from Defendant Czartorski's perspective, is unreliable, based on facts not in the record (actually a misrepresentation of facts in the record) and ultimately is speculative and unhelpful to the jury. Further, Gaut's opinions based on (v) his summary of the facts from his viewing of the basement video (Report at 19-25) that differ from testimony in this matter, and conflict with the video of the incident is irrelevant, unhelpful, and unreliable;**

"Courts have permitted experts to testify about discrete police-practice issues when those experts are properly credentialed and their testimony assists the trier of fact." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 908 (6th Cir. 2004). However, courts must ensure that police expert testimony focuses on facts rather than legal conclusions. *See Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir.1994) ("We would not allow a fingerprint expert in a criminal case to opine that a defendant was guilty (a legal conclusion), even though we would allow him to opine that the defendant's fingerprint was the only one on the murder weapon (a fact). The distinction, although subtle, is nonetheless important."); *see also DeMerrell v. City of Cheboygan*, 206 Fed. App'x 418, 426 (6th Cir. 2006) (finding a police use of force expert opinion improper when the expert described an officer's actions as "objectively unreasonable" and "improper and unnecessary" because those were legal conclusions).

Gaut does not get to offer opinons that conflict with the facts in this case, which facts are clearly demonstrated by the video. *Jackson v. Catanzariti*, 2019 U.S. Dist. LEXIS 81047 (GASD 2019) ("Here, Mr. Atherton's proffered case-specific opinions offer nothing to assist the tier of fact in determining what exactly occurred in the handheld video; rather, they are unexplained

interpretations of video evidence that the jury itself is fully capable of reviewing in the first instance. In other words, because Mr. Atherton's opinions on Defendants' alleged conduct are primarily conclusory observations from the handheld video, they will not assist the tier of fact in determining what the video actually shows of the disputed events. These opinions as stated, moreover, are within the jury's province to conclude what occurred based on its credibility determinations of fact witnesses as supplemented by video, medical, and other evidence.")

In fact, and given that the entirety of Gaut's opinions rest on factual assertions that are contradicted by the video, they are unreliable and improper. *See Rose v. Truck Centers, Inc.*, 388 F. App'x 528, 535 (6th Cir. 2010) ("Expert testimony may not be based on mere speculation, and assumptions must be supported by evidence in the record.") (citation omitted).

**D. Gaut's opinion about the (i) training for Kentucky State Police Troopers generally, and these troopers specifically, was adequate and in keeping with generally recognized standards (Report at 11-16) is irrelevant and unhelpful to the jury;**

Gaut's opinion about the (i) training for Kentucky State Police Troopers generally, and these troopers specifically, was adequate and in keeping with generally recognized standards (Report, DE#63-1, at 11-16) is irrelevant and unhelpful to the jury.   There is no dispute here about the training of the Troopers.  And thus any commentary about the Troopers training being adequate or not is likely to confuse issues in this case, and should, on that basis, be excluded. *Goodwin v. Richland Cty.*, 832 Fed. Appx. 354 (6th Cir. 2020), *citing Salem v. U.S. Lines Co.*, 370 U.S. 31, 35, 82 S. Ct. 1119, 8 L. Ed. 2d 313 (1962), Fed. R. Evid. 702(a) (requiring the court to determine that the proffered expert testimony "will help the trier of fact to understand the evidence or to determine a fact in issue").

**E. Gaut's opinion about (ii) his view of failure to train liability under 1983 cases (Report at 14) is irrelevant, offers a legal opinion, is unhelpful, and unreliable**.

Gaut's opinion about (ii) his view of failure to train liability under 1983 cases (Report, DE#63-1, at 14) is irrelevant, offers a legal opinion, is unhelpful, and unreliable.  There is no dispute here about failure to train.  And thus any commentary about the Troopers training being adequate or not is likely to confuse issues in this case, and should, on that basis, be excluded.  *Goodwin v. Richland Cty.*, 832 Fed. Appx. 354 (6th Cir. 2020), *citing Salem v. U.S. Lines Co.*, 370 U.S. 31, 35, 82 S. Ct. 1119, 8 L. Ed. 2d 313 (1962), Fed. R. Evid. 702(a) (requiring the court to determine that the proffered expert testimony "will help the trier of fact to understand the evidence or to determine a fact in issue").  Further, this is an improper legal conclusion.  *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir.1994).

### F.  Gaut's opinion about (iii) the practice of a trooper to cover the rear of the residence (Report at 17) is irrelevant, unhelpful, and unreliable.

Gaut's opinion about (iii) the practice of a trooper to cover the rear of the residence (Report, DE#63-1, at 17) is irrelevant, unhelpful, and unreliable.  There is no dispute about the propriety of sending Trooper Dreisbach to the back door.  And thus any commentary about sending Dreisbach to the back door is likely to confuse issues in this case, and should, on that basis, be excluded.  *Goodwin v. Richland Cty.*, 832 Fed. Appx. 354 (6th Cir. 2020), *citing Salem v. U.S. Lines Co.*, 370 U.S. 31, 35, 82 S. Ct. 1119, 8 L. Ed. 2d 313 (1962), Fed. R. Evid. 702(a) (requiring the court to determine that the proffered expert testimony "will help the trier of fact to understand the evidence or to determine a fact in issue").

### G.  Gaut's opinion about (iv) the troopers ability to carry out their threats of arrest directed to Kevin and Sonya Hornback for harboring a fugitive/interference (something they threatened unless Kevin Hornback deleted his cell phone video of the arrest), in light of their knowledge that an affirmative defense applied to the Hornbacks as the parents of Alex Hornback, and Gaut's opinion that this knowledge does not matter (Report at 18) is irrelevant, unhelpful, and unreliable – further, this is a legal opinion that directly contradicts Sixth Circuit case law and should be stricken for its ability to confuse the jury.

Gaut doubled down in his testimony on this: he opined that the officers could have arrested Sonya and Kevin Hornback for harboring a fugitive, even though the officers knew that Kevin and Sonya were Alex's parents and the officers also knew this fact provided an applicable affirmative defense to the charge.  (Depo. Gaut, DE#63, at 165-166; DE#63-1, Report at p.18).

Kentucky law provides certain offenses for hindering prosecution.  KRS 520.120; KRS 520.130.  It also provides an affirmative defense in KRS 520.110(2), "In any prosecution for hindering prosecution or apprehension it is a defense that the accused is the spouse, parent, child, brother, sister, grandparent or grandchild of the person whose discovery or apprehension he sought to prevent."

With respect to affirmative defenses, "where a reasonable police officer would conclusively know that [a suspect's] behavior is protected by a legally cognizable affirmative defense, that officer lacks a legal foundation to arrest that person for that behavior." *Painter v. Robertson*, 185 F.3d 557, 571 & n.21 (6th Cir. 1999) ("[A] peace officer, in assessing probable cause to effect an arrest, may not ignore information known to him which proves that the suspect is protected by an affirmative legal justification for his suspected criminal actions.").   Gaut's opinion, contrary to published Sixth Circuit case law, should never see the inside of the Courtroom.  It is bad enough that he offers legal opinions, which are inadmissible for that reason alone, but all the worse when he provides complete misstatements of law.  This opinion is the definition of unreliable, and highly likely to confuse a jury. *City of Detroit*, 25 F.3d 1342, 1353; *City of Cheboygan*, 206 Fed. App'x 418, 426; *Richland Cty.*, 832 Fed. Appx. 354.

**H. Gaut's opinion on (vi) his interpretation of the Kentucky State Police's Use of Force policy (Report at 21), which conflicts with KSP Trooper and Supervisor testimony about the policy and its meaning and import is unhelpful and unreliable.**

Gaut's opinion on (vi) his interpretation of the Kentucky State Police's Use of Force policy that recites Kentucky Statutes (DE#63-1, Report at 21), where his interpretation conflicts with KSP Supervisor testimony about the policy and its meaning and import, is not based on facts in the case, interprets the law and is, therefore, unhelpful and unreliable.  (Cf. Depo. Brown, DE#23, at 25; Depo. Gaut, DE#63, 124-130).

**I.** **Gaut's opinion about (vii) the use of force and application of *Graham v. Connor* (Report at 22) are legal opinions, the ultimate question in the case, and, based on his testimony, is unreliable, and should be excluded on those bases.**

Gaut's opinion about (vii) the use of force and application of *Graham v. Connor* (Report at 22) are legal opinions, the ultimate question in the case, and, based on his testimony, is unreliable, and should be excluded on those bases. *City of Detroit*, 25 F.3d 1342, 1353; *City of Cheboygan*, 206 Fed. App'x 418, 426; *Richland Cty.*, 832 Fed. Appx. 354.

**J.** **Gaut's opinions about (viii) the use of force in light of an Eighth Circuit case (Report at 24) are legal opinions, the ultimate question in the case, and are irrelevant and should be excluded.**

Gaut's opinions about (viii) the use of force in light of an Eighth Circuit case (Report at 24) are legal opinions, the ultimate question in the case, and are irrelevant and should be excluded. *City of Detroit*, 25 F.3d 1342, 1353; *City of Cheboygan*, 206 Fed. App'x 418, 426; *Richland Cty.*, 832 Fed. Appx. 354.

**K.** **Gaut's opinions (ix) about Alex Hornback not being injured from the beating he received (Report at 25), and his testimony about bruise development, should be stricken as unreliable, particularly where Gaut has no medical license or degree but still attempts to offer medical opinions.**

Gaut has no medical license or degree, but still attempts to offer medical opinions. Consequently, those unreliable opinions should be excluded. *United States v. Rodella*, 2014 U.S. Dist. LEXIS 164776 (D.N.M. 2014) (concluding testimony about bruises is expert testimony that must be offered by an expert, and in particular, that medical doctors are qualified to give such

testimony, but finding that an , assessment of photographs depicting an injury is an issue that the jury, not an expert should assess); *Giles v. Rhodes*, 2000 U.S. Dist. LEXIS 13980 (SDNY 2000) (use of force expert who was not a medical director not qualified in injury causation and not permitted to testify about bruising).

Equally to the point, this kind of attempt by *this very expert* has been stricken by courts routinely. *Jones v. Norton*, 3 F. Supp. 3d 1170 (D. Utah 2014) (striking Gaut's testimony on medical issues as being unqualified); *Hessler v. County of St. Croix*, 2009 U.S. Dist. LEXIS 22738 (WIWD 2009) ("As to proposed testimony about Brandon Hessler's medical condition, Gaut has shown no reason why he would be considered an expert in this field. He has never taken a medical course, undertaken any medical research, performed an autopsy or worked as a doctor or in other position in the medical field. In the absence of any experience, training, instruction, he is not qualified as an expert to testify about what was happening to Brandon Hessler"); *Goode v. City of Southaven*, 2018 U.S. Dist. LEXIS 166426 (MIND 2018) ("Furthermore, insofar as Gaut indisputably lacks expertise in medicine and its related fields, he will also be precluded from offering opinions regarding the scientific connection between a prone-restraint and positional asphyxia, or assessments or characterizations of the scientific literature on positional asphyxia.")

Further, because Gaut relies upon these unqualified opinions to render his opinions about the use of force in this matter, (Depo. Gaut. DE#63 at 55-57, 64, 68-69), the entirety of his opinions are unreliable and should be excluded under *Daubert*.

**L. Gaut's (x) unsolicited opinion about Plaintiffs' damage to reputation claims (Report at 25) is unreliable, unhelpful to the jury, and invades the province of the jury. Likewise, Gaut lacks any qualifications to opine on such matters, and thus his opinions should be excluded.**

Gaut's (x) unsolicited opinion about Plaintiffs' damage to reputation claims (Report at 25) are unreliable, unhelpful to the jury, invades the province of the jury, and as Gaut lacks any qualifications to opine on such matters, such opinions should be excluded.  Gaut testified that he gratuitously added his opinion of Alex Hornback's claims about injury to reputation, even though he had no professional or other training on that subject. (Depo. Gaut, DE#63 at 189, 192).

These sorts of opinions inherently invade the province of the jury and are unhelpful to the jury.  *Amber Reineck House v. City of Howell*, 2021 U.S. Dist. LEXIS 252292 at *30-*31 (MIED 2021).

> **M. Given his material non-compliance with FRCP 26 (a)(2)(B)(v), along with his multiple and numerous attempts to interject himself into areas where he lacks any foundation or qualifications, Gaut's testimony generally, and his ability to testify in this matter generally, should be precluded.**

FRCP 26(a)(2)(B)(v) provides that for expert testimony to be admissible, an expert/party must provide: "a list of **all** other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition." (emphasis added).  A party who fails to disclose as required under Rule 26(a) "is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed.R.Civ.P. 37(C)(1).  And case law is clear that, where, as here, there are material deficiencies with such a listing, the expert should be struck.  *Taylor v. Nock*, 2009 U.S. Dist. LEXIS 3647 (MIED 2009) (failure to fully comply with FRCP 26(a)(2)(B)(v) warranted striking expert).

Page 32 of Gaut's report provides a list of cases.  (Depo. Gaut, Exhibit 1, DE#63-1, page 32). He omits numerous cases in which he gave testimony, including, materially, cases in which his testimony was called into question in the last four years.  *Richards v. Gelsomino*, 2019 U.S. Dist. LEXIS 59877 (DCD 2019); *Goode v. City of Southaven*, 2018 U.S. Dist. LEXIS 166426 (MSND

2018); *Coleman v. City of Peoria*, 2018 U.S. Dist. LEXIS 225918 (ILCD 2018); *Hagan v. Jackson Cnty.*, 2016 U.S. Dist. LEXIS 36035 (MSSD 2016); *Dotterer v. Pinto*, 2016 U.S. Dist. LEXIS 9992, n.7 (PAED 2016); *Florence v. City of Lakeland*, 2015 U.S. Dist. LEXIS 164942 (FLMD 2015); *Hurt v. Vantlin*, 2019 U.S. Dist. LEXIS 229413 (INSD 2019).

Given multiple and numerous attempts to interject himself into areas where he lacks either any foundation or qualifications, Gaut's testimony generally, and his ability to testify in this matter generally, should be precluded. *Goode v. City of Southaven*, 2018 U.S. Dist. LEXIS 166426 (MIND 2018) (excluding Gaut as unreliable).

## III.    CONCLUSION

As another federal court recently observed about Dr. Gaut's testimony generally, "Gaut's expert report fails to specify what the relevant standards are—either by way of direct citation to nationally recognized standards or based on his own experience—and whether they were adhered to in this case. Furthermore, Gaut does not address the sufficiency of training in the context of an excessive force claim related to restraint. Instead, Gaut infers the policy was sufficient and adhered to by its very existence. Gaut's opinion on these matters are thus conclusory and properly excluded." Goode v. City of Southaven, 2018 U.S. Dist. LEXIS 166426 (MIND 2018). "If the trial court had allowed Gaut to state his highly subjective and speculative opinions, neither peer reviewed nor empirically tested, his credibility would surely have been called into serious question or cross-examination by the prosecutor." *Pair v. Cummins*, 2009 U.S. Dist. LEXIS 147124 (ALND 2009).

Gaut's speculative, without-foundation, and baseless opinions in this matter are no less objectionable.  The entirety of his testimony should be precluded.

24

Respectfully submitted,

/s/ Christopher Wiest
Christopher Wiest (KBA 90725)
Chris Wiest, Atty at Law, PLLC
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
513/257-1895 (v)
859/495-0803 (f)
chris@cwiestlaw.com

/s/ Thomas B. Bruns
Thomas B. Bruns (KBA 84985)
Bruns, Connell, Vollmer, Armstrong
4555 Lake Forrest Dr., Ste. 330
Cincinnati, OH 45242
513-312-9890 (v)

## CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing upon Counsel of record, by filing same with this Court via CM/ECF, this 25th day of March, 2022.

/s/ Christopher Wiest